**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
| --- | --- | --- |
| _____ | : | |
| IN RE INSULIN PRICING LITIGATION | : | Civil Action No. 3:17-cv-0699-BRM-LHG |
| | : | |
| | : | **OPINION** |
| _____ | : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Motion to Dismiss filed by Defendant Novo Nordisk Inc. ("Novo") and Defendant Sanofi-Aventis U.S. LLC ("Sanofi") (collectively "Defendants") seeking to dismiss the putative plaintiffs' ("Plaintiffs") First Amended Complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). (ECF No. 158.)[1] Plaintiffs filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 181.) Defendants filed a Reply Brief to the Plaintiffs' Opposition. (ECF No. 190.) On January 17, 2019, this Court held oral argument on the limited issue of the applicability of the indirect purchaser rule to Plaintiffs' RICO claims, Counts One and Two. Plaintiffs' counsel supplemented the record by way of a letter brief to this Court on February 5, 2019. (ECF No. 249.) Defendants replied on February 8, 2019. (ECF No. 251.) For the reasons set forth herein, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Defendants' Motion to Dismiss is separated into two briefs. The first brief addresses Counts One (Violation of RICO), Two (Conspiracy to Violate RICO), Three (Violation of the New Jersey Consumer Fraud Act Against Novo), Four (Violation of the New Jersey Consumer Fraud Act Against Sanofi), and Five (Violation of the New Jersey Consumer Fraud Act Against Novo and Sanofi). (ECF No. 158-1.) The second brief focuses on Counts Six through Fifty-Nine, violations of the consumer fraud laws of the various states. (ECF No. 158-2.)

## I.    BACKGROUND

### A.  Factual Background

The Plaintiffs are sixty-seven individuals, including one "Jane Doe," who filed the Complaint on behalf of themselves and a proposed nationwide class of analog insulin consumers. (Plaintiffs' First Amended Complaint (ECF No. 131) ¶¶ 21-155.) The Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a) and 23(b)(3). (ECF No. 131 ¶ 280.) The Plaintiffs define their class as

> "[a]ll individual persons in the United States and its territories who paid any portion of the purchase price for a prescription of Lantus, Levemir, Novolog, Apidra, and/or Toujeo at a price calculated by reference to a benchmark price, AWP (Average Wholesale Price)[2], or WAC (Wholesale Acquisition Price) for purposes other than resale."

(*Id.*)

Specifically, the class includes uninsured consumers, consumers in high-deductible health plans, consumers who reach the Medicare Part D donut hole, and consumers with high coinsurance rates. (*Id.* ¶ 282.) The Plaintiffs request this Court toll the class period to the "earliest date of the Defendant Drug Manufacturers' initiation of the scheme described herein." (*Id.* ¶ 283.)

Defendants are pharmaceutical companies headquartered in the United States. (*Id.* ¶¶ 157-58.) Defendants research, develop, and manufacture prescription medications. (*Id.*) Defendant Novo ("Novo") makes the "rapid-acting" analog insulin Novolog and the "long-acting" insulin Levemir. (*Id.* ¶ 282 (Table 2).) Novo introduced Novolog to the United States market in 2000 and Levemir in 2005. (*Id.*) Defendant Sanofi ("Sanofi") manufactures the "rapid-acting" insulin Apidra and the "long-acting" insulin Pantus. (*Id.*) Sanofi introduced Lantus to the

---

[2] The Plaintiffs frequently use the terms "benchmark price" and "sticker price" to refer to the AWP. (ECF No. 131 ¶¶ 1, 2, 174.)

United States market in 2000 and Apidra in 2004. Novo and Sanofi determine the sale price of their drugs, the AWP or WAC, and subsequently publish list prices for their analog insulins. (*Id.* ¶ 174.)

The distribution of a branded prescription drug, such as the analog insulin at issue in this litigation, involves three transactions. First, a drug manufacturer sells its medication to a wholesaler. (*Id.* ¶¶ 163-164.) Second, the wholesaler takes possession of the medication and sells it to a pharmacy. (*Id.* ¶¶ 164, 170 fig. 3.) Third, the pharmacy sells the drug to the consumers. (*Id.* ¶¶ 164, 170 fig. 3.) Health insurers and pharmacy benefit managers ("PBMs")[3], which many insurers hire to manage their prescription drug benefits, are not directly involved in this distribution chain as they do not take physical possession of the medication. (*Id.* ¶¶ 165-66.)

Three separate payments are involved in the medication distribution chain: from the wholesaler to the manufacturer; from the pharmacy to the wholesaler; and from the consumer, and his or her insurer, if any, to the pharmacy. (*Id.* ¶ 168.) Additionally, there may also be a rebate payment from the manufacturer to the insurer or the insurer's PBM. (*Id.* ¶ 169.)

Wholesalers pay manufacturers based on the manufacturer's publicly reported list price, the WAC. (*Id.* ¶ 176.) The WAC is "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates, or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). Accordingly, wholesalers pay the manufacturer the WAC price minus small percentage discounts derived via prompt payment or some other incentive. (ECF No. 131 ¶¶ 169, 176, 181.) Manufacturers are

---

[3] PBMs are retained by health insurance companies to manage their prescription drug benefits and negotiate, specifically for discounts, with drug companies and pharmacies on behalf of the health insurance companies. (ECF No. 131 ¶ 166.) PBMs do not purchase prescription drugs, nor do they make any payments to manufacturers. (*Id.*) PBMs typically do not take possession of drugs either, however, some PBMs operate mail-order pharmacies and purchase drugs from wholesalers solely in their capacity as a seller to the consumer. (ECF No. 131 ¶¶ 7, 166.)

required to report the average price that wholesalers pay for each drug, accounting for any discounts, which is known as the Average Manufacturing Price ("AMP"). *See* 42 U.S.C. § 1396r-8(k)(1).

Wholesalers sell to pharmacies at a price negotiated with each individual pharmacy. (ECF No. 131 ¶ 176.) The prices paid by the pharmacies are frequently very close to the WAC, as wholesalers generally pay manufacturers the WAC minus a percentage discount. (*Id.* ¶ 181.)

The consumer's purchase price is determined by his or her pharmacy, and in the case of insured consumers, by the terms of his or her insurance contract. (*Id.* ¶¶ 181, 183-184.) The drug manufacturers do not sell the drugs directly to the consumers, and as such, they do not set the price that the consumer pays for the prescription drug. (*Id.* ¶¶ 163, 171.) If a consumer is uninsured, the pharmacy independently determines the payment price. (*Id.* ¶¶ 182, 285.) If the consumer is insured, the insurance company or its PBM negotiates with the pharmacy to set a price. (*Id.* ¶¶ 166, 170 fig. 3, 171.) The insurer and the consumer each pay a portion of the negotiated price, subject to any deductibles or copayment requirements contained in the consumer's contract. (*Id.* ¶¶ 165, 183-184.) Plaintiffs contend that the prices charged by the pharmacies to uninsured consumers, and the prices set by insurers and PBMs for consumers subject to deductible and copayment requirements, are directly related to the AWP, or "benchmark" or "sticker" price. (*Id.* ¶¶ 2, 209.)

Plaintiffs allege that PBMs retain a portion of the rebate and pass the remainder of the cost on to the health insurance company and/or consumer. (*Id.* ¶¶ 4, 201, 204.) Plaintiffs further maintain that some insurers have elected not to pass on manufacturer rebates to consumers (*Id.* ¶ 200), and that as a result, the benchmark price is fraudulent because it does not account for manufacturer rebate payments made to PBMs. (*Id.* ¶¶ 252, 255). Additionally, Plaintiffs assert

that spread between the "net price"[4] and the benchmark price constitutes further evidence of a fraudulent scheme. (*Id.* ¶¶ 202, 206.)

