James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
(206) 623-7292

*Plaintiffs Co-Lead Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| IN RE INSULIN PRICING LITIGATION | Civil Action No. 17-699 (BRM)(LHG) |
|---|---|
| | **SECOND AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   PARTIES ...............................................................................................................11

      A.    Plaintiffs ....................................................................................................11

            1.    Alabama Plaintiffs ...........................................................................11

                  a.    Christie Boelman ...................................................................11

                  b.    Samantha Nelson ...................................................................11

            2.    Arizona Plaintiffs ............................................................................11

                  a.    F. Donald Fellow ...................................................................11

                  b.    Michelle Gwin .......................................................................12

                  c.    Ruth Hart................................................................................12

                  d.    Jeffrey Liedl ..........................................................................13

            3.    Arkansas Plaintiffs ..........................................................................13

                  a.    Lynn Davidson .......................................................................13

                  b.    William LaSuer ......................................................................13

            4.    California Plaintiffs..........................................................................14

                  a.    Sara Hasselbach .....................................................................14

                  b.    Jeanne MacNitt ......................................................................14

                  c.    Juliana Patton ........................................................................14

                  d.    Bertha Sanders .......................................................................15

                  e.    Mark Schloemer .....................................................................15

            5.    Colorado Plaintiffs ..........................................................................15

                  a.    Scott Andel.............................................................................15

                  b.    Donald Douthit.......................................................................16

6.      Connecticut Plaintiffs..................................................................16

        a.      Jonathan R. Chappell ...............................................16

        b.      Samantha Jensen .......................................................16

7.      Delaware Plaintiffs.....................................................................17

        a.      Ann-Marie Jordan ....................................................17

        b.      Carole Matheny.........................................................17

8.      Florida Plaintiffs .......................................................................17

        a.      Gay Deputee..............................................................17

        b.      Edward Johnson ........................................................18

        c.      Sean Mac an Airchinnigh..........................................18

        d.      Anne Olinger..............................................................18

        e.      Howard Schurr ..........................................................19

        f.      Tremayne Sirmons ....................................................19

        g.      Hector J. Valdes, Sr. .................................................19

9.      Georgia Plaintiffs ......................................................................20

        a.      Marilyn Person ..........................................................20

        b.      Karyn Wofford ..........................................................20

10.     Idaho Plaintiff ...........................................................................21

        a.      Emma Jensen .............................................................21

11.     Illinois Plaintiffs........................................................................21

        a.      Andre' Arnold ...........................................................21

        b.      Valetina Bohner ........................................................21

        c.      Wendy Dunnington....................................................22

        d.      Adam Levett...............................................................22

12.     Indiana Plaintiffs .......................................................................22

     a.    Mary Bobo ..................................................................................22

     b.    Arthur Janz ................................................................................23

     c.    Marie Saffran ............................................................................23

13.    Iowa Plaintiffs .....................................................................................23

     a.    Richard Knauss .........................................................................23

     b.    Sara Stock .................................................................................24

14.    Kansas Plaintiffs .................................................................................24

     a.    Kandyce Gunther ......................................................................24

     b.    Susan Marsh ..............................................................................24

15.    Kentucky Plaintiff ...............................................................................25

     a.    Donna Ramsey ..........................................................................25

16.    Louisiana Plaintiffs .............................................................................25

     a.    Terry Brewster ..........................................................................25

     b.    Robyn Rushing..........................................................................25

17.    Maine Plaintiff ....................................................................................26

     a.    Molly Thompson .......................................................................26

18.    Maryland Plaintiff ...............................................................................26

     a.    Brian Phair ................................................................................26

19.    Massachusetts Plaintiffs ......................................................................27

     a.    Donald Chaires..........................................................................27

     b.    Sheila Cooney ...........................................................................27

     c.    Gerald Girard ............................................................................27

     d.    Sara Hasselbach ........................................................................28

20.    Michigan Plaintiffs..............................................................................28

     a.    Mildred Ford .............................................................................28

b. Ritch Hoard ................................................................28

c. Susan Landis ..............................................................29

d. Patricia Quint ............................................................29

e. Andrew Van Houzen ....................................................29

21. Minnesota Plaintiffs ...........................................................30

a. Christina Elberling .......................................................30

b. Quinn Nystrom ...........................................................30

c. Jon Ugland ................................................................30

22. Mississippi Plaintiffs .........................................................31

a. Alethea Weir ..............................................................31

b. John Blake .................................................................31

23. Missouri Plaintiffs .............................................................31

a. Monique Armstrong .....................................................31

b. Lauren Robb ...............................................................32

c. Mary Maberry .............................................................32

24. Montana Plaintiffs .............................................................32

a. James Bonser ..............................................................32

b. Gay Deputee ...............................................................32

25. Nebraska Plaintiff .............................................................33

a. John Loschen ..............................................................33

26. Nevada Plaintiff ...............................................................33

a. Andrew Bauer .............................................................33

27. New Jersey Plaintiffs .........................................................34

a. Carole Andrew ............................................................34

b. Michael Carfagno .........................................................34

|  |  | c. | David Hernandez | 34 |
|  |  | d. | Lawrence Mandel | 35 |
| 28. | New Mexico Plaintiffs | | | 35 |
|  |  | a. | Francis Barnett | 35 |
|  |  | b. | Roseanna Barnett | 36 |
| 29. | New York Plaintiffs | | | 36 |
|  |  | a. | Julia D'Arrigo | 36 |
|  |  | b. | Sarah Gierer | 36 |
|  |  | c. | Robert Lowman | 37 |
|  |  | d. | Melissa Passarelli | 37 |
| 30. | North Carolina Plaintiff | | | 37 |
|  |  | a. | Donna Miller | 37 |
| 31. | North Dakota Plaintiff | | | 38 |
|  |  | a. | Jake Knaack | 38 |
| 32. | Ohio Plaintiffs | | | 38 |
|  |  | a. | Julia Blanchette | 38 |
|  |  | b. | Carole Matheny | 38 |
|  |  | c. | Larissa Shirley | 39 |
| 33. | Oklahoma Plaintiffs | | | 39 |
|  |  | a. | Melinda Bell | 39 |
|  |  | b. | Clayton McCook | 39 |
|  |  | c. | Shannon Meadows | 40 |
| 34. | Oregon Plaintiffs | | | 40 |
|  |  | a. | Russell Scott Palmer | 40 |
|  |  | b. | Kim and Jim Wallan | 41 |

35.    Pennsylvania Plaintiffs ..................................................................41

      a.    Carl Brockmeyer ................................................................41

      b.    Deborah Schwab ................................................................41

      c.    Kerry Stare ........................................................................42

36.    South Carolina Plaintiffs .............................................................42

      a.    Jonathan Rollins ................................................................42

      b.    Sarah Krueger ...................................................................42

      c.    Robert Vissage ..................................................................43

37.    Tennessee Plaintiffs .....................................................................43

      a.    Tyler Campbell ..................................................................43

      b.    Willie Phillips ....................................................................43

38.    Texas Plaintiffs ............................................................................44

      a.    Patricia Dague ...................................................................44

      b.    Michael Horton .................................................................44

      c.    Laura Stark ........................................................................44

      d.    Bret Stewart ......................................................................45

39.    Utah Plaintiffs .............................................................................45

      a.    Scott Christensen ..............................................................45

      b.    Dianna Gilmore .................................................................45

40.    Washington Plaintiffs ...................................................................46

      a.    Garett Johnson ..................................................................46

      b.    Edward Stanford ...............................................................46

      c.    Richard Thomas ................................................................46

41.    Virginia Plaintiff ..........................................................................47

      a.    Michael Foster ..................................................................47

42.   West Virginia Plaintiff ........................................................................47

    a.   Natalie Sargent ..........................................................................47

43.   Wisconsin Plaintiffs ............................................................................48

    a.   Scott Dercks ..............................................................................48

    b.   Angela Kritselis .......................................................................48

    c.   Michael Starr .............................................................................48

B.   Defendants ...................................................................................................49

III.   JURISDICTION AND VENUE ...............................................................................50

IV.   DRUG PRICING IN THE UNITED STATES....................................................51

A.   Entities Involved in Drug Pricing ..............................................................51

B.   The Drug Payment & Distribution Structure ..........................................52

C.   Benchmark pricing as a Basis for Reimbursement .................................54

D.   Consumer Drug Costs .................................................................................55

E.   Impact on Consumers .................................................................................64

F.   Drug Manufacturer Manipulation of PBM Incentives..........................66

V.   ANALOG INSULIN.......................................................................................................69

A.   Diabetes: The Disease and Demographics...............................................69

B.   The Origins of Insulin Treatment ............................................................71

C.   Current Insulin Treatment Landscape ......................................................78

D.   Climbing Insulin Benchmark Prices .........................................................79

E.   Eli Lilly, Novo Nordisk, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status.........................97

F.   The Defendant Drug Manufacturers' benchmark price inflation deceived and harmed the plaintiffs and class members. ....................................105

G.   The Health Impact of Artificial Pricing .................................................110

VI.   TOLLING OF THE STATUTE OF LIMITATIONS.....................................113

A.     Discovery Rule Tolling ...................................................................................113

B.     Fraudulent Concealment Tolling ...........................................................114

C.     Estoppel ...........................................................................................................114

VII.    CLASS ACTION ALLEGATIONS ................................................................114

VIII.  CLAIMS FOR RELIEF ...................................................................................119

COUNT ONE  VIOLATIONS OF RICO, 18 U.S.C. § 1962(C) (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)...................................................................119

A.     Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under RICO. .........119

B.     The Manufacturer-PBM Insulin Pricing RICO Enterprises...............................120

       1.     The Eli Lilly-PBM Enterprises ................................................124

       2.     The Novo Nordisk-PBM Insulin Pricing Enterprises ..............................125

       3.     The Sanofi-PBM Insulin Pricing Enterprises .........................................126

C.     The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities...................................................................................................129

D.     Conduct of the RICO Enterprises' affairs.........................................................131

E.     The Defendant Drug Manufacturers' pattern of racketeering activity.................133

F.     The Defendant Drug Manufacturers' motive....................................................136

G.     Damages caused by the Defendant Drug Manufacturers' rebate scheme............136

COUNT TWO  VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)  BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ....................................................................................................142

COUNT THREE  VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT N.J. STAT. ANN. § 56:8-1, *ET SEQ.* (AGAINST NOVO NORDISK AND SANOFI ON BEHALF OF A NATIONWIDE CLASS) .................................................145

COUNT FOUR  VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT N.J. STAT. ANN. § 56:8-1, *ET SEQ.* (AGAINST NOVO NORDISK AND SANOFI ON BEHALF OF A NATIONWIDE CLASS) .................................................151

FACTUAL ALLEGATIONS RELEVANT TO  COUNTS 5 THROUGH 49 (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) .........................................................155

COUNT FIVE  VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES
ACT ALA. CODE § 8-19-1, *ET SEQ.* (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) ....................................................................160

COUNT SIX  VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT ARIZ.
REV. STAT. § 44-1521, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK,
AND SANOFI) ........................................................................................162

COUNT SEVEN  VIOLATION OF THE ARKANSAS  DECEPTIVE TRADE
PRACTICES ACT ARK. CODE § 4-88-101, *ET SEQ.* (AGAINST ELI LILLY
AND NOVO NORDISK) ..........................................................................164

COUNT EIGHT  VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
CAL. CIV. CODE § 1750, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK,
AND SANOFI) ........................................................................................165

COUNT NINE  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) .......................................................................167

COUNT TEN  VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
COLO. REV. STAT. § 6-1-101, *ET SEQ.* (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) .......................................................................170

COUNT ELEVEN  VIOLATION OF THE CONNECTICUT  UNFAIR TRADE
PRACTICES ACT CONN. GEN. STAT. § 42-110A, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ................................................171

COUNT TWELVE   VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
DEL. CODE TIT. 6, § 2513, *ET SEQ.* (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) .......................................................................173

COUNT THIRTEEN  VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT FLA. STAT. § 501.201, *ET SEQ.* ......................174

COUNT FOURTEEN  VIOLATION OF THE GEORGIA FAIR BUSINESS
PRACTICES ACT GA. CODE ANN. § 10-1-390, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ................................................176

COUNT FIFTEEN   VIOLATION OF THE GEORGIA UNIFORM  DECEPTIVE
TRADE PRACTICES ACT GA. CODE ANN. § 10-1-370, *ET SEQ.* (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI) ..........................................177

COUNT SIXTEEN  VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
IDAHO CODE § 48-601, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK,
AND SANOFI) ........................................................................................178

COUNT SEVENTEEN   VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT 815 ILL. COMP. STAT. § 505/1,
*ET SEQ*., & § 295/1A (AGAINST ELI LILLY, NOVO NORDISK, AND
SANOFI)..................................................................................................................180

COUNT EIGHTEEN   VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
SALES ACT IND. CODE § 24-5-0.5-2, *ET SEQ*.  (AGAINST ELI LILLY,
NOVO NORDISK, AND SANOFI)................................................................................181

COUNT NINETEEN  VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION
FOR CONSUMER FRAUDS ACT IOWA CODE § 714H.1, *ET SEQ*.
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ......................................183

COUNT TWENTY   VIOLATION OF THE KANSAS CONSUMER PROTECTION
ACT KAN. STAT. § 50-623, *ET SEQ*. (AGAINST NOVO NORDISK)......................184

COUNT TWENTY-ONE  VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION LAW LA. REV. STAT. §
51:1401, *ET SEQ*. (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI).........185

COUNT TWENTY-TWO  VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ*.
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ......................................187

COUNT TWENTY-THREE  VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT MD. CODE, COM. LAW § 13-101, *ET SEQ*. (AGAINST
ELI LILLY AND NOVO NORDISK) ...............................................................................188

COUNT TWENTY-FOUR  VIOLATION OF THE MASSACHUSETTS  GENERAL
LAW CHAPTER 93(A) MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ*.
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ......................................189

COUNT TWENTY-FIVE  VIOLATION OF THE MICHIGAN CONSUMER
PROTECTION ACT MICH. COMP. LAWS § 445.902, *ET SEQ*. (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI)............................................................190

COUNT TWENTY-SIX  VIOLATION OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT MINN. STAT. § 325F.68, *ET SEQ*. (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ...................................................................192

COUNT TWENTY-SEVEN  VIOLATION OF THE MINNESOTA DECEPTIVE
TRADE PRACTICES ACT MINN. STAT. §§ 325D.43-48, *ET SEQ*. (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI)............................................................193

COUNT TWENTY-EIGHT  VIOLATION OF THE MISSISSIPPI CONSUMER
PROTECTION ACT MISS. CODE § 75-24-1, ET SEQ. (AGAINST ELI LILLY,
NOVO NORDISK, AND SANOFI)..................................................................................194

COUNT TWENTY-NINE  VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT MO. REV. STAT. § 407.010, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ...................................................195

COUNT THIRTY   VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT OF 1973 MONT. CODE ANN. § 30-
14-101, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)...........196

COUNT THIRTY-ONE   VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT NEB. REV. STAT. § 59-1601, ET SEQ. (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ...................................................197

COUNT THIRTY-TWO   VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT NEV. REV. STAT. § 598.0903, *ET SEQ.* (AGAINST
SANOFI)........................................................................................................198

COUNT THIRTY-THREE   VIOLATION OF THE NEW JERSEY CONSUMER
FRAUD ACT N.J. STAT. ANN. § 56:8-1, *ET SEQ.* (AGAINST ELI LILLY,
NOVO NORDISK, AND SANOFI)..................................................................199

COUNT THIRTY-FOUR   VIOLATION OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT N.M. STAT. § 57-12-1, *ET SEQ.* (AGAINST NOVO
NORDISK AND SANOFI) ..............................................................................201

COUNT THIRTY-FIVE   VIOLATION OF THE NEW YORK GENERAL BUSINESS
LAW N.Y. GEN. BUS. LAW §§ 349-350 (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) ..............................................................................202

COUNT THIRTY-SIX   VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT N.C. GEN. STAT. § 75-1.1, *ET SEQ.*
(AGAINST NOVO NORDISK AND SANOFI)............................................203

COUNT THIRTY-SEVEN   VIOLATION OF THE NORTH DAKOTA CONSUMER
FRAUD ACT N.D. CENT. CODE § 51-15-02 (AGAINST ELI LILLY) ......................205

COUNT THIRTY-EIGHT   VIOLATION OF THE OHIO CONSUMER SALES
PRACTICES ACT OHIO REV. CODE ANN. § 1345.01, *ET SEQ.* (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI) ............................................206

COUNT THIRTY-NINE  VIOLATION OF THE OKLAHOMA CONSUMER
PROTECTION ACT OKLA. STAT. TIT. 15, § 751, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ...................................................207

COUNT FORTY   VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT OR. REV. STAT. § 646.605, *ET SEQ.* (AGAINST NOVO
NORDISK AND SANOFI) ..............................................................................210

COUNT FORTY-ONE   VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE
   PRACTICES  AND CONSUMER PROTECTION LAW 73 PA. CONS. STAT. §
   201-1, *ET SEQ.* (AGAINST ELI LILLY AND NOVO NORDISK) ............................211

COUNT FORTY-TWO   VIOLATION OF THE SOUTH CAROLINA  UNFAIR
   TRADE PRACTICES ACT S.C. CODE ANN. § 39-5-10, *ET SEQ.* (AGAINST
   ELI LILLY, NOVO NORDISK, AND SANOFI) ...........................................................213

COUNT FORTY-THREE   VIOLATION OF THE TENNESSEE CONSUMER
   PROTECTION ACT TENN. CODE ANN. § 47-18-101, *ET SEQ.* (AGAINST
   ELI LILLY AND NOVO NORDISK) ...............................................................................214

COUNT FORTY-FOUR   VIOLATION OF THE TEXAS DECEPTIVE TRADE
   PRACTICES CONSUMER PROTECTION ACT TEX. BUS. & COM. CODE §
   17.41, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) .............215

COUNT FORTY-FIVE   VIOLATION OF THE UTAH CONSUMER SALE
   PRACTICES ACT UTAH CODE § 13-11-1, *ET SEQ.* (AGAINST ELI LILLY,
   NOVO NORDISK, AND SANOFI)...................................................................................217

COUNT FORTY-SIX   VIOLATION OF THE VIRGINIA CONSUMER PROTECTION
   ACT VA. CODE ANN. § 59.1-196, *ET SEQ.* (AGAINST ELI LILLY, NOVO
   NORDISK, AND SANOFI) .............................................................................................218

COUNT FORTY-SEVEN   VIOLATION OF THE WASHINGTON CONSUMER
   PROTECTION ACT WASH. REV. CODE § 19.86.010, *ET SEQ.* (AGAINST
   ELI LILLY, NOVO NORDISK, AND SANOFI) ...........................................................220

COUNT FORTY-EIGHT   VIOLATION OF THE WEST VIRGINIA CONSUMER
   CREDIT  AND PROTECTION ACT W. VA. CODE § 46A-1-101, *ET SEQ.*
   (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) .......................................221

COUNT FORTY-NINE  VIOLATION OF THE WISCONSIN DECEPTIVE TRADE
   PRACTICES ACT WIS. STAT. § 110.18 (AGAINST ELI LILLY, NOVO
   NORDISK, AND SANOFI) .............................................................................................223

DEMAND FOR JUDGMENT.....................................................................................................224

JURY DEMAND ........................................................................................................................225

The plaintiffs, on behalf of themselves and all others similarly situated, for their complaint against defendants Eli Lilly and Company (Eli Lilly), Novo Nordisk Inc. (Novo Nordisk), and Sanofi-Aventis U.S. LLC (Sanofi) (collectively, the Defendant Drug Manufacturers or defendants), allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.      INTRODUCTION

1.      The plaintiffs, consumers of analog insulins, bring this proposed class action against the manufacturers of their insulin medications—Eli Lilly, Novo Nordisk, and Sanofi— for their artificial and fraudulent inflation of the analog insulins' benchmark (or point of sale) prices in the United States. The analog insulin medications at issue in this complaint are Humalog, Basaglar, Fiasp, Novolog, Levemir, Tresiba, Apidra, Lantus, and Toujeo.

2.      Eli Lilly, Novo Nordisk, and Sanofi separately conspired with each of the largest pharmacy benefit managers (PBMs)—CVS Health, Express Scripts, and OptumRx—to widen a secret spread between the defendants' published benchmark prices and their undisclosed net selling prices for their analog insulins. Cognizant that PBM profits are tied to the size of the spread between benchmark price and net selling price, the defendants have offered the PBMs higher spreads in exchange for preferred positions on the PBMs' drug formularies. To carry out this scheme, the Defendant Drug Manufacturers artificially inflate the prices they publicly report—their benchmark or "sticker" price—and then secretly offer a far lower price—the net price—to the largest PBMs. This benchmark price inflation pads the pockets of PBMs who retain a percentage of the spread between benchmark price and net price. In exchange for the defendants' fraudulent inflation of their reported benchmark prices (and corresponding spreads between prices), the PBMs promise preferred formulary placement to the winning bidder (i.e., the manufacturer with the highest spread). As a result, formulary decisions for these important

medications are increasingly made based on inflated benchmark prices (and corresponding spread inflation), rather than net prices or the safety and efficacy of the analog insulins.

3.      Caught in the middle of this fraudulent price reporting are consumers whose payments for analog insulin are tied directly to the defendants' published benchmark prices at the point of sale. The Defendant Drug Manufacturers' scheme deceived the plaintiffs and class members. Rather than pay for analog insulin based on fair benchmark prices—reasonable approximations of the insulins' real prices—consumers instead paid for their insulins at the point of sale based on the manufacturers' fake benchmarks prices that bear little or no resemblance to the true prices of the drugs. All consumer payers relied on and reasonably believed the defendants' representations that their sticker prices were reasonable benchmarks for making significant, out-of-pocket payments for their insulin medications.

4.      PBMs effectuate the drug transactions between health insurers, pharmacies, and drug manufacturers. They negotiate directly with drug manufacturers on behalf of health insurers to determine the prices those insurers pay for the manufacturers' drugs. Drug manufacturers and PBMs negotiate these price discounts in the form of "rebates"; the drug manufacturer pays back to the insurer's PBM a portion of that drug's cost (the rebate). The PBM may then give a portion of that rebate to the health insurer client. The nation's most influential PBMs—CVS Health, Express Scripts, and OptumRx—together cover over 80% of the insured market—in total, 180 million lives.

5.      When two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the analog insulins), a PBM is in the position to sometimes exclude, or place in a non-preferred position, one of the medications in favor of another. When a drug is excluded from formulary or placed in a non-preferred

position, health insurers using that formulary will make their plan beneficiaries shoulder a greater percentage or all of the disadvantaged product's cost. As a result, in the branded analog insulin therapeutic category, the large PBMs can push significant portions of the sales toward or away from the Defendant Drug Manufacturers' products.

6.      Ostensibly, PBMs in such a position might negotiate real price discounts from drug manufacturers. In other words, the PBMs might negotiate discounts or rebates that lower the manufacturers' *net* selling prices and then use those reductions as legitimate bases to confer formulary status to the least costly medication. The legitimate use of discounts and rebates that actually reduce the manufacturers' net selling prices (and their accompanying benchmark prices) is not at issue in this case.

7.      PBMs make money by pocketing a percentage of the difference between a drug's benchmark price and the net price they negotiate with its manufacturer, i.e., the "spread" between prices. Simply put, the larger the spread between a drug's benchmark and net price, or the higher the absolute benchmark price, the larger the PBM's profits.

8.      In this case, in order to gain or maintain formulary placement, the Defendant Drug Manufacturers curried favor with the larger PBMs by increasing manufacturer benchmark (or list) prices so as to increase "rebate" amounts. In effect, the defendants announced a fictitious increase in their published prices, while secretly an offsetting rebate to the PBMs. The defendants gained or maintained formulary placement through a payoff without impacting their net sales prices. The PBMs sold formulary placement (on the basis of profit rather than product attributes or real price reductions), and obtained a fictitious, larger spread from which they profited. Only consumers lost, as only they paid higher prices at the point of pharmacy sale based

on a fraudulently inflated benchmark (or list) prices. Over time, the defendants have engaged in an arms race of false benchmark price increases to the detriment of consumers.

9.      In the last five years alone, Eli Lilly, Novo Nordisk, and Sanofi raised their benchmark prices by over 150%. Benchmark prices that used to be $75 a decade ago are now between $300 and $700. And *nothing* about the defendants' analog insulins has changed in that period; the $600 drug is the exact same one the defendants sold for $75 years ago. And the defendants have raised their benchmark prices in perfect lockstep.



**Figure 1: Defendant Drug Manufacturers increase long-acting insulin benchmark prices in lock-step.**

**Figure 2: Defendant Drug Manufacturers increase rapid-acting insulin benchmark prices in lock-step.**



10.     All of the defendants have participated in this arms race escalation of reported benchmark prices and consequently spreads. Each Defendant Drug Manufacturer has incrementally raised its benchmark prices (with offsetting payoffs to PBMs) just a bit more than its competitors, encouraging the large PBMs to keep its insulin on the formulary or in a preferred formulary position. Yet, at the same time, the manufacturers' net selling prices have generally remained level. In short, the Defendant Drug Manufacturers have sold to the PBMs fictitious spreads between inflated benchmark prices and net selling prices. In this case, the fraud the defendants have committed is the publication of fake benchmark prices for their analog insulins.

10.     This fraud has a victim: consumers who pay for their drugs based on benchmark prices. The plaintiffs and class members are people living with diabetes who pay for their insulin based on benchmark prices, including uninsured patients, patients in high deductible health plans, patients in Medicare Part D plans, and patients with coinsurance obligations. These plaintiffs' out-of-pocket expenditures at the point of sale are based on benchmark prices. In other words, when plaintiffs go to pharmacies (or use mail order services) to pick up their analog insulins, the charges they incur are based on the analog insulins' *benchmark* prices, not the medicines' *net* prices.[1] The price reductions the defendants offer PBMs *are not reflected in price tags the plaintiffs see*. And the larger the benchmark price, the larger the plaintiffs' out-of-pocket payments.

11.     The Defendant Drug Manufacturers' publication of their benchmark prices, while concealing their net prices, has deceived the plaintiffs into believing that the benchmark prices on which their out-of-pocket payments are based are reasonable and fair approximations of the

---

[1] If the consumer is uninsured, the pharmacy offers the consumer a "usual and customary rate" based on benchmark price.

actual cost of their analog insulins. The defendants publicly represent that the benchmark prices of their analog insulins are just that—*benchmark* prices; *reasonable approximations* of the cost of their analog insulins and a *reasonable basis* for consumer out-of-pocket payments. Thus, by publicizing their fake benchmark prices, while keeping their net prices confidential, the defendants have deceived and/or acted unfairly toward the plaintiffs and caused class members to make out-of-pocket payments for their analog insulins that are grossly inflated.

12.     In a similar case, defendant drug manufacturers "repeatedly asserted that they had no duty to disclose what was publicly known to everyone, that is, that the [drug's benchmark price] was a 'sticker price' and never intended to reflect the drug's true average wholesale price."[2] But the district court saw through this argument: "There is a difference between a sticker price and a sucker price. . . . The [plaintiffs] . . . have it exactly right: '[I]f everything [about the drug] was known to everybody, why did [d]efendants emphasize secrecy?'"[3] As the court explained, the "defendants trumpeted a lie by publishing the inflated [benchmark prices], knowing (*and intending*) them to be used as instruments of fraud."[4]

13.     Had the Defendant Drug Manufacturers published true benchmark prices— benchmark prices that were reasonable approximations of their analog insulins' true costs—the plaintiffs and class members would have paid much less for their analog insulins.

14.     As a result of the Defendant Drug Manufacturers' deceptive, unfair, and unconscionable conduct, the plaintiffs and members of the class have overpaid for their analog insulins when they paid for these medications based on the defendants' fake benchmark prices.

---

[2] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003).

[3] *Id.*

[4] *Id.* at 167.

The amount they have overpaid is the difference between the drugs' point-of-sale prices and a reasonable approximation of the drugs' true net prices.

15.     For the plaintiffs and class members, the physical, emotional, and financial tolls of paying such excessive prices for insulin is devastating. Unable to afford their analog insulins, plaintiffs report under-dosing their insulin, injecting expired insulin, re-using needles, and starving themselves to control their blood sugars with as little insulin as possible. These behaviors are dangerous for people living with diabetes. Because such behaviors ineffectively control those individuals' blood sugar levels, they can lead to serious complications such as kidney failure, heart disease, blindness, infection, and amputations. Unable to afford the analog insulins their doctors prescribe, multiple plaintiffs have lost their vision and/or kidneys. Other plaintiffs have been rushed to emergency rooms because they were unable to afford enough analog insulin to control their blood sugars and developed diabetic ketoacidosis. To cut down on costs, many class members re-use needles and pen tips, a dangerous practice that can lead to infection. Other class members explain that they avoid the doctor because their inability to afford insulin has caused their blood sugars to spike. They know that their doctors will prescribe more analog insulin to treat this problem, and they simply cannot afford to buy any more analog insulin. Plaintiffs describe how the amount they spend on analog insulin makes it impossible for them to maintain the healthy diet that people living with diabetes need, further compromising their health. Thus, while the purpose of insulin is to improve the health of those living with diabetes, the rising and excessive cost of these drugs is actually forcing the plaintiffs to jeopardize their health.