Plaintiffs allege that PBM rebates are part of an industry scheme to inflate the price of analog insulin, whereby the three largest PBMs – CVS Health, Express Scripts, and OptumRx – use their leverage to create formularies, ranked lists of drugs. (*Id.* ¶¶ 169, 180.) Plaintiffs allege that health insurers "cover all or a portion of their members' drug costs based on whether and where drugs fall on their PBM formularies." (*Id.* ¶ 180.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost. (*Id.* ¶¶ 193-94.) Plaintiffs assert that the use of formularies gives PBMs wide latitude to extract rebates from manufacturers. (*Id.* ¶ 241.) Accordingly, Plaintiffs contend that Novo and Sanofi compete against one another by offering rebates to PBMs for formulary placements. (*Id.*)

Plaintiffs contend a pricing "scheme" to "widen a secret spread between the manufacturers' published and misleading benchmark prices, and their undisclosed, net selling prices for their analog insulins." (*Id.* ¶ 2.) Plaintiffs assert "PBM profits are tied to the size of the spread between the benchmark price and actual net selling prices," (*Id.* ¶¶ 2, 210) such that manufacturers have an incentive to offer a larger spread to PBMs than those offered by their competitors. (*Id.* ¶ 267). Plaintiffs premise their pricing scheme on two separate theories. First, Plaintiffs contend that Defendants "publicly report one price . . . for their analog insulins while secretly offering a far lower price – the net price – to the largest PBMs." (*Id.* ¶ 2.) Plaintiffs argue that because PBMs do not "negotiate discounts or rebates" and instead merely "pad [their] pockets[,]" the rebates are illegitimate. (*Id.* ¶¶ 2, 6.) Second, Plaintiffs contend that Defendants

---

[4] The "net price" refers to the revenue obtained by the manufacturer after subtracting the rebate amounts it negotiates and pays to PBMs. (ECF No. 131 ¶¶ 169, 170 fig. 3.) The net price may fluctuate as it necessarily depends on a particular PBM's negotiation. (ECF No. 131 ¶ 171.)

misrepresented the benchmark prices as "reasonable approximations of the insulins' real prices." (*Id.* ¶¶ 3, 12-13, 254, 302, 350.) Plaintiffs allege that each of these schemes entails a "pattern" of predicate acts of federal mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, (*Id.* ¶ 326) and that these violations "have directly and proximately caused the plaintiffs and members of the class to be injured . . . [through] inflated payments based on fictitious benchmark prices for the analog insulins." (*Id.* ¶¶ 20, 266, 336, 341, 354.)

### B.  Procedural History

On February 2, 2017, the first complaint was filed in this matter, *Chaires, et. al v. Novo Nordisk, et al.* ("*In re Insulin*"), Civil Action No. 17-699(BRM)(LHG). (ECF No. 1.) Thereafter, several prospective plaintiffs filed complaints in six separate actions: *Barnett, et. al. v. Novo Nordisk, Inc* ("*Barnett*")., Civil Action No. 17-1580(BRM)(LHG); *Boss, et. al. v. CVS Health Corp.* ("*Boss*"), Civil Action No. 17-1823(BRM)(LHG); *Christensen, et. al. v. Novo Nordisk, Inc., et. al.* ("*Christensen*"), Civil Action No. 17-2678(BRM)(LHG); *Valdes, et. al. v. Sanofi-Aventis U.S. LLC, et. al.* ("*Valdes*"), Civil Action No. 17-939(BRM)(LHG); *Carfagno v. Novo Nordisk Inc.* ("*Carfagno*"), Civil Action No. 17-3407(BRM)(LHG); and *Bentele, et. al. v. Eli Lilly & Co.* ("*Bentele*")*,* Civil No. 18-11479(BRM)(LHG).

On February 22, 2017, this Court consolidated *Valdes* into *In re Insulin* absent objection from any parties, pursuant to Federal Rule of Civil Procedure 42(a). (ECF No. 11.) On September 18, 2017, this Court appointed Steve W. Berman, Esq. of Hagens Berman and James E. Cecchi, Esq. of Carella Byrne as interim lead Plaintiffs' counsel pursuant to Federal Rule of Civil Procedure 23(g). (ECF Nos. 71 & 72.) On January 3, 2018, this Court consolidated *Carfagno* into *In re Insulin* absent objection from any of the parties. (ECF No. 84.) On January

19, 2018, this Court consolidated *Barnett*, *Boss*, and *Christensen* into *In re Insulin*. (ECF No. 89.)

On March 29, 2018, Plaintiffs filed the First Amended Class Action Complaint against Defendants. (ECF No. 131.) On May 14, 2018, Defendants filed a Motion to Dismiss Plaintiffs' Complaint (ECF No. 158), comprised of a brief in support of dismissing Counts One through Five of the Complaint (ECF No. 158-1) and a separate brief in support of dismissing Counts Six through Fifty-Nine of the Complaint. (ECF No. 158-2.) On July 5, 2018, Plaintiff filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 181.) On August 20, 2018, Defendants filed a Reply Brief to Plaintiffs' Opposition to the Motion to Dismiss. (ECF No. 190.)

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec.*

*Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint.'" *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

### B. Rule 9(b)

Pursuant to Federal Rule of Civil Procedure 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (citations omitted); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue") (citations omitted). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

### III. DECISION

### A. RICO Violation Claims

Defendants contend that this Court should dismiss Counts One and Two of Plaintiffs' Complaint, which allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (1970) ("RICO"), asserting that Plaintiffs' claims are barred by the "indirect purchaser rule," do not plead facts amounting to mail or wire fraud, fail to plead a valid

RICO enterprise, do not adequately plead proximate causation, and do not adequately plead a RICO conspiracy. (ECF No. 158-1 at 26-54.) Plaintiffs counter that the RICO claims should not be dismissed at this juncture because, *inter alia*, they have adequately pled each element of such violation and Supreme Court and Third Circuit precedent have consistently rejected Defendants' narrow interpretation of the indirect purchaser rule. (ECF No. 181 at 14-52.) For the reasons set forth below, this Court finds that Plaintiffs cannot sustain their RICO causes of action.

To demonstrate a violation of 18 U.S.C. § 1962(c), a plaintiff must prove:

> "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . . , either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."

*United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011) (quoting *United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003)).

Proving a violation of 18 U.S.C. § 1962(c) "requires no more than this." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

### i.     RICO Elements

First, Defendants contend that Plaintiffs do not plead facts amounting to mail or wire fraud. (ECF No. 158-1 at 30.) Illicit racketeering activity includes "a host of so-called predicate acts, including 'any act which is indictable under . . . Section 1341 [mail fraud].'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting 18 U.S.C. § 1961(1)(B)). The Third Circuit has traditionally interpreted mail fraud statutes broadly. *See United States v. Martinez*, 905 F.2d 709, 715 (3d Cir.), *cert. denied*, 498 U.S. 1017 (1990). Fraud is "measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the

10

community." *United States v. Riley*, 621 F.3d 312, 327 n.19 (3d Cir. 2010) (citation omitted). However, without "a specific fraudulent statement" identifying "the time, place, speaker, and content" of the alleged misrepresentation, a civil RICO claim asserting fraud should be dismissed. *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n, Inc.*, 2016 WL 7013468, at *15 (D.N.J. Nov. 30, 2016).

Plaintiffs have adequately pled mail and wire fraud. Plaintiffs allege Defendants committed mail and wire fraud by publishing artificially inflated AWPs via mail and interstate wire facilities. (ECF No. 131 ¶¶ 318-25.)[5] Plaintiffs further alleged Defendants knew that AWP is a pricing index and that purchasers pay for analog insulin based on that index. (ECF No. 131 ¶¶ 253-62, 323, 325.) Federal courts have held that excessive inflation of prices on an index, such as the AWPs in this matter, may constitute mail and wire fraud. *See In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 165-68 (D. Mass. 2003); *see also Schmuck v. United States,* 489 U.S. 705, 710-11 (1989). Defendants' reliance on *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1313-14 (11th Cir. 2000) and *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 71 (1st Cir. 1998) is misplaced. As Plaintiffs highlight in their brief, this is not a matter of nondisclosure. (ECF No. 181 at 19.) Rather, Plaintiffs allege that Defendants committed fraud by "[holding] out their artificially increased AWPs as benchmark prices, fully aware that AWP is a pricing index intended to approximate the true cost of a drug." (*Id.*) Plaintiffs further contend that the AWP had no reasonable relationship to the actual price of the drugs, and that Defendants knew of this fraud. (ECF No. 131 ¶¶ 176-178, 254.) Accordingly, Plaintiffs have adequately pled mail and wire fraud.

---

[5] Specifically, Plaintiffs allege "[t]he Defendant Drug Manufacturers intended that the PBMs would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers and consumers like the plaintiffs and class members money on their prescription needs." (ECF No. 131 ¶ 321(f).)

Second, Defendants contend Plaintiffs failed to plead a valid RICO enterprise. (ECF No. 158-1 at 41.) An essential feature of an association-in-fact enterprise is the sharing of a "common purpose" between the members. *United States v. Boyle*, 556 U.S. 938, 948 (2009). "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the enterprise's purpose." *Id.* at 946.[6] The Third Circuit has held that *Boyle*'s construction of the term "association-in-fact enterprise" is "capacious," "expansive," and "obviously broad." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 366 (3d Cir. 2010). Additionally, a valid RICO enterprise requires "defendants [to] conduct[] or participat[e] in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)).

Plaintiffs have adequately pled a valid RICO enterprise. Indeed, Plaintiffs' Complaint alleged a common fraudulent purpose between the Defendants, provided a motive for such purpose, and detailed the alleged relationships between the Defendants. (ECF No. 131 ¶¶ 254, 302-09, 334-35.)[7] Moreover, Plaintiffs also point out that the Amended Complaint satisfies the participation prong by virtue of their allegation that Novo and Sanofi both accomplished

---

[6] The Supreme Court has also defined an association-in-enterprise, for RICO purposes, as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

[7] Specifically, Plaintiffs allege that "[e]ach manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry . . . these corporations would not be able to market large spreads to PBMs in exchange for formulary positions without the use of the inflated benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry." (ECF No. 131 ¶ 302.) Plaintiffs further alleged that "[e]ach of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant Drug Manufacturer and each PBM that is an associate." (ECF No. 131 ¶ 303.)