16.     The financial strain that the defendants' fake benchmark prices cause infects all areas of the plaintiffs' lives. Stories of diabetics taking out loans and accruing debt to afford

insulin are common. Multiple people living with diabetes estimate that they spend over 50% of their monthly income on analog insulin medications. Some patients have been unable to leave bad jobs for fear of losing their health insurance; others have been encouraged to leave good jobs for positions that might pay more or have better insurance. Many plaintiffs describe rearranging their lives around their analog insulin costs—keeping lights off and the heat low to avoid high electricity bills, moving back in with parents, and leaving school. Many parents of children with diabetes have had to make hard choices regarding their children's futures: pre-Kindergarten schooling or insulin? As one plaintiff put it, "[f]inancially, it's killing me."

17.     The financial hardships the defendants' price hikes impose on those living with diabetes also have serious mental health consequences. Many patients describe the constant stress and anxiety that accompanies not knowing how they will pay for next month's analog insulin supply. "I often cry, and I think, have I done something wrong that I can't afford to take care of myself?" Others express anger and a deep sense of betrayal that once-affordable medications are now completely unaffordable. "I feel so taken advantage of; now, I can't afford my medications, and for what? All so some drug company can profit from my sickness?" In short, a medication that should be a source of health has become a cause of pain.

18.     This action alleges that the Defendant Drug Manufacturers' violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and various state consumer protection laws by publishing fraudulent benchmark prices for their analog insulins. This scheme directly and foreseeably caused and continues to cause consumers to overpay for the analog insulins they need.

## II.      PARTIES

### A.    Plaintiffs

#### 1.    Alabama Plaintiffs

##### a.    Christie Boelman

19.      Plaintiff Christie Boelman is a citizen of the State of Alabama and resides in Phenix City, Alabama.

20.      Ms. Boelman purchases insulin for her minor son who has type 1 diabetes. He currently takes Novolog brand insulin. In the past, he took Humalog and Lantus. In 2016, when her son was diagnosed, Ms. Boelman was uninsured and paid for Humalog based on benchmark prices. In early 2017, Ms. Boelman obtained some insurance, but still made large out-of-pocket payments for Humalog and Lantus. As a direct result of the scheme, she has overpaid for at least Humalog.

##### b.    Samantha Nelson

21.      Plaintiff Samantha Nelson was a citizen of the State of Alabama and resided in Birmingham, Alabama.

22.      Ms. Nelson has type 1 diabetes and currently takes Novolog brand insulin to treat her diabetes. She also occasionally takes Lantus. In the past, she took Humalog. Ms. Nelson is currently, and has also been in the past, insured in a high deductible health plan where she pays for insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for at least Novolog and Lantus in Alabama.

#### 2.    Arizona Plaintiffs

##### a.    F. Donald Fellow

23.      Plaintiff F. Donald Fellow is a citizen of the State of Arizona and resides in Peoria, Arizona.

24.     Mr. Fellow has type 2 diabetes and currently takes Lantus and Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog and Lantus.

      **b.**     **Michelle Gwin**

25.     Plaintiff Michelle Gwin is a citizen of the State of Arizona and resides in Prescott Valley, Arizona.

26.     Ms. Gwin used to purchase insulin on behalf of her adult sons, Taylor and Alex Gwin. She purchased insulin for Taylor until March 31, 2017 and purchased insulin for Alex until 2012. Both Alex and Taylor have type 1 diabetes and take Humalog brand insulin to treat their diabetes. Ms. Gwin has a high deductible health plan and pays for insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog.

      **c.**     **Ruth Hart**

27.     Plaintiff Ruth Hart is a citizen of the State of Arizona and resides in Mesa, Arizona.

28.     Ms. Hart has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Novolog. Between May 2013 and April 2015, Ms. Hart was insured through her employer and enrolled in an employee welfare benefit health plan. Beginning in June 2015 through August 2017, she worked for a different employer and enrolled in that company's employee welfare benefit health plan. Under the terms of that plan, she made high coinsurance payments for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Novolog.

### d.   Jeffrey Liedl

29.     Plaintiff Jeffrey Liedl is a citizen of the State of Arizona and resides in Gold Canyon, Arizona.

30.     Mr. Liedl has type 2 diabetes, and he currently takes Toujeo and Novolog brand insulin to treat his diabetes. In the past, he took Lantus and Levemir. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Lantus, Toujeo, Levemir, and Novolog.

### 3.   Arkansas Plaintiffs

### a.   Lynn Davidson

31.     Plaintiff Lynn Davidson is a citizen of the State of Arkansas and resides in Rogers, Arkansas.

32.     Ms. Davidson has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes. In the past, she took Novolog and Levemir brand insulin. She is currently insured in a Medicare Part D plan and pays for insulin based on benchmark prices due to her high coinsurance rates. In the past, she was insured in a high deductible plan and paid for insulin based on benchmark price before she hit her deductible. As a direct result of the scheme, she has overpaid for at least Humalog. The rising prices of analog insulin have forced her into the Medicare Part D "Donut Hole" earlier and earlier each year.

### b.   William LaSuer

33.     Plaintiff William LaSuer is a citizen of the State of Arkansas and resides in Harrisburg, Arkansas.

34.     Mr. LaSuer has type 1 diabetes, and he currently takes Novolog and Tresiba brand insulin to treat his diabetes. He is currently insured in a Medicare Part D plan, and therefore

makes high coinsurance payments based on benchmark prices for his analog insulins. As a direct result of the scheme, he has overpaid for Novolog and Tresiba.

### 4.   California Plaintiffs

#### a.   Sara Hasselbach

35.     Plaintiff Sara Hasselbach is a citizen of the State of California and resides in San Diego, California.

36.     Ms. Hasselbach has type 1 diabetes and currently takes Humalog and Lantus brand insulin to treat her diabetes. In the past, she took Novolog brand insulin. She is insured through her employer and has a high deductible health plan with coinsurance requirements. She has to pay for her insulin based on benchmark prices before she hits her deductible, and her coinsurance requirements are also calculated based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog, Lantus, and Novolog.

#### b.   Jeanne MacNitt

37.     Plaintiff Jeanne MacNitt is a citizen of the State of California and resides in Sonora, California.

38.     Ms. MacNitt has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes. She used to take Lantus and Humalog. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Novolog, Lantus, and Humalog.

#### c.   Juliana Patton

39.     Plaintiff Juliana Patton is a citizen of the State of California and resides in Fresno, California.

40.     Ms. Patton purchases insulin for her minor daughter, Alexa Patton, who has type 1 diabetes. In January 2017, Ms. Patton began to purchase Novolog brand insulin for her

daughter. Prior to that, she purchased Apidra and Humalog brand insulin. Ms. Patton is insured in a high deductible health plan with high coinsurance rates and pays for her daughter's insulin based on benchmark price. As a direct result of the scheme, she has overpaid for at least Novolog and Apidra.

### d.      Bertha Sanders

41.      Plaintiff Bertha Sanders is a citizen of the State of California and resides in Los Angeles, California.

42.      Ms. Sanders has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes. Ms. Sanders is currently insured through the BlueCross BlueShield Federal Employee Program. Under the terms of that plan, she makes high coinsurance payments for her insulin, based on benchmark prices. As a direct result of the scheme, she has overpaid for Lantus and Novolog.

### e.      Mark Schloemer

43.      Plaintiff Mark Schloemer is a citizen of the State of California and resides in Corona, California.

44.      Mr. Schloemer purchased insulin for his adult son, Luke, who has type 1 diabetes. Luke has taken Humalog and Novolog brand insulin to treat his diabetes. Mr. Schloemer paid for these purchases under his GEHA health plan, which has a high deductible and coinsurance requirements. He was paying for his son's insulin based on benchmark prices. As a direct result of the scheme, he has overpaid for Humalog and Novolog.

### 5.      Colorado Plaintiffs

### a.      Scott Andel

45.      Plaintiff Scott Andel is a citizen of the State of Colorado and resides in Castle Pines, Colorado.

46. Mr. Andel has type 1 diabetes, and currently takes Novolog brand insulin to treat his diabetes. He was previously insured under a high deductible plan and paid for insulin based on benchmark price. As a direct result of the scheme, he has overpaid for Novolog.

**b.    Donald Douthit**

47. Plaintiff Donald Douthit is a citizen of the State of Colorado and resides in Woodland Park, Colorado.

48. Mr. Douthit has type 2 diabetes, and he used to take Lantus and Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

**6.    Connecticut Plaintiffs**

**a.    Jonathan R. Chappell**

49. Plaintiff Jonathan R. Chappell is a citizen of the State of Connecticut and resides in Wallingford, Connecticut.

50. Mr. Chappell has type 1 diabetes, and he takes Humalog brand insulin to treat his diabetes. He is insured in high deductible health plan and must pay for insulin based on benchmark prices before he meets his deductible. As a direct result of the scheme, he has overpaid for Humalog.

**b.    Samantha Jensen**

51. Plaintiff Samantha Jensen is a citizen of the State of Connecticut and resides in Avon, Connecticut.

52. Ms. Jensen purchased insulin on behalf of her son, Matthew Jensen, who has type 1 diabetes. She currently purchases Novolog brand insulin to treat his diabetes. In the past, he took Humalog and Lantus brand insulin. Ms. Jensen is insured in high deductible health plan and

must pay for insulin based on benchmark prices before she meets her deductible. As a direct result of the scheme, she has overpaid for Humalog, Novolog, and Lantus.

### 7. Delaware Plaintiffs

#### a. Ann-Marie Jordan

53.     Plaintiff Ann-Marie Jordan is a citizen of the State of Delaware and resides in Dover, Delaware.

54.     Ms. Jordan has type 1 diabetes, and she is a brittle diabetic. She currently takes Lantus and Humalog brand insulin. In the past, she took Novolog. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she overpaid for Lantus, Humalog, and Novolog.

#### b. Carole Matheny

55.     Plaintiff Carole Matheny was a citizen of the State of Delaware and resided in Middletown, Delaware. She moved from Delaware to Ohio on March 1, 2019.

56.     Ms. Matheny purchased analog insulin in Delaware for her son, Mark Matheny, who has type 1 diabetes. In Delaware, she purchased Tresiba, Novolog, Levemir, Lantus, and Humalog brand insulin for her son. Ms. Matheny is currently insured in high deductible health plan and must pay for insulin based on benchmark prices before she meets her deductible. As a direct result of the scheme, she has overpaid for Novolog, Levemir, Tresiba, and Lantus in Delaware.

### 8. Florida Plaintiffs

#### a. Gay Deputee

57.     Plaintiff Gay Deputee previously lived in the State of Florida for eight months, and she purchased insulin in Dunedin, Florida.

- 17 -

58.     Ms. Deputee has type 2 diabetes, and when she lived in Florida, she took Novolog and Levemir brand insulin to treat her diabetes. She was uninsured and paid for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she overpaid for Novolog and Levemir in Florida.

**b.     Edward Johnson**

59.     Plaintiff Edward Johnson is a citizen of the State of Florida and resides in Ponte Vedra, Florida.

60.     Mr. Johnson has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog.

**c.     Sean Mac an Airchinnigh**

61.     Plaintiff Sean Mac an Airchinnigh is a citizen of the State of Florida and resides in Ave Maria, Florida.

62.     Mr. Airchinnigh has type 2 diabetes, and he currently takes Novolog and Novolin brand insulin to treat his diabetes. In the past, he took Lantus and Humalog brand insulin. In December 2018, he obtained insurance coverage through the Veteran's Administration. Prior to that, he was insured through Medicare Part D and where he paid for insulin based on benchmark prices due to his high coinsurance rate. As a direct result of the scheme, he overpaid for Lantus and Humalog.

**d.     Anne Olinger**

63.     Plaintiff Anne Olinger is a citizen of the State of Florida and resides in Naples, Florida.

64.     Ms. Olinger purchases insulin for her adult son and has purchased insulin on his behalf since he was 12 years old. He has type 1 diabetes. In spring 2017, Ms. Olinger began to purchase Humalog brand insulin for him. In the past, she has purchased Levemir and Novolog brand insulin. She has a high deductible plan and must pay for insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for at least Levemir and Novolog.

### e.     Howard Schurr

65.     Plaintiff Howard Schurr is a citizen of the State of Florida and resides in Boca Raton, Florida.

66.     Mr. Schurr has type 2 diabetes, and he currently takes Toujeo and Novolog brand insulin to treat his diabetes. In the past, he took Lantus and Humalog. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog, Novolog, Toujeo, and Lantus.

### f.     Tremayne Sirmons

67.     Plaintiff Tremayne Sirmons is a citizen of the State of Florida and resides in Winter Park, Florida.

68.     Mr. Sirmons has type 1 diabetes, and he currently takes Levemir and Humalog brand insulin to treat his diabetes. He is insured in a high deductible health plan and pays for his insulin based on benchmark prices. As a direct result of the scheme, he has overpaid for both Levemir and Humalog.

### g.     Hector J. Valdes, Sr.

69.     Plaintiff Hector J. Valdes, Sr. is a citizen of the State of Florida and resides in Miami, Florida.

70.     Mr. Valdes, Sr. has type 2 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog.

**9.     Georgia Plaintiffs**

      **a.     Marilyn Person**

71.     Plaintiff Marilyn Person is a citizen of the State of Georgia and resides in Villa Rica, Georgia.

72.     Ms. Person has type 2 diabetes, and she currently takes Levemir and Novolog brand insulin to treat her diabetes. She was previously taking Humalog and Lantus brand insulin. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. She sometimes obtains samples when she cannot afford her prescribed insulin medications. As a direct result of the scheme, she has overpaid for Novolog, Levemir, Lantus, and Humalog.

      **b.     Karyn Wofford**

73.     Plaintiff Karyn Wofford is a citizen of the State of Georgia and resides in Jackson, Georgia.

74.     Ms. Wofford has type 1 diabetes, and she currently takes Lantus and Humalog brand insulin to treat her diabetes. She is insured through the Georgia Healthcare Marketplace in a high deductible health plan. She started this plan in January 2018 and cannot afford to hit her deductible. As a direct result of the scheme, she has overpaid for both Lantus and Humalog.

### 10.   Idaho Plaintiff

#### a.   Emma Jensen

75.   Plaintiff Emma Jensen is a citizen of the State of Idaho and resides in Meridian, Idaho.

76.   Ms. Jensen has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes. Previously, she purchased several different insulin brands, including Novolog and/or Lantus. During the class period, she was uninsured and paid for her insulin out-of-pocket based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog, Novolog, and/or Lantus.

### 11.   Illinois Plaintiffs

#### a.   Andre' Arnold

77.   Plaintiff Andre' Arnold is a citizen of the State of Illinois and resides in Belleville, Illinois.

78.   Ms. Arnold has type 2 diabetes, and she takes Tresiba brand insulin to treat her diabetes. In the past she took Lantus and Levemir. She is insured under Medicare Part D and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Tresiba and Lantus.

#### b.   Valetina Bohner

79.   Plaintiff Valentina Bohner is a citizen of the State of Illinois and resides in Casey, Illinois.

80.   Ms. Bohner purchases insulin on behalf of her daughter, Miriam Bohner, who has type 1 diabetes. Ms. Bohner currently purchases Novolog and Lantus brand insulin for her daughter. She used to purchase Humalog brand insulin. She was previously insured in a high

deductible health plan and paid for her daughter's insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Humalog and Lantus.

### c.    Wendy Dunnington

81.    Plaintiff Wendy Dunnington is a citizen of the State of Illinois and resides in Arlington Heights, Illinois.

82.    Ms. Dunnington purchases insulin on behalf of her daughter who has type 1 diabetes. Ms. Dunnington currently purchases Humalog brand insulin for her daughter. She is insured in a high deductible health plan and pays for her daughter's insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog.

### d.    Adam Levett

83.    Plaintiff Adam Levett is a citizen of the State of Illinois and resides in Chicago, Illinois.

84.    Mr. Levett has type 1 diabetes, and he currently takes Novolog brand insulin to treat his diabetes. He was previously insured in a high deductible health plan and paid for his insulin based on benchmark price. As a direct result of the scheme, he has overpaid for Novolog.

### 12.    Indiana Plaintiffs

### a.    Mary Bobo

85.    Plaintiff Mary Bobo is a citizen of the State of Indiana and resides in Kirklin, Indiana.

86.    Ms. Bobo has type 1 diabetes, and she currently takes Fiasp brand insulin. In the past, she took Novolog and Humalog. She was previously insured in a high deductible health plan, where she paid for insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Novolog and Fiasp.

### b.      Arthur Janz

87.     Plaintiff Arthur Janz is a citizen of the State of Indiana and resides in Elkhart, Indiana.

88.     Mr. Janz has type 2 diabetes, and he currently takes Tresiba and Novolog brand insulin to treat his diabetes. In the past, he took Levemir and Lantus brand insulin. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for at least Levemir, Tresiba, and Novolog.

### c.      Marie Saffran

89.     Plaintiff Marie Saffran has resided in Nevada since 2016. However, she was previously a citizen of Indiana, where she purchased insulin.

90.     Ms. Saffran has type 2 diabetes, and she currently takes Humalog and Basaglar brand insulin to treat her diabetes. She previously took Lantus brand insulin. When she moved to Nevada, she enrolled in Medicaid. Her insulin is now affordable. However, she was previously insured in a high deductible health plan and paid for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Lantus and Humalog.

### 13.    Iowa Plaintiffs

### a.      Richard Knauss

91.     Plaintiff Richard Knauss is a citizen of the State of Iowa and resides in Madrid, Iowa.

92.     Mr. Knauss has type 1 diabetes, and he currently takes Lantus and Novolog brand insulin to treat his diabetes. He recently switched to Novolog from Humalog brand insulin. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high

coinsurance rates. As a direct result of the scheme, he has overpaid for Lantus, Novolog, and Humalog.

### b. Sara Stock

93.    Plaintiff Sara Stock is a citizen of the State of Iowa and resides in Akron, Iowa.

94.    Ms. Stock has type 1 diabetes, and she currently takes Lantus and Humalog brand insulin to treat her diabetes. She was uninsured prior to 2017 and paid for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Lantus and Humalog.

### 14. Kansas Plaintiffs

### a. Kandyce Gunther

95.    Plaintiff Kandyce Gunther is a citizen of the State of Kansas and resides in Douglass, Kansas.

96.    Ms. Gunther has type 1 diabetes and currently takes Novolog brand insulin to treat her diabetes. Ms. Gunther was insured under a high deductible health plan, and she paid for insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Novolog.

### b. Susan Marsh

97.    Plaintiff Susan Marsh is a citizen of the State of Kansas and resides in Lenexa, Kansas.

98.    Ms. Marsh has type 1 diabetes and currently takes Novolog brand insulin to treat her diabetes. In the past, she took Humalog, Lantus, and Apidra brand insulin. In 2017, Ms. Marsh moved into a high deductible health plan with a 30% coinsurance obligation after she meets her deductible. She must now pay for insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Novolog.

### 15.    Kentucky Plaintiff

#### a.    Donna Ramsey

99.    Plaintiff Donna Ramsey is a citizen of the State of Kentucky and resides in Louisville, Kentucky.

100.    Ms. Ramsey has type 1 diabetes and he currently takes Basaglar and Novolog brand insulin to treat her diabetes. She used to take Lantus. She is insured under Medicare Part D and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for at least Lantus and Novolog.

### 16.    Louisiana Plaintiffs

#### a.    Terry Brewster

101.    Plaintiff Terry Brewster is a citizen of the State of Louisiana, but has been traveling abroad since 2018. His permanent address is his mother's address in Oak Ridge, Louisiana. He has purchased insulin in Louisiana.

102.    Mr. Brewster has type 1 diabetes and currently takes Lantus and Apidra brand insulin to treat his diabetes. In the past, he purchased Novolog. He was previously insured in a high deductible health plan with coinsurance obligations. Therefore, he paid for Lantus, Apidra, and Novolog based on benchmark prices. As a direct result of the scheme, he has overpaid for Novolog, Lantus, and Apidra.

#### b.    Robyn Rushing

103.    Plaintiff Robyn Rushing is a citizen of the State of Louisiana and resides in Winnsboro, Louisiana.

104.    Ms. Rushing has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. She also previously took Levemir and Novolog brand insulin. In November 2016, she enrolled in Medicaid. She now pays $3 per bottle for insulin. However, she was

previously uninsured and paid for her insulin out-of-pocket based on benchmark prices. As a direct result of the scheme, she has overpaid for at least Humalog.

### 17. Maine Plaintiff

#### a. Molly Thompson

105.    Plaintiff Molly Thompson is a citizen of the State of Maine and resides in Portland, Maine.

106.    Ms. Thompson has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Levemir and Lantus brand insulin. In January 2017, she moved into a high deductible insurance plan where she pays for insulin based on benchmark prices. Prior to January 2017, she was enrolled in a different high deductible plan and paid for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Levemir, Lantus, and Humalog.

### 18. Maryland Plaintiff

#### a. Brian Phair

107.    Plaintiff Brian Phair is a citizen of the State of Maryland and resides in North Bethesda, Maryland.

108.    Mr. Phair has type 1 diabetes and currently takes Humalog brand insulin to treat his diabetes. In the past, he has also taken previously taking Novolog brand insulin. He is insured in a high deductible health plan and must pay out-of-pocket, based on benchmark prices, before he meets his deductible. As a direct result of the scheme, he has overpaid for Novolog and Humalog.

19.     **Massachusetts Plaintiffs**

a.     **Donald Chaires**

109.     Plaintiff Donald Chaires is a citizen of the Commonwealth of Massachusetts and resides in Springfield, Massachusetts.

110.     Mr. Chaires has type 2 diabetes and currently takes Levemir and Novolin brand insulin to treat his diabetes. In the past, he took Lantus, Humalog, and Novolog brand insulin. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Novolog, Levemir, and Lantus.

b.     **Sheila Cooney**

111.     Plaintiff Sheila Cooney is a citizen of the Commonwealth of Massachusetts and resides in Taunton, Massachusetts.

112.     Ms. Cooney has type 2 diabetes and currently takes Lantus brand insulin to treat her diabetes. She is insured under Medicare Part D and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Lantus.

c.     **Gerald Girard**

113.     Plaintiff Gerald Girard is a citizen of the Commonwealth of Massachusetts and resides in Fairhaven, Massachusetts.

114.     Mr. Girard has type 2 diabetes and currently takes Lantus brand insulin to treat his diabetes. In the past, he has taken Novolog and Humalog brand insulin. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Novolog, Lantus, and Humalog.

### d.     Sara Hasselbach

115.    Plaintiff Sara Hasselbach is a citizen of the State of California and resides in San Diego, California. However, she spends nearly half the year in the Commonwealth of Massachusetts and purchases insulin there.

116.    Ms. Hasselbach has type 1 diabetes and currently takes Humalog and Lantus brand insulin to treat her diabetes. In the past, she took Novolog brand insulin. She is insured through her employer and has a high deductible health plan with coinsurance requirements. She has to pay for her insulin based on benchmark prices before she hits her deductible, and her coinsurance requirements are also calculated based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog, Lantus, and Novolog in Massachusetts.

### 20.    Michigan Plaintiffs

### a.     Mildred Ford

117.    Plaintiff Mildred Ford is a citizen of the State of Michigan and resides in Dearborn, Michigan.

118.    Ms. Ford has type 2 diabetes and currently takes Levemir and Novolog. She is insured under Medicare Part D and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Levemir and Novolog.

### b.     Ritch Hoard

119.    Plaintiff Ritch Hoard is a citizen of the State of Michigan and resides in Atlanta, Michigan.

120.    Mr. Hoard has type 1 diabetes and currently takes Lantus brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Lantus.

### c. Susan Landis

121.    Plaintiff Susan Landis is a citizen of the State of Michigan and resides in Taylor, Michigan.

122.    Ms. Landis has type 1 diabetes and currently takes Lantus and Novolog brand insulin to treat her diabetes. In the past, she took Humalog. She is insured under Medicare Part D and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Lantus, Humalog, and Novolog.

### d. Patricia Quint

123.    Plaintiff Patricia Quint is a citizen of the State of Michigan and resides in Rochester Hills, Michigan.

124.    Ms. Quint has type 1 diabetes and currently takes Humalog, Humulin R, and Humulin N brand insulin to treat her diabetes. She is insured under Medicare Part D and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Humalog.

### e. Andrew Van Houzen

125.    Plaintiff Andrew Van Houzen is a citizen of the State of Michigan and resides in Lewiston, Michigan.

126.    Mr. Van Houzen has type 2 diabetes and currently takes Lantus brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Lantus.

21.    **Minnesota Plaintiffs**

a.    **Christina Elberling**

127.    Plaintiff Christina Elberling is a citizen of the State of Minnesota and resides in Redwood Falls, Minnesota.

128.    Ms. Elberling has type 1 diabetes and currently takes Novolog brand insulin to treat her diabetes. She is insured in a high deductible health plan and pays for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Novolog.

b.    **Quinn Nystrom**

129.    Plaintiff Quinn Nystrom is a citizen of the State of Minnesota and resides in Baxter, Minnesota.

130.    Ms. Nystrom has type 1 diabetes and currently takes Novolog brand insulin to treat her diabetes. She is insured in a high deductible health plan with high coinsurance rates and pays for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Novolog.

c.    **Jon Ugland**

131.    Plaintiff Jon Ugland is a citizen of the State of Minnesota and resides in Byron, Minnesota.

132.    Mr. Ugland has type 1 diabetes and currently takes Humalog brand insulin to treat his diabetes. In the past, he took Lantus and Novolog brand insulin. He is insured under Medicare Part D and pays for insulin based on benchmark prices due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog, Lantus, and Novolog.

### 22.   Mississippi Plaintiffs

#### a.   Alethea Weir

133.   Plaintiff Alethea Weir is a citizen of the State of Mississippi and resides in Grenada, Mississippi.

134.   Ms. Weir has type 2 diabetes and currently takes Basaglar brand insulin to treat her diabetes. She previously took Levemir brand insulin. She is insured under Medicare Part D and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for at least Levemir.

#### b.   John Blake

135.   Plaintiff John Blake is a citizen of the State of Mississippi and resides in Starkville, Mississippi.

136.   Mr. Blake has type 1 diabetes and currently takes Humalog and Tresiba brand insulin to treat his diabetes. In the past, he took Novolog and Lantus. He is insured in a high deductible health plan and pays for his insulin based on benchmark prices. He also pays 20% coinsurance after he meets his deductible, with a $200 out-of-pocket maximum. As a direct result of the scheme, he has overpaid for Humalog, Tresiba, Novolog, and Lantus.

### 23.   Missouri Plaintiffs

#### a.   Monique Armstrong

137.   Plaintiff Monique Armstrong is a citizen of the State of Missouri and resides in St. Louis, Missouri.

138.   Ms. Armstrong has type 1 diabetes, and currently takes Humalog and Levemir brand insulin. Ms. Armstrong is currently insured in a high deductible health plan and pays for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog and Levemir.

### b.      Lauren Robb

139.    Plaintiff Lauren Robb is a citizen of the State of Missouri and resides in Webster Groves, Missouri.

140.    Ms. Robb has type 1 diabetes, and currently takes Humalog brand insulin. Ms. Robb is insured in a high deductible health plan and pays for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog.

### c.      Mary Maberry

141.    Mary Maberry is a citizen of Missouri and resides in Hillsboro, Missouri.

142.    Ms. Maberry has type 2 diabetes and currently takes Lantus to treat her diabetes. In the past, she took Humalog and Levemir. She is currently insured under Medicare Part D, and pays for insulin based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Lantus.

### 24.    Montana Plaintiffs

### a.      James Bonser

143.    Plaintiff James Bonser is a citizen of the State of Montana and resides in Bigfork, Montana.

144.    Mr. Bonser has type 2 diabetes, and he currently takes Lantus and Novolog brand insulin to treat his diabetes. In the past, he took Apidra, Humalog, and Levemir. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog, Novolog, Levemir, Apidra, and Lantus.

### b.      Gay Deputee

145.    Plaintiff Gay Deputee is a currently a citizen of the State of Montana and resides in Hardin, Montana.

146.    Ms. Deputee has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes. In the past she took, she took Levemir and Humalog. She is insured under Medicare Part D and pays for her insulins based on benchmark prices due to her high coinsurance rates. As a direct result of the scheme, she overpaid for Humalog, Levemir, Novolog, and Lantus in Montana.

**25.    Nebraska Plaintiff**

      **a.    John Loschen**

147.    Plaintiff John Loschen is a citizen of the State of Nebraska and resides in Holdrege, Nebraska.

148.    Mr. Loschen has type 1 diabetes, and he currently takes Novolog brand insulin to treat his diabetes. In the past, he took Levemir, Lantus, and Humalog brand insulin. He was previously insured in a high deductible health plan and paid for his insulin based on benchmark prices. As a direct result of the scheme, he overpaid for Lantus, Levemir, Humalog, and Novolog.

**26.    Nevada Plaintiff**

      **a.    Andrew Bauer**

149.    Plaintiff Andrew Bauer is a citizen of the State of Nevada and resides in Las Vegas, Nevada.

150.    Mr. Bauer has type 2 diabetes, and he currently takes Lantus brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Lantus. He has also lost his vision and his kidney is failing due to the high cost of insulin.

27.     **New Jersey Plaintiffs**

    a.     **Carole Andrew**

151.     Plaintiff Carole Andrew is a citizen of the State of New Jersey and resides in the Township of East Brunswick, New Jersey.