"something more" that would be unlikely absent collusion: preferred formulary status without real price reductions. (ECF No. 181 at 48-49.)

Defendants' contentions that Plaintiffs have failed to adequately plead a valid RICO enterprise are without merit. Defendants contend that PBMs and manufacturers cannot have a common purpose in the RICO enterprise because they play different roles in the distribution chain (ECF No. 158-1 at 42-43.) However, Defendants' construction of the common fraudulent purpose prong is too narrow, as federal courts have held that allegations of falsely inflated AWPs may "provide a plausible common fraudulent purpose." *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 206 (D. Mass. 2004). Defendants also argue that Plaintiffs have not adequately pled that Defendants participated in the affairs of the alleged enterprise, contending that the allegations are "entirely consistent with [defendants and the PBMs] each going about their own business." *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013). On the contrary, Plaintiffs have alleged conduct that would not occur in competition for business in a legitimate market. *See id.* at 856. As such, Plaintiffs adequately alleged a valid RICO enterprise.

Third, Defendants contend that Plaintiffs failed to adequately plead proximate causation. A sustainable RICO claim requires proximate causation. *In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 804 F.3d 633, 638 (3d Cir. 2015). "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a but for cause of his injury, but was the proximate cause as well.'" *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). If a plaintiff's alleged injuries "could have resulted from factors other than [the defendants'] alleged acts of fraud," there is no proximate causation. *Anza v. Ideal Steel Supply*

*Corp.*, 547 U.S. 451, 459 (2006).

Plaintiffs have adequately plead proximate causation. Although Plaintiffs assert that the costs were passed down to them, they explicitly allege that their injuries would not have occurred "[b]ut for the misrepresentations that the Defendant Drug Manufacturers made regarding the benchmark prices of their analog insulins" as the inflated AWP prices forced the intermediaries to raise their prices so as to not suffer the out-of-pocket overcharges alleged in the suit. (ECF No. 131 ¶¶ 339-40.) Defendants assert that Plaintiffs "cannot show the direct relationship required to establish proximate causation," (ECF No. 158-1 at 50), however, the allegation that the cost is borne by the "end payor" is sufficient to establish proximate causation in this context. *In re Pharm. Indus. Average Wholesale Price Litig.*, 295 F. Supp. 2d at 175. Proximate causation in the RICO context requires "some direct relation between the injury asserted and the injurious conduct alleged," *Holmes*, 503 U.S. at 268, and the Amended Complaint makes such allegations.

Finally, Defendants assert that Plaintiffs have not adequately pled a RICO conspiracy. (ECF No. 158-1 at 51.) In order to adequately plead a RICO conspiracy, Plaintiffs must "allege facts suggesting that [the defendants] knowingly agreed to facilitate any illegal scheme." *Mason v. Campbell*, 2016 WL 8716458, at *6 (E.D. Pa. July 29, 2016) (citing *Twombly*, 550 U.S. at 570). "[E]vidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement." *In re Ins. Brokerage*, 618 F.3d at 321. Rather, allegations of parallel conduct "'must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* at 322 (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs have adequately pled a RICO conspiracy. Plaintiffs do not merely allege parallel conduct, but rather assert facts that suggest a preceding agreement. Plaintiffs assert not

only that Defendants "agree[d] and conspir[ed] to violate 18 U.S.C. § 1962(c)" (ECF No. 131 ¶ 346), but also allege separate conspiracies of pricing enterprises between Novo and Sanofi and each PBM: CVS, Express Scripts, and OptumRx. (ECF No. 131 ¶¶ 310-12.) These allegations clearly suffice for a RICO conspiracy, and as such, Plaintiffs have adequately pled the existence of a RICO conspiracy.

### ii.    The Indirect Purchaser Rule

Next, Defendants assert Plaintiffs lack standing to pursue their RICO claim because they are "three levels down the distribution chain" from Defendants and are therefore "classic indirect purchasers" pursuant to the indirect purchaser rule doctrine established by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) and *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199 (1998). (ECF No. 158-1 at 26-27.) Plaintiffs argue that applying the indirect purchaser rule – an antitrust law principle – to RICO claims of fraudulent pricing runs contrary to Supreme Court precedent, and that, in any event, Plaintiffs were directly harmed as they paid prices based on Defendants' fraudulent AWPs, irrespective of the prices paid by intermediaries in the distribution chain. (ECF No. 181 at 31-32.) On January 17, 2019, this Court held oral argument on the limited issue of the applicability of the indirect purchaser rule to Plaintiffs' RICO claims.

The Supreme Court developed the indirect purchaser rule in the antitrust context, when it held that Clayton Act plaintiffs may not demonstrate injury by providing evidence only of indirect purchases. *Illinois Brick*, 431 U.S. at 737. The Court warned that allowing indirect purchasers to recover under such a theory would "transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 739. Moreover, the indirect purchaser rule was also intended to prevent defendants from being exposed to "multiple liability" should both

indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of a single overcharge. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996). Becacuase 18 U.S.C. § 1964(c), RICO's private cause of action, was modeled on the Clayton Act, "antitrust standing principles apply equally to allegations of RICO violations." *McCarthy*, 80 F.3d at 855; *see also Holmes*, 503 U.S. at 270-74.

Defendants argue Plaintiffs "do not, and cannot, allege that they purchase analog insulin directly from any defendant," (ECF No. 158-1 at 39), citing the Complaint's allegation that Defendants' products are sold "from manufacturers to wholesaler, wholesaler to retailer (or mail order), and retailer to patient." (*Id.*) In support of its argument, Defendants cite this District's decision in *Hale v. Stryker Orthopaedics*, 2009 WL 321579 at *3 (D.N.J. Feb. 9, 2009), which dismissed a plaintiff's RICO complaint where the plaintiffs did "not plead that they purchased [the products] directly from [the defendants]." The *Hale* court determined that a plaintiffs' co-payment alone does not confer standing upon it as several actors stood in the distribution chain between the plaintiffs and the defendants. *Id* at *4.

Although Plaintiffs advocated competently against applying the indirect purchaser rule in this case, this Court is bound by the controlling caselaw and thus concludes Plaintiffs' Complaint has not sufficiently pled allegations to withstand Defendants' indirect purchaser rule challenge. Plaintiffs' Complaint merely alleges that Defendants' artificial price inflation of the AWPs caused them to pay an increased price for analog insulin, yet never alleges that such overpayments were made directly to Defendants. Specifically, Plaintiffs assert:

> 336. . . . [W]hen a plaintiff or class member fills a prescription for one of the analog insulins, she is responsible for paying all or a portion of the medication's cost. If the plaintiff or class member is uninsured, she must pay 100% of the drugs' point-of-sale prices, which are based on the Defendant Drug Manufacturers' benchmark prices. If the plaintiff or class member has a high-deductible health

plan, she must pay 100% of the drugs' point-of-sale prices, based on Defendant Drug Manufacturers' benchmark prices, until she satisfies her deductible. If the plaintiff's or class member's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drugs' point-of-sale prices, based on the Defendants Drug Manufacturers' benchmark prices. And if the plaintiff or class member is a member of a Medicare Part D plan, she is responsible for paying all or a portion of her drugs' point-of-sale prices based on Defendant Drug Manufacturers' benchmark prices, until she reaches her maximum contribution.

337. The amount of each of these cash payments is based on the Defendant Drug Manufacturers' benchmark prices. Therefore, when each Defendant Drug Manufacturer artificially inflated each analog insulin's benchmark price and then used each Manufacturer-PBM Insulin Pricing Enterprises to sell those analog insulins, they also artificially inflate plaintiffs' and class members' out-of-pocket expenses.

338. The plaintiffs' and class members' damages are therefore the difference between the defendants' reported benchmark prices and the net prices at which they sell their analog insulins for all plaintiff and class member out-of-pocket expenses.

339. Plaintiffs' injuries, and those of the class members, were proximately caused by the Defendant Drug Manufacturers' racketeering activity. But for the misrepresentations that the Defendant Drug Manufacturers made regarding the benchmark prices of their analog insulins and the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, plaintiffs and others similarly situated would have paid less, out-of-pocket, for their analog insulins.

(ECF No. 131 ¶¶ 336-39.)