152.     Ms. Andrew purchases insulin for her son, who has type 1 diabetes. She currently purchases Novolog brand insulin for her son, but, in the past, she purchased Lantus for him as well. In 2015, when her son was diagnosed, Ms. Andrew was insured in a high deductible plan with coinsurance obligations. In July 2016, she switched to a different plan, which also has high coinsurance obligations. Ms. Andrew has paid for both Novolog and Lantus based on benchmark prices. As a direct result of the scheme, she has overpaid for Novolog and Lantus.

    b.     **Michael Carfagno**

153.     Plaintiff Michael Carfagno is a citizen of the State of New Jersey and resides in Clementon, New Jersey.

154.     Mr. Carfagno has type 2 diabetes, and he currently takes Novolog brand insulin to treat his diabetes. In the past, Mr. Carfagno also took Levemir to treat his diabetes. As of last year, Mr. Carfagno was insured under Medicare Part D. Prior to becoming a Medicare recipient, he was insured by Horizon Blue Cross/Blue Shield of New Jersey. Under that plan, Mr. Carfagno paid for his insulin drugs out-of-pocket until he reached his deductible and then he made a co-payment for each purchase. As a direct result of the scheme, he has overpaid for his Novolog.

    c.     **David Hernandez**

155.     Plaintiff David Hernandez is a citizen of the State of New Jersey and resides in Paterson, New Jersey.

156.     Mr. Hernandez has type 1 diabetes, and he recently received a pancreas transplant so he no longer takes insulin. In the past, he took Humalog and Lantus brand insulin to treat his

- 34 -

diabetes. From 2014 through 2018, he received pharmaceutical coverage under the New Jersey

Pharmaceutical Assistance to the Aged and Disabled Program. However, until 2014, he was

uninsured or had sporadic coverage. During that time, he could not afford his insulin. As a result,

his blood sugar levels caused severe damage to his eyes and kidneys. He is now blind in one eye

and has had a kidney transplant due to his inability to afford insulin and control his type 1

diabetes. As a direct result of the scheme, he has overpaid for both Humalog and Lantus.

### d.      Lawrence Mandel

157.    Plaintiff Lawrence Mandel is a citizen of the State of New Jersey and resides in

West Orange, New Jersey.

158.    Mr. Mandel has type 1 diabetes, and he currently takes Lantus and Humalog

brand insulin to treat his diabetes. He occasionally buys Levemir instead of Lantus depending on

the drugs' prices. He is insured under Medicare Part D and pays for insulin based on benchmark

price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for

Lantus, Levemir, and Humalog.

### 28.    New Mexico Plaintiffs

### a.      Francis Barnett

159.    Plaintiff Francis Barnett is a citizen of the State of New Mexico and resides in

Albuquerque, New Mexico.

160.    Mr. Barnett has type 2 diabetes, and he currently takes Novolin N to treat his

diabetes. In the past, he has taken Novolog, Lantus, and Basaglar. He is insured under Medicare

Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a

direct result of the scheme, he has overpaid for Lantus, Basaglar, and Novolog.

b.      **Roseanna Barnett**

161.    Plaintiff Roseanna Barnett is a citizen of the State of New Mexico and resides in Albuquerque, New Mexico.

162.    Ms. Barnett has type 2 diabetes, and she currently takes Novolin N brand insulin to treat her diabetes. In the past, she took Lantus brand insulin. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Lantus.

29.    **New York Plaintiffs**

a.      **Julia D'Arrigo**

163.    Plaintiff Julia D'Arrigo is a citizen of the State of New York and resides in Staten Island, New York.

164.    Ms. D'Arrigo has type 1 diabetes, and she currently takes Novolog brand insulin to treat her diabetes. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Novolog.

b.      **Sarah Gierer**

165.    Plaintiff Sarah Gierer is a citizen of the State of New York and resides in Bridgeport, New York.

166.    Ms. Gierer has type 1 diabetes, and she currently takes Apidra brand insulin to treat her diabetes. From 2017 until present, she was insured by Medicaid and paid $3 for a vial of insulin. Her Medicaid plan just stopped covering Apidra, and she is unsure how she will pay for it this year. From 2013 to 2016, she was insured in a high deductible health plan. In that plan, she paid for her insulin based on benchmark price before she hit her deductible. As a direct result of the scheme, she has overpaid for Apidra.

- 36 -

### c.      Robert Lowman

167.     Plaintiff Robert Lowman is a citizen of the State of New York and resides in Buffalo, New York.

168.     Mr. Lowman has type 1 diabetes, and he currently takes Humalog and Basaglar brand insulin to treat his diabetes. In the past, he also took Novolog, Levemir, and Lantus brand insulin. He is currently insured, but was not in the past. During the time he was uninsured, he had very high out-of-pocket costs due to benchmark prices. As a direct result of the scheme, he has overpaid for at least Lantus and Humalog.

### d.      Melissa Passarelli

169.     Plaintiff Melissa Passarelli is a citizen of the State of New York and resides in Astoria, New York.

170.     Ms. Passarelli has type 1 diabetes, and takes Novolog brand insulin to treat her diabetes. She used to take Humalog brand insulin. She is currently insured in a high deductible health plan and pays for her insulin based on benchmark price before she hits her deductible. As a direct result of the scheme, she has overpaid for at least Novolog.

### 30.    North Carolina Plaintiff

### a.      Donna Miller

171.     Plaintiff Donna Miller is a citizen of North Carolina and resides in Fletcher, North Carolina.

172.     Donna Miller has type 2 diabetes and currently takes Novolin 70/30 insulin to treat her diabetes. In the past, she took Novolog and Lantus to treat her diabetes. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Lantus and Novolog.

**31.    North Dakota Plaintiff**

    **a.    Jake Knaack**

173.    Plaintiff Jake Knaack is a citizen of North Dakota and resides in Fargo, North Dakota.

174.    Jake Knaack has type 1 diabetes and currently takes Novolog brand insulin to treat his diabetes. In the past, he took Humalog and Lantus to treat his diabetes. He is currently insured in a health plan that covers Novolog. However, in the past, he was insured in a high deductible health plan with coinsurance where he had to purchase Humalog based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog.

**32.    Ohio Plaintiffs**

    **a.    Julia Blanchette**

175.    Plaintiff Julia Blanchette is a citizen of the State of Ohio and resides in Cleveland Heights, Ohio.

176.    Ms. Blanchette has type 1 diabetes, and takes Novolog and Fiasp brand insulin to treat her diabetes. She used to take Apidra brand insulin. When she took Apidra, she was insured in a high deductible health plan and paid for her insulin based on benchmark price before she hit her deductible. As a direct result of the scheme, she has overpaid for Apidra.

    **b.    Carole Matheny**

177.    Plaintiff Carole Matheny is currently a citizen of the State of Ohio and resides in Hebron, Ohio. She moved there on March 1, 2019.

178.    Ms. Matheny will purchase Tresiba and Humalog brand insulin for her son, Mark Matheny, who has type 1 diabetes. Ms. Matheny is currently insured in high deductible health plan and must pay for insulin based on benchmark prices before she meets her deductible.

Although, at the time of this filing, she has not yet purchased analog insulin for her son in Ohio, she will in the near future and, therefore, she will overpay for Tresiba and Humalog in Ohio.

### c.   Larissa Shirley

179.   Plaintiff Larissa Shirley is a citizen of the State of Ohio and resides in Marion, Ohio.

180.   Ms. Shirley has type 1 diabetes, and she currently takes Fiasp brand insulin to treat her diabetes. She previously took Humalog and Novolog brand insulin. She was previously insured under Medicare Part D, but when she hit the Donut Hole, she filled her prescriptions through her husband's health insurance plan. Her husband's plan is a high deductible plan. Her doctor also sometimes gives her samples. In her husband's plan and in her Medicare Part D plan, she paid for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for at least Novolog.

### 33.   Oklahoma Plaintiffs

### a.   Melinda Bell

181.   Plaintiff Melinda Bell is a citizen of the State of Oklahoma and resides in Allen, Oklahoma.

182.   Ms. Bell purchases insulin for her son who has type 1 diabetes. She currently purchases Humalog brand insulin for her son, but, in the past, she purchased Lantus and Novolog brand insulin. Ms. Bell was insured in a high deductible plan. As a direct result of the scheme, she has overpaid for Novolog and Lantus.

### b.   Clayton McCook

183.   Plaintiff Clayton McCook is a citizen of the State of Oklahoma and resides in Allen, Oklahoma.

184.     Mr. McCook purchases insulin for his daughter who has type 1 diabetes. He currently purchases Novolog brand insulin for his daughter, but, in the past, he purchased Lantus and Humalog brand insulin for her. Mr. McCook is currently insured in a high deductible plan and was insured in other high deductible plans in the past. As a direct result of the scheme, he has overpaid for Humalog, Novolog, and Lantus.

### c.     Shannon Meadows

185.     Plaintiff Shannon Meadows is a citizen of the State of Oklahoma and resides in Duncan, Oklahoma.

186.     Ms. Meadows has type 1 diabetes, and she currently takes Novolog and Levemir brand insulin to treat her diabetes. In the past, she took Humalog, Toujeo, and Lantus brand insulin. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Novolog, Levemir, Lantus, and Toujeo.

### 34.     Oregon Plaintiffs

### a.     Russell Scott Palmer

187.     Plaintiff Russell Scott Palmer is a citizen of the State of Oregon and resides in Eugene, Oregon.

188.     Mr. Palmer has type 2 diabetes, and he currently takes Lantus and Novolog brand insulin to treat his diabetes. In 2015 and the first half of 2016, he was insured in a health insurance plan with high co-payments. He is now insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Lantus and Novolog.

### b.     Kim and Jim Wallan

189.    Plaintiffs Kim and Jim Wallan are citizens of the State of Oregon and reside in Medford, Oregon.

190.    Ms. and Mr. Wallan's son, Eric Wallan, was diagnosed with type 1 diabetes in 2014. He takes Lantus and Novolog brand insulin to treat his diabetes. From April 2014 through December 2014, the Wallans were uninsured and paid for their son's insulin out-of-pocket based on benchmark prices. As a direct result of the scheme, they have overpaid for Lantus and Novolog.

### 35.    Pennsylvania Plaintiffs

### a.     Carl Brockmeyer

191.    Plaintiff Carl Brockmeyer is a citizen of the State of Pennsylvania and resides in Pittsburgh, Pennsylvania.

192.    Mr. Brockmeyer has type 1 diabetes, and he currently takes Novolog brand insulin to treat his diabetes. He is currently insured in a high deductible health plan. As a direct result of the scheme, he has overpaid for Novolog.

### b.     Deborah Schwab

193.    Plaintiff Deborah Schwab is a citizen of Pennsylvania and resides in Canonsburg, Pennsylvania.

194.    Ms. Schwab has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Novolog. In the past, she was insured in a high deductible health plan with coinsurance requirements where she purchased Humalog and Novolog based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog and Novolog.

### c.    Kerry Stare

195.    Plaintiff Kerry Stare is a citizen of Pennsylvania and resides in Bethel Park, Pennsylvania.

196.    Ms. Stare has type 1 diabetes and currently takes Novolog brand insulin to treat her diabetes. In the past, she took Humalog. Ms. Stare has been insured in a high deductible health plan since about 2012 or 2013 and therefore has paid Humalog and Novolog based on benchmark prices. As a direct result of the scheme, she has overpaid for Novolog and Humalog.

### 36.    South Carolina Plaintiffs

### a.    Jonathan Rollins

197.    Plaintiff Jonathan Rollins is a citizen of the State of South Carolina and resides in Charleston, South Carolina.

198.    Dr. Rollins has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. During the class period, he was insured under National Union Fire Insurance Company of Pittsburgh, PA and paid for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog.

### b.    Sarah Krueger

199.    Plaintiff Sarah Krueger is a citizen of the State of South Carolina and resides in Okatie, South Carolina.

200.    Ms. Krueger has type 1 diabetes and currently purchases Novolog to treat her diabetes. In the past, she took Humalog and Lantus brand insulin. Ms. Krueger is insured in a high deductible health plan with high coinsurance rates. She pays for her Novolog based on benchmark price due to her deductible and coinsurance requirements. As a direct result of the scheme, she has overpaid for at least Novolog.

### c.    Robert Vissage

201.    Plaintiff Robert Vissage is a citizen of the State of South Carolina and resides in Seneca, South Carolina.

202.    Mr. Vissage has type 2 diabetes, and he currently takes Novolog brand insulin to treat his diabetes. In the past, he took Lantus. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. The high prices of insulin have forced Mr. Vissage to systematically under-dose his insulin, leading a partial amputation of his right foot. As a direct result of the scheme, he has overpaid for Novolog and Lantus.

### 37.    Tennessee Plaintiffs

### a.    Tyler Campbell

203.    Plaintiff Tyler Campbell is a citizen of the State of Tennessee and resides in Old Hickory, Tennessee.

204.    Mr. Campbell has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. In the past, he was uninsured and paid benchmark prices for his insulin. As a direct result of the scheme, he has overpaid for Humalog.

### b.    Willie Phillips

205.    Plaintiff Willie Phillips is a citizen of the State of Tennessee and resides in Prospect, Tennessee.

206.    Ms. Phillips has type 2 diabetes, and she currently takes Levemir brand insulin to treat her diabetes. She is insured under Medicare Part D and pays for insulin based on benchmark price due to her high coinsurance rates. As a direct result of the scheme, she has overpaid for Levemir.

38.     **Texas Plaintiffs**

a.     **Patricia Dague**

207.     Plaintiff Patricia Dague is a citizen of the State of Texas and resides in Rosenberg, Texas.

208.     Ms. Dague has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes. She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she receives assistance through a patient assistance program. In the past, she was insured in a high deductible health plan, where she paid based on benchmark price. As a direct result of the scheme, she has overpaid for Lantus and Novolog.

b.     **Michael Horton**

209.     Plaintiff Michael Horton is a citizen of the State of Texas and resides in Telephone, Texas.

210.     Mr. Horton has type 2 diabetes, and he currently takes Novolog and Levemir brand insulin to treat his diabetes. In the past, he took Lantus brand insulin. He is insured in a high deductible health plan with high coinsurance rate and has to pay for insulin based on benchmark prices. As a direct result of the scheme, he has overpaid for at least Lantus and Levemir.

c.     **Laura Stark**

211.     Plaintiff Laura Stark is a citizen of the State of Texas and resides in Cypress, Texas.

212.     Ms. Stark purchases insulin for her minor son, Jakob Stark, who has type 1 diabetes. Jakob currently takes Tresiba and Novolog brand insulin. In the past, he took Lantus, Humalog, and Levemir. Ms. Stark was previously insured in a high deductible health plan and

paid for her son's insulin based on benchmark price. As a direct result of the scheme, she has overpaid for at least Tresiba, Novolog, Humalog, and Lantus.

### d.      Bret Stewart

213.    Plaintiff Bret Stewart is a citizen of the State of Texas and resides in Dalhart, Texas.

214.    Mr. Stewart has type 1 diabetes, and he currently takes Novolin R and Novolin N brand insulin to treat his diabetes. In the past, he took Humalog, Lantus, Apidra, and Toujeo. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for Humalog, Lantus, Apidra, and Toujeo.

### 39.     Utah Plaintiffs

### a.      Scott Christensen

215.    Plaintiff Scott Christensen is a citizen of the State of Utah and resides in Elk Ridge, Utah.

216.    Mr. Christensen has type 1 diabetes, and he currently alternates between Novolog and Humalog brand insulin to treat his diabetes. For a portion of 2016, Mr. Christensen's insurance provider did not cover his insulin medications, and he was forced to pay for his insulin out-of-pocket based on benchmark price. As a direct result of the scheme, Mr. Christensen overpaid for his Novolog and Humalog.

### b.      Dianna Gilmore

217.    Plaintiff Dianna Gilmore is a citizen of the State of Utah and resides in Spanish Fork, Utah.

218.    Ms. Gilmore has type 2 diabetes, and she currently takes Novolog and Toujeo brand insulin to treat her diabetes. In the past, she has taken Lantus, Levemir, and Humalog. Ms.

Gilmore is currently insured under Medicaid and Medicare Part A and B. In the past, Ms. Gilmore was uninsured and paid out-of-pocket for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Lantus, Levemir, Novolog, and Toujeo.

### 40.   Washington Plaintiffs

#### a.   Garett Johnson

219.    Plaintiff Garett Johnson is a citizen of the State of Washington and resides in Kent, Washington.

220.    Mr. Johnson purchases insulin on behalf of his spouse who has type 1 diabetes. She currently takes Novolog brand insulin to treat her diabetes, but, in the past, she took Humalog brand insulin. Mr. Johnson was previously insured in a high deductible health plan and paid for his spouse's insulin based on benchmark prices. As a direct result of the scheme, he has overpaid for Humalog and Novolog.

#### b.   Edward Stanford

221.    Plaintiff Edward Stanford is a citizen of the State of Washington and resides in Olympia, Washington.

222.    Mr. Stanford has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. He has a high deductible health plan and coinsurance requirement and pays for his insulin based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog.

#### c.   Richard Thomas

223.    Plaintiff Richard Thomas is a citizen of the State of Washington and resides in College Place, Washington.

224.    Mr. Thomas purchases insulin on behalf of his daughter who has type 1 diabetes. She currently takes Humalog brand insulin to treat her diabetes, but, in the past, she took

Novolog and Lantus brand insulin. Mr. Thomas has a high deductible health plan and coinsurance requirements and pays for his daughter's insulin based on benchmark prices. As a direct result of the scheme, he has overpaid for Humalog, Novolog, and Lantus.

**41.    Virginia Plaintiff**

      **a.    Michael Foster**

225.    Plaintiff Michael Foster is a citizen of the State of Virginia and resides in Sterling, Virginia.

226.    Mr. Foster has type 1 diabetes and currently purchases Tresiba and Humalog brand insulin to treat his diabetes. In the past, he purchased Lantus. In addition, he purchases Tresiba and Humalog brand insulin for his daughter who also has type 1 diabetes. He used to purchase Lantus for her as well. Mr. Foster has a high deductible insurance plan with high coinsurance rates. He pays for Humalog, pays for Tresiba, and paid for Lantus based on benchmark prices due to his deductible and coinsurance requirements. As a direct result of the scheme, he has overpaid for Humalog, Tresiba, and Lantus for both himself and his daughter's required insulin needs.

**42.    West Virginia Plaintiff**

      **a.    Natalie Sargent**

227.    Plaintiff Natalie Sargent is a citizen of the State of West Virginia and resides in Beaver, West Virginia.

228.    Ms. Sargent purchases insulin on behalf of her son, Jaron Bragg, who has type 1 diabetes. Her son currently takes Novolog and Tresiba brand insulin to treat his diabetes. In the past, he took Lantus and Humalog brand insulin. Ms. Sargent has an insurance plan with high coinsurance rates and must therefore pay for her son's insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Novolog, Humalog, and Lantus.

- 47 -

### 43.    Wisconsin Plaintiffs

#### a.    Scott Dercks

229.    Plaintiff Scott Dercks is a citizen of the State of Wisconsin and resides in Milwaukee, Wisconsin.

230.    Mr. Dercks has type 2 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. In the past, he also purchased Lantus. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

#### b.    Angela Kritselis

231.    Plaintiff Angela Kritselis is a citizen of the State of Wisconsin and resides in Grafton, Wisconsin.

232.    Ms. Kritselis has type 1 diabetes, and she currently takes Lantus and Humalog. In the past, she has also taken Novolog. Ms. Kritselis was uninsured until October 2017 and paid for Lantus, Novolog, and Humalog out-of-pocket based on benchmark prices. Her health savings account is dwindling away due to the high cost of insulin. As a direct result of the scheme, she has overpaid for Lantus, Novolog, and Humalog.

#### c.    Michael Starr

233.    Plaintiff Michael Starr is a citizen of the State of Wisconsin and resides in Pleasant Prairie, Wisconsin.

234.    Mr. Starr has type 2 diabetes, and he currently takes Levemir and Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and pays for insulin based on benchmark price due to his high coinsurance rates. As a direct result of the scheme, he has overpaid for both Levemir and Humalog.

235.    On information and belief, each plaintiff paid out-of-pocket for analog insulin and those payments were based on the artificially inflated benchmark prices. As a result, each plaintiff has been injured. With the exception of Mr. Hernandez, each plaintiff will continue to purchase analog insulin in the future.

**B.    Defendants**

236.    Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana. Eli Lilly's principal place of business is Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly manufactures Humalog and Basaglar, which are used for the treatment of diabetes. Lilly's revenues from Humalog in 2016 were $2.84 billion. Its revenues from Humalog were $1.5 billion in 2013 and $1.7 billion in 2015 and owe $10 billion during the class period.

237.    Defendant Novo Nordisk Inc. is a Delaware corporation and has a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536. Novo Nordisk manufactures Fiasp, Novolog, Levemir, and Tresiba, which are used for the treatment of diabetes. Novo Nordisk's revenues from the sale of Novolog were $3.03 billion in 2016, over $2 billion in 2014 and 2015, and over $10 billion during the class period. Revenues from Levemir were $955 million in 2013, $1.3 billion in 2014, and $1.3 billion in 2015. Sales to diabetic patients are such a critical part of Novo Nordisk's business that its 2015 Annual Report's cover page stated in bold letters, "*Why Do So Many People in Cities Get Diabetes?*".

238.    Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi manufactures Apidra, Lantus, and Toujeo, which are used for the treatment of diabetes. Sanofi's revenues from Lantus were $6.98 billion in 2016 and over $4 billion in each year since 2013 for a total of $24 billion during the class period. Sanofi's SEC Form 20-F for the year 2015 notes

that "Lantus is particularly important; it was the Group's leading product . . . representing 17.2% of . . . net sales . . . ."

## III.    JURISDICTION AND VENUE

239.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the plaintiffs' claims arise under federal law and under 18 U.S.C. § 1964(c): this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

240.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because each defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to this complaint took place within this district.

241.    The Court has personal jurisdiction over each defendant. Each defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    DRUG PRICING IN THE UNITED STATES

### A.    Entities Involved in Drug Pricing

242.    The prescription drug industry consists of an opaque network of entities, including pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health and welfare plans), pharmacy benefit managers, and patient-consumers.

243.    *Pharmaceutical Companies*. Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs. This remains true even if these companies contract out the actual production of their drugs. Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers. Critically, pharmaceutical companies set the prices of their drugs and those prices are the prices used to calculate payments made by consumers. The defendants here are pharmaceutical companies.

244.    *Wholesalers*. After production, the defendant manufacturers send their drugs to FDA-registered drug wholesalers for further distribution. Wholesalers purchase inventory and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.

245.    *Health benefit providers*. Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans. These plans submit payments on behalf of insured individuals to healthcare providers for services rendered to those individuals. Health insurers also cover a portion of their beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" includes public and private entities, the latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits.

- 51 -

246.   ***Pharmacy Benefit Managers***. Pharmacy benefit managers (PBMs) effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers. In this role, PBMs perform a variety of services on behalf of their health insurer clients, including the negotiation of drug prices with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services. Nonetheless, they generally are not a direct link in the physical supply chain for pharmaceutical products because, in most instances, they do not take possession or control of prescription drugs. The largest PBMs are CVS Health, Express Scripts, and OptumRx. Together, they cover roughly 80 to 85 percent of privately insured Americans.

## B.   The Drug Payment & Distribution Structure

247.   ***Distribution***. Generally speaking, for retail pharmacy channels, branded prescription drugs are distributed from manufacturer to wholesaler, wholesaler to retail pharmacy (or mail order), and retailer to patient.

248.   ***Downstream charges***. The downstream charges are from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of ingredient cost reimbursement and dispensing fees) and consumers (in the form of coinsurance, copayment, deductible payment, and/or cash).

249.   ***Upstream charges***. The upstream charges are from health benefit providers and/or PBMs directly back to the manufacturer. These upstream charges are price discounts the defendant drug manufacturers offer PBMs and their health insurer clients in the form of "rebates." They typically occur well after the point-of-sale transactions.

250.   The figure below illustrates this payment structure. This figure labels certain payments "payment" and others "negotiated payment." The term "payment" refers to individual payments, made at the time of delivery; for example, when a patient walks into a pharmacy and

picks up her prescription. At that moment, her health plan also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies. In contrast, a "negotiated payment" is a payment made under a negotiated contract. For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time. The figure also indicates the flow of products and rebates.

**Figure 3: The U.S. Drug Payment Structure[5]**



251.     When an insured consumer buys a medication from a pharmacy (a retailer), her insurer pays the pharmacy based on the price its PBM negotiated for that medication (the net price). In addition to her insurer's payment, the patient usually pays for a portion of the medication's cost, out-of-pocket. Importantly, the patient's payment is typically based on the benchmark price the *drug manufacturer* set for that drug.

---

[5] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

### C.       Benchmark pricing as a Basis for Reimbursement

252.       The prices for the drugs distributed in this chain are different for each
participating entity: different actors pay different prices for the same drugs. In this system, only a
drug's benchmark price—also known as its Average Wholesale Price (AWP) or the
mathematically-related Wholesale Acquisition Price (WAC)—is publicly available.

253.       The prescription drug industry is unusual in that there are stark differences in the
way patients pay for the products versus the ways institutions and health benefit providers pay
for the same products. The beneficiary of this industry's products (the patient) typically pays in
one of several predictable ways for a *single* product based on the manufacturer's published
benchmark price. First, in the case of coinsurance, consumers pay a pre-set percentage of the
point-of-sale transaction price. Second, in the case of cash transactions, consumers pay a usual
and customary price. And, third, in the case of deductibles, consumers pay a portion of the point-
of-sale transaction price. (Consumers might also pay a tiered or fixed copay). Consumer make
these payments at the *point-of-sale* only. In contrast, intermediaries and third-party payers
typically determine net costs for pharmaceuticals based on arrangements that apply to *hundreds
of products*. And these charges occur not only at the point-of-sale, but also during later, off-
invoice transactions.

254.       The use of price benchmarks to calculate and communicate reimbursement
payments reflects an efficient method by which to maintain the system's flexibility, minimize
uncertainty through predictable costs, maximize coverage in a cost-effective manner, and
provide a mechanism for competition among payers. Payers' reimbursement formulas will often
include a series of price benchmarks and payment caps. The price benchmarks used in payers'
formulas are commonly adjusted by a percentage that is contractually set (for commercial
payers) or established through regulatory procedures (for public payers). For example,

reimbursement could be determined based on the lower of the drug's (i) AWP – *x%*, (ii) WAC + *y%*, and (iii) payment cap.

255.    Despite multiple modifications to health insurers' reimbursement policies over time, the most commonly and continuously used set of reference prices in reimbursement and provider payment calculations and negotiations for retail channel drug transactions remains AWP. Crucially, AWP is the basis for plaintiffs' payments in this case.

256.    From an administrative perspective, AWP provides a logical starting point for the calculation and communication of reimbursement to various pharmacy providers for various drugs. Moreover, given the historical use of AWP by all industry participants, one cannot discount the significance of AWP's entrenchment in the complex and highly automated payment system that is used to process billions of payments. As such, it is widely used as a competitive benchmark and to estimate costs and revenues.

257.    This benchmark serves as the immovable reference point off of which PBMs and drug manufacturers negotiate price, i.e., the basis for reimbursement. As previously explained, PBMs create formularies for their health insurer clients, and those formularies significantly influence patients' drug purchasing behavior. Health insurers cover all or a portion of their members' drug costs based on whether and where drugs fall on their PBMs' formularies. Drug companies offer PBMs "rebates"—essentially discounts off benchmark prices—to influence the PBMs' formulary decisions.

258.    As explained in the following section, consumer payments are directly based on the manufacturers' benchmark prices.

**D.    Consumer Drug Costs**

259.    Pharmaceutical companies directly set the prices certain consumers pay by setting benchmark prices.

260.     When a consumer goes to a retail pharmacy (or the website of a mail order pharmacy) and requests to buy a drug, the pharmacy's computer system pulls up the benchmark price the *manufacturer* of that drug has set and published. This benchmark price is *not* determined by the pharmacy or the wholesaler that brought the drug to the pharmacy. Rather, the pharmacy's computer system taps into a database of benchmark prices that manufacturers have published. The pharmacy's search for the drug's benchmark price is akin to stock broker's search for the price of a stock; the pharmacy, like the broker, does not and cannot change or influence the benchmark price. It can only report that price to the consumer. The prices pharmacies charge consumers are directly computed based on the manufacturer's benchmark prices (e.g., the published list price less a small discount of, say, 15%).[6]

261.     Three principal types of consumers pay based on the benchmark prices that drug manufacturers—and drug manufacturers alone—set: (1) uninsured consumers; (2) consumers in high deductible plans; and (3) consumers with coinsurance obligations.

262.     ***Uninsured***. Uninsured consumers must pay the full, point-of-sale prices (based on benchmark prices) every time they pick up their prescriptions. Despite the Affordable Care Act's expansion of Medicaid coverage and establishment of Health Insurance Marketplaces, millions of people—28.5 million in 2015—remain without coverage. This uninsured population is especially concentrated in states that did not take the Medicaid expansion, where diabetes is prevalent. Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but could not afford it. The uninsured population may grow drastically in the next few years if cost-sharing reduction payments under the Affordable Care Act are discontinued.

---

[6] This complaint refers to this price as the full, point-of-sale price (based on benchmark price).