Plaintiffs' core allegation is that Defendants engaged in a scheme to "artificially inflat[e] the benchmark prices of their analog insulin." (ECF No. 131 at ¶ 20.) However, Plaintiffs concede that they, the consumers, are not the first party to pay for the analog insulin at a purportedly inflated price. Rather, Plaintiffs outline a scheme whereby the analog insulins are sold to wholesalers at prices "based on the benchmark prices that are set by the manufacturers," and are subsequently sold to pharmacies, hospitals, and clinics at prices approximating the

benchmark prices. (ECF No. 131 at ¶¶ 164, 176.) As such, Plaintiffs are multiple purchasers down the distribution chain from Defendants and are quintessential indirect purchasers for the purposes of the indirect purchaser rule. *See McCarthy*, 80 F.3d at 848 (holding that "only the purchaser immediately downstream from the alleged [RICO violator]" possesses standing to pursue an action).

Plaintiffs contend the indirect purchaser rule does not vitiate their RICO standing as the rule does not apply to RICO claims, and that Defendants' alleged fraud directly injured Plaintiffs as Defendants set the AWPs that ultimately dictated the price paid by the Plaintiffs, thereby conferring upon them RICO standing. (ECF No. 181 at 30-36.) Plaintiffs posit the Complaint explains the process by which Plaintiffs pay out-of-pocket costs, and thus suffer a direct injury based directly on the prices set by Defendants. (ECF No. 131 ¶¶ 260-69.)  This Court is not persuaded by Plaintiffs' arguments. In *McCarthy*, the Third Circuit unequivocally held that the indirect purchaser rule applies to RICO claims, stating "the central and dispositive issue [in a RICO action] is whether plaintiffs are 'direct purchasers.' If so, they are entitled to pursue . . . their . . . RICO claims." *McCarthy*, 80 F.3d at 855.

At oral argument, Plaintiffs urged this Court to rely on *Avandia*, 804 F.3d at 638, to the extent it conflicts with *McCarthy* with respect to the applicability of the indirect purchaser rule in RICO actions. Though *Avandia* is the more recent Third Circuit decision, the facts of this matter are meaningfully distinguishable such that *Avandia* does not provide persuasive support to Plaintiffs' position. Plaintiffs assert the *Avandia* plaintiffs were "third party payors" who "did not directly purchase [the product] from the manufacturer . . . but instead reimbursed a pharmacy that purchased [the product] in the chain of distribution." (ECF No. 181 at 35.) Plaintiffs contend that because the "distribution chain did not preclude the RICO claim" and because "the issue was

whether the pharmaceutical company's misrepresentations directly caused the health insurers to pay a higher rate than they otherwise would have," its Complaint should be permitted to proceed as it alleges the "same conduct forming the basis of the RICO scheme." (ECF No. 181 at 35-36.) This Court disagrees.

Unlike here, the *Avandia* plaintiffs were not seeking recourse pursuant to payments made to third parties based on allegedly fraudulent prices set by a manufacturer. *Avandia* did not concern an identical case of an indirect purchaser. Rather, the *Avandia* plaintiffs' cause of action was couched in the defendants' alleged failure to disclose known health risks of various drugs ultimately included in their formularies, as the court explained:

> The conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint – the misrepresentation of the heart-related risks of taking Avandia that caused TPPs and PBMs to place Avandia in the formulary. The injury alleged by the TPPs is an economic injury independent of any physical injury suffered by Avandia users. And, as far as we can tell, prescribing physicians did not suffer RICO injury from [the] marketing of Avandia.

*Avandia*, 804 F.3d at 644.

The *Avandia* plaintiffs were third-party payors who included the product, Avandia, in their formulary decisions at favorable rates in *direct reliance* on material misrepresentations made by the defendant, a pharmaceutical company. *Avandia*, 804 F.3d at 636.[8] By contrast, Plaintiffs allege their damages stem from artificially inflated AWPs paid by wholesalers and pharmacies *before* the consumers make their purchasers from those intermediaries. *See Warren*

---

[8] Similarly, Plaintiffs' reliance on the Second Circuit's decision in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) is also misplaced. (ECF No. 181 at 36.) *Desiano* concerned an antitrust action to recover alleged overpayments made to a drug manufacturer, however, unlike in this matter, the relief sought included "only the portion of the prescription paid [directly] by the [healthcare providers] and exclude[d] the part paid by the patients, in the form of a 'co-pay.'" *Id.* at 345.

*Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 95 (3d Cir. 2011) (holding that the indirect purchaser rule applies to prescription drug sales and noting that "[b]ecause of the complicated interplay between market forced, the possibility that the wholesaler was harmed by defendant's actions exists even if the majority of the injury is borne by the indirect purchaser").

At oral argument, Plaintiffs also cited a recent decision from the District of Kansas, *In re Epipen*, 336 F. Supp. 3d 1259 (D. Kan. 2018), in further support of its position that the indirect purchaser rule should not bar its RICO claim. (Ps' Ltr. (ECF No. 244).) Plaintiffs contend the *Epipen* court relied on Supreme Court decisions in *Holmes* and *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) in declining to extend the indirect purchaser rule to a RICO action with a similar fact pattern. (*Id.*) This Court disagrees with Plaintiffs' assertions. *Holmes* explicitly held that federal jurisprudence interpreting antitrust principles govern RICO claims because Congress modeled RICO's civil action provision on a substantially similar provision in the Clayton Act, stating:

> The key to better interpretation lies in some statutory history. We have repeatedly observed, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150-51 (1987) . . . that Congress modeled § 1964(c) . . . [of RICO after] the federal antitrust laws, § 4 of the Clayton Act . . .
>
> In *Associated General Contractors* . . . we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier. Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation . . . and as we reasoned, as many lower federal courts had done before us . . . that congressional use of the § 7 language in § 4 presumably carried the intention to adopt 'the judicial gloss that avoided a simple literal interpretation.' . . . Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well.
>
> The reasoning applies just as readily to § 1964(c) [of RICO]. We may fairly credit the 91st Congress, which enacted RICO, with

> knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. . . . It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

*Holmes*, 503 U.S. at 267-68.

Nothing in *Holmes* undercuts the voluminous federal jurisprudence determining that courts may apply the indirect purchaser rule to RICO actions with the same force as under antitrust law.[9] The *Epipen* court's discussion of *Holmes* merely suggests *Holmes* did not create a bright line applying the indirect purchaser rule to all RICO actions with the same force as in the antitrust context, stating "the Court has 'cautioned our use of the term "direct" should merely be understood as a reference to the proximate cause enquiry that is informed by the concerns set out in the text.'" *Epipen*, 336 F. Supp. 3d at 1324 (quoting *Holmes*, 503 U.S. at 269 n.15). The court in *Epipen* continued to note "the Supreme Court has recognized that 'the infinite variety of claims that may arise [under RICO] make it virtually impossible to announce a black-letter rule that will dictate the result in every case' for determining whether an alleged RICO violation was the proximate cause of plaintiff's injuries." *Epipen*, 336 F. Supp. 3d at 1324-25 (quoting *Holmes*, 503 U.S. at 272 n.20).

Similarly, the Supreme Court's holding in *Bridge* does not preclude the application of the indirect purchaser rule to Plaintiffs' RICO claims. *Bridge* merely held that plaintiffs who are injured "by reason of" a pattern of mail fraud may have RICO standing "even if he [or she] has not relied on any misrepresentations." *Bridge*, 553 U.S. at 649-50. Unlike here, *Bridge* does not

---

[9] Additionally, this Court disagrees with Plaintiffs' reliance on *Sedima*, 479 U.S. at 498-99. Although *Sedima* postulates that "RICO is evolving into something quite different from the original conception of its enactors," *id.* at 500, and even suggests that interpreting its elements in identical fashion to those under antitrust law may play a role in such evolution, *id.* at 498-99, it does not at all mention the indirect purchaser rule and certainly provides no analysis tending to suggest a preference that such rule not be applied in the RICO context.

concern the case of an indirect purchaser and does not stand for the proposition that plaintiffs

multiple levels down the consumer chain may possess RICO standing despite the indirect

purchaser rule. The disparity between the holding in *Epipen* and the Third Circuit decisions is

best explained by the conflicting application of the indirect purchaser rule between the Third and

Tenth Circuits. The *Epipen* court readily admitted the Third Circuit recognizes the indirect

purchaser rule in the RICO context, whereas the Tenth Circuit does not, explaining:

> Because defendants just cite cases from outside the Tenth Circuit
> to support their argument that indirect purchasers lack RICO
> standing, the court declines to apply that rule here. Instead,
> applying the guidance from our Circuit in *Safe Streets* [*Alliance v.
> Hickenlooper*, 859 F.3d 865 (10th Cir. 2017)], the court already
> has determined that the class plaintiffs adequately have alleged that
> defendants' RICO violations proximately caused their injuries.
>
> . . .
>
> And just as importantly, defendants cite no cases from the Tenth
> Circuit holding that a RICO plaintiff lacks standing to assert a
> claim for overpaying for pharmaceuticals when the plaintiff
> receives the benefit of the bargain in the form of purchasing
> effective drugs, even at inflated prices. The court declines to apply
> the holdings from the District of New Jersey cases here, as
> defendants urge.