263.    The uninsured are not the only patients saddled with high out-of-pocket costs. Despite their monthly insurance premiums, insured consumers often pay a significant portion of a drug's benchmark price. Out-of-pocket costs for insured consumers come in three forms: deductibles, coinsurance requirements, and/or copayment requirements.

264.    ***High deductible Plans***. The term "deductible" refers to a set amount of healthcare cost an insured must shoulder (out-of-pocket) before her plan will begin to contribute to her healthcare costs. Although most health plans have some form of a deductible, high deductible health plans are aptly named for their larger-than-average deductibles. And while high deductible health plans usually boast lower premiums, they are nonetheless more onerous to patients and families that need expensive care on a regular basis. Insured individuals in high deductible plans are usually required to pay full, point-of-sale prices (based on benchmark prices) before they reach their deductibles.

265.    The past decade has witnessed a shift away from traditional health plans, which provide broader coverage, toward high deductible health plans. In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high deductible health plans, up from 17% in 2011. Although Preferred Provider Organizations (PPOs) are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs has fallen 10% over the last two years, while enrollment in high deductible health plans has increased by 8%. Figure 4 illustrates the rising trend in high deductible plans.

**Figure 4: Percentage of covered workers enrolled in high deductible health plans from 2006-2016.[7]**





*Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE:  Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

266.    Moreover, deductibles themselves have risen. The average annual deductible for

an individual enrolled in a high deductible plan was between $2,031 and $2,295 in 2016,

depending on the exact type of plan.[8] The average annual deductible for family coverage was

between $4,321 and $4,364 in 2016, again, depending on the type of plan.

267.    A recent Kaiser Family Foundation study found that 30% to 40% of U.S.

households with private coverage do not have enough liquid assets to pay the deductible required

by their health plan. Figure 5 below demonstrates this reality.

---

[7] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 3 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

[8] There are two primary types of high deductible health plans: high deductible plans with Health Reimbursement Arrangements and high deductible plans with Health Savings Accounts.

**Figure 5: Share of non-elderly households with liquid assets less than their deductibles among people with private health insurance.[9]**



268.    Overall, in the entire employer-based health plan marketplace, deductibles have risen 12% since 2015—four times faster than premiums increased in the same period. Among all individuals enrolled in employer health plans (both high deductible plans as well as others), the average deductible in 2016 was $1,478.

269.    The average deductible for individuals working at smaller firms was higher than that in larger firms ($2,069 v. $1,238 in 2016).

270.    Figure 6 shows the increase in health plans with a general annual deductible of $1,000 or more, broken down by firm size.

---

[9] Drew Altman, *The Biggest Health Issue We Aren't Debating*, Axios (Nov. 22, 2017), https://www.axios.com/the-biggest-health-issue-we-arent-debating-2511098849.html (graphic based on data from Matthew Rae, Gary Claxton, and Larry Levitt, *Do Health Plan Enrollees Have Enough Money to Pay Cost Sharing*, Kaiser Family Foundation (Nov. 23, 2017), https://www.kff.org/health-costs/issue-brief/do-health-plan-enrollees-have-enough-money-to-pay-cost-sharing/).

**Figure 6: Percentage of covered workers enrolled in a plan with a general annual deductible of $1000 or more for single coverage, by firm size, from 2006-2016.[10]**







\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

271.     The average deductibles for plans available under the Affordable Care Act on the Marketplace Exchanges are also high. The Marketplace health plans are broken into "metal" tiers: bronze, silver, gold, and platinum. The cheapest plans—bronze and silver—unsurprisingly come with very high deductibles. In 2016, the average deductibles in such plans were $5,765 for bronze plans (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

272.     High deductible plans are particularly hard on patients with chronic diseases: not only do patients living with chronic diseases, like diabetes, hit their deductibles year after year, but they hit their deductibles over a shorter period of time, resulting in significant financial burden at the start of each year. Individuals and families who do not have savings or access to

---

[10] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 4 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

credit often take less insulin than they are prescribed to spread their out-of-pocket payments over a longer period of time.

273. ***Coinsurance and Copayments***. In addition to their deductibles, individuals with insurance typically make copayments or coinsurance payments for the healthcare services they need. A copayment is a fixed or tiered fee that an individual must pay for a healthcare service at the time of care; for example, when she picks up a prescription. Copayment rates vary depending on the drug; usually drugs in preferred formulary positions have lower copays, and drugs in disfavored formulary positions require larger copays.

274. Coinsurance is similar. However, instead of paying a fixed or tiered fee for a particular service, individuals with coinsurance arrangements are required to pay a fixed *percentage* of the cost of the healthcare service provided. For drugs, this means a percentage of the plan's point-of-sale price, which is mathematically tied to the drug's *benchmark* price. This percentage can vary, with lower coinsurance rates for preferred drugs and higher coinsurance rates for disfavored drugs.

275. For those in high deductible health plans, copayments and coinsurance obligations begin after they reach their deductibles. Plans that cover prescription drugs right away, not requiring patients to reach deductibles first, usually require copayments or coinsurance contributions for every drug purchase.

276. For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, the average coinsurance rates in 2016 were 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs (fourth tier drugs are usually specialty medications, for diseases such as cancer, and are extremely expensive). Humalog, Basaglar, Levemir, Novolog, Fiasp, Tresiba, Lantus, Toujeo, and Apidra

are still branded drugs. Therefore, insurance plans generally classify them as second-tier or third-tier drugs on their formularies. As a result, coinsurance payments keyed to the benchmark prices of these medicines can be quite burdensome.

277.    Recently, health plans have been demanding higher and higher coinsurance contributions from patients. Table 1 shows this trend.

**Table 1: Rising Coinsurance Rates**

| Retail Coinsurance Payment | | | |
|---|---|---|---|
| | T2 Brand | T3 Brand | Flat |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

278.    Overall, out-of-pocket spending for prescription drugs has shifted away from copayments toward deductibles and coinsurance spending over the past decade. In 2014, patients paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to just 4% in 2004. Similarly, patients paid for 20% of their out-of-pocket drug expenses through coinsurance in 2014, compared to just 3% in 2004.

279.    ***Medicare Part D***. Finally, patients in Medicare Part D plans—Medicare's prescription drug program—often pay a large portion of their drugs' benchmark prices. In 2017, the Medicare Part D standard prescription drug plan had a $400 deductible and a 25%

- 62 -

coinsurance obligation up to an initial coverage limit of $3,700. This meant patients in Medicare

Part D plans paid full, point-of-sale prices (based on benchmark price) until they spent $400.

After they hit this deductible, they paid 25% of their drugs' point-of-sale prices (based on

benchmark prices) until they, together with their plans, spent $3,700 on drugs. Once Part D

patients met this $3,700 coverage limit, they fell into the Coverage Gap, more commonly known

as the "Donut Hole." In the Donut Hole, they were required to pay 40% of their brand-name

drugs' point-of-sale prices. Only once the patients' total out-of-pocket spending (both before and

in the Donut Hole) reached $4,950 did their Medicare Part D plans begin to shoulder 95% of

their healthcare costs again. Figure 7 demonstrates patient cost-sharing in the standard Medicare

Part D plan for 2017.

**Figure 7: The standard Medicare prescription drug benefit in 2017.**[11]



NOTE: Some amounts rounded to nearest dollar. ¹Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.



## E.   Impact on Consumers

280.   The defendants and their collaborators have exploited the drug pricing and

payment system, forcing patient consumers to pay drastically higher prices for analog insulins

than their insurers (if they have insurance). If a patient is uninsured, she is required to pay *full*,

*point-of-sale prices* (based on benchmark prices); if a patient is responsible for all of her drugs'

costs before she hits her deductible, she is required to pay *full*, *point-of-sale prices* (based on

benchmark prices) until she meets her deductible; if a patient pays coinsurance, she pays for a

percentage of her drugs' *point-of-sale prices* (based on benchmark prices); if the patient is in a

_____

[11] *The Medicare Part D Prescription Drug Benefit*, The Kaiser Family Foundation 6 (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

Medicare Part D plan, she pays based on benchmark price before she meet her deductible, and then pays between 25% and 40% of *point-of-sale prices* (based on benchmark prices).

281.    An example helps illustrate this structure. A woman with diabetes needs to purchase a box of insulin pens. She goes to her local retail pharmacy, where the pharmacist tells her the box's benchmark price is $450. She has health insurance through her employer. Her plan requires her to pay a $2,000 deductible and then 30% coinsurance after she hits her deductible. If she has not yet reached her deductible, she pays $382.50 (benchmark price (AWP) minus 15%, i.e., the point-of-sale price) for the box of insulin. If she has reached her deductible (paid $2,000 in health care costs), she pays $114.75 (382.50 x .3) for the box. The consumer believes her insurer paid the remaining $276.75. But it has not. In fact, in a transaction concealed from the patient, the drug manufacturer has paid an undisclosed amount of money back to the PBM. The PBM then paid a portion of this "rebate" to its insurer client. Thus, the net price of this insulin to the consumer's insurer is much lower than the price she paid.

282.    In the case of insulin, the defendants' publicly-reported benchmark prices, used for consumer transactions, has climbed further and further away from the net prices that institutional payers pay. The net prices of analog insulins to PBMs and insurers are much lower: 35%, 40%, or even 50% lower than benchmark prices.

283.    Taking the above example one step further: the manufacturer's publicly-reported benchmark price is $450, but its secret net price to PBMs is $229.50 (AWP minus 15%, less a 40% "rebate"). As a result, when the consumer paid $382.50 for the box during her deductible period, she really paid 166% of the net price ($382.50 divided by $229.50). And when she paid $114.75 for her 30% coinsurance, she really paid 50% coinsurance ($114.75 divided by $229.50).

F.      **Drug Manufacturer Manipulation of PBM Incentives**

284.    PBMs turn a profit in two primary ways relevant here: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, PBMs take a cut of the drug price discounts they negotiate with drug companies (with the rest passed on to their health insurer clients). The manufacturers' "rebate" arrangements are meant to create an incentive for PBMs to negotiate lower *real* drug prices. But the manufacturers know that this business model can be manipulated such that PBMs no longer have an incentive to control costs.

285.    PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, i.e., when a drug "goes generic." But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar efficacy and risk profiles. That is the case with the analog insulins. In such a scenario, the drug companies should compete for formulary access by lowering their real prices.

286.    But the defendants have found a way to game this system. As the defendants have realized, the spread between real and benchmark price can be enlarged by *raising benchmark prices* while holding *net prices constant*. In exchange for this spread enlargement, the PBMs agree with the manufacturer, either explicitly or implicitly, to favor, or at least not disfavor, the drug with the most elevated benchmark price. The defendants know that when they increase the benchmark prices of their insulins, the PBMs can earn substantially greater revenues so long as net prices remain constant.

287.    The perverse, reverse incentives for larger benchmark prices (and consequent consumer overpayments) was described in a recent report on the drug industry:

At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher benchmark price increases than would otherwise occur, particularly on the eve of a general election. Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [benchmark price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid benchmark price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of benchmark price inflation at least as high, and ideally just a bit higher, than peers'. Durable benchmark price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher benchmark prices directly impact consumers who have not yet met their deductibles.[12]

288.     This is not the first time manipulation of the spread between benchmark and real prices has been the subject of large-scale litigation. In *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the District Court for the District of Massachusetts certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher, engaged in a scheme to inflate the benchmark prices of brand name drugs. McKesson asserted that a class could not be certified because the PBMs had become aware of the phony increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for its health insurer clients. However, part of the evidence the district court relied upon in rejecting this argument was evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of consumers and health insurers:

Because these PBMs benefited from the increased [benchmark price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [third party payers] of the inflated AWP, let alone fiercely compete to mitigate any damage. As proof, Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being

---

[12] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[13]

289.    Just so, the defendants here have used the phony benchmark prices to their advantage. They use the spread between prices to provide kickbacks to PBMs in exchange for formulary status. Indeed, as the District Court for the District of Massachusetts explained, rebates are really "direct kickbacks," disguised as market-share discounts and rebates."[14] This "rebate" scheme enables the defendants to maintain preferred formulary positions without reducing their net prices.

290.    And the PBMs benefit from the larger spreads. The PBMs boast of the "increased rebates" they have achieved, when, in reality, the "discounts" they have obtained are simply reductions off artificially-inflated benchmark prices. In other words, these "discounts" are not discounts at all.

291.    The losers in this scheme are analog insulin consumers. When the defendants publish fraudulent benchmark prices so that they can offer PBMs larger spreads, they harm: uninsured patients, insured consumers in high deductible plans, insured consumers paying coinsurance, and insured consumers in Medicare Part D plans, especially those who reach the Donut Hole, all whom pay for analog insulin based on the defendants' *benchmark* prices.

---

[13] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

[14] *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

## V.      ANALOG INSULIN

### A.      Diabetes: The Disease and Demographics

292.      Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with diagnosed diabetes. Over 30 million people, 9.4% of the country, live with diabetes. A life-threatening disease, many of those living with diabetes rely on daily insulin treatments to survive. Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days. Diabetic ketoacidosis is responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[15]

293.      The number of Americans who live with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over 10 million. Just 14 years later, the head count tripled again. Now over 30 million people—9.4% of the country—live with the disease. And this trend does not appear to be slowing: 86 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes.

294.      Diabetes occurs when a person has too much glucose—sugar—in their blood stream. Normally, the human body breaks down ingested food into glucose, which in turn feeds

---

[15] Abbas E. Kitabchi, et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 Diabetes Care 1335, 1335 (2009).

cells and enables them to function. In this process, insulin functions as a key, opening the cells and permitting glucose to enter. A lack of insulin or responsiveness to insulin causes the process to break down. Glucose is unable to enter the cells, which leads to high blood sugar levels. Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

295.    There are two basic types of diabetes. Roughly 90-95% of Americans living with diabetes developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term. To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce. About a quarter of type 2 patients rely on insulin treatment.

296.    Type 1 diabetes occurs when a patient completely ceases insulin production. This form of diabetes is usually diagnosed in children and young adults, but can occur at any age. In contrast to type 2 patients, people with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die. Individuals living with type 1 must rely on insulin treatments from the point of diagnosis until death.

297.    If left untreated or under-treated, diabetes can become a debilitating and deadly disease. Indeed, it remains the seventh leading cause of death in the United States despite the availability of effective treatment. People with diabetes are almost twice as likely to have heart disease or a heart attack and one and one-half times more likely to have a stroke as those without the disease. Chronic kidney disease and failure is also much more common among those with

diabetes. Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections and even amputations. Finally, the disease is the leading cause of blindness.

298.    The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos and Pacific Islanders. For example, Native Americans are 420% more likely to die from diabetes-related causes of death than other Americans. With decreased access to nutritious food sources and fitness options, low-income individuals are at a greater risk of obesity and, correspondingly, diabetes. These same demographic groups also account for a disproportionate share of the uninsured.

## B.    The Origins of Insulin Treatment

299.    Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the harmful symptoms and health complications associated with the disease are entirely avoidable. And what's more, unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

300.    In 1922, two men pioneered a technique for removing active insulin from an animal pancreas that could then be used to treat human patients with diabetes.

301.    A "widely celebrated tale of biomedical serendipity,"[16] this breakthrough is revered for two reasons. First, the duo that discovered how to extract insulin for patient treatment was an unlikely pair: a young orthopedic surgeon without laboratory training, Frederick Banting, and his medical-student assistant, Charles Best. Second, neither Banting nor Best applied for a patent on their game-changing innovation because they wanted to ensure their discovery

---

[16] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

remained open to the public, available to all. This decision offers a sad commentary on the state of the current pharmaceutical industry.

302.     Ironically, Banting and Best eventually ended up applying for a patent to guarantee access: Banting and Best realized that if they did not patent their drug, someone else would. To prevent others from obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 each. As they wrote to the University's president, the patent was a form of publication: "When the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[17]

303.     After selling their patent to the University of Toronto, university researchers attempted to manufacture insulin on campus. However, they quickly realized they lacked the facilities necessary to meet the demand. Therefore, to scale production, the University of Toronto teamed up with Eli Lilly, "an established pharmaceutical company with experience producing glandular extracts."[18] Under this arrangement, Eli Lilly was allowed to apply for U.S. patents on any improvements to the manufacturing process. In addition to their contract with Eli Lilly, the Toronto team licensed the rights to produce insulin to a few other companies, including Denmark's Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium.[19] Those initial licenses laid the groundwork for Eli Lilly and Nordisk's future domination over the sale of insulin products.

---

[17] M. Bliss, *The Discovery of Insulin* (2013).

[18] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[19] Nordisk and Novo merged in 1989 to form Novo Nordisk.

304.    Although the Toronto team's early iteration of insulin was immediately perceived as "a lifesaving drug of vast clinical public health significance,"[20] subsequent research led to further improvements in the drug's efficacy. The original animal insulin isolated by the Toronto team was short acting—it only had an effect on patient blood sugar levels for three to six hours. In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin altered its absorption into the blood stream, prolonging its effect. This form of insulin became known as long-acting. A subsequent innovation in 1946—the addition of zinc to form the crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH)— made it possible to combine long-acting and rapid-acting insulin. This advance allowed many diabetes patients to take a single daily injection. Soon afterward, a method for prolonging the action of insulin without adding protamine was discovered. These developments offered new options for the dosing of insulin. But they also extended the reach of insulin patents into the 1970s.

305.    When the animal-based insulin patents finally began to expire, researchers took another step forward in the development of insulin technology. In the late 1970s, scientists began to produce human insulin through recombinant technology. By 1982, Eli Lilly brought the first recombinant human insulins—Humulin R (regular) and N (NPH)—to the U.S. marketplace. Around the same time, Novo and Nordisk developed methods for chemically converting bovine insulin into human insulin. In 1988, a year prior to merging, Novo and Nordisk obtained approval for their own recombinant insulin. This innovation allowed them to continue shared

---

[20] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172 (2015).

domination over insulin sales with Eli Lilly. It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin patents, promising to stretch into the 21st century.

306.    After the introduction of human insulin, an improved understanding of the human genetic code and recombinant technology put a third insulin development within reach. In the mid-1980s, scientists began to modify the molecular structure of insulin, attempting to improve its physiological effects. By 1996, Eli Lilly had obtained approval for Humalog (generic name, insulin lispro), the first rapid-acting, man-made insulin. This new type of insulin—known as an analog—allowed for faster absorption times. Never far behind, Novo Nordisk released its own rapid-acting analog, Novolog (generic name, insulin aspart), in 2000. Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra (generic name, insulin glulisine).

307.    The same technological advances that brought about rapid-acting analogs gave rise to long-acting analogs. In 2000, Sanofi released the first long-acting analog. This drug was branded as Lantus (generic name, insulin glargine). Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir (generic name, insulin detemir). The first patents on these long-acting analogs expired in June 2014, nearly a century after Banting and Best's first patent application in 1923.

308.    In February 2015, Sanofi launched a higher dosage of insulin glargine, branded as Toujeo (generic name, insulin glargine). In September 2015, Novo Nordisk released a fourth type of long-acting insulin called Tresiba (generic name, insulin degludec). In December 2016,

Eli Lilly released its own version of insulin glargine, branded as Basaglar (generic name, insulin glargine). Basaglar is a follow-on product to Lantus.[21]

309.     In September 2017, the Novo Nordisk released a fourth rapid-acting insulin called Fiasp (generic name, insulin aspart). Fiasp is a slightly modified version of Novolog. Table 2 summarizes the current insulin treatment landscape.

---

[21] It is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's (FDCA) Abbreviated New Drug Application pathway—the normal pathway to generic entry—for approval. Instead, Basaglar was approved through a different FDCA pathway as a follow-on medication.

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | Benchmark Price (AWP) |
| Human | Rapid-acting | Humulin R | Insulin Regular | Eli Lilly | 1982 | $185.88 (vial[i]) |
| | | Novolin R | Insulin Regular | Novo Nordisk | 1991 | $172.13 (vial[ii]) |
| | Intermediate | Humulin N | Insulin Suspension Isophane (NPH) | Eli Lilly | 1982 | $185.88 (vial[iii]) |
| | | Novolin N | Insulin Suspension Isophane (NPH) | Novo Nordisk | 1991 | $172.13 (vial[iv]) |
| Analogs | Rapid-Acting | Humalog | Lispro | Eli Lilly | 1996 | $663.00 (pen[v]) $343.38 (vial[vi]) |
| | | Novolog | Aspart | Novo Nordisk | 2000 | $698.54 (pen[vii]) $361.70 (vial[viii]) |
| | | Apidra | Glulisine | Sanofi | 2004 | $651.76 (pen[ix]) $337.39 (vial[x]) |
| | | Fiasp | Aspart | Novo Nordisk | 2017 | $698.54 (pen[xi]) $361.70 (vial[xii]) |
| | Long-Acting | Lantus | Glargine | Sanofi | 2000 | $505.36 (pen[xiii]) $336.93 (vial[xiv]) |
| | | Levemir | Detemir | Novo Nordisk | 2005 | $504.38 (FlexTouch[xv]) $367.19 (vial[xvi]) |
| | | Basaglar | Glargine | Eli Lilly | 2016 | $407.95 (pen[xvii]) |
| | | Toujeo | Glargine | Sanofi | 2015 | $775.71(pen[xviii]) |
| | | Tresiba | Insulin Degludec | Novo Nordisk | 2016 | $745.53 (pen[xix]) |

---

[i] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[ii] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[iii] Humulin N 100unit/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[iv] Novolin N 100units/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[v] Humalog KwikPen 100unit/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

[vi] Humalog 100unit/ml Cartridge Solution for Injection (box, 5 cartridges, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

[vii] Novolog FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[viii] Novolog 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[ix] Apidra SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018).

[x] Apidra 100unit/ml Solution for Injection (vial, 10 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018).

[xi] Fiasp FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[xii] Fiasp 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[xiii] Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

[xiv] Lantus 100units/mL Solution for Injection (vial, 10 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

[xv] Levemir FlexTouch 100units/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2016).

[xvi] Levemir 100units/ml Solution for Injection (vial, 10 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2018).

[xvii] Basaglar KwikPen 100units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2017).

[xviii] Toujeo SoloStar 300units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 1.5 ml Insulin Glargine 300U/1mL, Solution for injection) (2018).

[xix] Tresiba Insulin Degludec 200units/mL Pre-Filled Pen Solution for Injection (box, 3 pens, 3 ml Insulin Glargine 200U/1mL, Solution for injection) (2018).

## C.     Current Insulin Treatment Landscape

310.    Today, analogs dominate insulin sales. Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas. As a result, it can be used in more flexible ways.

311.    The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

312.    For type 1 patients, insulin analogs are unquestionably the best course of treatment. Doctors uniformly prescribe analogs for type 1 patients.

313.    For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin regimen."[22] Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

314.    But doctors still prefer to prescribe analog insulins to type 2 patients. A recent study found that as of 2010, among adults who filled prescriptions for more than one brand of insulin, 91.5% filled prescriptions for insulin analogs. The study found that percentage has grown considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin. Now, type 2 patients use human insulin less frequently: the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.

---

[22] American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/S52?ijkey=07291605370b 0a3e07418e06fb5e894fb4314f05&keytype2=tf_ipsecsha.

**Figure 8: Type of insulin used among U.S. adults with type 2 diabetes
(who filled more than one prescription).[23]**



315.    In 2016, the top three selling insulins were all analogs: Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and Eli Lilly's rapid-acting Humalog: $2.84 billion.

**D.    Climbing Insulin Benchmark Prices**

316.    Despite the availability of many highly effective insulins, too many people living with diabetes go without proper treatment for a familiar reason: cost.

317.    Eli Lilly raised the benchmark prices (AWP) of Humalog to $663.00 for a package of pens and $343.38 for a box of cartridges by the end of 2017. Eli Lilly also raised the

---

[23] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

benchmark prices of Basaglar to $407.95 for a package of pens by the end of 2017. Figure 9 demonstrates Eli Lilly's price increases from 2006 to 2019 for Humalog, and Figure 10 illustrates Eli Lilly's price increases for Basaglar.

**Figure 9: Rising benchmark prices of Humalog vials and pens from 2006-2019.**



**Figure 10: Rising benchmark prices of Basaglar pens from 2016-2019.**



318.    Novo Nordisk's benchmark prices (AWP) for Levemir were $504.38 for a package of pens at the end of 2017 and $367.19 for a vial at the end of 2018. Novo Nordisk's benchmark prices for Novolog sat at $698.54 for a package of pens and $361.70 for a vial at the end of 2018. Novo Nordisk's benchmark prices for Fiasp also sat at $698.54 for a package of pens and $361.70 for a vial at the end of 2018. Novo Nordisk's benchmark price for Tresiba was $745.53 for a package of pens at the end of 2018. Most diabetes patients need at least one package of insulin per month. Figures 11 and 12 demonstrate Novo Nordisk's price increases from 2006 to 2019 for Levemir and Novolog. And Figures 13 and 14 show Novo Nordisk's benchmark price increases for Tresiba and Fiasp.

**Figure 11: Rising benchmark prices of Levemir vials and pens from 2006-2019.**



**Figure 12: Rising benchmark prices of Novolog vials and pens from 2006-2019.**



**Figure 13: Rising benchmark prices of Tresiba pens from 2015-2019.**



**Figure 14: Rising benchmark prices of Fiasp pens from 2017-2019.**



319.     Sanofi's benchmark prices for Lantus, the top-selling analog insulin, sat at $505.36 for a package of pens and $336.93 for a vial at the end of 2018. Sanofi's benchmark prices for Apidra were $651.76 for a package of pens and $337.39 for a vial at the end of 2018. Sanofi's benchmark price for Toujeo was $775.71 for a package of Toujeo pens at the end of 2018. Figures 15 and 16 demonstrate Sanofi's price increases from 2006 to 2019 for Lantus and Apidra vial and pen packages. Figure 17 demonstrates Sanofi's benchmark prices increases for Toujeo.

**Figure 15: Rising benchmark prices of Lantus vials and pens from 2006-2019.**



**Figure 16: Rising benchmark prices of Apidra vials and pens from 2006-2019.**



**Figure 17: Rising benchmark prices of Toujeo pens from 2015-2019.**



320.    The benchmark prices of insulin analogs have not always been so high. In just the

last five years, Sanofi and Novo Nordisk have raised Lantus's and Levemir's reported prices an

astounding 168% and 169%, respectively. In fact, in 2016, Novo Nordisk and Sanofi were

responsible for the highest drug benchmark price increases in the *entire pharmaceutical industry*.

This distinction largely reflected their price hikes for Lantus and Levemir. Figure 18 shows Eli

Lilly, Novo Nordisk, and Sanofi's exponential benchmark price hikes from 2000 to 2015.

**Figure 18: Rising insulin benchmark prices from 2000-2015.[24]**



321.    Eli Lilly, Novo Nordisk, and Sanofi have not only dramatically increased their

insulins' benchmark prices in the last 10 years, they have done so in perfect lock-step. In thirteen

instances since 2009, Sanofi and Novo Nordisk raised the benchmark prices of their long-acting

analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the

---

[24] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

decimal point within a few days of each other."[25] As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[26] Eli Lilly, Novo Nordisk, and Sanofi have engaged in the same lock-step behavior with respect to their rapid-acting analog insulins, Humalog, Novolog, and Apidra, respectively. Figures 19 and 20 demonstrate this seemingly collusive behavior with respect to Lantus and Levemir, with the entry of Eli Lilly's Basaglar, Novo Nordisk's Tresiba, and Sanofi's Toujeo noted as well. Figures 21 and 22 demonstrate this behavior with respect to Novolog, Fiasp, Humalog, and Apidra.

---

[25] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015).

[26] *Id*.

**Figure 19: Rising benchmark prices of long-acting insulins from 2006-2019.**



**Figure 20: Rising Lantus and Levemir benchmark prices from 2001-2015.**



**Figure 21: Rising benchmark prices of rapid-acting insulin from 2006-2019.**



**Figure 22: Rising Humalog and Novolog benchmark prices from 1996-2016.**



**E.**    **Eli Lilly, Novo Nordisk, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status.**

322.    In the past, Novo Nordisk maintained that its price increases reflected the "clinical benefit" of its drugs.[27] But Levemir and Novolog are the exact same drugs they were 10 years ago—the clinical benefits of these medications have not changed. Where clinical benefit has not changed, it cannot be used to justify a 169% price increase. Therefore, another factor motivates these benchmark price increases.

_____

[27] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

323.    The real reason Eli Lilly, Novo Nordisk, and Sanofi have increased their benchmark prices is because these firms choose to compete based on hidden rebates to PBMs rather than transparent prices for all. PBMs control the formularies that determine whether people living with diabetes will purchase Eli Lilly, Novo Nordisk, and Sanofi's analog insulins. The defendants have realized that they can manipulate the PBMs' formulary choices by artificially inflating their benchmark prices, rather than lowering net prices.

324.    Under pressure to explain its rising benchmark prices, Novo Nordisk admitted to this behavior in a press release. On November 30, 2016, Novo Nordisk stated:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "[benchmark] price" increases we've made over the last decade. In other words, a [benchmark] price increase by **XX percent leads to an automatic XX percent profit** for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "[benchmark] price" and have full accountability for those increases. However, after we set the [benchmark] price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[28]

Explaining the company's benchmark price increases, Novo Nordisk directly admitted that it "set[s] [benchmark] price" with an eye to achieving "preferred" formulary status.