*Epipen*, 336 F. Supp 3d at 1325-26.

Finally, Plaintiffs' contentions that they suffered direct injury as a result of Defendants'

artificially inflated AWPs, thereby conferring RICO standing, are also without merit. (ECF No.

181 at 32.) Plaintiffs argue the consumers' place in the chain of distribution in irrelevant because

"the plaintiffs pay prices *directly* based on the defendants' fraudulent AWPs *irrespective of the

prices other intermediaries within the chain pay.*" (*Id.*) Plaintiffs further assert that Defendants'

potential overcharges of intermediaries are inconsequential as "[t]he issue is that the defendant[]

grossly misrepresented the pricing benchmarks used to *directly* set consumer prices." (*Id.*)

However, such is still insufficient to overcome the indirect purchaser rule.

The Amended Complaint explicitly describes the distribution chain and flow of revenue therein: first, Defendants sell analog insulin to wholesalers at prices "based on benchmark prices that are set by manufacturers" (ECF No. 131 ¶ 176); second, wholesalers earn a margin by selling insulin to pharmacies at approximately the same prices as the benchmarks prices set (ECF No. 131 ¶¶ 164, 167-68); and third, pharmacies earn a margin by charging benchmark-based prices, which are set by bargaining between the pharmacy and PBMs (in the case of insured consumers) or unilaterally by the pharmacy (in the case of uninsured consumers). (ECF No. 131 ¶¶ 179, 181, 201). Notably, Plaintiffs do not allege that Defendants invariably set the direct prices paid by consumers, but instead that those prices are sometimes determined after certain negotiations between intermediaries in the distribution chain who subsequently impose various mark-ups. (*Id.*)

Although Plaintiffs do allege the benchmark prices "directly" affect the price paid by consumers (ECF No. 181 at 32), such would be insufficient to overcome the indirect purchaser rule bar to RICO standing. The indirect purchaser rule still applies even when the alleged improper price inflation is passed to a plaintiff on a "dollar for dollar basis." *McCarthy*, 80 F.3d at 853.[10] The Plaintiffs have merely alleged a pass-through of the inflated price from one of the various intermediaries to the consumers. Such allegations cannot overcome an indirect purchaser rule challenge.

The facts of this case closely mirror those of *Hale*. 2009 WL 321579. In *Hale*, plaintiffs

---

[10] *McCarthy* notes "the fact that the [subject costs] were passed on [from an intermediary] to [the plaintiffs] on a dollar for dollar basis . . . is not dispositive. Indeed, the subcontractors in *Illinois Brick* and the utility companies in *Utilicorp* passed on their costs to the plaintiffs in those respective cases; yet the Supreme Court deemed this fact insufficient to confer standing to the indirect-purchaser plaintiffs in those cases." 80 F.3d at 853.

asserted RICO violations pursuant to the defendants' alleged artificial price inflation of hip and knee implant devices. *Id.* at *1. As in this matter, the *Hale* plaintiffs failed to allege they directly purchased the subject products from the defendants. *Id.* at *4. Rather, the plaintiffs pled only that they suffered a direct injury evidenced by heightened coinsurance payments passed down to them through the distribution chain. Accordingly, the *Hale* court determined that the plaintiffs lacked RICO standing pursuant to the indirect purchaser rule, stating:

> While Plaintiffs argue that they have pled direct injury since they paid artificially-inflated coinsurance payments for their surgeries, Plaintiffs have not alleged that they were direct purchasers of the replacement joints manufactured by Defendants. Between Plaintiffs and Defendants in the chain of distribution stand several actors, including the hospitals performing the joint surgeries and Plaintiffs' insurers. The chain of distribution squarely presents the multiple liability and damage apportionment risks discussed in *McCarthy*. Thus, Plaintiffs' co-payment alone does not allow them to stand in the shoes of a direct purchaser for standing purposes.
>
> . . .
>
> After carefully considering the arguments put forth by both sides, it seems clear that under the facts as pled, Plaintiffs cannot escape the bar of the "direct purchaser" rule. To do so, Plaintiffs would have to plead that they bought their implants directly from Defendants. Since Plaintiffs have not so pled, they lack standing under these facts to bring their RICO claims.

*Id.*

Although Plaintiffs allege injury not only through heightened coinsurance payments, but also via fraudulent AWPs that "directly set consumer prices" (ECF No. 181 at 32), Plaintiffs have failed to plead any direct purchase between themselves and Defendants. The chain of distribution alleged in this matter is fatal to Plaintiff's RICO claim, and as in *Hale*, such distribution chain "squarely presents the multiple liability and damage apportionment risks discussed in *McCarthy*." *Id.* Allowing Plaintiffs' RICO claims to proceed would expose Defendants to liability to Plaintiffs as well as to the various direct purchasers, such as the

24

wholesalers and PBMs, thereby allowing to persist the exact harm that the indirect purchaser rule seeks to prevent.

Finally, in a February 5, 2019 letter brief (ECF No. 249), Plaintiffs urged this Court to follow a recent decision from this District, *In re Mercedes-Benz Emission Litig.*, No. 16-881, 2019 WL 413541 (D.N.J. Feb. 1, 2019), in which the court allowed RICO claims to persist despite the fact that the plaintiffs did not directly purchase the product, luxury automobiles, directly from the manufacturers. *Mercedes-Benz* is distinguishable from this case. Although the *Mercedes-Benz* plaintiffs were not direct purchasers, that matter did not concern overpayments made to and by intermediaries, as here. Rather, *Mercedes-Benz* dealt primarily with proximate causation in the RICO context, a separate requirement. The court was not confronted with an indirect purchaser challenge to plaintiffs' standing, it was not briefed on the indirect purchaser rule, and it did not perform an analysis of the indirect purchaser rule whatsoever. *Id.* at *18-26.

Although Plaintiffs have adequately pled the various elements of a RICO claim, they failed to allege that they directly purchased the analog insulin from Defendants. Rather, Plaintiffs claim injury by virtue of inflated prices of their downstream purchase. Therefore, Plaintiffs' claims are barred by the indirect purchaser rule, and as such, Plaintiffs lack standing to maintain this action pursuant to RICO. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Counts One and Two.

### B. New Jersey Consumer Fraud Act

Defendants contend that this Court should dismiss Counts Three, Four, and Five of the Plaintiffs' Complaint, which allege violations of the NJCFA, asserting that the Plaintiffs' Complaint fails to plead the deceptive practices and unconscionable pricing claims with specificity, does not plead unlawful conduct, and does not allege that Plaintiffs suffered any

ascertainable loss. (ECF No. 158-1 at 54-60.) Plaintiffs counter that the Complaint plausibly pleads all necessary elements on an NJCFA claim. (ECF No. 181 at 52-59.) For the reasons set forth below, this Court finds that Plaintiffs have adequately pled an NJCFA claim.

The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* ("NJCFA") states, in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; . . . .

N.J.S.A. § 56:8-2.

Courts have interpreted this section to require the following three elements to state a cause of action under the NJCFA: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009) (citing *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007)).

### i. **Specificity**

Defendants assert Plaintiffs' Complaint does "not identify with specificity how defendants purportedly violated the NJCFA," and that as such, the Complaint lacks the particularity and specificity required by Rule 9(b) to withstand a motion to dismiss. (ECF No. 158-1 at 54.) The heightened pleading standard set forth in Rule 9(b) applies to a plaintiff's NJCFA claim. *See Dewey v. Volkswagen*, 558 F. Supp. 2d 505, 524 (D.N.J. 2008) (applying Rule 9(b) to a NJCFA and common law fraud claims); *see also DeGennaro v. Am. Bankers Ins. Co. of*

*Fla.*, 2017 WL 2693881, at *5 (D.N.J. June 22, 2017). To satisfy the specificity requirement of Rule 9(b), "the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." *Smajlaj v. Campbell Soup Co.*, 728 F. Supp. 2d 84, 104 (D.N.J. 2011).

Plaintiffs' Complaint makes the necessary, specific allegations to withstand Defendants' Motion to Dismiss. The Complaint alleges misrepresentation in that Defendants warranted that the artificially inflated publicly reported benchmark prices of Novolog, Levemir, Apidra, Lantus, and Toujeo were the reasonable approximations of the true cost (ECF No. 131 ¶¶ 359-63, 379-83). Moreover, the Complaint also alleges that Plaintiffs purchased the subject drugs (*Id.* ¶¶ 355, 375), provides allegations concerning when the conduct occurred. (*Id.* ¶¶ 234-37), and asserts that the conduct led Plaintiffs to suffer a loss. (*Id.* ¶¶ 372-73, 392-93, 403-04). Accordingly, the allegations in Plaintiffs' Complaint are pled with sufficient specificity.