325.    For over a decade, Novo Nordisk has steeply raised the benchmark prices of Levemir and Novolog while keeping the net prices of these medicines constant. Figures 23 and 24 (included in Novo Nordisk's press release) illustrate this conduct.

---

[28] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

**Figure 23: Real versus Benchmark Prices of Novolog Vials[29]**



**Figure 24: Real versus Benchmark Prices of Novolog FlexPens[30]**



---

[29] *Id.*

[30] *Id.* The FlexPen is a type of insulin injection. Patients who use this pen stick themselves with a pen-like insulin distributor instead of injecting insulin through a pump or syringe.

326. Lilly, too, has admitted that it raises benchmark prices as a *quid pro quo* for formulary positions: "The reason drugmakers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[31]

327. Sanofi has also conceded its participation in this benchmark price inflation scheme:

> [S]ince 2014, we have increased the level of rebates granted for Lantus® in order to maintain favorable formulary positions with key payers in the US.[32]

328. Sanofi's manipulation of its spreads is visible in Figure 25.

**Figure 25: Real versus Benchmark Price of Lantus**



---

[31] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

[32] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2016).

329.    Eli Lilly's, Novo Nordisk's, and Sanofi's spread-increasing behavior is also visible from data on these companies' "rebates" to PBMs and insurers.

330.    The two figures below illustrate Eli Lilly's "rebates" from 2007 to 2014. Figures 26 and 27 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 26:**
**Eli Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



Source: Company data, Credit Suisse estimates

**Figure 27:**
**Eli Lilly's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



Source: Company data, Credit Suisse estimates

    331.    Novo Nordisk has also greatly increased its spreads. Figures 28 and 29 show the amount Novo Nordisk has increased its rebates (spreads) from 2007 to 2014.

**Figure 28: Novo Nordisk's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



**Figure 29: Novo Nordisk's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



332.    Finally, Sanofi has greatly increased its spreads. Figures 30 and 31 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 30: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



Source: Company data, Credit Suisse estimates

**Figure 31: Sanofi's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



Source: Company data, Credit Suisse estimates

333.    Sanofi and Novo Nordisk have stretched the spreads on their analog insulin medications to the point where they have become the second and third largest rebators in the entire pharmaceutical industry.

334.    Although the Defendants Drug Manufacturers claim they "need" to inflate their benchmark prices to obtain formulary status, this explanation omits a crucial detail. Drug companies could compete for formulary status in a manner that would help consumers: *they could significantly lower their real prices, instead of inflating their benchmark prices*. Yet, the insulin manufacturers refuse to significantly lower their net prices. And the PBMs continue to accept the manufacturers' benchmark-raising behavior so long as net prices stay constant.

**F.    The Defendant Drug Manufacturers' benchmark price inflation deceived and harmed the plaintiffs and class members.**

335.    The defendants' false benchmark prices have deceived the plaintiffs and class members. During the class period, the vast majority of plaintiffs and class members had no idea that the benchmark prices they struggled to afford were not only different from the prices PBMs and insurers receive, but actually trend in an *entirely different direction*.

336.    As the defendants' benchmark prices soared further and further away from their net prices, these benchmark prices became so misrepresentative, so untethered from their true average prices as to be fraudulent.

337.    During the class period, Eli Lilly, Novo Nordisk, and Sanofi deliberately and intentionally published benchmark prices for the analog insulins that did not reflect the actual, market prices of the drugs. Instead, these benchmark prices were fabricated overstatements; inflations designed to create net-to-benchmark price spreads that the defendants could market to PBMs in exchange for formulary status.

338.    The Defendant Drug Manufacturers concealed their analog insulins' net prices and prevented the plaintiffs and class members from knowing what these prices were to ensure the PBMs could and would benefit from the spreads between the net and benchmark prices. Put another way, the defendants' publication of their benchmark prices, while concealing their net prices, is the basis for the *quid pro quo* with the PBMs. If consumers did not understand benchmark prices as reasonable approximations of the cost of their analog insulins—as reasonable bases for their cost-sharing obligations—PBMs and health insurers would not be able to use the defendants' benchmark prices as a basis for consumer cost-sharing. If the PBMs could not use these benchmark prices as a basis for reimbursement, the spreads between benchmark and net prices would evaporate. Without spreads to sell, the Defendant Drug Manufacturers would have nothing to offer PBMs in exchange for preferred formulary status except lower real prices.

339.    Instead, the defendants' spread schemes enabled them to offer something of value to the PBMs (large spreads on which to make profits) in exchange for preferred formulary status. If the defendants did not have these spreads to offer, they would have been forced to compete for preferred formulary status through lower prices. Put simply, without the fraudulent spread schemes, the defendants would have competed for PBM business the way competitors do in healthy markets: by lower real prices. Such competition would have benefited the plaintiffs and class members greatly. But instead of competing on real price, each defendant competed on spread.

340.    To do so, the defendants closely guarded their pricing structures and sales figures for their analog insulins. Each Defendant Drug Manufacturer kept secret the net prices it offered to the three largest PBMs.

341.    Each defendant also concealed its fraudulent conduct by signing confidentiality agreements with those in the supply chain that knew the net prices.

342.    Each defendant's efforts to conceal its pricing structures for the analog insulins is evidence that it knew that its conduct was fraudulent.

343.    In sum, each defendant concealed that: (i) its benchmark prices were fraudulently-inflated, (ii) it was manipulating the benchmark prices of its analog insulins, and (iii) the benchmark prices bore no relationship to the prices paid for, or the pricing structure of, the analog insulins as they were sold to PBMs.

344.    The defendants' publication of their benchmark prices, combined with their concealment of their net prices, deceived the plaintiffs and class members into believing that the analog insulins' benchmark prices were reasonably related or close to the drugs' true prices.

345.    The plaintiffs relied on the defendants' representations regarding their benchmark prices and paid for their analog insulins based on these fraudulent benchmark prices to their detriment. The plaintiffs, unaware of the true facts about the pricing of the analog insulins, continue to pay for the analog insulins based on their benchmark prices, the only price truly available to them.

346.    As a result of the Defendant Drug Manufacturers' deceptive, unfair, and unconscionable conduct, the plaintiffs and members of the class have overpaid for their analog insulins when they pay for these medications based on their benchmark prices. As previously explained, the defendants' benchmark price inflation harms the plaintiffs and class members. People living with diabetes who are uninsured, who are in high deductible plans, who have high coinsurance rates, and/or who are in Medicare Part D plans must pay for their analog insulins based on the defendants' fictitious *benchmark* prices. No other entity in the drug supply chain

sets these benchmark prices and no other entity in the supply chain has the ability to change these benchmark prices, on which consumer payments are directly based. The amount the plaintiffs and class members have overpaid is the difference between the drugs' point-of-sale prices and a reasonable approximation of the drugs' net prices.

347.     Currently, 150 million Americans get healthcare insurance through their employers. Increasingly, individuals within this group are unable to afford their prescribed insulins due to the cost-sharing obligations their health plans impose. A 2014 study found that among patients with commercial insurance, out-of-pocket costs for people with type 2 diabetes rose a staggering 89% from 2000 to 2010.

348.     In fact, patients with endocrine disorders, such as diabetes, are more likely to shoulder out-of-pocket costs in excess of $1,000 than patients *in any other disease class*. As Figure 32 illustrates, 70% of people with endocrine disorders have out-of-pocket drug spending at or above $1,000.

**Figure 32: Conditions that are more likely to lead to high out-of-pocket spending.**



349.     The increasing number of patients with high deductible plans and coinsurance obligations, together with the rise in coinsurance rates, has made the pain associated with the analog insulin price hikes particularly acute. Although insulin has been available for over 100 years, Eli Lilly, Novo Nordisk, and Sanofi's price hikes are now making it harder than ever to obtain.[33]

_____

[33] The Affordable Care Act sets a limit for patient out-of-pocket spending. For 2017, the Affordable Care Act has capped out-of-pocket costs at $7,150 for an individual plan and $14,300

350.    The Defendant Drug Manufacturers' pattern of fraudulent conduct in artificially inflating the benchmark prices of the analog insulins directly and proximately caused plaintiffs and the members of the class to substantially overpay for those drugs.

351.    The plaintiffs were diligent in pursuing an investigation of the claims asserted in this Second Amended Complaint. Through no fault of their own, they did not receive inquiry notice nor learn of the factual basis for their claims in this complaint and the injuries suffered therefrom until recently.

## G.    The Health Impact of Artificial Pricing

352.    For many plaintiffs and class members, the defendants' artificial price inflation has cost them their health, financial stability, and emotional wellbeing. Unable to afford the defendants' price increases, many plaintiffs have begun to engage in highly risky behaviors with respect to their disease. Plaintiffs report under-dosing their insulin, skipping their refills, injecting expired insulin, re-using needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, foregoing one or even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness. Multiple plaintiffs have lost their vision as a result of their inability to consistently afford insulin. Others have experienced loss of kidney function, and have had to have kidney transplants. Ineffective control of blood sugar can also cause sustained hyperglycemia and, in severe cases, diabetic ketoacidosis—a life-threatening condition. Many plaintiffs describe multiple trips to emergency rooms for diabetic ketoacidosis. Other plaintiffs explain that their

---

for family plans. Nevertheless, for many low income and middle-income individuals and families, these ceilings provide little relief—many cannot afford to hit them.

insulin costs have left them unable to afford the healthy diets they should be maintaining. Too many plaintiffs re-use needles and pen tips to cut back on their diabetes costs. This practice is dangerous as it can cause infection. Others attempt to lower their costs by skipping the glucose testing they should be doing prior to injecting insulin. Foregoing glucose testing can lead to under- or over-dosing insulin. While analog insulin should be improving the health of plaintiffs, the defendants' price hikes have had the opposite effect.

353.    The toll of the defendants' price hikes is not just physical: the high cost of insulin causes serious financial difficulty and emotional stress. Multiple class members spend over 50% of their income on their insulin supplies. Plaintiffs describe going into debt, taking out loans, moving back in with their parents, and quitting school to pay for their insulin. Multiple plaintiffs state that they keep the heat low—even in the dead of winter—so they can afford insulin. Parents of children with diabetes describe the anguish of not being able to afford pre-kindergarten and other educational services for their children due to their insulin costs. They say that the cost of insulin is a huge stress in their children's lives, as these young patients realize the financial strain their disease puts on their families. As one plaintiff, whose son has type 1 diabetes, explained:

> As a mom, of course I would sacrifice anything for my child, so over the years, we have had to learn to adjust to living around the cost of insulin. [My son] and his sisters live at home and commute to a nearby college instead of being able to go off to college, . . . all with keeping in mind that we all need to learn a lifestyle of constantly fearing the cost to keep [my son] going, as this is a lifelong disease. However, the most immediate financial consequence came that very first month of diagnosis when we had not budgeted for a sudden increase in our bills. So when [we were] suddenly hit with an extra expense for insulin, the first thing to go was the youngest sibling's pending preschool tuition. This cost was the easiest to cut financially, but not mentally/emotionally. We could not cut our other bills (mortgage, utilities, etc.) much more, so my youngest child has forgone her early childhood education. It makes me feel like a horrible mother to admit, but that was our panic response to save ourselves from going into more debt. We are a family that . . . works hard for everything we have. We don't take handouts or accumulate debt. We put ourselves through college and earn all that we have. We value a strong work ethic; we are middle America. Since [my son's] diagnosis,

> every penny I spend and save is with affording insulin in mind. Since type 1 is
> hereditary, an autoimmune disease, any of our other children could be diagnosed
> at any time, and their children, and so on, so in that sense, our entire family is
> 100% insulin dependent, and it could span generations. Without it, my son can't
> survive.

Most plaintiffs described the anxiety associated with their insulin costs as all-consuming and

constant.

354.    Cognizant of the damage increasing benchmark prices have inflicted on patients,

Novo Nordisk has recently announced that they will take steps, going forward, to rein in this

harm. In its November 30, 2016 press release, Novo Nordisk made a modest commitment to

"limit[] any potential future benchmark price increases for our medicines to no more than single-

digit percentages annually."[34]

355.    Long overdue, these affordability measures still do not end or even address the

insidious practice of artificially inflating the spread between benchmark and net price. Nor do

they make whole the patients who have spent thousands of dollars out-of-pocket on long acting

insulins for the past few years. Therefore, these measures fail to address the structural issues that

have given rise to the price hikes that have hurt under-insured and uninsured diabetes patients for

years.

356.    Individuals living with diabetes spend, on average, twice as much as those

without the disease despite the fact that treatment for the disease has existed for more than 100

years. Diagnosed diabetes now costs the United States over $245 billion per year; an estimated

$1 of every $5 spent on health care in the United States. The Defendant Drug Manufacturers'

artificial inflation of analog insulin prices has pushed, and will continue to push, access to life-

saving drugs out of reach of uninsured and underinsured American diabetes patients, even

---

[34] Novo Nordisk Press Release, *supra*.

despite recent efforts to control prices. Without access to proper treatment, diabetes patients experience serious and costly health complications. Despite Banting and Best's efforts to ensure insulin was widely accessible, the pharmaceutical companies that have inherited their legacy have eschewed this aspiration, sublimating it to the companies' profit margins. The fraudulent practice of creating a large spread between benchmark and real prices has harmed and will continue to harm diabetes patients across the country. Millions more will suffer painful complications and early death unless Eli Lilly, Novo Nordisk, and Sanofi make analog insulin more affordable.

357.     This case focuses on the overcharges the plaintiffs have incurred as a result of the defendants' fraudulent scheme. Plaintiffs seeks relief from these overcharges.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

358.     Plaintiffs and class members had no way of knowing about the defendants' scheme and deception with respect to insulin pricing.

359.     The manufacturers and PBMs refuse to disclose the real, net prices of insulin, labeling them trade secrets. Hence, a reasonable plaintiff and consumer could not discover the truth.

360.     Within the period of any applicable statutes of limitation, plaintiffs and members of the proposed class could not have discovered, through the exercise of reasonable diligence, that the defendants were concealing the conduct complained of herein and misrepresenting the true cost of insulin.

361.     Plaintiffs and the other class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that the defendants were engaged in the

scheme and were publishing phony benchmark prices, nor would a reasonable and diligent investigation have disclosed the true facts.

362.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all insulin products identified herein.

**B.    Fraudulent Concealment Tolling**

363.    All applicable statutes of limitation have also been tolled by the defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.    Estoppel**

364.    The defendants were under a continuous duty to disclose to plaintiffs and class members the true character, quality, and nature of the benchmark prices upon which their payments for insulin were based.

365.    Based on the foregoing, the defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

366.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a class defined as follows:

> All individual persons in the United States and its territories who paid any portion of the purchase price for a prescription of Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba, and/or Toujeo at a price calculated by reference to a benchmark price, AWP (Average Wholesale Price), or WAC (Wholesale Acquisition Price) for purposes other than resale.

367.    The class period is tolled to the earliest date of the Defendant Drug Manufacturers' initiation of the scheme described herein, wherein the Defendant Drug

Manufacturers artificially inflated the benchmark prices of Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba, and Toujeo (the analog insulins) to offer PBMs higher spreads in exchange for preferred formulation status (the spread scheme).

368.    Excluded from the class are: (a) Eli Lilly and any entity in which it has a controlling interest, and their legal representatives, officers, directors, assignees, and successors; (b) Novo Nordisk and any entity in which it has a controlling interest, and their legal representatives, officers, directors, assignees, and successors; (c) Sanofi and any entity in which it has a controlling interest, and their legal representatives, officers, directors, assignees, and successors; and (c) any co-conspirators, and their officers, directors, management, employees, subsidiaries, and affiliates.

369.    There are a number of ways in which an individual person may pay a portion of the benchmark price of an analog insulin and thereby gain inclusion in the class. First, a person may be uninsured and, therefore, responsible for paying 100% of the cost of her analog insulins based on the Defendant Drug Manufacturers' benchmark prices (the uninsured scenario). Second, a person's insurance plan may require her to satisfy a deductible before insurance benefits cover all or a portion of her prescription needs. If so, that person is paying for 100% of the cost of her analog insulins based on the Defendant Drug Manufacturers' benchmark prices before she meets her deductible (the deductible scenario). Third, a person may have a coinsurance requirement. If so, that person is paying a portion of the cost of her analog insulins based on the Defendant Drug Manufacturers' benchmark prices (the coinsurance scenario). Fourth, a person may obtain insurance through a Medicare Part D Plan. If so, that person is paying a portion of the cost (or 100% of the cost before she meets her deductible) based on the Defendant Drug Manufacturers' benchmark prices (the Medicare Part D scenario).

370.     In each of these scenarios—the uninsured scenario, the deductible scenario, the coinsurance scenario, and the Medicare Part D scenario—a person's out-of-pocket expense for the analog insulins is determined based on the benchmark prices Defendant Drug Manufacturers unilaterally set for these drugs. Accordingly, each falls within the class definition.

371.     Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for the analog insulins throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals. The class is readily identifiable from information and records in the possession of the Defendant Drug Manufacturers.

372.     Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and all members of the class were damaged by the same wrongful conduct of the defendants— i.e., as a result of Defendant Drug Manufacturers' misconduct, these purchasers paid artificially inflated prices for the analog insulins, and they will continue to do so in the future.

373.     Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of plaintiffs are coincident with, and not antagonistic to, those of the other members of the class.

374.     Lead counsel that represents the plaintiffs are experienced in the prosecution of class action litigation and have particular experience with class action litigation involving pharmaceutical products and extensive experience in class actions concerning the use of benchmark pricing, including two cases in federal district court (*AWP* and *McKesson*) that resulted in recoveries well in excess of $500 million.

375.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because the defendants have acted on

grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally-applicable conduct is inherent in the defendants' wrongful conduct.

376.   Questions of law and fact common to the class include, but are not limited to:

     i.   Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in a fraudulent, unfair, and/or deceptive scheme or course of conduct by improperly publishing inflated benchmark prices for their analog insulins, which the plaintiffs and class members purchased;

     ii.   Whether Eli Lilly, Novo Nordisk, and Sanofi artificially inflated the benchmark prices of the analog insulins;

     iii.   What the benchmark prices versus net (true average) prices for the analog insulins are;

     iv.   Whether it was the policy and practice of Eli Lilly, Novo Nordisk, and Sanofi to prepare marketing and sales materials for PBMs that contained comparisons of their benchmark prices and net prices for their analog insulins and the spreads available;

     v.   Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in a pattern and practice of paying illegal kickbacks, disguised as "rebates," to PBMs, such as CVS Health, Express Scripts, and OptumRX, that created substantial spreads between the benchmark and net prices;

     vi.   Whether the large benchmark-to-net price spreads were intended to induce CVS Health, Express Scripts, and OptumRX to give Eli Lilly's, Novo Nordisk's, and Sanofi's analog insulins favorable placement on the PBMs' formularies;

     vii.   Whether Eli Lilly, Novo Nordisk, and Sanofi used artificially inflated benchmark prices as a starting point for negotiating these kickbacks or "rebates" for the analog insulins;

     viii.   Whether each defendant conspired with the PBMs for the purpose of carrying out this spread scheme;

     ix.   Whether the spread scheme caused plaintiffs and class members to make inflated payments based on the artificial benchmark prices for the analog insulins;

     x.   Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in a pattern of deceptive and/or fraudulent activity intended to defraud or deceive plaintiffs and class members;

xi.   Whether Eli Lilly, Novo Nordisk, and Sanofi formed one-on-one enterprises with each of the largest PBMs—CVS Health, Express Scripts, and OptumRX—for the purpose of carrying out the spread schemes;

xii.   Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in mail or wire fraud in furtherance of the spread schemes;

xiii.   Whether Eli Lilly's, Novo Nordisk's, and Sanofi's conduct violated RICO;

xiv.   Whether Eli Lilly, Novo Nordisk, and Sanofi are liable to plaintiffs and class members for damages for conduct actionable under the various state consumer protection statutes; and

xv.   Whether Eli Lilly, Novo Nordisk, and Sanofi are liable to plaintiffs and the class members for damages flowing from their misconduct.

377.   Plaintiffs and members of the class have all suffered, and will continue to suffer, harm and damages as a result of the defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally, defendants have acted and failed to act on grounds generally applicable to plaintiffs and the class and require court imposition of

uniform relief to ensure compatible standards of conduct toward the class, thereby making appropriate equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

378.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

379.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this amended complaint.

380.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

### A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under RICO.

381.    This count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of the plaintiffs and class members as represented by the named plaintiffs.

382.    Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

383.    The following pharmacy benefit managers are each "persons," as that term is defined in 18 U.S.C. § 1961(3): (a) CVS Health Corporation (CVS), a Delaware corporation with

its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

## B.    The Manufacturer-PBM Insulin Pricing RICO Enterprises

384.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the Defendant Drug Manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the Defendant Drug Manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

385.    Each of the Manufacturer-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of selling, purchasing, and administering the analog insulins to individual plaintiffs and class members and deriving secret profits from these activities (the spread scheme). These profits are greater than either the Defendant Drug Manufacturers or the PBMs could obtain absent their fraudulent concealment of the substantial rebates from Defendant Drug Manufacturers to PBMs.

386.     To accomplish this common purpose, the Defendant Drug Manufacturers periodically and systematically inflate the benchmark prices of the analog insulins. They did so willfully, and with knowledge that class members make payments directly based on the manufacturers' benchmark price. The Manufacturer-PBM Insulin Pricing Enterprises then represented—either affirmatively or through half-truths and omissions—to the general public and consumers, including plaintiffs and the class, that the analog insulin benchmark prices are a reasonable approximation of the actual cost of these medicines. The Manufacturer-PBM Insulin Pricing Enterprises conceal from the general public and consumers, like the plaintiffs and class members, the reality that the net prices offered to PBMs in exchange for preferred formulary positions are *exponentially lower.*

387.     It is this scheme that is fraudulent. The Defendant Drug Manufacturers' benchmark prices are no longer a reasonable approximation of the actual price of insulin, and the Manufacturer-PBM Insulin Pricing Enterprises concealed the magnitude of the spreads between benchmark prices and net prices from the plaintiffs and the class. The Manufacturer-PBM Insulin Pricing Enterprises also concealed from the public the purpose of these spreads: the spreads ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring significant price reductions; and they result in higher profits for the PBMs, whose earnings increase as the spread between benchmark and real prices grows.

388.     Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. With respect to the Defendant Drug Manufacturers, these corporations would not be able to market large spreads to PBMs in exchange for favorable formulary positions without the use of the inflated benchmark prices as

the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. The PBMs share this common purpose because, without the use of the inflated benchmark prices, their profits on the spread between benchmark and net prices would collapse. As a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBMs, to a large extent, keep; (ii) pocketing secret spreads between net and benchmark analog insulin prices; and (iii) keeping secret discounts the drug manufacturers provide in association with the PBMs' mail order operations.

389.   Each of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant Drug Manufacturer and each PBM that is an associate. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, there is a common communication network by which each Defendant Drug Manufacturer and each PBM share information on a regular basis, including information regarding the analog insulin benchmark prices and net prices. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, each Defendant Drug Manufacturer and each PBM functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Insulin Pricing Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the spread scheme.

390.   At all relevant times, the PBMs have been aware of the Manufacturer-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct, and have reaped profits from that conduct. The PBMs strike rebate deals with the Defendant Drug Manufacturers to conceal the true net prices of the analog insulins and profit from the

inflated benchmark prices. The PBMs have represented to the public that the rebates they negotiate save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But they have known that the increasing spreads did not and do not actually decrease the net prices of the analog insulins: the benchmark prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the Manufacturer-PBM Insulin Pricing Enterprises' common purpose of enlarging the hidden spreads between net and benchmark price, the PBMs would have had the incentive to disclose the fraudulence of the Defendant Manufacturers' benchmark prices. By failing to disclose this information, the PBMs and Defendant Drug Manufacturers perpetuated the conduct of the Manufacturer-PBM Insulin Pricing Enterprises.

391.   Further, the PBMs took instructions and commands from the Defendant Drug Manufacturers regarding use of the analog insulin benchmark prices, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *access rebates* for placement of products on their formulary; (ii) *market share rebates* for garnering higher market share than established targets; (iii) *administrative fees* for assembling data to verify market share results; and (iv) *other fees and grants* in an effort to promote products.

392.   In order to garner all of these fees from the Defendant Drug Manufacturers, each PBM and each Defendant Drug Manufacturer meet on a regular basis to discuss analog insulin prices, spreads, marketing opportunities, and coordination of all of the above.

393.   There is a common communication network between each PBM and each manufacturer for the purpose of implementing the rebate scheme and for the exchange of financial rewards for the PBM activities that benefit the Defendant Drug Manufacturers.

394.    At all relevant times, each one of the PBMs was aware of the Defendants Drug Manufacturers' spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

395.    For purposes of this count, the Manufacturer-PBM Insulin Pricing Enterprises are further identified as follows:

**1.      The Eli Lilly-PBM Enterprises**

396.    The Eli Lilly-PBM Enterprises are three separate associations-in-fact consisting of each of the PBMs that administers purchases of Eli Lilly's Humalog and Basaglar, including its directors, employees, and agents, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-CVS association-in-fact enterprise; (2) the Eli Lilly-Express Scripts association-in-fact enterprise; and (3) the Eli Lilly-OptumRx association-in-fact enterprise. Each of the Eli Lilly-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Eli Lilly's rapid-acting analog insulin product, Humalog, and it's long-acting analog insulin product, Basaglar, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx. As to each of these Eli Lilly-PBM Enterprises, there is a common communication network by which Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx share information on a regular basis. As to each of these Eli Lilly-PBM Enterprises, Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx function as continuing but separate units. At all relevant times, each of the Eli Lilly-

PBM Enterprises was operated and conducted by Eli Lilly for criminal purposes, namely, carrying out the spread scheme.

## 2. The Novo Nordisk-PBM Insulin Pricing Enterprises

397. The Novo Nordisk-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Novo Nordisk's Fiasp, Novolog, Levemir, and Tresiba including its directors, employees, and agents, and Novo Nordisk, including its directors, employees and agents: (1) the Novo Nordisk-CVS association-in-fact enterprise; (2) the Novo Nordisk-Express Scripts association-in-fact enterprise; and (3) the Novo Nordisk-OptumRx association-in-fact enterprise. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog insulin products, Levemir and Tresiba, and its rapid-acting analog insulin products, Fiasp and Novolog, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, there is a common communication network by which Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx share information on a regular basis. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx function as continuing but separate units. At all relevant times, each of the Novo Nordisk-PBM Insulin

Pricing Enterprises was operated and conducted by Novo Nordisk for criminal purposes, namely, carrying out the spread scheme.

### 3.   The Sanofi-PBM Insulin Pricing Enterprises

398.    The Sanofi-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Sanofi's Apidra, Lantus, and Toujeo, including its directors, employees, and agents, and Sanofi, including its directors, employees and agents: (1) the Sanofi-CVS association-in-fact enterprise; (2) the Sanofi-Express Scripts association-in-fact enterprise; and (3) the Sanofi-OptumRx association-in-fact enterprise. Each of the Sanofi-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Sanofi-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx. As to each of these Sanofi-PBM Insulin Pricing Enterprises, there is a common communication network by which Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx share information on a regular basis. As to each of these Sanofi-PBM Insulin Pricing Enterprises, Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx function as continuing but separate units. At all relevant times, each of the Sanofi-PBM Insulin Pricing Enterprises was operated and conducted by Sanofi for criminal purposes, namely, carrying out the spread scheme.

399.   The Manufacturer-PBM Insulin Pricing Enterprises (Eli Lilly-CVS, Eli Lilly-Express Scripts, Eli Lilly-OptumRx, Novo Nordisk-CVS, Novo Nordisk-Express Scripts, Novo-Nordisk-OptumRx, Sanofi-CVS, Sanofi-Express Scripts, and Sanofi-OptumRx) knowingly made material misrepresentations to class members in furtherance of the fraudulent scheme regarding:

a.   The net prices of the analog insulins;[35]

b.   The extent to which the net prices of the analog insulins departed from their artificially-inflated benchmark prices;

c.   That the analog insulins' benchmark prices served as a reasonable cost-sharing benchmark and that this benchmark price was a fair basis on which to base consumer out-of-pocket payments;

d.   The extent to which the Defendant Drug Manufacturers and the PBMs negotiated the rebates discounting the benchmark prices of the analog insulins in good faith and for a proper purpose;

e.   Whether the rebates were intended to benefit plan members and/or the general public;

f.   Whether the rebates saved plan members and the general public money;

g.   Whether the "preferred" formulary status of the analog insulins reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' formulary committees;

---

[35] The Eli Lilly-PBM Enterprises made these misrepresentations with respect to Humalog and Basaglar. The Novo Nordisk-PBM Insulin Pricing Enterprises made these representations with respect to Fiasp, Novolog, Levemir, and Tresiba. The Sanofi-PBM Enterprises made these misrepresentations with respect to Apidra, Lantus, and Toujeo. All references to "analog insulins" refer to the specific insulins relevant to each manufacturer PBM enterprise.

h.      Whether the analog insulins would have been placed in "preferred" formulary positions absent the spreads; and

f.      The extent to which the spread schemes forced plaintiffs and the class members to incur additional expenses for their analog insulin prescriptions.

400.    The Defendant Drug Manufacturers alone could not have accomplished the purposes of the Manufacturer-PBM Insulin Pricing Enterprises without the assistance of the PBMs. For the Defendant Drug Manufacturers to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formularies, on which varying analog insulins were given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured lower prices. The lower prices were fictitious, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the Manufacturer-PBM Enterprise could not have achieved its common purpose.