### ii.    Unlawful Conduct

Defendants assert Plaintiffs' Complaint has "failed to plead any unlawful conduct by defendants" in that it fails "to identify any actions of defendants that were capable of misleading consumers as to analog insulin pricing or rebates" (ECF No. 158-1 at 55), and that as such, it cannot withstand this Motion to Dismiss. "The [NJCFA] creates three categories of unlawful practices: affirmative acts, knowing omissions, and violations of state regulations." *Maniscalo v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 499 (D.N.J. 2009) (quoting *Vukovich v. Haifa*, No. 03-737, 2007 WL 655597, *9 (D.N.J. Feb. 27, 2007) (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454 (N.J. 1994))). Affirmative acts require no showing of intent on behalf of the defendant. *See Fenwick v. Kay Am. Jeep, Inc.*, 371 A.2d 13, 16 (N.J. 1977). "Thus, a defendant

who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence or the intent to deceive." *Vukovich*, 2007 WL 655597, at *9 (citation omitted). "In contrast, when the alleged consumer fraud consists of an omission, a plaintiff must show that the defendant acted with knowledge, thereby making intent an essential element of the fraud." *Id.* Notably, unlawful acts expressly regulated by other statutes, regulations, or rules not promulgated under the NJCFA can also give rise to an NJCFA claim. *See Henderson v. Hertz Corp.*, No. L-6937-03, 2005 WL 4127090, at *5 (N.J. Super. Ct. App. Div. June 22, 2006); *see also Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551-55 (N.J. 1997).

Additionally, the NJCFA "prohibit[s] business practices that are unfair or unconscionable *in addition to* practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 166 (3d Cir. 2017) (citations omitted). "There is no precise formulation for an 'unconscionable' act that satisfies the statutory standard for an unlawful practice." *D'Agostino v. Maldonado*, 78 A.2d 527, 537 (N.J. 2013). Rather, the NJCFA "establishes 'a broad business ethic' applied 'to balance the interest of the consumer public and those of the sellers.'" *Id.* (quoting *Kugler v. Romain*, 279 A.2d 640, 652 (N.J. 1971)).

Plaintiffs' Complaint adequately pled unlawful conduct in violation of the NJCFA. New Jersey courts have interpreted NJCFA's reach expansively, and in light of the applicable jurisprudence, Plaintiffs have adequately pled unconscionable conduct. Specifically, the Complaint alleges that Defendants knew, but did not disclose, the benchmark prices it selected for the various drugs it manufactures, and then offered the price spreads to PBMs in exchange for favorable placement on formularies. (ECF No. 131 ¶¶ 360, 380.) Additionally, Plaintiffs

28

adequately pled unfair business practices in their assertions that Defendants' artificially inflated AWPs thereby causing gross overpayments among the most vulnerable members of society. (ECF No. 131 ¶¶ 267-71.) Accordingly, Plaintiffs' Complaint has adequately pled unlawful conduct pursuant to the NJCFA.

### iii.    Ascertainable Loss

Defendants contend Plaintiffs' Complaint must be dismissed because they have not, and cannot, establish an ascertainable loss, as required in an NJCFA pleading. (ECF No. 158-1 at 57.) An "ascertainable loss" is one that is "quantifiable or measurable." *Thiedemann v. Mercedes-Benz USA, LLC,* 872 A.2d 783, 793 (N.J. 2005). A "plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical." *Bosland*, 964 A.2d at 749. However, New Jersey courts have found that "if the defendant or a non-party takes action to ensure that plaintiff sustains no out-of-pocket loss or loss of value prior to litigation, then plaintiff's CFA claim may fail." *D'Agostino*, 78 A.2d at 543; *see also Thiedemann*, 872 A.2d at 794 (finding no ascertainable loss when defendant repaired defect in accordance with terms of warranty). Courts support alleged damages based on either an out-of-pocket theory or a benefit of the bargain theory. *See Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99-103 (D.N.J. 2011). "An out-of-pocket-loss theory will suffice only if the product received was essentially worthless." *Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 374 (D.N.J. 2015). "A benefit-of-the-bargain theory requires that the consumer be misled into buying a product that is ultimately worth less than the product that was promised." *Id.* (citation omitted). Additionally, plaintiffs must set forth allegations sufficient to show that those losses are causally connected to defendant's alleged conduct. *Bosland*, 964 A.2d at 749.

Plaintiffs have adequately pled an ascertainable loss. Plaintiffs' Complaint fails to plead

an ascertainable loss under the "out-of-pocket-loss" theory because it never alleges that the products are "essentially worthless." *Mladenov*, 124 F. Supp. 3d at 374, however, Plaintiffs have adequately pled ascertainable losses pursuant to the "benefit-of-the-bargain theory." A plaintiff alleging an ascertainable loss under the benefit of the bargain theory "states a claim if he or she alleges (1) a reasonable belief about the product induced by a misrepresentation; and (2) that the difference in value between the product promised and the one received can be reasonably quantified." *Smajlaj*, 782 F. Supp. 2d at 99. As such, a plaintiff "'must proffer evidence of a loss that is not hypothetical or illusory' and that is 'presented with some certainty demonstrating that it is capable of calculation.'" *Id.* (quoting *Thiedemann*, 872 A.2d at 792-93); *see also Hemy v. Perdue Farms, Inc.*, 2011 WL 6002463, at *18 (D.N.J. Nov. 30, 2011) (holding that the allegation that plaintiff was charged a "premium," by itself, does not support a claim for an ascertainable loss).

Plaintiffs have alleged that they were misled as to the difference between the benchmark prices and the "true prices" of the medications. (ECF No. 131 ¶¶ 359-63, 379-83.) Plaintiffs contend that Defendants intentionally and knowingly misrepresented material facts and thereby "inflated" the price of analog insulin to the detriment of the consumers, who "pay for analog insulin based on the medicines' *benchmark* price." (ECF No. 131 ¶¶ 10, 209.) Accordingly, Plaintiffs have adequately pled an ascertainable loss pursuant to the "benefit-of-the-bargain" theory, as they contend that they were "unfairly deprived of the benefit of the bargain" as they paid more than their pro-rata share of the net prices of the subject insulin. (ECF No. 131 ¶¶ 368-70.)

As Plaintiffs have sufficiently pled unlawful conduct with specificity as well as an ascertainable loss, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED**

as to Counts Three, Four, and Five.

### C. Plaintiffs' State Law Claims, Generally

Defendants contend that all of Plaintiffs' various state law claims should be dismissed, as Plaintiffs fail to allege fraudulent, unfair, or unconscionable conduct (ECF No. 158-2 at 4-5), all of Plaintiffs' claims are cursory recitations of the statutory elements (*Id.* at 5-6), all the claims fail to plead proximate causation (*Id.* at 6-7), all the claims fail to comply with Rule 9(b) (*Id.* at 7-8), and all the claims fail because the Plaintiffs' damages are speculative (*Id.* at 8-9). This Court finds Plaintiffs have adequately alleged fraudulent, unfair, or unconscionable conduct, have pled proximate causation, and have satisfied the requirements of Rule 9(b). Additionally, Plaintiffs have also adequately pled an ascertainable loss. (ECF No. 131 ¶ 250.) Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Six through Fifty-Nine.[11]

### D. Plaintiffs' State Law Claims, Specifically

#### i.    Article III Standing

Defendants contend that seventeen of the various state law claims asserted against them should be dismissed as they each lack a plaintiff with Article III standing. (ECF No. 158-2 at 9-11.) Specifically, Defendants assert that the Complaint contains seventeen counts under the laws of states in which no named plaintiff resides or is alleged to have made any purchases of the subject insulin analog.[12] (ECF No. 158-2 at 10.) "Plaintiffs have the burden to establish

---

[11] Defendants' motion to dismiss each count herein is only denied as to the extent that such counts may be dismissed on other grounds.

[12] Those counts include: Count Seven (Alabama); Count Eight (Alaska); Count Fourteen (Connecticut) Count Fifteen (Delaware); Count Sixteen (Washington, D.C.); Count Twenty (Hawaii); Count Thirty-Nine (New Hampshire); Count Forty-Two (North Carolina); Count Forty-Three (North Dakota); Count Forty-Five (Oklahoma); Count Forty-Eight (Rhode Island);

standing." *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). "[A] plaintiff who raises multiple causes of action 'must demonstrate standing for each claim he seeks to press.'" *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). The threshold standing determination may not be postponed to class certification, rather, "class representatives must meet Article III standing requirements the moment a complaint is filed." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015) (citing *Lewis v. Casey*, 518 U.S. 343, 358 (1996)).

Consistent with *Neale*, district courts within the Third Circuit and throughout the nation have held that named plaintiffs in a class action "lack standing to bring claims on behalf of putative classes under the laws of states where no named plaintiff is located and where no named plaintiff purchased the product at issue." *In re: Niaspan Antitrust Litig.*, 2015 WL 8150588, at *3 (E.D. Pa. Dec. 8, 2015). Indeed, the Complaint includes seventeen counts in which no named plaintiff resides in such state, nor is there any allegation of injury in such state. This runs afoul of the Supreme Court's holding in *DaimlerChrysler*, as well as the rules promulgated by courts of this Circuit.