401.    The impacts of the Manufacturer-PBM Insulin Pricing Enterprises are still in place, i.e., the increased spreads between the benchmark and net prices of the analog insulins are still being maintained and increased.

402.    The foregoing evidences that the Defendant Drug Manufacturers and PBMs were each willing participants in the Manufacturer-PBM Insulin Pricing Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprises' purposes, i.e., to increase profits for both the Defendant Drug Manufacturers and the PBMs through kickbacks to the PBMs and continued formulary status without net price reductions for the Defendant Drug Manufacturers.

**C.      The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities**

403.      Each of the Manufacturer-PBM Insulin Pricing Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries: the sale, purchase and/or administration of the analog insulins; the setting of the prices of the analog insulins; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for the analog insulins by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of the analog insulins. During the class period, the Manufacturer-PBM Insulin Pricing Enterprises participated in the administration of the analog insulins to millions of individuals located throughout the United States.

404.      During the class period, Eli Lilly, Novo Nordisk, and Sanofi's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

405.      The nature and pervasiveness of the Defendant Drug Manufacturers' spread scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the PBMs.

406.      Most of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these defendants' books and records. Indeed, an essential part of the successful operation of the spread scheme alleged herein depended upon secrecy, and as alleged above. And the Defendant Drug Manufacturers took

deliberate steps to conceal their wrongdoing. However, the plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the spread scheme.

407.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the spread scheme involved thousands of communications throughout the class period including, *inter alia*:

a.    Marketing materials about the benchmark prices for the analog insulins and the available spreads, which Defendant Drug Manufacturers sent to PBMs located across the country;

b.    Written and oral representations of the analog insulin benchmark prices that the Defendant Drug Manufacturers made at least annually and, in many cases, several times during a single year;

c.    Thousands of written and oral communications discussing, negotiating, and confirming the placement of a Defendant Drug Manufacturer's analog insulin or insulins on a particular PBM's formulary;

d.    Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBMs paid for the analog insulins, and/or to conceal those prices or the spread scheme;

e.    Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBMs to persuade them to advocate one Defendant Drug Manufacturers' analog insulin over a competitor's product;

f.    Written and oral communications with U.S. government agencies and private insurers that fraudulently misrepresented what the benchmark prices were, or that

were intended to deter investigations into the true nature of the benchmark prices or to forestall changes to reimbursement based on something other than benchmark prices;

g.      Written and oral communications with health insurers and patients;

h.      Transmission of benchmark prices from manufacturers to third parties.

i.      Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Defendant Drug Manufacturers' spread scheme; and

j.      In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the spread scheme. These mails include some of the documents referenced in this Second Amended Complaint.

## D.     Conduct of the RICO Enterprises' affairs

408.    During the class period, each of the Defendant Drug Manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

a.      Each of the Defendant Drug Manufacturers has directly controlled the benchmark and net prices for its analog insulins, which determines the amount of each of the PBMs' compensation;

b.      Each of the Defendant Drug Manufacturers has directly controlled the benchmarks prices that it publicly reports;

c.      Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its analog insulins;

d.      Each of the Defendant Drug Manufacturers has relied upon its employees and agents to promote the spread scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

e.      Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Insulin Pricing Enterprises with which it is associated by providing rebates (as detailed above) or other inducements to place that Defendant Drug Manufacturer's analog insulin or insulins on a PBM's formulary or advocate the use of a certain analog insulins. These inducements include the Defendant Drug Manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to retain a significant portion of the rebates. Furthermore, PBMs usually refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true number of rebates that the PBM has received in connection with the health plan client.

f.      The Defendant Drug Manufacturers intended that the PBMs would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other

materials which claimed that rebates saved health care payers and consumers like the plaintiffs and class members money on their prescription needs; and

g.     The Defendant Drug Manufacturers represented to the general public, by stating the analog insulins' benchmark prices without stating that these benchmark prices differed substantially from those net prices offered to the PBMs, that the analog insulins' benchmark prices reflected or approximated analog insulins' true price.

409.    Each of the Manufacturer-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.

410.    In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers has conducted the affairs of each of the Manufacturer-PBM Insulin Pricing Enterprises with which they associated by reporting fraudulently inflated benchmark prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their benchmark prices that these benchmark prices were reasonable bases for plaintiff and class member out-of-pocket payments, thereby inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

**E.    The Defendant Drug Manufacturers' pattern of racketeering activity**

411.    Each of the Defendant Drug Manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their spread schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern

of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendant Drug Manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

412.    Each Defendant Drug Manufacturer's fraudulent and unlawful spread scheme consisted, in part, of deliberately overstating the benchmark prices for its analog insulins, thereby creating a spread between net and benchmark prices. Each Defendant Drug Manufacturers then used those spreads to induce each of the PBMs to advocate and favor that particular Defendant Drug Manufacturer's drugs.

413.    The spread scheme was calculated and crafted such that plaintiffs and members of the class would pay for the analog insulins based on the artificially inflated, benchmark prices. In designing and implementing the spread scheme, the Defendant Drug Manufacturers were cognizant, at all times, of the fact those plaintiffs and class members were not part of the enterprise and relied upon the integrity of the Defendant Drug Manufacturers in setting the benchmark prices.

414.    By intentionally and artificially inflating the benchmark prices, and by subsequently failing to disclose such practices to the plaintiffs and class members, each of the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

415.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive plaintiffs and members of the class. Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results

affecting the same victims, including plaintiffs and members of the class. Each of the Defendant

Drug Manufacturers has engaged in the pattern of racketeering activity for the purpose of

conducting the ongoing business affairs of the respective Manufacturer-PBM Insulin Pricing

Enterprises with which each of them is and was associated in fact.

416.    The Defendant Drug Manufacturers' conduct is also unfair, deceptive, and

unlawful because it violates the Federal Anti-Kickback statutes.

417.    The Anti-Kickback Statute prohibits knowing and willful solicitation, receipt,

offer, or payment of remuneration to induce the purchase of any item or service for which

payment may be made in whole or in part under a Federal health care program. 42 U.S.C.

§ 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if

they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal

health care program. "Federal health care program" is defined in the anti-kickback statute as "(1)

any plan or program that provides health benefits, whether directly, through insurance, or

otherwise, which is funded directly, in whole or in part, by the United States Government (other

than the health insurance program under Chapter 89 of Title 5); or (2) any State health care

program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

418.    The purported "discounts" or "rebates" afforded by the PBMs to the

manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" or

"rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary

treatment. Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling

price—to the extent that the manufacturer has increased the benchmark price to make up for an

increased "rebate," all that it has done is created a widened spread from which the PBM can

make more money. This is a classic kickback.

**F.**      **The Defendant Drug Manufacturers' motive**

419.      The Defendant Drug Manufacturers' motive in creating and operating the spread scheme and conducting the affairs of the Manufacturer-PBM Insulin Pricing Enterprises described herein was to fraudulently obtain sales of and profits from their analog insulins.

420.      The spread scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' analog insulins. Thus, each of the Defendant Drug Manufacturers used the spread scheme to sell more of its drugs, thereby fraudulently gaining sales, marketplace share, and profits.

**G.**      **Damages caused by the Defendant Drug Manufacturers' rebate scheme**

421.      The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused the plaintiffs and members of the class to be injured in their business or property. The plaintiffs and class members have overpaid many hundreds of millions of dollars based on the defendants' fictitious benchmark prices for their analog insulins. Each defendant intended and foresaw that the plaintiffs and class members would make such payments tied directly to the defendants' benchmark prices.

422.      The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported the benchmark prices and other information by the same methods in furtherance of their spread scheme. The plaintiffs and members of the class have made inflated payments for the analog insulins based on and/or in reliance on reported and false benchmark prices.

423.      As previously explained, when a plaintiff or class member fills a prescription for one of the analog insulins, she is responsible for paying all or a portion of the medication's cost. If the plaintiff or class member is uninsured, she must pay 100% of the drugs' point-of-sale prices, which are directly tied to the Defendant Drug Manufacturers' benchmark prices. If the

plaintiff or class member has a high deductible health plan, she must pay 100% of the drugs'

point-of-sale prices, which are directly tied the Defendant Drug Manufacturers' benchmark

prices, until she satisfies her deductible. If the plaintiff's or class member's health plan contains

a coinsurance requirement, she is responsible for paying a percentage of her drugs' point-of-sale

prices, which are directly tied the Defendant Drug Manufacturers' benchmark prices. And if the

plaintiff or class member is a member of a Medicare Part D plan, she is responsible for paying all

or a portion of her drugs' point-of-sale prices based directly on the Defendant Drug

Manufacturers' benchmark prices, until she reaches her maximum contribution.

424.    The amount of each of these cash payments is tied directly to the Defendant Drug

Manufacturers' benchmark prices. No other intermediary in the supply chain has control over or

is responsible for the benchmark prices on which consumer payments are based. By setting the

benchmark prices of the analog insulins, the defendants are setting the prices plaintiffs and class

members must pay. Therefore, when each Defendant Drug Manufacturer artificially inflates each

analog insulin's benchmark price and then uses each Manufacturer-PBM Insulin Pricing

Enterprises to sell those analog insulins, they also artificially inflate plaintiffs' and class

members' out-of-pocket expenses.

425.    The plaintiffs' and class members' damages are therefore the difference between

the defendants' reported benchmark prices and the net prices at which they sell their analog

insulins for all plaintiff and class member out-of-pocket payments.

426.    Plaintiffs' injuries, and those of the class members, were proximately caused by

the Defendant Drug Manufacturers' racketeering activity. But for the misrepresentations that the

Defendant Drug Manufacturers made regarding the benchmark prices of their analog insulins and

the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, plaintiffs and others similarly situated would have paid less, out-of-pocket, for their analog insulins.

427.    The Defendant Drug Manufacturers racketeering activity directly and proximately caused the plaintiffs' injuries.

428.    The plaintiffs and class members were both: (i) the participants in the marketplace that most directly relied on the falsity of the defendants' inflated benchmark prices, and (ii) the participants that were most directly harmed by the fraud. There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms resulting from the Defendant Drug Manufacturers' fraudulent scheme.

        a.    *Wholesalers are not eligible to be plaintiffs for this fraud.* Although wholesalers purchase the physical vials and pens of analog insulin directly from the defendants, wholesaler prices are determined on the basis of wholesale acquisition price (i.e., WAC) not average wholesale price (i.e., AWP). The defendants' inflated AWPs (used at the point of sale) do not affect wholesaler purchases, and, therefore, the wholesalers suffer no damages here. To the extent that the WAC wholesalers paid for the analog insulins followed the same unlawful price hikes as AWP, in the circumstances of this case, the wholesalers suffered no "injury to business or property" within the meaning of the RICO. Wholesalers suffer no damages because the charges they make to their customers (other wholesalers or pharmacies) are mathematically and automatically tied to the exact same WAC list price. In other words, wholesalers are both charged and themselves use to charge others the same unlawfully inflated benchmark price. In addition, wholesalers would have bought the exact same insulin products were it not for the fraud (i.e., this is not a situation where the wholesaler has been deprived the ability to

buy some other product, such as a generic or biosimilar to the brand). As a result, even when benchmark prices escalate due to the fraud here, wholesalers buy the same products and receive the same (or more) net revenues from the buy-sell transactions than they otherwise would. Furthermore, wholesalers typically effectuate "chargebacks" and other off-invoice, price reductions that are a part of the secret price concessions that are unrevealed to consumers and play a part of the unlawful scheme to widen the gulf between benchmark prices and net manufacturer prices. As a result, wholesalers are not wholly unaware of secret price concessions the defendant manufacturers provide.

      b.    *Pharmacies are not eligible to be plaintiffs for this fraud.* Similar observations apply to retail and mail order pharmacies. Like wholesalers, retailers purchase the defendants' products on the basis of WAC, not AWP. Thus, again, the inflated benchmark prices used at the point of sale do not affect retailers and they suffer no damages here. To the extent that the WAC retailers paid followed the same unlawful price hikes as AWP, in the circumstances of this case, the retailers suffered no "injury to business or property" within the meaning of the RICO. Retailers suffer no damages because the charges they make to their customers (other retailers or plans) are mathematically and automatically tied to the exact same WAC list price. In other words, retailers are both charged and themselves use to charge others the same unlawfully inflated benchmark price. In addition, retailers would have bought the exact same insulin products were it not for the fraud (i.e., this is not a situation where the retailer has been deprived the ability to buy some other product, such as a generic or biosimilar to the brand). As a result, even when benchmark prices escalate due to the fraud here, the retailers buy the same products and receive the same (or more) net revenues from the

buy-sell transactions than they otherwise would. Furthermore, retailers typically effectuate "chargebacks" and other off-invoice, price reductions that are a part of the secret price concessions that are unrevealed to consumers and play a part of the unlawful scheme to widen the gulf between benchmark prices and net manufacturer prices. As a result, retailers are not wholly unaware of secret price concessions the defendant manufacturers provide.

    c.  *Pharmacy benefit managers are not eligible to be plaintiffs for this fraud.* PBMs, when undertaking their role as benefit managers, are not in the physical distribution chain at all. They are not potential plaintiffs. And to the extent they also run mail order operations, they remain ineligible as plaintiffs for all of the reasons stated in this and the previous three paragraphs.

    d.  *Health benefit providers are not eligible to be plaintiffs for this fraud.* Similar observations apply to health plans. While health plans do, in fact, initially reimburse pharmacies based on the same inflated AWP created by the manufacturers, the plans' payments are entirely distinct from the payments that are made by their insureds and by cash-only purchasers. There is no overlap in the impact of the fraud between consumer overpayments and the reimbursements made by plans.

    e.  *Consumer are the only RICO plaintiffs for this fraud.* In contrast to all these marketplace participants, consumers are the most effective plaintiffs for this RICO fraud. Consumers directly and innocently rely—at the point-of-sale—on the unlawfully inflated benchmark prices that the defendants cause to be published. The charges consumers pay (coinsurance, cash payments, deductibles payments, etc.) are directly tied to the unlawfully inflated benchmarks. The damages incurred by the plaintiffs and class

members do not overlap with those of any other marketplace participant. This is not a case about how sequential participants in a marketplace pass-on an inflated price from one level to another such that, in the end, consumers overpay. Here, whatever transactions may or may not happen between manufacturers and wholesalers or wholesalers and pharmacies *have little to nothing to do with the prices plaintiffs and class members pay.* It is the defendant manufacturers, through their control over benchmark prices, that determine what the plaintiffs and class members pay.

429.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to plaintiffs and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.[36]

430.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent benchmark prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no

---

[36] Plaintiffs assume the Court's ruling that the indirect purchaser rule bars the plaintiffs' claims for damages under RICO will apply equally to the plaintiffs' Second Amended Complaint, as the plaintiffs have not amended their allegations to claim that the plaintiffs purchase their analog insulins directly from the Defendant Drug Manufacturers.

cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting benchmark prices that do not approximate their true net prices.

**COUNT TWO**

**VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)**
**BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C)**
**(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

431.    The plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

432.    This count is against Eli Lilly, Novo Nordisk, and Sanofi.

433.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

434.    The Defendant Drug Manufacturers have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Manufacturer-PBM Insulin Pricing Enterprises described previously through a pattern of racketeering activity.

435.    As set forth in detail above, the Defendant Drug Manufacturers' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, the defendants inflated the stated benchmark prices of the analog insulins to achieve an unlawful purpose; made false or misleading statements or material omissions regarding the net prices of their analog insulins; and made false or misleading statements or material omissions regarding the existence and amount of their analog insulins'

benchmark-to-net price spread. The truth about the net prices of the analog insulins as distinguished from the inflated benchmark prices would be material to a reasonable consumer.

436.     From the outset, the defendants knew, but did not disclose, that the benchmark prices they selected and published for the analog insulins did not reflect the net prices of those products. The Defendant Drug Manufacturers knew that the benchmark prices they selected were not reasonable approximations of the true market prices of their analog insulins. Yet they held out these benchmark prices as reasonable approximations of the true costs of the analog insulins and reasonable bases for consumer cost-sharing obligations with respect to these medicines. The Defendant Drug Manufacturers substantially inflated the benchmark prices of their analog insulins so they could offer larger spreads to the PBMs in exchange for favorable formulary positions. The defendants knew, but did not disclose, that the benchmark-to-net price spreads did not reduce the prices paid by the plaintiffs and class members who purchased their analog insulins based on benchmark price. The Defendant Drug Manufacturers knowingly and deliberately misled consumers regarding the pricing of the analog insulins.

437.     The nature of the above-described Defendant Drug Manufacturers' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

438.     The Defendant Drug Manufacturers have and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

    a.     Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

b.      Multiple instances of wire fraud in violations of 18 U.S.C. § 1343;

c.      Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952; and

d.      Multiple instances of bribery in violation of state statutes, including but not limited to N.J. Stat. Ann. § 2C:21-10(a).

439.    The Defendant Drug Manufacturers' violations of the above federal and state laws and the effects thereof detailed above are continuing and will continue. The plaintiffs and members of the class have been injured in their property by reason of these violations: the plaintiffs and class members have made billions of dollars in payments for the analog insulins that they would not have made but for the Defendant Drug Manufacturers' conspiracy to violate 18 U.S.C. § 1962(c).

440.    The Defendant Drug Manufacturers' racketeering activity directly and proximately injured the plaintiffs and members of the class: the plaintiffs and class members substantially overpaid for their analog insulins when they paid for these medicines at the point of sale based on the defendants' benchmark prices.

441.    By virtue of these violations of 18 U.S.C. § 1962(d), the Defendant Drug Manufacturers are jointly and severally liable to plaintiffs and the class for three times the damages the plaintiffs and class have sustained, plus the cost of this suit, including reasonable attorneys' fees.[37]

---

[37] Plaintiffs assume the Court's ruling that the indirect purchaser rule bars the plaintiffs' claims for damages under RICO will apply equally to the plaintiffs' Second Amended Complaint, as the plaintiffs have not amended their allegations to claim that the plaintiffs purchase their analog insulins directly from the Defendant Drug Manufacturers.

442.     By virtue of these violations of 18 U.S.C. § 1962(d), under the provisions of Section 1964(d) of RICO, the plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent benchmark prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendant manufacturers to prevent them from reporting list prices that do not approximate their true net prices.

## COUNT THREE

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. STAT. ANN. § 56:8-1, *ET SEQ.*
### (AGAINST NOVO NORDISK AND SANOFI ON BEHALF OF A NATIONWIDE CLASS)

443.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

444.     This claim is brought by all plaintiffs that have purchased the analog insulins made by Novo Nordisk. Novo Nordisk is a corporation with its headquarters in Plainsboro, New Jersey. New Jersey "has a powerful incentive to ensure that local merchants deal fairly with

citizens of other states and countries"[38] and a "strong interest 'in regulating its domestic

businesses and in deterring fraudulent business practices.'"[39] Furthermore, New Jersey has some

of the "strongest consumer protection laws in the nation."[40] Therefore, although other states may

have some interest in protecting their own consumers, that interest is not frustrated by the

application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the

failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever

in blanketing that particular issue with its law."[41]

445.    This claim is further brought by all plaintiffs that have paid for the analog insulins

made by Sanofi. Sanofi is a corporation with its headquarters in Bridgewater, New Jersey.

446.    Plaintiffs seek in this Count a nationwide class applying New Jersey law to the

claims against Novo Nordisk and Sanofi.

447.    The New Jersey Consumer Fraud Act (NJCFA) makes unlawful "[t]he act, use or

employment by any person of any unconscionable commercial practice, deception, fraud, false

pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission

of any material fact with the intent that others rely upon such concealment, suppression or

omission, in connection with the sale or advertisement of any merchandise or real estate, or with

---

[38] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[39] *Kalow & Springut LLP v. Commence Corp.*, No. 07-3442 (JEI/AMD), 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, No. 04-2152, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[40] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

[41] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."[42]

448.    Novo Nordisk, Sanofi, and the plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

449.    Novo Nordisk and Sanofi engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

450.    As described above, Novo Nordisk and Sanofi engaged in deceptive business practices prohibited by the NJCFA, including artificially inflating the publicly reported benchmark prices of their analog insulins; misrepresenting, affirmatively and/or through omission, that their benchmark prices were reasonable approximations of the true prices of these medicines; concealing and/or misrepresenting the net prices of their analog insulins concealing and/or misrepresenting the existence and amount of the benchmark-to-net price spreads for their analog insulins, and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce. In violation of the NJCFA, these acts and omissions constitute "unconscionable commercial practice[s], deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission in connection with the sale"[43] and pricing of their analog insulins.

451.    From the outset, Novo Nordisk and Sanofi knew, but did not disclose, that the benchmark prices they selected and published for their analog insulins did not reflect the true prices of those products. They created substantial spreads between the benchmark and net prices

---

[42] N.J. Stat. Ann. § 56:8-2.

[43] N.J. Stat. Ann. § 56:8-2.

of those medications and they knew these spreads resulted in windfalls to the PBMs. Novo Nordisk and Sanofi offered these spreads to CVS, Express Scripts, and OptumRx in exchange for their agreement to grant exclusive or at least favorable placement on their formularies.

452.    Novo Nordisk and Sanofi knew, but did not disclose, that the benchmark-to-real price spreads injured consumers who paid for all or part of their prescriptions out-of-pocket based on benchmark prices. Novo Nordisk and Sanofi knowingly and deliberately misled consumers regarding the existence, purpose, and extent of net price reductions off benchmark prices. Novo Nordisk and Sanofi knowingly and deliberately misled consumers as to whether the benchmark prices were reasonable approximations of the true prices of these medicines and, therefore, reasonable bases for consumer cost-sharing obligations.

453.    By failing to disclose the net prices they offered to PBMs and by actively concealing this pricing deceit, Novo Nordisk, and Sanofi engaged in unfair and deceptive business practices in violation of the NJCFA. In the course of Novo Nordisk's and Sanofi's business, they willfully failed to disclose and actively concealed their misrepresentations regarding benchmark prices.

454.    Novo Nordisk and Sanofi intentionally and knowingly misrepresented material facts regarding the true prices of their analog insulins with the intent to mislead consumers, including plaintiffs.

455.    Novo Nordisk's and Sanofi's conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

456.    The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b).

Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

457.    The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturers' net selling prices—to the extent that the manufacturers have increased the benchmark prices to make up for an increased "rebate," all that they have done is created a widened spread from which the PBM can make more money. This is a classic kickback.

458.    Novo Nordisk and Sanofi owed the plaintiffs a duty to disclose the fact that each benchmark price did not approximate its true price because each:

a.    Possessed exclusive knowledge about the means by which they selected the benchmark prices;

b.    Knew material, non-public information regarding the existence and amount of the spreads between the benchmark and net prices; and

c.    Made incomplete representations about the prices of their analog insulins, while purposefully withholding material facts from the plaintiffs that contradicted these representations.

459.   The truth about the actual prices of these medicines, as distinguished from their inflated benchmark prices, would be material to a reasonable consumer.

460.   Novo Nordisk's and Sanofi's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the plaintiffs.

461.   Novo Nordisk and Sanofi knew, or should have known, that their conduct violated the NJCFA.

462.   As a direct and proximate result of Novo Nordisk's and Sanofi's violations of the NJCFA, the plaintiffs and class members have suffered injury-in-fact and/or actual damages. As a direct and proximate result of Novo Nordisk's and Sanofi's misconduct, all plaintiffs and class members incurred damages in the amount of the difference between Novo Nordisk's and Sanofi's reported benchmark prices and their net prices for their analog insulins.

463.   This wrongful conduct by Novo Nordisk and Sanofi, coupled with the damages the plaintiffs and class members incurred, entitles members of the class to relief under the NJCFA. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[44] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[45] Therefore, the plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct,

---

[44] N.J. Stat. Ann. § 56:8-19.

[45] *Id.*

treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and

any other just and appropriate relief.

## COUNT FOUR

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. STAT. ANN. § 56:8-1, *ET SEQ.***
**(AGAINST NOVO NORDISK AND SANOFI ON BEHALF OF A NATIONWIDE**
**CLASS)**

389.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

464.    This claim is brought by all plaintiffs that have purchased the analog insulins

made by Novo Nordisk. Novo Nordisk is a corporation with its headquarters in Plainsboro, New

Jersey. New Jersey "has a powerful incentive to ensure that local merchants deal fairly with

citizens of other states and countries"[46] and a "strong interest 'in regulating its domestic

businesses and in deterring fraudulent business practices.'"[47] Furthermore, New Jersey has some

of the "strongest consumer protection laws in the nation."[48] Therefore, although other states may

have some interest in protecting their own consumers, that interest is not frustrated by the

application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the

---

[46] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[47] *Kalow & Springut LLP v. Commence Corp.*, No. 07-3442 (JEI/AMD), 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, No. 04-2152, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[48] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[49]

465.    This claim is further brought by all plaintiffs that have paid for the analog insulins made by Sanofi. Sanofi is a corporation with its headquarters in Bridgewater, New Jersey.

466.    Plaintiffs seek in this Count a nationwide class applying New Jersey law to the claims against Novo Nordisk and Sanofi.

467.    In addition to prohibiting fraudulent and deceptive conduct, the NJCFA prohibits unfair or unconscionable conduct.

468.    Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[50] Unconscionable practices include performance of an agreement, in addition to inducing a purchase.[51] Charging a price far in excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the NJCFA.[52]

469.    As the Third Circuit recently recognized, "unfair" and "unconscionable" business practices are "a category of business practices entirely separate from practices that are

---

[49] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

[50]   *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

[51]   *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. April 18, 2011) (citing *New Mea Constr. Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

[52]   *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Grp., LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equip. Rental*, No. 06-cv-03830, 2012 WL 12906183 (D.N.J. June 25, 2012).

fraudulent, deceptive, or misleading" prohibited under the NJCFA.[53] The NJCFA "prohibit[s] business practices that are 'unfair' or 'unconscionable' in addition to practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them."[54]

470.    As is set forth above, the prices the plaintiffs and class members pay for analog insulin, based on their benchmark prices, have been skyrocketing. This overpayment is a result of Novo Nordisk's and Sanofi's spread scheme, wherein they sell larger benchmark prices, and therefore spreads, to the largest PBMs in exchange for preferred formulary positions.

471.    The analog insulins Novo Nordisk and Sanofi are selling have not changed since they entered the marketplace in the 1990s and 2000s. These analog insulins are no more effective and provide no more benefit than they did decades ago. Nonetheless, the Novo Nordisk and Sanofi have exponentially increased their benchmark prices.

472.    There is no economic or technological reason why analog insulin would have become more expensive to produce during the period outlined above. Indeed, with technological advances and economies of scale, the per-unit cost of analog insulin should have gone down during the same period that Novo Nordisk and Sanofi were drastically raising prices.

473.    Novo Nordisk and Sanofi were able to raise the benchmark prices of insulin because consumers with diabetes literally have no choice but to purchase and use their prescribed analog insulins. If they do not, they will die, and Novo Nordisk and Sanofi know it. Even cutting

---

[53] *Cottrell v. Alcon Labs.*, 874 F.3d 154, 165 (3d Cir. 2017).

[54] *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, "even if no person was in fact misled or deceived thereby").

back on analog insulins to save money, as is described above, can lead to serious health consequences.

474.    These actions are made all the more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, giving Novo Nordisk, Sanofi, and PBMs more people of whom they can take advantage. Moreover, Novo Nordisk and Sanofi know that the other has not and will not compete based on real reductions in net price; each prefers to compete on inflation of benchmark prices. Even in the absence of collusion, it is in each of Novo Nordisk's and Sanofi's individual best interest to not compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all three.

475.    The plaintiffs, on behalf of the class, therefore allege that Novo Nordisk and Sanofi, in violation of N.J. Stat. Ann. § 56:8-2, have engaged in an unconscionable commercial practice in connection with their sale and pricing of the analog insulins.

476.    The plaintiffs and other class members have suffered ascertainable losses as a result of the defendants' unfair and unconscionable act complained of herein. Under N.J. Stat. Ann. § 56:8-19, they are entitled to relief in the amount of Novo Nordisk's and Sanofi's overcharges: the difference between the benchmark prices for their analog insulins and a reasonable approximation of their net prices. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[55] Furthermore, "In any action under this section the court shall, in addition to any other appropriate legal or equitable

---

[55] N.J. Stat. Ann. § 56:8-19.

relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[56] Therefore, the plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## FACTUAL ALLEGATIONS RELEVANT TO COUNTS 5 THROUGH 49 (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

477.    The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

478.    In addition to violating RICO, the Defendant Drug Manufacturers' conduct set forth above constitutes unfair competition or unfair, unconscionable, deceptive, and/or fraudulent acts or practices in violation of various states' consumer protection statutes.

479.    As described above, through the Manufacturer-PBM Insulin Pricing Enterprises, the defendants engaged in unfair, unconscionable, and deceptive business practices prohibited by state consumer protection laws including: inflating the stated benchmark prices of the analog insulins to achieve an unlawful purpose; making false or misleading statements or material omissions regarding the net prices of the analog insulins; making false or misleading statements or material omissions regarding the existence and amount of the analog insulins' benchmark-to-net price spread; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. The truth about the net prices of the analog insulins as distinguished from the inflated benchmark prices would be material to a reasonable consumer.