Plaintiffs concede that the Complaint includes several counts for which it lacks a named plaintiff residing in, or claiming injury in, such state. (ECF No. 181 at 63.) Instead, Plaintiffs assert that they do not need to claim an injury in each state to maintain standing, citing the Third Circuit's decision in *In re Prudential Ins. Co.*, 148 F.3d 283 (3d Cir. 1998). Plaintiffs' reliance on *Prudential* is inappropriate. While the court in *Prudential* held that "[o]nce individual

---

Count Forty-Nine (South Carolina); Count Fifty (South Dakota); Count Fifty-Five (Virginia); County Fifty-Six (Washington); Count Fifty-Seven (West Virginia); and County Fifty-Nine (Wyoming).

standing by the class representative is met, a proper party is before the court" and there "remains no further separate class standing requirement in the constitutional sense," *id.* at 306-07, *Prudential* concerned a matter where the class included members alleging injury in all fifty states. Indeed, *Prudential* explicitly noted that the matter was "an appeal from the approval of the settlement of a nationwide class action lawsuit against Prudential Life Insurance company alleging deceptive sales practices *affecting over 8 million claimants throughout the fifty states and the District of Columbia.*" *Id.* at 289 (emphasis added). As such, any attempt by Plaintiffs to assert that the holding in *Prudential* somehow undermines the Supreme Court's ruling in *DaimlerChrysler* is without merit.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Counts Seven, Eight, Fourteen, Fifteen, Sixteen, Twenty, Thirty-Nine, Forty-Two, Forty-Three, Forty-Five, Forty-Eight, Forty-Nine, Fifty, Fifty-Five, Fifty-Six, Fifty-Seven, and Fifty-Nine.

### ii.    Standing for Claims as to Particular Defendants

Defendants contend that Plaintiffs lack standing to pursue certain claims against certain defendants because none of them "suffered an injury alleged in a given state from that defendant's products." (ECF No. 158-2 at 11.)[13] Plaintiffs counter that all claims raised in the Complaint satisfy Rule 23's typicality requirement. (ECF No. 181 at 66-67.) To determine whether a plaintiff is typical of a class, courts consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class. *Marcus v. BMW of N. Am., LLC*,

---

[13] Those counts are, as to Novo: Count Thirteen (Colorado); County Thirty (Massachusetts); Count Thirty-Five (Missouri); and Count Thirty-Eight (Nevada). As to Sanofi, the counts include: Count Twenty-Seven (Louisiana); County Twenty-Nine (Maryland); Count Thirty-Four (Mississippi); Count Forty-Seven (Pennsylvania); and Count Fifty-One (Tennessee).

687 F.3d 583, 598 (3d Cir. 2012). The Third Circuit has explained the typicality requirement as follows:

> [The analysis involves] three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advances and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*Schering Plough*, 589 F.3d at 599.

Although Plaintiffs' claims at issue may satisfy the three typicality prongs, this matter is distinguishable from *Marcus* in that *Marcus* dealt with claims regarding slightly differing products against a *single* defendant. Contrary to Plaintiffs' contention, *Marcus* did not hold that plaintiffs who did not purchase a product from a defendant may nevertheless sue that defendant based on their purchase of a different defendant's similar product.[14] *Marcus*, 687 F.3d at 599. Rather, this District has held that claims concerning products that a class-action plaintiff neither purchased nor used cannot stand.[15] *See Lieberson v. Johnson & Johnson Consumer Cos., Inc.*,

---

[14] Similarly, this Court is unpersuaded by Plaintiffs' argument that *Riaubia v. Hyundai Motor Am.*, No. 16-5150, 2017 WL 3602520 (Aug. 22, 2017) supports its position. Like *Marcus*, *Riaubia* deals with "absent [class] members [who] were allegedly injured by the same non-conforming feature of different models of the same product, manufactured or distributed *by the same defendants* based on uniform representations." *Id.* at *2 (emphasis added).

[15] This Court notes that, while many decisions from this District have held that claims concerning products that a plaintiff has not alleged to have used nor purchased cannot stand, "[c]ourts in this district are divided on this issue." *Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at *5 (D.N.J. May 31, 2017). In *Neuss*, this District declined to grant a defendant's motion to dismiss claims against one defendant from plaintiffs who had neither purchased nor used their product, on the basis that (1) the class-action plaintiffs had the same basis for each defect among the different products, (2) the products were closely related, and (3) all of the claims were against only two defendants. *Id.* Unlike in this matter, however, one of the defendants in *Neuss* was a subsidiary and agent of the other. *Id.* at *2.

865 F. Supp. 2d 529, 537 (D.N.J. 2011) (holding that "[b]ecause Plaintiff has not alleged that she purchased or used two of the four . . . products at issue here, Plaintiff cannot establish an injury-in-fact with regard to those products); *see also Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 280 (D.N.J. 2011) (holding that plaintiffs did not have standing to pursue claims concerning products that they "neither purchased nor used"). As Plaintiffs have asserted multiple claims absent allegations of such products being purchased or used in such jurisdictions, such claims cannot withstand this Motion to Dismiss.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Counts Thirteen, Twenty-Seven, Twenty-Nine, Thirty, Thirty-Four, Thirty-Five, Thirty-Eight, Forty-Seven, and Fifty-One.

### iii.    Statutory Prohibitions on Consumer Class Actions

Defendants contend that eight of the Plaintiffs' claims must be dismissed due to state law statutory prohibitions on consumer class actions in each respective state.[16] (ECF No. 158-2 at 13.) Defendants assert that the Supreme Court's holding in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*, 559 U.S. 393 (2010) compels this Court to apply the class-action bar incorporated in state consumer protection laws. (ECF No. 158-2 at 14.) Plaintiffs argue that the Third Circuit's holding in *Knepper v. Rite Aid Corp.*, 675 F.3d 249 (3d Cir. 2012) interprets *Shady Grove* to preclude applying state class-action bars in the consumer protection context. (ECF No. 181 at 68.)

*Shady Grove* held that the certification of a class-action under Rule 23 alleging violations of New York law did not violate the Rules Enabling Act, even though New York state law

---

[16] Those eight counts are: Count Seven (Alabama); Count Eighteen (Georgia); Count Twenty-Six (Kentucky); Count Twenty-Seven (Louisiana); Count Thirty-Four (Mississippi); Count Thirty-Six (Montana); Count Forty-Nine (South Carolina); and Count Fifty-One (Tennessee).

prohibited such a suit from proceeding as a class action. 559 U.S. at 406-09. *Knepper* noted "[u]nder the plurality's view [in *Shady Grove*], any supposed substantive purpose underlying § 216(b) [the FLSA's provision barring opt-out classes] is irrelevant, and we need only determine whether Rule 23 'really regulates procedure,' which the Court has already concluded it does." 675 F.3d at 265. As such, any supposed, substantive purpose of a state law bar to class-actions is irrelevant, because Rule 23 "really regulates procedure." *Id.* Therefore, Defendants' contention lacks merit.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Seven, Eighteen, Twenty-Six, Twenty-Seven, Thirty-Four, Thirty-Six, Forty-Nine, and Fifty-One.[17]

### iv.    Privity

Defendants assert that six of Plaintiffs' claims must be dismissed as the consumer protection laws of such states require privity, which Plaintiffs have failed to plead.[18] (ECF No. 158-2 at 14-15.) Plaintiffs' concede that Kentucky law requires privity – thereby agreeing that their claim under Kentucky law should be dismissed – but that no other state law as alleged by Defendant requires privity to maintain a consumer fraud action. (ECF No. 181 at 69-70.)

In support of its contention that privity is required under the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 14-1522, *et seq.* ("ACFA"), Defendants cite *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401 (9th Cir. 1992). The court in *Sutter* held that the ACFA has a "clear intent to protect unwary buyers from unscrupulous sellers" and that where a plaintiff

---

[17] Defendants' motion to dismiss each count herein is only denied as to the extent that such counts may be dismissed on other grounds.

[18] Those six counts are: Count Nine (Arizona); Count Sixteen (Washington, D.C.); Count Twenty-One (Idaho); Count Twenty-Six (Kentucky); Count Thirty (Massachusetts); and Count Fifty-Four (Vermont).

is "not a buyer, nor [a] . . . target of deceptive advertising" it cannot maintain an action under the ACFA. *Id.* at 407. Plaintiffs have asserted that they are both "buyers," although not directly from Defendants, and the target of deceptive pricing. As Arizona jurisprudence does not explicitly require *direct* privity of contract between the plaintiff and defendant to maintain a suit under the ACFA, Plaintiffs' Arizona state law claim survives.