---

[56] *Id.*

480.    The Defendant Drug Manufacturers also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, unfair practices, misrepresentations, or concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission in connection with the pricing and sale of the analog insulins.

481.    From the outset, the defendants knew, but did not disclose, that the benchmark prices they selected and published for the analog insulins did not reflect the net prices of those products. The Defendant Drug Manufacturers knew that the benchmark prices they selected were not reasonable approximations of the true market prices of their analog insulins. Yet they held out these benchmark prices as reasonable approximations of the true costs of the analog insulins and reasonable bases for consumer cost-sharing obligations with respect to these medicines. The Defendant Drug Manufacturers substantially inflated the benchmark prices of their analog insulins so they could offer larger spreads to the PBMs in exchange for favorable formulary positions. The defendants knew, but did not disclose, that the benchmark-to-net price spreads did not reduce the prices paid by the plaintiffs and class members who purchased their analog insulins based on benchmark price. The Defendant Drug Manufacturers knowingly and deliberately misled consumers regarding the pricing of the analog insulins.

482.    Furthermore, as is set forth above, the prices the plaintiffs and class members pay for analog insulin, based on their benchmark prices, have been skyrocketing. The analog insulins the Defendant Drug Manufacturers are selling have not changed since they entered the marketplace in the 1990s and 2000s. These analog insulins are no more effective and provide no more benefit than they did decades ago. Nonetheless, the Defendant Drug Manufacturers have exponentially increased their benchmark prices.

483.    There is no economic or technological reason why analog insulin would have become more expensive to produce during the period outlined above. Indeed, with technological advances and economies of scale, the per-unit cost of analog insulin should have gone down during the same period that the Defendant Drug Manufacturers were drastically raising prices.

484.    The Defendant Drug Manufacturers were able to raise the benchmark prices of insulin because consumers with diabetes literally have no choice but to purchase and use their prescribed analog insulins. If they do not, they will die, and the Defendant Drug Manufacturers know it. Even cutting back on analog insulins to save money, as is described above, can lead to serious health consequences.

485.    The Defendant Drug Manufacturers' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

486.    The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

487.    The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" nor

"rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has increased the benchmark price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM can make more money. This is a classic kickback.

488.    The Defendant Drug Manufacturers' actions are made all the more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, giving the Defendant Drug Manufacturers and PBMs more people to take advantage of. Moreover, each of the Defendant Drug Manufacturers knows that the others have not and will not compete based on real reductions in net price; they prefer to compete on inflation of benchmark prices. Even in the absence of collusion, it is in each of the Defendant Drug Manufacturers' individual best interest to not compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all of three.

489.    By exponentially raising the benchmark prices on which consumer cost-sharing obligations are based, while offering the three largest PBMs significantly lower, but secret, net prices, the defendants have engaged in unfair, unconscionable, and deceptive business practices in violation of state consumer protection laws. In the course of their business, the defendants willfully failed to disclose and actively concealed the reality that their benchmark prices are not reasonable approximations of the real prices of their analog insulins, knowing that the plaintiffs and class members pay for such insulins based on the medicines' benchmark prices. This course of conduct was deceptive as well as unconscionable and unfair.

490.    The Defendant Drug Manufacturers intentionally and knowingly misrepresented material facts and/or omitted material facts regarding the true prices of the analog insulins with

the intent to mislead consumers, including the plaintiffs. As alleged above, the Defendant Drug Manufacturers, through the Manufacturer-PBM Insulin Pricing Enterprises, made material misstatements about the prices of the analog insulins and the existence and extent of rebates on these drugs. These misstatements and omissions were either false or misleading.

491.    The Defendant Drug Manufacturers owed the plaintiffs a duty to disclose the reality that the benchmark prices of the analog insulins were not reasonable approximations of the true costs of these medications and were not reasonable bases for the consumers' cost sharing obligations because the Defendant Drug Manufacturers:

a.    Possessed knowledge about the benchmark prices of the analog insulins;

b.    Possessed exclusive, non-public, and material information regarding the net prices of the analog insulins; and

c.    Made false or incomplete representations about the prices of the analog insulins, while purposefully withholding material facts from the plaintiffs that contradicted these representations.

492.    Because the Defendant Drug Manufacturers fraudulently concealed the true prices of the analog insulins, the plaintiffs were deprived of the benefit of their bargain: they grossly overpaid for the analog insulins.

493.    The Defendant Drug Manufacturers' concealment of the analog insulin pricing fraud was material to the plaintiffs. Had the plaintiffs known that the net prices of these analog insulins were much lower, they would have demanded that the benchmark prices on which their cost-sharing obligation were based be lowered as well.

494.     The Defendant Drug Manufacturers' unfair, unconscionable, and/or deceptive acts or practices harmed the plaintiffs. They also were likely to and did, in fact, deceive reasonable consumers, including the plaintiffs, about the true prices of the analog insulins.

495.     The Defendant Drug Manufacturers knew, or should have known, that their conduct violated state consumer protection laws.

496.     As a direct and proximate result of the Defendant Drug Manufacturers' conduct, the plaintiffs and class members have suffered injury-in-fact and/or actual damages. As a direct and proximate result of the Defendant Drug Manufacturers' misconduct, all plaintiffs and class members who purchased the analog insulin incurred damages in the amount of the difference between the Defendant Drug Manufacturers' reported benchmark prices for these medicines and their net prices for plaintiff and class member out-of-pocket payments.

497.     This wrongful conduct by the Defendant Drug Manufacturers, coupled with the damages incurred by the plaintiffs and class members, entitles members of the class to relief under the consumer protection laws of the state in which each plaintiff or class member resides, as set forth below.

**COUNT FIVE**

**VIOLATION OF THE ALABAMA DECEPTIVE
TRADE PRACTICES ACT
ALA. CODE § 8-19-1, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

498.     The Alabama plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

499.     This claim is brought by the Alabama plaintiffs on behalf of residents of Alabama who are members of the class.

500.    The Alabama Deceptive Trade Practices Act (Alabama DTPA) declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."[57]

501.    Plaintiffs and class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

502.    Plaintiffs, class members, Novo Nordisk and Sanofi are "persons" within the meaning of Ala. Code § 8-19-3(3).

503.    Each defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

504.    As alleged in this complaint, the Defendant Drug Manufacturers have made "false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions"[58] with respect to their analog insulins.

505.    The defendants' conduct, as described in this complaint, also constitutes "unconscionable, false, misleading, [and] deceptive act or practice in the conduct of trade or commerce."[59]

506.    Pursuant to Ala. Code § 8-19-10, plaintiffs seek monetary relief against defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

---

[57] Ala. Code § 8-19-5.

[58] *Id.*

[59] *Id.*

507.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code § 8-19-1, *et seq.*

508.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Ala. Code § 8-19-10(e) to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT SIX

### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
### ARIZ. REV. STAT. § 44-1521, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

509.     The Arizona plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

510.     This claim is brought by the Arizona plaintiffs on behalf of residents of Arizona who are members of the class.

511.     The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."[60]

512.     The defendants, plaintiffs, and class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

---

[60] Ariz. Rev. Stat. § 44-1522(A).

513.    Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

514.    The defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

515.    As alleged in this complaint, the defendants have employed "deception," "fraud, false pretense, false promise, misrepresentation, [and/]or concealment"[61] with respect to their analog insulins.

516.    The Defendant Drug Manufacturers' conduct, as described in this complaint, also constitutes "unfair act[s]."[62]

517.    Pursuant to the Arizona CFA, the plaintiffs seek monetary relief against each defendant in an amount to be determined at trial. The plaintiffs also seek punitive damages because the defendants have engaged in conduct that is wanton, reckless, or shows spite or ill-will,[63] and/or acted with reckless indifference to the interests of others.[64]

518.    Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

---

[61] *Id.*

[62] *Id.*

[63] *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 577 (1974); *Lufty v. R. D. Roper & Sons Motor Co.*, 57 Ariz. 495, 115 P.2d 161 (1941)

[64] *See Sellinger*, 110 Ariz. at 577; *McNelis v. Bruce*, 90 Ariz. 261 (1961).

## COUNT SEVEN

## VIOLATION OF THE ARKANSAS
## DECEPTIVE TRADE PRACTICES ACT
## ARK. CODE § 4-88-101, *ET SEQ.*
## (AGAINST ELI LILLY AND NOVO NORDISK)

519.     The Arkansas plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

520.     This claim is brought by the Arkansas plaintiffs on behalf of residents of Arkansas who are members of the class.

521.     The Arkansas Deceptive Trade Practices Act (Arkansas DTPA) prohibits "[d]eceptive and unconscionable trade practices,"[65] which include, but are not limited to, "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade."[66] The Arkansas DTPA also prohibits "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A) Physical infirmity; (B) Ignorance; . . . or (E) A similar factor."[67] The statute further bars, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission."[68]

522.     Defendants, plaintiffs, and class members are "persons" within the meaning of Ark. Code § 4-88-102(5).

---

[65] Ark. Code. § 4-88-107(a).

[66] *Id.* § 4-88-107(a)(10).

[67] *Id.* § 4-88-107(a)(8).

[68] *Id.* § 4-88-108.

- 164 -

523.    Each drug at issue constitutes "goods" within the meaning of Ark. Code § 4-88-102(4).

524.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unconscionable" and "deceptive" acts in violation of the Arkansas DTPA.

525.    Plaintiffs seek monetary relief against defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because defendants acted wantonly in causing plaintiffs' and class members' injuries or with such a conscious indifference to the consequences that malice may be inferred.

526.    Plaintiffs also seek an order enjoining defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT EIGHT

**VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
CAL. CIV. CODE § 1750, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

527.    The California plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

528.    This claim is brought by the California plaintiffs on behalf of residents of California who are members of the class.

529.    The California Legal Remedies Act (CLRA) prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or

- 165 -

lease of goods or services to any consumer,"[69] including: "Making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions."[70]

530.    Each defendant is a "person" under Cal. Civ. Code § 1761(c).

531.    The plaintiffs and class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased one or more analog insulin at issue.

532.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts in violation of the CLRA.

533.    The plaintiffs seek injunctive relief under the CLRA for the defendants' violations of Cal. Civ. Code § 1770. On January 24, 2017, and January 25, 2017, the plaintiffs sent demand letters notifying the defendants of such claims for relief pursuant to Cal. Civ. Code § 1782(d). Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

534.    The plaintiffs also seek, under Cal. Civ. Code § 1780(a), monetary relief against the Defendant Drug Manufacturers for the harm their violations of the CLRA caused the plaintiffs.

535.    Under Cal. Civ. Code § 1780(b), the plaintiffs seek an additional award against each defendant of up to $5,000 for each plaintiff or class member who qualifies as a "senior citizen" or "disabled person" under the CLRA. Each defendant knew or should have known that its conduct was directed to one or more plaintiffs or class members who are senior citizens or disabled persons. The defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or

---

[69] Cal. Civ. Code § 1770(a).

[70] *Id.* § 1770(a)(13).

family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more plaintiffs or class members who are senior citizens or disabled persons are substantially more vulnerable to each defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from each defendant's conduct.

536.     The plaintiffs further seek an order enjoining defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA. The plaintiffs sent letters complying with Cal. Civ. Code § 1780(b) on January 24, 2017, and January 25, 2017, to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT NINE

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

537.     The California plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

538.     This claim is brought by the California plaintiffs on behalf of residents of California who are members of the class.

539.     California Business and Professions Code § 17200 (UCL) prohibits "unlawful, unfair, or fraudulent business acts or practices."

540.     The defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, as described above.

541.    Defendants also violated the "fraudulent" prong of § 17200 through their pricing fraud, as described throughout this complaint.

542.    In addition, the defendants violated the "unfair" prong of § 17200[71] because the defendants' acts and practices described in this complaint, including artificial inflation of benchmark prices to offer large rebates to the PBMs, caused the Defendant Drug Manufacturers to profit at the expense of consumers.

543.    The California courts have set out several definitions of unfairness. The Defendant Drug Manufacturers' conduct is unfair under each of them:

a.      "[T]he consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[72]

b.      The Defendant Drug Manufacturers' conduct "offends an established public policy [the FTC Policy Statement on Unfairness] or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[73]

c.      The plaintiffs' claim is predicated upon public policy which is "'tethered' to specific constitutional, statutory or regulatory provisions."[74]

---

[71] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." (internal quotation marks and citation omitted)).

[72] *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).

[73] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001)).

[74] *See West*, 214 Cal. App. at 806 (quoting *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003)).

544.    The defendants' actions, as set forth above, occurred within the conduct of their business and in trade or commerce.

545.    Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute.

546.    The plaintiffs request that this Court enter such orders or judgments as may be necessary, including: a declaratory judgment that each defendant has violated the UCL; an order enjoining the defendants from continuing their unfair, unlawful, and/or fraudulent trade practices; an order restoring to the plaintiffs any money lost as result of each defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits the defendants received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

547.    In addition, under Cal. Civ. Proc. Code § 1021.5, the Court "may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

## COUNT TEN

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### COLO. REV. STAT. § 6-1-101, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

548.     The Colorado plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

549.     This claim is brought by the Colorado plaintiffs on behalf of residents of Colorado who are members of the class.

550.     The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business including, but not limited to: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."[75]

551.     Each defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

552.     Plaintiffs and class members are "consumers" for purposes of Colo. Rev. Stat. § 6-1-113(1)(a).

553.     Each defendant's conduct, as set forth above, occurred in the conduct or trade or commerce.

554.     As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes: "Advertis[ing] goods, services, or property with intent not to sell them as

---

[75] Colo. Rev. Stat. § 6-1-105(1).

advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods,

services, or property or the reasons for, existence of, or amounts of price reductions"; and

"Fail[ing] to disclose material information concerning goods, services, or property which

information was known at the time of an advertisement or sale if such failure to disclose such

information was intended to induce the consumer to enter into a transaction"[76] in violation of the

Colorado CPA.

555.   Under Colo. Rev. Stat. § 6-1-113, plaintiffs seek monetary relief against each

defendant measured as the greater of (a) actual damages in an amount to be determined at trial

and discretionary trebling of such damages and (b) statutory damages in the amount of $500 for

each plaintiff or class member.

556.   Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, or

deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy

under the Colorado CPA.

**COUNT ELEVEN**

**VIOLATION OF THE CONNECTICUT**
**UNFAIR TRADE PRACTICES ACT**
**CONN. GEN. STAT. § 42-110A, *ET SEQ*.**
**(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

557.   The Connecticut plaintiffs hereby incorporate by reference the allegations

contained in the preceding paragraphs of this Second Amended Complaint.

558.   This claim is brought by the Connecticut plaintiffs on behalf of residents of

Connecticut who are members of the class.

---

[76] *Id.*

559. The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[77]

560. Each defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

561. The defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

562. As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts in violation of the Connecticut UTPA.

563. The plaintiffs and class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

564. The defendants acted with reckless indifference to another's rights or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

565. Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Conn. Gen. Stat. § 42-110g(d).

---

[77] Conn. Gen. Stat. § 42-110b(a).

## COUNT TWELVE

### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### DEL. CODE TIT. 6, § 2513, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

566.    The Delaware plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

567.    This claim is brought by the Delaware plaintiffs on behalf of residents of Delaware who are members of the class.

568.    The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."[78]

569.    Each defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

570.    The defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

571.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins violated the Delaware CFA.

572.    The plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each defendant's unlawful conduct.[79] The plaintiffs also seek

---

[78] Del. Code tit. 6, § 2513(a).

[79] *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).

an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory

relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

573.    The defendants engaged in gross, oppressive, or aggravated conduct justifying the

imposition of punitive damages.

## COUNT THIRTEEN

### VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE
### TRADE PRACTICES ACT
### FLA. STAT. § 501.201, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

574.    The Florida plaintiffs hereby incorporate by reference the allegations contained in

the preceding paragraphs of this Second Amended Complaint.

575.    This claim is brought by the Florida plaintiffs on behalf of residents of Florida

who are members of the class.

576.    The Florida Unfair and Deceptive Trade Practices Act (FUDTPA) prohibits

"[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts

or practices in the conduct of any trade or commerce."[80]

577.    In outlawing unfair acts or practices, the Florida Legislature adopted the FTC's

interpretations of § 5(a)(1) of the Federal Trade Commission Act.[81] The Legislature specifically

stated that a violation of FUDTPA "may be based upon . . . [t]he standards of unfairness . . . set

forth and interpreted by the Federal Trade Commission or the federal courts."[82]

---

[80] Fla. Stat. § 501.204(1).

[81] *Id.* § 501.204(2).

[82] *Id.* § 501.203(3)(b).

578.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the FUDTPA.

579.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the FUDTPA.[83]

580.    Plaintiffs and class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

581.    Each defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

582.    The Florida Legislature has provided that a person who has suffered a loss as a result of a violation of FUDTPA may recover actual damages, plus attorneys' fees and court costs, all of which the plaintiffs seek in this action. The plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

583.    FUDTPA provides that "[a]nyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."[84] The plaintiffs seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the FUDTPA.

---

[83] *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice" under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and noting a separate definition for "deception" (internal quotation marks and citation omitted)).

[84] Fla. Stat. § 501.211(1).

## COUNT FOURTEEN

### VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT OF 1975
### GA. CODE ANN. § 10-1-390, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

584.    The Georgia plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

585.    This claim is brought by the Georgia plaintiffs on behalf of residents of Georgia who are members of the class.

586.    The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful.[85] Such acts include, but are not limited to: "[a]dvertising goods or services with intent not to sell them as advertised"; and "[m]aking false or misleading statements concerning the reasons for, existence of, or amounts of price reductions."[86]

587.    Plaintiffs and class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-393(b).

588.    Each defendant engaged in "trade or commerce" within the meaning of Ga. Code Ann. § 10-1-393(b).

589.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes "[a]dvertising goods or services with intent not to sell them as advertised"

---

[85] Ga. Code. Ann. § 101-393(a).

[86] *Id.* § 10-1-393(b).

and "[m]aking false or misleading statements concerning the reasons for, existence of, or amounts of price reductions."[87]

590.    The plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) under Ga. Code Ann. § 10-1-399(a).

591.    The plaintiffs also seek an order: enjoining the defendants' unfair, unlawful, and/or deceptive practices; attorneys' fees; and any other just and proper relief available under the Georgia FBPA.

592.    On January 24 and 25, 2017, certain plaintiffs sent letters complying with Ga. Code Ann. § 10-1-399(b) to the defendants.

## COUNT FIFTEEN

### VIOLATION OF THE GEORGIA UNIFORM
### DECEPTIVE TRADE PRACTICES ACT
### GA. CODE ANN. § 10-1-370, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

593.    The Georgia plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

594.    This claim is brought by the Georgia plaintiffs on behalf of residents of Georgia who are members of the class.

595.    Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include: "Mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[88]

---

[87] *Id.*

[88] Ga. Code Ann § 10-1-372(a).

- 177 -

596.    The defendants, plaintiffs, and class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

597.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes making "false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in . . .conduct which similarly creates a likelihood of confusion or of misunderstanding."[89]

598.    The plaintiffs seek an order that enjoin each defendant's unfair, unlawful, and/or deceptive practices, awards attorneys' fees, and awards any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT SIXTEEN

### VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### IDAHO CODE § 48-601, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

599.    The Idaho plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

600.    This claim is brought by the Idaho plaintiffs on behalf of residents of Idaho who are members of the class.

601.    The Idaho Consumer Protection Act (Idaho CPA) prohibits "unfair or deceptive acts or practices, including, but not limited to: "(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer"; or

---

[89] *Id.*

- 178 -

"(18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce."[90]

602.    Each defendant is a "person" under Idaho Code Ann. § 48-602(1).

603.    The defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

604.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts under the Idaho CPA.[91]

605.    Under Idaho Code § 48-608, the plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff.

606.    The plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

607.    The plaintiffs also seek punitive damages against defendants because each defendant's conduct evidences an extreme deviation from reasonable standards. The defendants flagrantly, maliciously, and fraudulently misrepresented the actual cost of their analog insulin products and the existence, purpose, and amount of the rebates granted to the PBMs. They concealed facts that only they knew. The defendants' unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

---

[90] Idaho Code Ann. § 48-603.

[91] *Id.*

**COUNT SEVENTEEN**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILL. COMP. STAT. § 505/1, *ET SEQ.***
**(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

608.    The Illinois plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

609.    This claim is brought by the Illinois plaintiffs on behalf of residents of Illinois who are members of the class.

610.    The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."[92]

611.    That section also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[93]

612.    Each defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

613.    The plaintiffs and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

---

[92] 815 Ill. Comp. Stat. § 505/2.

[93] *Id.*

614.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the ICFA.

615.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the ICFA.[94]

616.    The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . . ."[95] Pursuant to this provision of the code, the plaintiffs seek monetary relief against each defendant in the amount of actual damages, as well as punitive damages because defendants each acted with fraud and/or malice and/or was grossly negligent.

617.    The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

## COUNT EIGHTEEN

### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### IND. CODE § 24-5-0.5-2, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

618.    The Indiana plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

619.    This claim is brought by the Indiana plaintiffs on behalf of residents of Indiana who are members of the class.

---

[94] *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (stating that "[a] plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct" and "may allege that conduct is unfair . . . without alleging that the conduct is deceptive").

[95] 815 Ill. Comp. Stat. § 505/10a.

620. Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a supplier from committing "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction."[96] Such acts and practices include, but are not limited to, representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not."[97]

621. Each defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2) and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

622. Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

623. The defendants' conduct, as described in this complaint, constitutes "deceptive acts" as well as "unfair" acts in violation of the Indiana DCSA.

624. Under Ind. Code § 24-5-0.5-4, the plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for defendants' willfully deceptive acts.

625. The plaintiffs also seek punitive damages based on the outrageousness and recklessness of each defendant's conduct.

626. The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under Ind. Code § 24-5-0.5-4.

---

[96] Ind. Code § 24-5-0.5-3(a).

[97] *Id.* § 24-5-0.5-3(b).

627.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Ind. Code § 24-5-0.5-5(a) to the defendants. Because each defendant failed to remedy its unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT NINETEEN

## VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
## IOWA CODE § 714H.1, *ET SEQ.*
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

628.     The Iowa plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

629.     This claim is brought by the Iowa plaintiffs on behalf of residents of Iowa who are members of the class.

630.     The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."[98]

631.     Each defendant is a "person" under Iowa Code § 714H.2(7).

632.     The plaintiffs and class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased insulin.

---

[98] Iowa Code § 714H.3.1.

633.     The defendants' conduct, as described in this complaint, constitutes "deceptive" practices as well as "unfair" practices in violation of the Iowa CFA.

634.     Pursuant to Iowa Code § 714H.5, the plaintiffs seek: an order enjoining each defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of each defendant's willful and wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

635.     Furthermore, pursuant to Iowa Code § 714H.7, the plaintiffs have obtained the permission of the Iowa Attorney General to file this Second Amended Complaint because it is "materially the same" as the original complaint, for which the plaintiffs obtained permission to file.

## COUNT TWENTY

## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
## KAN. STAT. § 50-623, *ET SEQ.*
## (AGAINST NOVO NORDISK)

636.     The Kansas plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

637.     This claim is brought by the Kansas plaintiffs on behalf of residents of Kansas who are members of the class.

638.     The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."[99] Deceptive acts or practices include, but are not limited to: "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the

---

[99] Kan. Stat. § 50-626(a).

willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; and "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions."[100] These acts constitute deceptive conduct "whether or not any consumer has in fact been misled."[101]

639.    Plaintiffs and class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased insulin.

640.    The sale of insulin to plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

641.    The defendants' conduct, as described in this complaint, constitutes "deceptive" practices in violation of the Kansas CPA.

642.    Under Kan. Stat. Ann. § 50-634, the plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

643.    The plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT TWENTY-ONE

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW LA. REV. STAT. § 51:1401, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

644.    The Louisiana plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

---

[100] *Id.* § 50-626(b).

[101] *Id.*

645.    This claim is brought by the Louisiana plaintiffs on behalf of residents of Louisiana who are members of the class.

646.    The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."[102]

647.    The defendants, plaintiffs, and class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).

648.    The plaintiffs and class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

649.    Each defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

650.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" practices in violation of the Louisiana CPL.

651.    Pursuant to La. Rev. Stat. § 51:1409, plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; an order enjoining each defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

---

[102] La. Rev. Stat. § 51:1405(A).

## COUNT TWENTY-TWO

### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

652.     The Maine plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

653.     This claim is brought by the Maine plaintiffs on behalf of residents of Maine who are members of the class.

654.     The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[103]

655.     The defendants, plaintiffs, and class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

656.     The defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

657.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maine UTPA.

658.     Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, the plaintiffs seek an order enjoining each defendant's unfair and/or deceptive acts or practices.

659.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A) to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

---

[103] Me. Rev. Stat. tit. 5, § 207.

## COUNT TWENTY-THREE

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### MD. COM. LAW CODE § 13-101, *ET SEQ.*
### (AGAINST ELI LILLY AND NOVO NORDISK)

660.     The Maryland plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

661.     This claim is brought by the Maryland plaintiffs on behalf of residents of Maryland who are members of the class.

662.     The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice, including: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"; "Failure to state a material fact if the failure deceives or tends to deceive"; "False or misleading representation[s] of fact which concern[] . . . [t]he reason for or the existence or amount of a price reduction"; and "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same."[104] The statute further provides that a person may not engage in such conduct regardless of whether the consumer is actually deceived or damaged.[105]

663.     Defendants, plaintiffs, and class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

664.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maryland CPA.

---

[104] Md. Code, Com. Law § 13-301.

[105] *Id.* § 13-302.

665.     Pursuant to Md. Code, Com. Law § 13-408, plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

666.     The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under Md. Code, Com. Law § 13-406.

**COUNT TWENTY-FOUR**

**VIOLATION OF THE MASSACHUSETTS
GENERAL LAW CHAPTER 93(A)
MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

667.     The Massachusetts plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

668.     This claim is brought by the Massachusetts plaintiffs on behalf of residents of Massachusetts who are members of the class.

669.     Massachusetts law (the Massachusetts Act) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[106]

670.     The defendants, plaintiffs, and class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

671.     Each defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

672.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Massachusetts Act.

---

[106] Mass. Gen. Laws ch. 93A, § 2.

673.     Pursuant to Mass. Gen. Laws ch. 93A, § 9, the plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff. Because the defendants' conduct was committed willfully and knowingly, the plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

674.     The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

675.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Mass. Gen. Laws ch. 93A, § 9(3) to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT TWENTY-FIVE

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### MICH. COMP. LAWS § 445.902, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

676.     The Michigan plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

677.     This claim is brought by the Michigan plaintiffs on behalf of residents of Michigan who are members of the class.

678.     The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which

tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."[107]

679.    Plaintiffs and class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

680.    Each defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

681.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Michigan CPA.

682.    The plaintiffs seek: injunctive against the defendants to prevent their continuing unfair and deceptive acts; monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

683.    The plaintiffs also seek punitive damages because each defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented the actual price of their analog insulins, inflated their benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. They manipulated the price of

---

[107] Mich. Comp. Laws § 445.903(1).

their life-saving products without regard to the impact of their scheme on consumers' ability to

afford a life-saving product. The defendants' conduct constitutes malice, oppression, and fraud,

warranting punitive damages.

## COUNT TWENTY-SIX

### VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### MINN. STAT. § 325F.68, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

684.    The Minnesota plaintiffs hereby incorporate by reference the allegations

contained in the preceding paragraphs of this Second Amended Complaint.

685.    This claim is brought by the Minnesota plaintiffs on behalf of residents of

Minnesota who are members of the class.

686.    The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits

"[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with the intent that others rely

thereon in connection with the sale of any merchandise, whether or not any person has in fact

been misled, deceived, or damaged thereby."[108]

687.    Each purchase of analog insulin constitutes "merchandise" within the meaning of

Minn. Stat. § 325F.68(2).

688.    The defendants' conduct, as described in this complaint, constitutes "deceptive"

acts or practices in violation of the Minnesota CFA.

689.    Pursuant to Minn. Stat. § 8.31(3a), the plaintiffs seek actual damages, attorneys'

fees, injunctive relief, and any other just and proper relief available under the Minnesota CFA.

---

[108] Minn. Stat. § 325F.69(1).

690.    The plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT TWENTY-SEVEN

## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT
## MINN. STAT. §§ 325D.43-48, *ET SEQ.*
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

691.    The Minnesota plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

692.    This claim is brought by the Minnesota plaintiffs on behalf of residents of Minnesota who are members of the class.

693.    The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[109]

694.    The defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota DTPA.

695.    Pursuant to Minn. Stat. §§ 325 D.45, F.70, the plaintiffs seek actual damages, attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota DTPA.

---

[109] Minn. Stat. § 325D.44.

696.    The plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts showed deliberate disregard for the rights or safety of others.

### COUNT TWENTY-EIGHT

### VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT
### MISS. CODE § 75-24-1, ET SEQ.
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

697.    The Mississippi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

698.    This claim is brought by the Mississippi plaintiffs on behalf of residents of Mississippi who are members of the class.

699.    The Mississippi Consumer Protection Act (Mississippi CPA) prohibits "unfair or deceptive trade practices in or affecting commerce."[110] Unfair or deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions."[111]

700.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Mississippi CPA.