In support of its contention that privity is required under the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.* ("ICPA"), Defendants cite *Taylor v. McNichols*, 243 P.3d 642 (Idaho 2010). *Taylor* held that in order to have standing under the ICPA, "the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively." *Id.* at 662; *see also Haskin v. Glass*, 640 P.2d 1186, 1189 (Idaho Ct. App. 1982) (holding "that a claim under the ICPA must be based upon a contract"). However, while a contractual relationship is necessary, courts have not determined whether *direct* privity is required to confer standing under the ICPA. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1021-22 (N.D. Cal. 2018) (holding that "[a]rguably, [the ICPA] and *Haskin* simply reflect that a plaintiff's claim must ultimately be founded on a contract; they do not necessarily require that the contract must be one entered into by the plaintiff and defendant directly"); *see also Johnson v. Ford Motor Co.*, 2015 WL 7571841, at *10 (S.D. W.Va. Nov. 24, 2015) (rejecting the assertion that an automobile purchaser could not sue Ford Motor Company under the ICPA because she was not a direct purchaser). Accordingly, as direct privity is not required under Idaho law, Plaintiffs' failure to plead such is not fatal to its action.

Finally, Defendants assert that the Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et seq.* ("VCFA") requires privity of contract. (ECF No. 158-2 at 15.) In support of this contention, Defendants cite *Otis-Wisher v. Medtronic, Inc.*, 616 F. App'x 433, 435 (2d Cir.

2015), which upheld the dismissal of a claim under the VCFA finding that the plaintiff was not a "consumer" because she was merely prescribed the device by her doctor. *Otis-Wisher* is inapplicable to this matter, as Plaintiffs undoubtedly qualify as consumers. On the contrary, in *Elkins v. Microsoft Corp.*, 817 A.2d 9, 20 (Vt. 2002), the Vermont Supreme Court held that "consumers can generally sue under [the VCFA] even though they are indirect purchasers of a good or service from the defendant." Thus, direct privity of contract is not required under Vermont law and Plaintiffs may assert its claim under the VCFA.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Count Twenty-Six and **DENIED** as to Counts Nine, Twenty-One, and Twenty-Four.[19]

### v.    Reliance

Defendants assert that six of Plaintiffs' claims must be dismissed as Plaintiffs failed to adequately plead reliance.[20] (ECF No. 158-2 at 15-16.) These six counts all allege violations of state consumer fraud laws in which reliance is a necessary element. On the contrary to Defendants' contention, Plaintiffs adequately pled reliance upon Defendants' alleged misrepresentations, as well as proximate causation to their damages stemming therefrom. (ECF No. 131 ¶¶ 3, 206, 259, 335.) Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended

---

[19] This Court did not provide an analysis for its decision to grant Defendants' motion to dismiss Count Twenty-Six, pleading a violation of the Kentucky Consumer Protection Act, as Plaintiff conceded that such Act requires direct privity of contract, which its Complaint failed to allege. (ECF No. 181 at 69.) Additionally, this Court also did not provide an analysis of Defendants' privity of contract argument as to Count Sixteen, alleging a violation of the Washington D.C. Consumer Protection Procedures Act, or Count Thirty, alleging a violation of the Massachusetts General Law Chapter 93(A), as both counts were previously dismissed without prejudice for lack of standing.

[20] Those six counts are: Count Ten (Arkansas); Count Twelve (California); Count Eighteen (Georgia); Count Thirty-One (Michigan); Count Thirty-Eight (Nevada); and Count Forty-Seven (Pennsylvania).

Complaint is **DENIED** as to Counts Ten, Twelve, Eighteen, Thirty-One, Thirty-Eight, and Forty-Seven.[21]

### vi.    Allegations of Wrongdoing

Defendants assert that five of Plaintiffs' claims must be dismissed as Plaintiffs failed to adequately plead wrongdoing within the state, as required by each respective state consumer fraud law.[22] (ECF No. 158-2 at 16-17.) Plaintiffs contend that Defendants argument is erroneous, as each claim concerns consumers who reside in and purchased insulin in the particular state whose laws they invoke. (ECF No. 181 at 73.) The Court agrees with Plaintiffs.

The Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. § 505, *et seq.* ("ICFA") "applies only to fraudulent transactions that take place 'primarily and substantially' inside Illinois." *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 921 (Ill. 2007) (quoting *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005)). It is evident that the purchase of insulin by a plaintiff within Illinois would satisfy this requirement, and Plaintiffs' Complaint pled such. Therefore, Plaintiffs adequately pled wrongdoing under Illinois law.

The New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* ("NHCPA") is construed "to cover a defendant's extra-territorial acts if those acts affect travel or commerce within the state." *Harbour Capital Corp. v. Allied Capital Corp.*, 2009 WL 2185449, at *8-9 (D.N.H. July 22, 2009). Defendants may not "injure trade or commerce in New Hampshire but escape liability under [the NHCPA] by remaining outside the state." *Id.* As Plaintiffs have pled extra-territorial acts affecting commerce within New Hampshire, they have

---

[21] Defendants' motion to dismiss each count herein is only denied as to the extent that such counts may be dismissed on other grounds.

[22] Those five counts are: Count Twenty-Two (Illinois); Count Thirty-Nine (New Hampshire); Count Forty-One (New York); Count Fifty-One (Tennessee); and Count Fifty-Eight (Wisconsin).

sufficiently pled wrongdoing under New Hampshire law.

New York courts hold that in order to allege injury under the New York General Business Law §§ 349-350, the plaintiff must allege that "the transaction in which the consumer is deceived" occurred in New York. *Goshen v. Mut. Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 (N.Y. 2002). In *Goshen*, the plaintiff "purchased his policy and paid his premiums in Florida, through a Florida insurance agent," and the Court found that "for the purposes of section 349, any deception took place in Florida, not in New York." *Id.* at 1196. On the contrary, Plaintiffs allege that the New York class members purchased the insulin analog in New York, and thus that the deception occurred in New York. Accordingly, Plaintiffs have adequately alleged wrongdoing in New York.

Finally, this Court is satisfied that Plaintiffs have adequately pled wrongdoing in both Tennessee and Wisconsin so as to withstand Defendants' Motion to Dismiss. The Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.* ("TCPA") is to "be liberally construed" to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within the state." *Id.* at § 47-18-102(2). Tennessee courts allow plaintiffs discovery "in order to tie its TCPA claims to specific transactions occurring in Tennessee." *Encore Med., L.P. v. Jay Kennedy, D.C.*, 2013 WL 839838, at *32 (W.D. Pa. Mar. 6, 2013). Similarly, the Wisconsin Supreme Court has held that the purpose of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 110.18 ("DTPA") "includes protecting Wisconsin residents from untrue, deceptive, or misleading representation made to induce action." *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732 N.W.2d 792, 802 (Wis. 2007). This necessarily includes transactions that took place in Wisconsin, *see, e.g., In re GM LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 446-60

(S.D.N.Y. 2017), which the Complaint pleads. As such, Plaintiffs have sufficiently pled factual allegations asserting wrongdoing in Tennessee and Wisconsin so as to withstand Defendants' Motion to Dismiss.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Twenty-Two, Thirty-Nine, Forty-One, and Fifty-One.

### vii.    Procedural Requirements

Finally, Defendants contend that Plaintiffs' claims under Mississippi law, Count Thirty-Four, and Ohio law, Count Forty-Four, must be dismissed because they fail to meet procedural requirements under respective state laws. (ECF No. 158-2 at 17-18.) As this Court has determined that Plaintiffs lack standing to bring its Mississippi state claim, Count Thirty-Four will not be analyzed again herein.

Defendants assert that this Court must dismiss Plaintiffs' claim pursuant to the Ohio Consumer Sales Practice Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* ("OCSPA") because the statute's section on remedies prohibits a plaintiff from bringing a class action "unless the defendant has notice that conduct substantially similar to its alleged conduct is deceptive or unconscionable as declared by either (1) a rule adopted by the Ohio Attorney General, or (2) an Ohio state court holding." *Chapman v. Tristar Prods., Inc.*, 2016 WL 6216135, at *4 (N.D. Ohio Oct. 25, 2016). "Ohio courts are to construe the OCSPA liberally in favor of consumers." *Id.* Courts interpreting Ohio law have held that the notice argument "is not appropriate at the moment-to-dismiss stage; it belongs at the class certification or summary judgment stages." *Id.* at 4 (citing *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F. Supp. 2d 942, 948 (N.D. Ohio 2009). As such, there are no grounds to dismiss Plaintiffs' claims at Ohio law at this juncture. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is

**DENIED** as to Count Forty-Four.

IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED IN PART**

and **DENIED IN PART** as set forth herein and in the accompanying order.


Date: February 15, 2019                              /s/ Brian R. Martinotti
                                                     **HON. BRIAN R. MARTINOTTI**
                                                     **UNITED STATES DISTRICT JUDGE**