701.    The plaintiffs seek actual damages in an amount to be determined at trial any other just, injunctive relief, and proper relief available under the Mississippi CPA.

---

[110] Miss. Code Ann. § 75-24-5(1).

[111] *Id.* § 75-24-5(2).

## COUNT TWENTY-NINE

## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
## MO. REV. STAT. § 407.010, *ET SEQ.*
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

702.    The Missouri plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

703.    This claim is brought by the Missouri plaintiffs on behalf of residents of Missouri who are members of the class.

704.    The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."[112]

705.    The defendant, plaintiffs, and class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

706.    The defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

707.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Missouri MPA.

708.    The defendants are liable to the plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

---

[112] Mo. Rev. Stat. § 407.020.1.

**COUNT THIRTY**

**VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT OF 1973
MONT. CODE ANN. § 30-14-101, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

709.    The Montana plaintiffs hereby incorporate by reference the allegations contained
in the preceding paragraphs of this Second Amended Complaint.

710.    This claim is brought by the Montana plaintiffs on behalf of residents of Montana
who are members of the class.

711.    The Montana Unfair Trade Practices and Consumer Protection Act (Montana
CPA) makes unlawful any "[u]nfair methods of competition and unfair or deceptive acts or
practices in the conduct of any trade or commerce."[113]

712.    The defendants, plaintiffs, and class members are "persons" within the meaning
of Mont. Code Ann. § 30-14-102(6).

713.    The plaintiffs and class members are "consumer[s]" under Mont. Code Ann. § 30-
14-102(1).

714.    The sale of each drug at issue occurred within "trade and commerce" within the
meaning of Mont. Code Ann. § 30-14-102(8), and each defendant committed deceptive and
unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

715.    The defendants' conduct, as described in this complaint, constitutes both
"deceptive" and "unfair" acts or practices in violation of the Montana CPA.

716.    Because the defendants' unlawful methods, acts, and practices have caused the
plaintiffs to suffer an ascertainable loss of money and property, the plaintiffs seek from each

---

[113] Mont. Code Ann. § 30-14-103.

defendant the greater of actual damages or $500. The plaintiffs further seek to treble their actual damages under Mont. Code Ann. § 30-14-133.

717.    The plaintiffs also seek reasonable attorneys' fees under Mont. Code Ann. § 30-14-133.

718.    Finally, the plaintiffs seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper under Mont. Code Ann. § 30-14-133.

**COUNT THIRTY-ONE**

**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
NEB. REV. STAT. § 59-1601, ET SEQ.
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

719.    The Nebraska plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

720.    This claim is brought by the Nebraska plaintiffs on behalf of residents of Nebraska who are members of the class.

721.    The Nebraska Consumer Protection Act (Nebraska CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[114]

722.    The defendants, plaintiffs, and class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

723.    The defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

724.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Nebraska CPA.

---

[114] Neb. Rev. Stat. § 59-1602.

725.    Because the defendants' conduct caused injury to the plaintiffs' property through violations of the Nebraska CPA, the plaintiffs seek recovery of: actual damages, as well as enhanced damages up to $1,000; an order enjoining each defendant's unfair or deceptive acts and practices; costs of Court; reasonable attorneys' fees; and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

**COUNT THIRTY-TWO**

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
NEV. REV. STAT. § 598.0903, *ET SEQ.*
(AGAINST SANOFI)**

726.    The Nevada plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

727.    This claim is brought by the Nevada plaintiffs on behalf of residents of Nevada who are members of the class.

728.    The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions"[115]; "[k]nowingly makes any other false representation in a transaction"[116]; "[f]ails to disclose a material fact in connection with the sale or lease of goods or services"[117]; and/or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless,

---

[115] Nev. Rev. Stat. § 598.0915.

[116] *Id.*

[117] *Id.* § 598.0923.

at the time the assertion is made, the person making it has possession of factually objective

scientific, clinical or quantifiable evidence which substantiates the assertion."[118]

729.    The defendants' conduct, as described in this complaint, constitutes "deceptive"

acts or practices in violation of the Nevada CTPA.

730.    The plaintiffs seek their actual damages, punitive damages, an order enjoining the

defendants' deceptive acts or practices, costs of court, attorneys' fees, and all other appropriate

and available remedies under Nev. Rev. Stat. § 41.600.

### COUNT THIRTY-THREE

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. STAT. ANN. § 56:8-1, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

731.    The New Jersey plaintiffs hereby incorporate by reference the allegations

contained in the preceding paragraphs of this Second Amended Complaint.

732.    This claim is brought by the New Jersey plaintiffs on behalf of residents of New

Jersey who are members of the class.

733.    The New Jersey Consumer Fraud Act (NJCFA) makes unlawful "[t]he act, use or

employment by any person of any unconscionable commercial practice, deception, fraud, false

pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission

of any material fact with the intent that others rely upon such concealment, suppression or

omission, in connection with the sale or advertisement of any merchandise or real estate, or with

the subsequent performance of such person as aforesaid, whether or not any person has in fact

been misled, deceived or damaged thereby . . . ."[119]

---

[118] *Id.* § 598.0925.

[119] N.J. Stat. Ann. § 56:8-2.

734. The defendants, plaintiffs, and class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

735. The defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

736. As described above, the defendants' conduct, as described in this complaint, constitutes "deceptive," "unfair," and "unconscionable" acts or practices in violation of the NJCFA.

737. This wrongful conduct by the defendants, coupled with the damage the New Jersey plaintiffs and class members incurred, entitles members of the class to relief under the NJCFA. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[120] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[121]

738. Therefore, the plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

---

[120] N.J. Stat. Ann. § 56:8-19.

[121] *Id.*

## COUNT THIRTY-FOUR

### VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### N.M. STAT. § 57-12-1, *ET SEQ.*
### (AGAINST NOVO NORDISK AND SANOFI)

739.    The New Mexico plaintiffs hereby incorporate by reference the allegations

contained in the preceding paragraphs of this Second Amended Complaint.

740.    This claim is brought by the New Mexico plaintiffs on behalf of residents of New

Mexico who are members of the class.

741.    The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes

unlawful "a false or misleading oral or written statement, visual description or other

representation of any kind knowingly made in connection with the sale . . . of goods or services

. . . by a person in the regular course of the person's trade or commerce, that may, tends to or

does deceive or mislead any person," including, but not limited to: "making false or misleading

statements of fact concerning the price of goods or services, the prices of competitors or one's

own price at a past or future time or the reasons for, existence of or amounts of price reduction";

"making false or misleading statements of fact for the purpose of obtaining appointments for the

demonstration, exhibition or other sales presentation of goods or services"; and/or "failing to

state a material fact if doing so deceives or tends to deceive."[122]

742.    The New Mexico UTPA further makes unlawful "unconscionable trade

practice[s]," meaning "an act or practice in connection with the sale . . . or in connection with the

offering for sale . . . of any goods or services, . . . that to a person's detriment: (1) takes

advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair

---

[122] N.M. Stat. Ann. § 57-12-2(D).

degree; or (2) results in a gross disparity between the value received by a person and the price paid."[123]

743.    The defendants, plaintiffs, and class members are "person[s]" under N.M. Stat. § 57-12-2.

744.    The defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. § 57-12-2.

745.    The defendants' conduct, as described in this complaint, constitutes a pattern of "false or misleading oral or written statement[s]" in violation of N.M. Stat. Ann. § 57-12-2(D).

746.    The defendants' conduct, as described in this complaint, also constitutes a pattern of "unconscionable trade practice[s]" in violation of N.M. Stat. Ann. § 57-12-2(E).

747.    Because the defendants' false, unconscionable, and willful conduct caused actual harm to the plaintiffs, the plaintiffs seek recovery of: actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; reasonable attorneys' fees and costs; injunctive relief, and all other proper and just relief available under N.M. Stat. § 57-12-10.

## COUNT THIRTY-FIVE

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### N.Y. GEN. BUS. LAW §§ 349-350
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

748.    The New York plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

749.    This claim is brought by the New York plaintiffs on behalf of residents of New York who are members of the class.

---

[123] *Id.* § 57-12-2(E).

750.    The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."[124]

751.    The plaintiffs and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

752.    Each defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

753.    The defendants' conduct, as described in this complaint, constitutes deceptive acts in violation of the New York GBL.

754.    The defendants' deceptive acts and practices, which were intended to mislead consumers who purchased analog insulin, constitutes conduct directed at consumers.

755.    Because the defendants' willful and knowing conduct caused injury to the plaintiffs, the plaintiffs seek recovery of: actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining defendants' unlawful conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT THIRTY-SIX

### VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### N.C. GEN. STAT. § 75-1.1, *ET SEQ.*
### (AGAINST NOVO NORDISK AND SANOFI)

756.    The North Carolina plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

---

[124] N.Y. Gen. Bus. Law § 349.

757.     This claim is brought by the North Carolina plaintiffs on behalf of residents of North Carolina who are members of the class.

758.     North Carolina's Unfair and Deceptive Acts and Practices Act (NCUDTPA) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."[125]

759.     The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the NCUDTPA.

760.     In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the NCUDTPA.[126]

761.     Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

762.     Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages: "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict."[127]

---

[125] N.C. Gen. Stat. § 75-1.1(a).

[126] *Melton v. Family First Mortg. Corp.*, 576 S.E.2d 365, 368 (2003) ("A practice is unfair [under the NCUDTPA] when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" and offering a separate definition for "deceptive" practices (internal quotation marks and citations omitted)).

[127] N.C. Gen. Stat. § 75-16.

763.     The plaintiffs seek an order trebling their actual damages, an order enjoining defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

### COUNT THIRTY-SEVEN

### VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### N.D. CENT. CODE § 51-15-02
### (AGAINST ELI LILLY)

764.     The North Dakota plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

765.     This claim is brought by the North Dakota plaintiffs on behalf of residents of North Dakota who are members of the class.

766.     The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice."[128] The statute further provides that the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice."[129]

---

[128] N.D. Cent. Code § 51-15-02.

[129] *Id.*

767.    The defendants, plaintiffs, and class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

768.    The defendants engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

769.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the North Dakota CFA.

770.    In addition, the defendants' conduct, as described in this complaint, constitutes "unconscionable conduct" acts in violation of the North Dakota CFA.

771.    The defendants knowingly committed the conduct described above. As a result, under N.D. Cent. Code § 51-15-09, the defendants are liable to the plaintiffs for treble damages in amounts to be proven at trial, attorneys' fees, costs, and disbursements. The plaintiffs further seek an order enjoining each defendant's unfair and/or deceptive acts or practices as well as other just and proper available relief under the North Dakota CFA.

## COUNT THIRTY-EIGHT

### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT OHIO REV. CODE ANN. § 1345.01, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

772.    The Ohio plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

773.    This claim is brought by the Ohio plaintiffs on behalf of residents of Ohio who are members of the class.

774.    The Ohio Consumer Sales Practices Act (Ohio CSPA) broadly prohibits "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."[130] Specifically, and

---

[130] Ohio Rev. Code Ann. § 1345.02.

- 206 -

without limitation on the broad prohibition, the Ohio CSPA prohibits suppliers from representing that "a specific price advantage exists, if it does not."[131]

775.   Each defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

776.   The plaintiffs and class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D).

777.   The plaintiffs' purchases of analog insulins are "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

778.   The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Ohio CSPA.

779.   In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the Ohio CSPA.

780.   As a result of the defendants' wrongful conduct, the plaintiffs have been damaged in an amount to be proven at trial. They seek all just and proper remedies, including, but not limited to: actual and statutory damages, an order enjoining defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.*

### COUNT THIRTY-NINE

### VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### OKLA. STAT. TIT. 15, § 751, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

781.   The Oklahoma plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

---

[131] *Id.*

782.    This claim is brought by the Oklahoma plaintiffs on behalf of residents of Oklahoma who are members of the class.

783.    The Oklahoma Consumer Protection Act (Oklahoma CPA) declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction"[132] and/or "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[133]

784.    The Oklahoma CPA further provides that if "[t]he commission of any act or practice declared to be a violation of the Consumer Protection Act" "is also found to be unconscionable," the violator is liable to the aggrieved customer for the payment of a civil penalty, recoverable in an individual action only, in a sum set by the court of not more than Two Thousand Dollars ($2,000.00) for each violation."[134] "In determining whether an act or practice is unconscionable the following circumstances shall be taken into consideration by the court: (1) whether the violator knowingly or with reason to know, took advantage of a consumer reasonably unable to protect his or her interests because of his or her age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) whether, at the time the consumer transaction was entered into, the violator knew or had reason to know that price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers; . . . [and] (4) whether the violator knew or

---

[132] Okla. Stat. tit. 15, § 753.

[133] *Id.* § 752.

[134] *Id.* § 761.1.

had reason to know that the transaction he or she induced the consumer to enter into was excessively one-sided in favor of the violator."[135]

785.    The plaintiffs and class members are "persons" under Okla. Stat. tit. 15, § 752.

786.    Each defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

787.    The sale of insulin to the plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and each defendant's actions as set forth herein occurred in the conduct of trade or commerce.

788.    The defendants' conduct, as described in this complaint, constitutes "false or misleading statements" in violation of the Oklahoma CPA. The defendants' conduct, as described in this complaint, further constitutes practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers in violation of the Oklahoma CPA.

789.    The defendants' conduct as alleged herein was also unconscionable because (1) the defendants, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) the defendants knew or had reason to know that their benchmark prices grossly exceeded the prices at which similar property or services were readily obtainable in similar transactions by like consumers; and (3) the defendants knew or had reason to know that the transactions they induced the consumers to enter were excessively one-sided in favor of each defendant.

790.    The plaintiffs seek punitive damages because the defendants' conduct was egregious. The defendants misrepresented the actual prices of their analog insulins, inflated their

---

[135] *Id.*

benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. They manipulated the prices of their life-saving analog insulins without regard to the impact of their scheme on consumers' ability to afford these life-saving drugs. The defendants' egregious conduct warrants punitive damages.

791.    Furthermore, because the defendants' unconscionable conduct caused injury to plaintiffs, plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees under Okla. Stat. tit. 15, § 761.1. The plaintiffs further seek an order enjoining each defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under the Oklahoma CPA.

**COUNT FORTY**

**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
OR. REV. STAT. § 646.605, *ET SEQ.*
(AGAINST NOVO NORDISK AND SANOFI)**

792.    The Oregon plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

793.    This claim is brought by the Oregon plaintiffs on behalf of residents of Oregon who are members of the class.

794.    The Oregon Unfair Trade Practices Act (Oregon UTPA) prohibits a person from, in the course of the person's business: making "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions"; making "false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods"; or engaging "in any other unfair or deceptive conduct in trade or commerce."[136]

795.    Each defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

---

[136] Or. Rev. Stat. § 646.608(1).

796.     Each analog insulin at issue is a "good" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

797.     The defendants' conduct, as described in this complaint, constitutes "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions" on the analog insulins; "false or misleading representations of fact concerning the offering price of, or the person's cost for" the analog insulins; and "unfair or deceptive conduct."[137]

798.     The plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). The plaintiffs are also entitled to punitive damages because defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others. The plaintiffs further seek an order enjoining each defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under Or. Rev. Stat. §§ 646.632, 636.

## COUNT FORTY-ONE

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW 73 PA. CONS. STAT. § 201-1, *ET SEQ.* (AGAINST ELI LILLY AND NOVO NORDISK)

799.     The Pennsylvania plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

800.     This claim is brought by the Pennsylvania plaintiffs on behalf of residents of Pennsylvania who are members of the class.

---

[137] *Id.*

801.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pennsylvania CPL) prohibits "unfair or deceptive acts or practices," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."[138]

802.    The defendants, plaintiffs, and class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

803.    The plaintiffs purchased analog insulin primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

804.    All of the acts complained of herein were perpetrated by the defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

805.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Pennsylvania CPL.

806.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the Pennsylvania CPL.

807.    The defendants are liable to the plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.[139] The plaintiffs are also entitled to an award of punitive damages because the defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

---

[138] 73 Pa. Cons. Stat. § 201-2(4).

[139] 73 Pa. Cons. Stat. § 201-9.2(a).

## COUNT FORTY-TWO

## VIOLATION OF THE SOUTH CAROLINA
## UNFAIR TRADE PRACTICES ACT
## S.C. CODE ANN. § 39-5-10, *ET SEQ.*
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

808.    The South Carolina plaintiffs hereby incorporate by reference the allegations

contained in the preceding paragraphs of this Second Amended Complaint.

809.    This claim is brought by the South Carolina plaintiffs on behalf of residents of

South Carolina who are members of the class.

810.    The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits

"unfair or deceptive acts or practices in the conduct of any trade or commerce."[140]

811.    Each defendant is a "person" under S.C. Code Ann. § 39-5-10.

812.    The defendants' conduct, as described in this complaint, constitutes "deceptive

acts" in violation of the South Carolina UTPA.

813.    In addition, the defendants' conduct, as described in this complaint, constitutes

"unfair" acts in violation of the South Carolina UTPA.

814.    Pursuant to S.C. Code Ann. § 39-5-140(a), the plaintiffs seek monetary relief to

recover their economic losses. Because the defendants' actions were willful and knowing, the

plaintiffs' damages should be trebled.

815.    The plaintiffs further allege that the defendants' malicious and deliberate conduct

warrants an assessment of punitive damages because the defendants carried out despicable

conduct with willful and conscious disregard of the rights and safety of others, subjecting the

plaintiffs to cruel and unjust hardship as a result. The defendants misrepresented the actual prices

---

[140] S.C. Code Ann. § 39-5-20(a).

of the analog insulins, inflated their benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. They manipulated the prices of their life-saving products without regard to the impact of their scheme on consumers' ability to afford life-saving medicines. The defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

816.    The plaintiffs further seek an order enjoining each defendant's unfair or deceptive acts or practices.

## COUNT FORTY-THREE

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### TENN. CODE ANN. § 47-18-101, *ET SEQ.*
### (AGAINST ELI LILLY AND NOVO NORDISK)

817.    The Tennessee plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

818.    This claim is brought by the Tennessee plaintiffs on behalf of residents of Tennessee who are members of the class.

819.    Tennessee Consumer Protection Act (Tennessee CPA) prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."[141]

820.    The plaintiffs and class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

821.    Each defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

---

[141] Tenn. Code Ann. § 47-18-104.

822.     Each defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

823.     The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Tennessee CPA.

824.     Pursuant to Tenn. Code Ann. § 47-18-109(a), the plaintiffs seek monetary relief against each defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT FORTY-FOUR

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
### TEX. BUS. & COM. CODE § 17.41, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

825.     The Texas plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

826.     This claim is brought by the Texas plaintiffs on behalf of residents of Texas who are members of the class.

827.     Plaintiffs are individuals, partnerships, and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).[142]

828.     The Texas Deceptive Trade Practices-Consumer Protection Act (TDTPA) provides: "(a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is: (A)

---

[142] *See* Tex. Bus. & Com. Code § 17.41.

specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and (B) relied on by a consumer to the consumer's detriment; . . . [and] ([2]) any unconscionable action or course of action by any person . . . ."[143]

829.    The TDTPA defines an "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[144] The Texas courts further define an unconscionable act as "one that takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a 'grossly unfair degree,' or which results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration."[145]

830.    As alleged in this complaint, the defendants have engaged in false, misleading, or deceptive acts.

831.    They have also engaged in unconscionable actions in violation of the TDTPA. The defendants knew, or had reason to know, that consumers would rely on their reported benchmark price as the prices of their analog insulin. And they knew that these benchmark prices were not fair or reasonable approximations of the actual cost of those analog insulins.

---

[143] *Id.* § 17.50.

[144] *Id.* § 17.45(5).

[145] *Brennan v. Manning*, No. 07-06-0041-CV, 2007 WL 1098476, at *5 (Tex. App. Apr. 12, 2007); *see also Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 623, 2017 WL 3298391, at *11 (Tex. Ct. App. Aug 3, 2017) ("The DTPA defines '[u]nconscionable action or course of action' as 'an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.'" (quoting Tex. Bus. & Comm. Code Ann. § 17.45(5))); *Robinson v. Match.com, L.L.C.*, 3:10-CV-2651-L, 2012 WL 5007777, at *4 (N.D. Tex. Oct. 17, 2012), *aff'd sub nom. Malsom v. Match.com, L.L.C.*, 540 F. App'x 412 (5th Cir. 2013); *McPeters v. LexisNexis*, 910 F. Supp. 2d 981, 988 (S.D. Tex. 2012).

832.    Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the plaintiffs seek monetary relief against the defendants measured as actual damages in an amount to be determined at trial, treble damages for defendants' knowing violations of the TDTPA, and any other just and proper relief available under the TDTPA.

833.    Alternatively, or additionally, pursuant to Tex. Bus. & Com. Code § 17.50(b)(3) & (4), the plaintiffs who purchased analog insulin from the defendants in the class period are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on the defendants' violations of the TDTPA.

834.    The plaintiffs are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the TDTPA.

835.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Tex. Bus. & Com. Code § 17.50(a) to defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

### COUNT FORTY-FIVE

### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
### UTAH CODE § 13-11-1, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

836.    The Utah plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

837.    This claim is brought by the Utah plaintiffs on behalf of residents of Utah who are members of the class.

838.    The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."[146]

839.    "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.[147]

840.    As alleged in this complaint, the defendants have engaged in deceptive acts in violation of the Utah CSPA.

841.    They have also engaged in unconscionable actions in violation of the Utah CSPA. The defendants knew, or had reason to know, that consumers would rely on their reported benchmark price as the prices of their analog insulin. And they knew that these benchmark prices were not fair or reasonable approximations of the actual cost of those analog insulins.

842.    Pursuant to Utah Code Ann. § 13-11-4, the plaintiffs seek: monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

### COUNT FORTY-SIX

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### VA. CODE ANN. § 59.1-196, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

843.    The Virginia plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

---

[146] Utah Code § 13-11-4.

[147] *Id.* § 13-11-5.

844.    This claim is brought by the Virginia plaintiffs on behalf of residents of Virginia who are members of the class.

845.    The Virginia Consumer Protection Act (Virginia CPA) lists prohibited "fraudulent acts or practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."[148]

846.    Each defendant is a "supplier" under Va. Code Ann. § 59.1-198.

847.    The defendants' advertisements of the analog insulins' benchmark prices were "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

848.    The defendants' conduct, as described in this complaint, constitutes "fraudulent acts" in violation of the Virginia CPA.

849.    Pursuant to Va. Code Ann. § 59.1-204, the plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff. Because the defendants' conduct was committed willfully and knowingly, the plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

850.    The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq*.

---

[148] Va. Code Ann. § 59.1-200.

## COUNT FORTY-SEVEN

## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
## WASH. REV. CODE § 19.86.010, *ET SEQ.*
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

851.    The Washington plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

852.    This claim is brought by the Washington plaintiffs on behalf of residents of Washington who are members of the class.

853.    The Washington Consumer Protection Act (Washington CPA) broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[149]

854.    Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code. § 19.86.010.

855.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Washington CPA.

856.    The defendants' conduct, as described in this complaint, constitutes "unfair acts" in violation of the Washington CPA.

857.    The defendants are liable to the plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. § 19.86.090.

---

[149] Wash. Rev. Code. § 19.86.020.

## COUNT FORTY-EIGHT

## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT
## AND PROTECTION ACT
## W. VA. CODE § 46A-1-101, *ET SEQ.*
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

858.   The West Virginia plaintiffs hereby incorporate by reference the allegations

contained in the preceding paragraphs of this Second Amended Complaint.

859.   This claim is brought by the West Virginia plaintiffs on behalf of residents of

West Virginia who are members of the class.

860.   The West Virginia Consumer Credit and Protection Act (West Virginia CCPA)

prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[150]

Without limitation, "unfair or deceptive" acts or practices include:

> (I)   Advertising goods or services with intent not to sell them as
> advertised;
>
> . . .
>
> (K)   Making false or misleading statements of fact concerning
> the reasons for, existence of or amounts of price reductions;
>
> (L)   Engaging in any other conduct which similarly creates a
> likelihood of confusion or of misunderstanding;
>
> (M)   The act, use or employment by any person of any
> deception, fraud, false pretense, false promise or
> misrepresentation, or the concealment, suppression or omission of
> any material fact with intent that others rely upon such
> concealment, suppression or omission, in connection with the sale
> or advertisement of any goods or services, whether or not any
> person has in fact been misled, deceived or damaged thereby;
>
> (N)   Advertising, printing, displaying, publishing, distributing or
> broadcasting, or causing to be advertised, printed, displayed,
> published, distributed or broadcast in any manner, any statement or
> representation with regard to the sale of goods or the extension of
> consumer credit including the rates, terms or conditions for the sale

---

[150] W. Va. Code § 46A-6-104.

of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.[151]

861.     The defendants are "persons" under W. Va. Code § 46A-1-102(31).

862.     The plaintiffs are "consumers," as defined by W. Va. Code § 46A-6-102(2).

863.     The defendants engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

864.     The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the West Virginia CCPA.

865.     The defendants' conduct, as described in this complaint, constitutes "unfair acts" in violation of the West Virginia CCPA.

866.     Pursuant to W. Va. Code § 46A-6-106, the plaintiffs seek monetary relief against the defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each plaintiff.

867.     The plaintiffs also seek punitive damages against the defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting plaintiffs to cruel and unjust hardship as a result.

868.     The plaintiffs further seek an order enjoining the defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorney's fees under W. Va. Code § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

---

[151] *Id.* § 46A-6-102(7).

869.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with W. Va. Code § 46A-6-106(b) to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

### COUNT FORTY-NINE

### VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT WIS. STAT. § 100.18 (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

870.    The Wisconsin plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint.

871.    This claim is brought by the Wisconsin plaintiffs on behalf of residents of Wisconsin who are members of the class.

872.    The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading."[152]

873.    Each defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

874.    The plaintiffs and class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiffs purchased analog insulin.

875.    The defendants' conduct, as described in this complaint, constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

---

[152] Wis. Stat. § 100.18(1).

876.    The plaintiffs are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because the defendants' conduct was committed knowingly and/or intentionally, the plaintiffs are entitled to treble damages.

877.    The plaintiffs also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

## DEMAND FOR JUDGMENT

WHEREFORE, the plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare the plaintiffs as the representatives of the class;

B.    Enter judgments against the defendants and in favor of the plaintiffs and the class;

C.    Award the class damages (i.e., three times overcharges) in an amount to be determined at trial;

D.    Award the plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

E.    Enjoin the defendants from continuing to report artificially inflated benchmark prices that do not approximate their true net prices to CVS, Express Scripts, and OptumRx.

Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the plaintiffs, on behalf of themselves

and the proposed class, demand a trial by jury on all issues so triable.

Dated: March 18, 2019        Respectfully submitted,

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.


By      /s/ James E. Cecchi
     James E. Cecchi (NJBA #030861989)
Lindsey H. Taylor
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com


By      /s/ Steve W. Berman
     Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com


Thomas M. Sobol (admitted *pro hac vice*)
Hannah W. Brennan (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com


Craig L. Briskin (admitted *pro hac vice*)
MEHRI & SKALET, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, D.C. 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cbriskin@findjustice.com

Linda P. Nussbaum (admitted *pro hac vice*)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com

Michael E. Criden (admitted *pro hac vice*)
Lindsey C. Grossman (admitted *pro hac vice*)
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
mcriden@Cridenlove.com
lgrossman@cridenlove.com

Jayne A. Goldstein (admitted *pro hac vice*)
SHEPHERD FINKELMAN MILLER & SHAH, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jgoldstein@sfmslaw.com

Natalie Finkelman Bennett (NJBA #033601989)
SHEPHERD FINKELMAN MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
nfinkelman@sfmslaw.com

Roberta D. Liebenberg (admitted *pro hac vice*)
Adam J. Pessin (admitted *pro hac vice*)
Fine, Kaplan and Black, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

Lynn Lincoln Sarko (admitted *pro hac vice*)
Derek W. Loeser (admitted *pro hac vice*)
Gretchen S. Obrist (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Michael Critchley (NJBA #251821972)
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue, Suite 303
Roseland, New Jersey 07068
Telephone: (973) 422-9200
Facsimile: (973) 422-9700
mcritchley@critchleylaw.com

Ellen Relkin (NJBA #006691985)
WEITZ & LUXENBERG
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Telephone: (212) 558-5500
ERelkin@weitzlux.com

Paul F. Novak (admitted *pro hac vice*)
Diana Gjonaj (admitted *pro hac vice*)
Gregory Stamatopoulos (admitted *pro hac vice*)
WEITZ & LUXENBERG
719 Griswold, Ste. 620
Detroit, MI 48226
Telephone: (313) 800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

Todd A. Seaver (admitted *pro hac vice*)
Jessica Moy (admitted *pro hac vice*)
BERMAN TABACCO
44 Montgomery St., Ste. 650
San Francisco, CA 94104
Telephone: (415) 433-3200
tseaver@bermantabacco.com
jmoy@bermantabacco.com

Nyran Rose Rasche (*pro hac vice* forthcoming)
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60601
Telephone: (312) 782-4880
nrasche@caffertyclobes.com

Stephen H. Weil (admitted *pro hac vice*)
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
Telephone: 312-585-7404
steve@weilchardon.com

*Attorneys for Plaintiffs*