James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Ave., Suite 2000
Seattle, WA 98101
(206) 623-7292

*Co-Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IN RE INSULIN PRICING
LITIGATION

Civil Action No. 3:17-cv-00699(BRM)(LHG)

## THIRD AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

                                                                                        **Page**

THIRD AMENDED CLASS ACTION COMPLAINT.................................................................1

I.      INTRODUCTION.................................................................................................1

II.     PARTIES...............................................................................................................13

        A.      Plaintiffs...................................................................................................13

                1.      Alabama Plaintiff.........................................................................13

                        a.      Richard Sanders.................................................................13

                2.      Arizona Plaintiffs.........................................................................13

                        a.      Deanna Grimm...................................................................13

                        b.      Samantha Jensen.................................................................14

                3.      Arkansas Plaintiff.........................................................................14

                        a.      Lynn Davidson....................................................................14

                4.      California Plaintiffs.......................................................................15

                        a.      Sara Hasselbach..................................................................15

                        b.      Jeanne MacNitt...................................................................15

                        c.      Bertha Sanders....................................................................16

                5.      Colorado Plaintiff.........................................................................16

                        a.      Donald Douthit...................................................................16

                6.      Connecticut Plaintiff....................................................................17

                        a.      Samantha Jensen.................................................................17

                7.      Delaware Plaintiff.........................................................................17

                        a.      Ann-Marie Jordan..............................................................17

                8.      Florida Plaintiffs..........................................................................18

                        a.      Ritch Hoard........................................................................18

| | | | |
|---|---|---|---|
| | b. | Barbara Johnson .................................................................. | 18 |
| | c. | Anne Olinger ....................................................................... | 19 |
| | d. | Tremayne Sirmons .............................................................. | 19 |
| | e. | Hector J. Valdes, Sr. .......................................................... | 20 |
| | f. | Ann-Marie Jordan ............................................................... | 20 |
| 9. | | Georgia Plaintiff ................................................................. | 21 |
| | a. | Marilyn Person .................................................................... | 21 |
| 10. | | Illinois Plaintiffs ................................................................ | 21 |
| | a. | Andrè Arnold ...................................................................... | 21 |
| | b. | Adam Levett ........................................................................ | 22 |
| 11. | | Indiana Plaintiffs ................................................................ | 22 |
| | a. | Mary Bobo ........................................................................... | 22 |
| | b. | Arthur Janz .......................................................................... | 23 |
| | c. | Marie Saffran ...................................................................... | 23 |
| | d. | Scott Dercks ........................................................................ | 24 |
| 12. | | Iowa Plaintiff ...................................................................... | 24 |
| | a. | Richard Knauss ................................................................... | 24 |
| 13. | | Kansas Plaintiffs ................................................................. | 25 |
| | a. | Kandyce Gunther ................................................................. | 25 |
| | b. | Susan Marsh ........................................................................ | 25 |
| 14. | | Louisiana Plaintiffs ............................................................. | 26 |
| | a. | Terry Brewster ..................................................................... | 26 |
| | b. | Robyn Rushing ..................................................................... | 26 |
| 15. | | Maine Plaintiff .................................................................... | 27 |

a.    Molly Thompson ........................................................................27

16.    Maryland Plaintiff ................................................................................27

a.    Brian Phair ..............................................................................27

17.    Massachusetts Plaintiffs ......................................................................28

a.    Donald Chaires ......................................................................28

b.    Sheila Cooney .........................................................................28

c.    Gerald Girard ..........................................................................29

d.    Sara Hasselbach ......................................................................29

18.    Michigan Plaintiffs .............................................................................30

a.    Ritch Hoard ............................................................................30

b.    Susan Landis ...........................................................................30

c.    Andrew Van Houzen ...............................................................31

19.    Minnesota Plaintiff .............................................................................31

a.    Quinn Nystrom .......................................................................31

20.    Missouri Plaintiffs ..............................................................................32

a.    Monique Armstrong ...............................................................32

b.    Lauren Robb ...........................................................................32

c.    Mary Maberry .........................................................................33

21.    Nevada Plaintiff ..................................................................................33

a.    Leslie Bauer ...........................................................................33

22.    New Jersey Plaintiffs ..........................................................................34

a.    Carole Andrew ........................................................................34

b.    Michael Carfagno ...................................................................34

c.    David Hernandez .....................................................................35

|   |   | d. | Barry Hunsinger ........................................................................... | 35 |

| 23. | New Mexico Plaintiffs ................................................................................ | 36 |
|   | a. | Francis Barnett ............................................................................. | 36 |
|   | b. | Roseanna Harrison-Barnett ............................................................ | 36 |
|   | c. | Clayton McCook ........................................................................... | 37 |

| 24. | New York Plaintiffs .................................................................................... | 37 |
|   | a. | Tracy Gerber ................................................................................ | 37 |
|   | b. | Robert Lowman ............................................................................ | 38 |
|   | c. | Melissa Passarelli ......................................................................... | 38 |

| 25. | North Carolina Plaintiff .............................................................................. | 39 |
|   | a. | Donna Miller ................................................................................ | 39 |

| 26. | North Dakota Plaintiff ................................................................................ | 39 |
|   | a. | Jacob Knaack ............................................................................... | 39 |

| 27. | Ohio Plaintiffs ........................................................................................... | 40 |
|   | a. | Julia Blanchette ............................................................................ | 40 |
|   | b. | Ritch Hoard .................................................................................. | 40 |
|   | c. | Marilyn Person ............................................................................. | 41 |
|   | d. | Larissa Shirley .............................................................................. | 41 |

| 28. | Oklahoma Plaintiffs ................................................................................... | 42 |
|   | a. | Melinda Bell ................................................................................ | 42 |
|   | b. | Clayton McCook ........................................................................... | 42 |
|   | c. | Shannon Meadows ........................................................................ | 43 |

| 29. | Oregon Plaintiffs ....................................................................................... | 44 |
|   | a. | Russell Scott Palmer ..................................................................... | 44 |

|   |   | b. | Kim Wallan ............................................................................ | 44 |
|   |   | c. | Scott Christensen ................................................................. | 44 |
| 30. | Pennsylvania Plaintiff ..................................................................... | 45 |
|   | a. | Kerry Ann Stare .......................................................................... | 45 |
| 31. | South Carolina Plaintiffs ................................................................ | 46 |
|   | a. | Jonathan Rollins ........................................................................ | 46 |
|   | b. | Sarah Krueger ............................................................................ | 46 |
| 32. | Tennessee Plaintiffs ....................................................................... | 47 |
|   | a. | Tyler Campbell ........................................................................... | 47 |
|   | b. | Willie Phillips ............................................................................. | 47 |
| 33. | Texas Plaintiffs .............................................................................. | 48 |
|   | a. | Patricia Dague ............................................................................ | 48 |
|   | b. | Michael Horton .......................................................................... | 48 |
|   | c. | Laura Stark ................................................................................. | 49 |
|   | d. | Bret Stewart ................................................................................ | 49 |
| 34. | Utah Plaintiffs ................................................................................ | 50 |
|   | a. | Scott Christensen ....................................................................... | 50 |
|   | b. | Dianna Gilmore .......................................................................... | 50 |
| 35. | Virginia Plaintiff ............................................................................ | 51 |
|   | a. | Jonathan Rollins ........................................................................ | 51 |
| 36. | Wisconsin Plaintiffs ....................................................................... | 51 |
|   | a. | Scott Dercks .............................................................................. | 51 |
|   | b. | Angela Kritselis ......................................................................... | 52 |
|   | c. | Deanna Grimm ........................................................................... | 52 |

d.      Robyn Rushing ............................................................. 53

B.      Defendants .............................................................................. 54

III.    JURISDICTION AND VENUE ........................................................... 55

IV.     DRUG PRICING IN THE UNITED STATES ..................................... 56

A.      Entities Involved in Drug Pricing ......................................... 56

B.      The Drug Payment & Distribution Structure ........................ 57

C.      List pricing as a Basis for Reimbursement............................ 59

D.      Consumer Drug Costs ............................................................ 61

E.      Impact on Consumers ............................................................ 69

F.      Drug Manufacturer Manipulation of PBM Incentives ............ 71

V.      ANALOG INSULIN ........................................................................... 74

A.      Diabetes: The Disease and Demographics ............................ 74

B.      The Origins of Insulin Treatment .......................................... 76

C.      Current Insulin Treatment Landscape ................................... 83

D.      Climbing Insulin List Prices .................................................. 84

E.      Eli Lilly, Novo Nordisk, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status. .............................. 103

F.      The defendant drug manufacturers' list price inflation deceived and harmed the plaintiffs and class members. .................................... 112

G.      The Health Impact of Artificial Pricing................................ 117

VI.     TOLLING OF THE STATUTE OF LIMITATIONS........................... 120

A.      Discovery Rule Tolling .......................................................... 120

B.      Fraudulent Concealment Tolling .......................................... 121

C.      Estoppel ................................................................................. 121

VII.    CLASS ACTION ALLEGATIONS.................................................... 121

VIII.    CLAIMS FOR RELIEF .................................................................................... 126

COUNT ONE VIOLATIONS OF RICO, 18 U.S.C. § 1962(C) (AGAINST ELI LILLY,
     NOVO NORDISK, AND SANOFI) .................................................................. 126

     A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under RICO. .......... 127

     B.    The Manufacturer-PBM Insulin Pricing RICO Enterprises ................................. 127

          1.    The Eli Lilly-PBM Enterprises ....................................................... 131

          2.    The Novo Nordisk-PBM Insulin Pricing Enterprises .............................. 132

          3.    The Sanofi-PBM Insulin Pricing Enterprises ...................................... 133

     C.    The defendant drug manufacturers' use of the U.S. mails and interstate
        wire facilities ............................................................................... 136

     D.    Conduct of the RICO Enterprises' affairs ................................................ 138

     E.    The defendant drug manufacturers' pattern of racketeering activity .................... 140

     F.    The defendant drug manufacturers' motive ............................................... 143

     G.    Damages caused by the defendant drug manufacturers' rebate scheme ............... 143

COUNT TWO VIOLATIONS OF RICO, 18 U.S.C. § 1962(D) BY CONSPIRING TO
     VIOLATE 18 U.S.C. § 1962(C) (AGAINST ELI LILLY, NOVO NORDISK, AND
     SANOFI) ................................................................................................ 149

FACTUAL ALLEGATIONS RELATED TO STATE LAW RACKETEERING COUNTS
     AND STATE CIVIL CONSPIRACY COMMON LAWS ................................ 153

(COUNTS 3 THROUGH 10) ............................................................................... 153

     A.    The Manufacturer-PBM Insulin Pricing Racketeering Enterprises ...................... 153

          1.    The Eli Lilly-PBM Enterprises ....................................................... 157

          2.    The Novo Nordisk-PBM Insulin Pricing Enterprises .............................. 158

          3.    The Sanofi-PBM Insulin Pricing Enterprises ...................................... 159

          4.    The material misrepresentations of the Manufacturer-PBM Insulin Pricing
             Enterprises ............................................................................. 160

     B.    Conduct of the Enterprises' affairs ....................................................... 162

    C.      The defendant drug manufacturers' pattern of racketeering activity ....................164

    D.      The Defendant Drug Manufacturers' Motive ...........................................166

    E.      Damages caused by the defendant drug manufacturers' rebate scheme ...............166

COUNT THREE VIOLATION OF ARIZONA'S CIVIL RACKETEERING STATUTES ARIZ. REV. STAT. §§ 13-2314.04, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)...................................................................................171

    A.      Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Arizona's racketeering statutes. ............................................................................171

    B.      The Manufacturer-PBM Insulin Pricing Racketeering Enterprises. ......................172

    C.      The defendant drug manufacturers' pattern of racketeering activity. ...................172

    D.      Damages caused by the Defendant Drug Manufacturers' violations of Arizona's racketeering statutes. .....................................................................173

COUNT FOUR VIOLATION OF COLORADO ORGANIZED CRIME ACT COLO. REV. STAT. ANN. §§ 18-17-101, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)...................................................................................174

    A.      Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Colorado's Organized Crime Act. ...........................................................174

    B.      The Manufacturer-PBM Insulin Pricing Racketeering Enterprises. ......................175

    C.      The defendant drug manufacturers' pattern of racketeering activity. ...................175

    D.      Damages caused by the defendant drug manufacturers' rebate scheme. ...............176

COUNT FIVE VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT FLA. STAT. ANN. § 772.101, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) .....................................................................177

    A.      Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Florida's Organized Crime and Racketeering Act................................................177

    B.      The Manufacturer-PBM Insulin Pricing Racketeering Enterprises. ......................178

    C.      The defendant drug manufacturers' pattern of racketeering activity ....................178

    D.      Damages caused by the defendant drug manufacturers' rebate scheme ...............179

COUNT SIX VIOLATION OF THE GEORGIA RICO (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS) ACT GA. STAT. ANN. § 16-14-1, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ................................180

    A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Georgia's RICO Act. ........................................................................180

    B.    The Manufacturer-PBM Insulin Pricing Racketeering Enterprises. .......................181

    C.    The defendant drug manufacturers' pattern of racketeering activity. ...................181

    D.    Damages caused by the defendant drug manufacturers' rebate scheme. ..............182

COUNT SEVEN VIOLATION OF THE NORTH CAROLINA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT N.C. GEN. STAT. § 75D-1, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ................................................................183

    A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under North Carolina's RICO Act...............................................................184

    B.    The Manufacturer-PBM Insulin Pricing Racketeering Enterprises. .......................184

    C.    The defendant drug manufacturers' pattern of racketeering activity. ...................185

    D.    Damages caused by the defendant drug manufacturers' rebate scheme. ..............185

COUNT EIGHT VIOLATION OF THE UTAH PATTERN OF UNLAWFUL ACTIVITY ACT UTAH CODE ANN. § 76-10-1601, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)...........................................186

    A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Utah's Pattern of Unlawful Activity Act. ..........................................187

    B.    The Manufacturer-PBM Insulin Pricing Racketeering Enterprises. .......................187

    C.    The defendant drug manufacturers' pattern of racketeering activity ...................188

    D.    Damages caused by the defendant drug manufacturers' rebate scheme. ..............188

COUNT NINE VIOLATION OF THE WISCONSIN ORGANIZED CRIME CONTROL ACT WIS STAT. § 946.80, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)........................................................189

    A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Wisconsin's Organize Crime Control Act. ...........................................190

B.      The Manufacturer-PBM Insulin Pricing Racketeering Enterprises ........................ 190

C.      The defendant drug manufacturers' pattern of racketeering activity .................... 191

D.      Damages caused by the defendant drug manufacturers' rebate scheme ............... 192

COUNT TEN VIOLATION OF STATE CIVIL CONSPIRACY COMMON LAWS ............... 192

AL, AZ, AR, CA, CO, CT, DE, FL, GA, IL, IN, IA, KS, LA, ME, MD, MA, MI, MN, MS,
NV, NJ, NM, NY, NC, ND, OH, OK, OR, PA, SC, TN, TX, UT, VA, WI
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ............................................. 192

FACTUAL ALLEGATIONS RELATED TO CONSUMER FRAUD COUNTS
(COUNTS 11 THROUGH 56) (AGAINST ELI LILLY, NOVO NORDISK, AND
SANOFI) ....................................................................................................... 196

COUNT ELEVEN VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
N.J. STAT. ANN. § 56:8-1, *ET SEQ*. (AGAINST NOVO NORDISK AND
SANOFI ON BEHALF OF A NATIONWIDE CLASS) ................................................ 202

COUNT TWELVE VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
N.J. STAT. ANN. § 56:8-1, *ET SEQ*. (AGAINST NOVO NORDISK AND
SANOFI ON BEHALF OF A NATIONWIDE CLASS) ................................................ 208

COUNT THIRTEEN VIOLATION OF THE ALABAMA DECEPTIVE TRADE
PRACTICES ACT ALA. CODE § 8-19-1, *ET SEQ*. (AGAINST ELI LILLY,
NOVO NORDISK, AND SANOFI) ....................................................................... 212

COUNT FOURTEEN VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
ARIZ. REV. STAT. § 44-1521, *ET SEQ*. (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) ................................................................................. 214

COUNT FIFTEEN VIOLATION OF THE ARKANSAS DECEPTIVE TRADE
PRACTICES ACT ARK. CODE § 4-88-101, *ET SEQ*. (AGAINST ELI LILLY
AND NOVO NORDISK) .................................................................................... 215

COUNT SIXTEEN VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
CAL. CIV. CODE § 1750, *ET SEQ*. (AGAINST ELI LILLY, NOVO NORDISK,
AND SANOFI) ................................................................................................. 217

COUNT SEVENTEEN VIOLATION OF THE CALIFORNIA UNFAIR
COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI) ......................................... 219

COUNT EIGHTEEN VIOLATION OF THE COLORADO CONSUMER
PROTECTION ACT COLO. REV. STAT. § 6-1-101, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI)......................................................................221

COUNT NINETEEN VIOLATION OF THE CONNECTICUT UNFAIR TRADE
PRACTICES ACT CONN. GEN. STAT. § 42-110A, ET SEQ. (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI)......................................................................223

COUNT TWENTY VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
DEL. CODE TIT. 6, § 2513, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK,
AND SANOFI) ...............................................................................................................224

COUNT TWENTY-ONE VIOLATION OF THE FLORIDA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT FLA. STAT. § 501.201, *ET SEQ.*...................225

COUNT TWENTY-TWO VIOLATION OF THE GEORGIA FAIR BUSINESS
PRACTICES ACT OF 1975 GA. CODE ANN. § 10-1-390, *ET SEQ.* (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI) ...............................................................227

COUNT TWENTY-THREE VIOLATION OF THE GEORGIA UNIFORM
DECEPTIVE TRADE PRACTICES ACT GA. CODE ANN. § 10-1-370, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)............................................229

COUNT TWENTY-FOUR VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT 815 ILL. COMP. STAT. §
505/1, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)...............230

COUNT TWENTY-FIVE VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
SALES ACT IND. CODE § 24-5-0.5-2, *ET SEQ.* (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI)..............................................................................................231

COUNT TWENTY-SIX VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION
FOR CONSUMER FRAUDS ACT IOWA CODE § 714H.1, *ET SEQ.* (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI) ..............................................................233

COUNT TWENTY-SEVEN VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT KAN. STAT. § 50-623, *ET SEQ.* (AGAINST NOVO
NORDISK).......................................................................................................................234

COUNT TWENTY-EIGHT VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW LA. REV. STAT. §
51:1401, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)............236

COUNT TWENTY-NINE VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.* (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI) ..............................................................237

COUNT THIRTY VIOLATION OF THE MARYLAND CONSUMER PROTECTION
ACT MD. COM. LAW CODE § 13-101, *ET SEQ.* (AGAINST ELI LILLY AND
NOVO NORDISK) ........................................................................................238

COUNT THIRTY-ONE VIOLATION OF THE MASSACHUSETTS GENERAL LAW
CHAPTER 93(A) MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ........................................................239

COUNT THIRTY-TWO VIOLATION OF THE MICHIGAN CONSUMER
PROTECTION ACT MICH. COMP. LAWS § 445.902, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ........................................................241

COUNT THIRTY-THREE VIOLATION OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT MINN. STAT. § 325F.68, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ........................................................242

COUNT THIRTY-FOUR VIOLATION OF THE MINNESOTA DECEPTIVE TRADE
PRACTICES ACT MINN. STAT. §§ 325D.43-48, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI) ........................................................243

COUNT THIRTY-FIVE VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT MO. REV. STAT. § 407.010, *ET SEQ.* (AGAINST ELI LILLY,
NOVO NORDISK, AND SANOFI) ...................................................................244

COUNT THIRTY-SIX VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT NEV. REV. STAT. § 598.0903, *ET SEQ.* (AGAINST SANOFI) ......245

COUNT THIRTY-SEVEN VIOLATION OF THE NEW JERSEY CONSUMER FRAUD
ACT N.J. STAT. ANN. § 56:8-1, *ET SEQ.* (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) ...............................................................................247

COUNT THIRTY-EIGHT VIOLATION OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT N.M. STAT. § 57-12-1, *ET SEQ.* (AGAINST NOVO
NORDISK AND SANOFI) ................................................................................248

COUNT THIRTY-NINE VIOLATION OF THE NEW YORK GENERAL BUSINESS
LAW N.Y. GEN. BUS. LAW §§ 349-350 (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI) ...............................................................................250

COUNT FORTY VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT N.C. GEN. STAT. § 75-1.1, *ET SEQ.*
(AGAINST NOVO NORDISK AND SANOFI) ...................................................251

COUNT FORTY-ONE VIOLATION OF THE NORTH DAKOTA CONSUMER
FRAUD ACT N.D. CENT. CODE § 51-15-02 (AGAINST ELI LILLY) ........................252

COUNT FORTY-TWO VIOLATION OF THE OHIO CONSUMER SALES
PRACTICES ACT OHIO REV. CODE ANN. § 1345.01, *ET SEQ.* (AGAINST
ELI LILLY, NOVO NORDISK, AND SANOFI) ......................................................254

COUNT FORTY-THREE VIOLATION OF THE OKLAHOMA CONSUMER
PROTECTION ACT OKLA. STAT. TIT. 15, § 751, *ET SEQ.* (AGAINST ELI
LILLY, NOVO NORDISK, AND SANOFI)..............................................................255

COUNT FORTY-FOUR VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT OR. REV. STAT. § 646.605, *ET SEQ.* (AGAINST NOVO
NORDISK AND SANOFI).......................................................................................258

COUNT FORTY-FIVE VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW 73 PA. CONS. STAT. §
201-1, *ET SEQ.* (AGAINST ELI LILLY AND NOVO NORDISK)...................................259

COUNT FORTY-SIX VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE
PRACTICES ACT S.C. CODE ANN. § 39-5-10, *ET SEQ.* (AGAINST ELI LILLY,
NOVO NORDISK, AND SANOFI) ...........................................................................261

COUNT FORTY-SEVEN VIOLATION OF THE TENNESSEE CONSUMER
PROTECTION ACT TENN. CODE ANN. § 47-18-101, *ET SEQ.* (AGAINST ELI
LILLY AND NOVO NORDISK) .................................................................................262

COUNT FORTY-EIGHT VIOLATION OF THE TEXAS DECEPTIVE TRADE
PRACTICES CONSUMER PROTECTION ACT TEX. BUS. & COM. CODE §
17.41, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)................263

COUNT FORTY-NINE VIOLATION OF THE UTAH CONSUMER SALE
PRACTICES ACT UTAH CODE § 13-11-1, *ET SEQ.* (AGAINST ELI LILLY,
NOVO NORDISK, AND SANOFI) ...........................................................................265

COUNT FIFTY...........................................................................................................267

VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT VA. CODE
ANN. § 59.1-196, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND
SANOFI)...................................................................................................................267

COUNT FIFTY-ONE VIOLATION OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT WIS. STAT. § 100.18 (AGAINST ELI LILLY, NOVO
NORDISK, AND SANOFI)........................................................................................268

DEMAND FOR JUDGMENT .....................................................................................269

JURY DEMAND........................................................................................................270

The plaintiffs, on behalf of themselves and all others similarly situated, for their complaint against defendants Eli Lilly and Company (Eli Lilly), Novo Nordisk Inc. (Novo Nordisk), and Sanofi-Aventis U.S. LLC (Sanofi) (collectively, the defendant drug manufacturers or defendants), allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.    INTRODUCTION

1.      The plaintiffs, consumers of analog insulins, bring this proposed class action against the manufacturers of their insulin medications—Eli Lilly, Novo Nordisk, and Sanofi—for their artificial and fraudulent inflation of the analog insulins' list (or point of sale) prices in the United States. The analog insulin medications at issue in this complaint are Humalog, Basaglar, Fiasp, Novolog, Levemir, Tresiba, Apidra, Lantus, and Toujeo.

2.      Eli Lilly, Novo Nordisk, and Sanofi separately conspired with each of the largest pharmacy benefit managers (PBMs)—CVS Health, Express Scripts, and OptumRx—to widen a secret spread between the defendants' published list prices and their undisclosed net selling prices for their analog insulins. Cognizant that PBM profits are tied to the size of the spread between list price and net selling price, the defendants have offered the PBMs higher spreads in exchange for preferred positions on the PBMs' drug formularies. To carry out this scheme, the defendant drug manufacturers artificially inflate the prices they publicly report—their list or "sticker" price—and then secretly offer a far lower price—the net price—to the largest PBMs. This list price inflation pads the pockets of PBMs who retain a percentage of the list price plus some part of the rebates. In exchange for the defendants' fraudulent inflation of their reported list prices (and corresponding spreads between prices), the PBMs promise preferred formulary placement to the winning bidder (i.e., the manufacturer with the highest spread). As a result, formulary decisions for these

important medications are increasingly made based on inflated list prices (and corresponding spread inflation), rather than net prices or the safety and efficacy of the analog insulins.

3.     Caught in the middle of this fraudulent and unfair price reporting are consumers whose payments for analog insulin are tied directly to the defendants' published list prices at the point of sale. Rather than pay for analog insulin based on the competitive, net prices offered to intermediaries in the pharmaceutical supply chain, consumers pay for their insulins at the point of sale based on the manufacturers' list prices—prices that the manufacturers artificially inflate so that they can pay off the PBMs without lowering their net prices. These inflated list prices lack any reasonable relationship to the relative efficacy of the product, production costs, or the recoupment of research and development costs. All consumer payers relied on and reasonably believed the defendants' list prices were reasonable benchmarks for the true cost of the drug for which they were making out-of-pocket payments.

4.     PBMs effectuate the drug transactions between health insurers, pharmacies, and drug manufacturers. They negotiate directly with drug manufacturers on behalf of health insurers to determine the prices those insurers pay for the manufacturers' drugs. Drug manufacturers and PBMs negotiate these price discounts in the form of "rebates": drug manufacturers refund PBMs a portion of their drugs' prices (the rebate). PBMs then pass on a portion of those rebates to their health insurer clients. The nation's most influential PBMs—CVS Health, Express Scripts, and OptumRx—together cover over 80% of the insured market—in total, 180 million lives.

5.     When two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the analog insulins), a PBM is in the position to sometimes exclude, or place in a non-preferred position, one of the medications in

favor of another. When a drug is excluded from formulary or placed in a non-preferred position, health insurers using that formulary will make their plan beneficiaries shoulder a greater percentage or all of the disadvantaged product's cost. As a result, in the branded analog insulin therapeutic category, the large PBMs can push significant portions of the market toward or away from the defendants' products.

6.     When used correctly, rebates can significantly lower consumers' costs. In theory, drug manufacturers might offer PBMs discounts or rebates that lower the manufacturers' *net* selling prices while their list prices remain constant. Such rebates would serve as a legitimate basis to confer formulary status to the least costly medication. The legitimate use of discounts and rebates that actually reduce consumer costs is not at issue in this case.

7.     PBMs make money in two ways. First, they keep the difference between what they pay pharmacies for drugs—which is negotiated as a percentage of list price plus dispensing costs—and what insurers pay them—which is a higher percentage of list price plus dispensing costs. Second, PBMs pocket a percentage of the difference between a drug's list price and the net price they negotiate with its manufacturer—i.e., the "spread" between prices. Thus, PBMs benefit both from higher list prices and higher spreads between list and net price. The higher the list price and the larger the spread between a drug's list and net price, the larger the PBM's profits.

8.     In this case, in order to gain or maintain formulary placement, the drug manufacturer defendants offered the larger PBMs huge rebates on their list prices. However, instead of creating these rebates by significantly lowering their *net* prices while maintaining their *list* prices relatively constant, they significantly raised their *list* prices while maintaining their *net* prices relatively constant. In effect, the defendants announce a deceptive increase in their published

prices, only to secretly offer an offsetting rebate to the PBMs. This allows the defendants to "compete" for access to a PBM's customers by, ironically, offering a *less* competitive price to many of the consumers to whom they hope to sell insulin. As a result, the defendants gain or maintain formulary placement without impacting their net sales prices. The PBMs sell formulary placement (on the basis of profit rather than product attributes or real price reductions to the end users), and obtain a deceptive, larger spread from which they profited. Only consumers lose, as only they pay higher prices at the point of pharmacy sale based on a fraudulently inflated list price. Over time, the defendants have engaged in an "arms race" of false list price increases to the detriment of consumers.

9.      In a five year period alone, Eli Lilly, Novo Nordisk, and Sanofi raised their list prices by over 150%. List prices that used to be $75 a decade ago are now between $300 and $700. And *nothing* about the defendants' analog insulins has changed in that period; the $600 drug is the exact same one the defendants sold for $75 years ago. And the defendants have raised their list prices in perfect lockstep.

**Figure 1: Defendant drug manufacturers increase long-acting insulin list prices in lock-step.**



**Figure 2: Defendant drug manufacturers increase rapid-acting insulin list prices in lock-step.**



10.     All of the defendants have participated in this arms-race escalation of reported list prices and, consequently, spreads. Each defendant drug manufacturer has raised its list prices (with offsetting payoffs to PBMs) just a bit more than its competitors, encouraging the large PBMs to keep its insulins on the formulary or in a preferred formulary position. Yet, at the same time, the manufacturers' net selling prices have either stayed the same or decreased slightly.

11.     Olivier Brandicourt, the former-CEO of Sanofi, acknowledged the growing gap between list price and net price in sworn testimony before the United States Senate Finance Committee:

> Since 2012, the net price of Sanofi insulins has declined 25 percent. Yet patient out of pocket costs have continued to rise. If you take Lantus, for instance, our most prescribed insulin, the net price has fallen by 30 percent since 2012. Yet over the same period, average out-of-pocket costs have risen approximately 60 percent for patients with commercial insurance and Medicare. It is my belief that declining net prices should result in lower out-of-pocket costs for patients. But clearly this is not always the case.[1]

12.     The defendant drug manufacturers have sold deceptive spreads between inflated list prices and net selling prices to the PBMs. In this case, the wrong the defendants have committed is the publication of deceptive list prices for their analog insulin: (1) they have deceived consumers into believing the cost of their insulins is going up, when, in reality, the true net prices of their insulins are either staying the same or decreasing; (2) they have deceived consumers into believing that the prices they paid are related to the true cost of the drugs, which they are not; and (3) in the case of consumers who make co-insurance payments, those consumers have been

---

[1] Drug Pricing in America: A Prescription for Change, Part II, Hearing before the Committee on Finance United States Senate (Feb. 26, 2019), at 16.

deceived as they reasonably believed their co-insurance payments were based on the same price their insurers were paying.

13.     This fraud has a victim: consumers who pay for their drugs based on list prices. The plaintiffs and class members are people living with diabetes who pay for their insulin based on list prices, including uninsured patients, patients in high deductible health plans, patients in Medicare Part D plans, and patients with coinsurance obligations. These plaintiffs' out-of-pocket expenditures at the point of sale are based on list prices. In other words, when plaintiffs go to pharmacies (or use mail order services) to pick up their analog insulins, the charges they incur are based on the analog insulins' *list* prices, not the medicines' *net* prices.[2] The price reductions the defendants offer PBMs *are not reflected in price tags the plaintiffs see*. And the larger the list price, the larger the plaintiffs' out-of-pocket payments. Each of the defendants at all times were aware of the impact their list price increases had on consumers and were aware that such list price increases adversely impacted cash payers, those with high deductible health plans and those with a percentage co pay. .

14.     The defendants' publication of their list prices, while concealing their net prices, has deceived the plaintiffs into believing that the list prices on which their out-of-pocket payments are based are reasonable and fair approximations of the actual cost of their analog insulins. The defendants publicly represent that the list prices of their analog insulins are just that, *list* prices—a fair representation of the product's value in the market and a reasonable basis for consumer out-of-pocket payments. Thus, by publicizing their deceptive list prices, while keeping their net prices

---

[2] If the consumer is uninsured, the pharmacy offers the consumer a "usual and customary rate" based on list price.

confidential, the defendants have deceived and acted unfairly toward the plaintiffs, and caused class members to make out-of-pocket payments for their analog insulins that are grossly inflated.

15.     Indeed, no reasonable consumer would expect to pay *more* for insulin here. The cost to make the insulins has not increased. The analog insulins are fungible products in a market with multiple competitors. And the insurance companies continue to pay the same or *less* for the same products.

16.     In short, the true cost of insulin has trended in an entirely different direction from what the proposed class actually pays. Insured patients who paid based on a list price would not reasonably expect that their health plan was paying far less as a result of partial rebate pass-throughs. Nor should uninsured consumers reasonably anticipate that their skyrocketing insulin prices are inflated so that the defendant drug manufacturers can buy formulary access with rebates to PBMs.

17.     The defendants understand that this is unfair. Sometimes they even acknowledge the absurdity of patients paying based on an inflated list price. For example, Sanofi's CEO stated before the Senate Finance Committee that when patients "pay more" while "PBMs and health plans are paying less," the "***situation defies logic and should not happen***."[3] The CEO of NNI's parent company, Novo Nordisk A/S, expressed a similar sentiment to the media in 2017: "It was never the intention that individual patients should end up paying the list price. . . . I have a big

---

[3] Drug Pricing in America: A Prescription for Change, Part II, Hearing before the Committee on Finance United States Senate (Feb. 26, 2019), at 137.

problem with that."[4] These companies and their competitors nonetheless persist with these

illogical pricing practices that harm consumers with full knowledge of the "big problem."

18.    Nor is this the first time the drug manufacturers have had to defend deceptive

pricing. In a similar case from nearly 20 years ago, defendant drug manufacturers "repeatedly

asserted that they had no duty to disclose what was publicly known to everyone, that is, that the

[drug's list price] was a 'sticker price' and never intended to reflect the drug's true average

wholesale price."[5] But the district court saw through this argument: "There is a difference between

a sticker price and a sucker price. . . . The [plaintiffs] . . . have it exactly right: '[I]f everything [about

the drug] was known to everybody, why did [d]efendants emphasize secrecy?'"[6] As the court

explained, the "defendants trumpeted a lie by publishing the inflated [list prices], knowing (*and

intending*) them to be used as instruments of fraud."[7]

19.    Had the defendants published list prices uninflated by the rebate scheme the

plaintiffs and class members would have paid much less for their analog insulins.

20.    As a result of the defendants' deceptive, unfair, and unconscionable conduct, the

plaintiffs and members of the class have overpaid for their analog insulins when they paid for these

medications based on the defendants' deceptive list prices. The amount they overpaid is the

difference between their share of the artificially inflated list price, and the percentage of that share

that reasonably tracked the drug's true net price.

---

[4] James Paton, "Drug CEO Has Problem With U.S. Patients Paying His Prices,"
Bloomberg.com (March 14, 2017).

[5] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003).

[6] *Id.*

[7] *Id.* at 167.

- 10 -

21.     For the plaintiffs and class members, the physical, emotional, and financial tolls of paying such excessive prices for insulin is devastating. Unable to afford their analog insulins, plaintiffs report under-dosing their insulin, injecting expired insulin, re-using needles, and starving themselves to control their blood sugars with as little insulin as possible. These behaviors are dangerous for people living with diabetes. Because such behaviors ineffectively control those individuals' blood sugar levels, they can lead to serious complications such as kidney failure, heart disease, blindness, infection, and amputations. Unable to afford the analog insulins their doctors prescribe, multiple plaintiffs have lost their vision and/or kidneys. Other plaintiffs have been rushed to emergency rooms because they were unable to afford enough analog insulin to control their blood sugars and developed diabetic ketoacidosis. To cut down on costs, many class members re-use needles and pen tips, a dangerous practice that can lead to infection. Other class members explain that they avoid the doctor because their inability to afford insulin has caused their blood sugars to spike. They know that their doctors will prescribe more analog insulin to treat this problem, and they simply cannot afford to buy any more analog insulin. Plaintiffs describe how the amount they spend on analog insulin makes it impossible for them to maintain the healthy diet that people living with diabetes need, further compromising their health. Thus, while the purpose of insulin is to improve the health of those living with diabetes, the rising and excessive cost of these drugs is actually forcing the plaintiffs to jeopardize their health.

22.     The financial strain that the defendants' deceptive list prices cause infects all areas of the plaintiffs' lives. Stories of diabetics taking out loans and accruing debt to afford insulin are common. Multiple people living with diabetes estimate that they spend over 50% of their monthly income on analog insulin medications. Some patients have been unable to leave bad jobs for fear

of losing their health insurance; others have been encouraged to leave good jobs for positions that might pay more or have better insurance. Many plaintiffs describe rearranging their lives around their analog insulin costs—keeping lights off and the heat low to avoid high electricity bills, moving back in with parents, and leaving school. Many parents of children with diabetes have had to make hard choices regarding their children's futures: pre-Kindergarten schooling or insulin? As one plaintiff put it, "[f]inancially, it's killing me." Defendants were aware of the financial toll their high list prices were imposing on members of the class.

23.     The financial hardships the defendants' price hikes impose on those living with diabetes also have serious mental health consequences. Which were and are known to the defendants. Many patients describe the constant stress and anxiety that accompanies not knowing how they will pay for next month's analog insulin supply. "I often cry, and I think, have I done something wrong that I can't afford to take care of myself?" Others express anger and a deep sense of betrayal that once-affordable medications are now completely unaffordable. "I feel so taken advantage of; now, I can't afford my medications, and for what? All so some drug company can profit from my sickness?" In short, a medication that should be a source of health has become a cause of pain.

24.     This amended action alleges that the defendants violated various state racketeering laws, and various state consumer protection laws by publishing fraudulent, deceptive and unfair list prices for their analog insulins. This scheme directly and foreseeably caused and continues to cause consumers to overpay for the analog insulins they need.

## II.      PARTIES

**A.      Plaintiffs**

**1.      Alabama Plaintiff**

**a.      Richard Sanders**

25.      Plaintiff Richard Sanders is a citizen of the State of Alabama and resides in Ashland, Alabama.

26.      Mr. Sanders has type 1 diabetes, and he takes Toujeo Solostar and Humalog brand insulin to treat his diabetes. In the past, he took Lantus and Novolog brand insulin. Mr. Sanders is and has been insured under Medicare Part D plans that require payment of a percentage of the list price of the drugs, as coinsurance, and he was previously insured under health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles and/or coinsurance payments. Under these terms of Mr. Sanders's coverage, he paid for at least Toujeo, Humalog and Lantus brand insulin based on list prices. As a direct result of the scheme, he has overpaid for Toujeo, Humalog and Lantus brand insulin.

**2.      Arizona Plaintiffs**

**a.      Deanna Grimm**

27.      Plaintiff Deanna Grimm is a citizen of the State of New Mexico and resides in Cliff, New Mexico. However, Ms. Grimm was previously a citizen of the State of Arizona, and purchased insulin there.

28.      Ms. Grimm has type 1 diabetes, and she takes Humalog brand insulin to treat her diabetes. In the past she was insured under high deductible health plans, and other health insurance plans, that required out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and required payment of a percentage of the list price of the

- 13 -

drugs, as coinsurance. Under these terms of Ms. Grimm's coverage, she paid for at least Humalog based on list price. As a direct result of the scheme, Ms. Grimm has overpaid for Humalog brand insulin.

### b.   Samantha Jensen

29.     Plaintiff Samantha Jensen is a citizen of the State of Connecticut and resides in Avon, Connecticut. However, until 2014, Ms. Jensen was a citizen of the State of Arizona.

30.     Ms. Jensen purchases insulin for her son, who has type 1 diabetes. She currently purchases Humalog brand insulin to treat his diabetes, and, in the past, she purchased Novolog and Lantus brand insulin. Ms. Jensen was previously insured under high deductible, employer-sponsored health plans that required out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductible. Under these terms of Ms. Jensen's coverage, she paid for at least Novolog and Humalog brand insulin based on list prices. As a direct result of the scheme, Ms. Jensen has overpaid for at least Novolog and Humalog brand insulin.

### 3.   Arkansas Plaintiff

### a.   Lynn Davidson

31.     Plaintiff Lynn Davidson is a citizen of the State of Arkansas and resides in Rogers, Arkansas.

32.     Ms. Davidson has type 1 diabetes. In the past, she took Humalog, Novolog, Levemir and Lantus brand insulin to treat her diabetes. Ms. Davidson is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. She was previously insured under a high deductible plan where she also paid out-of-pocket for insulin based on list prices until she reached the deductible. Under

these terms of Ms. Davidson's coverage, she paid for at least Humalog, Novolog, Levemir and Lantus brand insulin based on the list prices. As a direct result of the scheme, Ms. Davidson has overpaid for at least Humalog, Novolog, Levemir and Lantus brand insulin.

      **4.**      **California Plaintiffs**

            **a.**      **Sara Hasselbach**

33.      Plaintiff Sara Hasselbach is a citizen of the State of California and resides in San Diego, California.

34.      Ms. Hasselbach has type 1 diabetes and currently takes Humalog and Lantus brand insulin to treat her diabetes. In the past, she took Novolog, Levemir and Basaglar brand insulin. Ms. Hasselbach is, and has been, insured under high deductible plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Hasselbach's coverage, she paid for at least Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Hasselbach has overpaid for at least Lantus brand insulin.

            **b.**      **Jeanne MacNitt**

35.      Plaintiff Jeanne MacNitt is a citizen of the State of California and resides in Sonora, California.

36.      Ms. MacNitt has type 2 diabetes, and she currently takes Novolog and Lantus brand insulin to treat her diabetes. In the past, she took Humalog brand insulin. Ms. MacNitt is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. MacNitt's coverage, she paid for at least Novolog, Lantus and Humalog brand insulin based on list prices. As

a direct result of the scheme, Ms. MacNitt has overpaid for at least Novolog, Lantus and Humalog brand insulin.

### c.    Bertha Sanders

37.    Plaintiff Bertha Sanders is a citizen of the State of California and resides in Los Angeles, California.

38.    Ms. Sanders has type 2 diabetes, and she currently takes Novolog and Lantus brand insulin to treat her diabetes. Ms. Sanders was previously insured under employee-sponsored health plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Sanders's coverage, she paid for at least Novolog and Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Sanders has overpaid for at least Novolog and Lantus brand insulin

### 5.    Colorado Plaintiff

### a.    Donald Douthit

39.    Plaintiff Donald Douthit is a citizen of the State of Colorado and resides in Woodland Park, Colorado.

40.    Mr. Douthit has type 2 diabetes, and in the past he took Lantus and Humalog brand insulin to treat his diabetes. Mr. Douthit was previously insured under Medicare Part D plans, and other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Douthit's coverage, he paid for at least Lantus and Humalog brand insulin based on list prices. As a direct result of the scheme, Mr. Douthit has overpaid for at least Lantus and Humalog brand insulin.

6.      **Connecticut Plaintiff**

      a.      **Samantha Jensen**

41.      Plaintiff Samantha Jensen is a citizen of the State of Connecticut and resides in Avon, Connecticut.

42.      Ms. Jensen purchases insulin for her son, who has type 1 diabetes. She currently purchases Humalog brand insulin to treat his diabetes, and, in the past, she purchased Novolog and Lantus brand insulin. Ms. Jensen and her son were previously insured under high deductible, employer-sponsored health plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles. Under these terms of their coverage, Ms. Jensen paid for at least Novolog and Humalog brand insulin based on list prices. As a direct result of the scheme, Ms. Jensen has overpaid for at least Novolog and Humalog brand insulin.

7.      **Delaware Plaintiff**

      a.      **Ann-Marie Jordan**

43.      Plaintiff Ann-Marie Jordan is a citizen of the State of Delaware and resides in Dover, Delaware.

44.      Ms. Jordan has type 1 diabetes, and she is a brittle diabetic. She currently takes Lantus and Humalog brand insulin to treat her diabetes, and, in the past, she took Novolog brand insulin. Ms. Jordan is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Jordan's coverage, she paid for at least Lantus and Novolog brand insulin based on list prices. As a direct result of the scheme, Ms. Jordan overpaid for at least Lantus and Novolog brand insulin.

8. **Florida Plaintiffs**

   a. **Ritch Hoard**

45.     Plaintiff Ritch Hoard is a citizen of the State of Michigan and resides in Atlanta, Michigan. However, Mr. Hoard also purchased insulin in the State of Florida.

46.     Mr. Hoard has type 1 diabetes and currently takes Lantus brand insulin to treat his diabetes. Mr. Hoard is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Hoard's coverage, he paid for at least Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Hoard has overpaid for at least Lantus brand insulin.

   b. **Barbara Johnson**

47.     Plaintiff, Barbara Johnson, is a citizen of the State of Florida and resides in Ponte Vedra, Florida.

48.     Mrs. Johnson purchased insulin for her recently deceased husband, Edward Johnson. Mr. Johnson had type 1 diabetes and took Humalog brand insulin to treat his diabetes. Mr. Johnson was previously insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductible, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Johnson's coverage, Mrs. Johnson paid for at least Humalog brand insulin based on list prices. In 2016, Mr. Johnson obtained Medicare Part F coverage, which allowed him to receive his insulin without paying out-of-pocket under Medicare Part B, but at an additional monthly cost to the Johnsons in excess of $220. As a direct result of the scheme, Mrs. Johnson has overpaid for at least Humalog brand insulin.

### c.     Anne Olinger

49.     Plaintiff Anne Olinger is a citizen of the State of Florida and resides in Naples, Florida.

50.     Ms. Olinger purchases insulin for her son, who has type 1 diabetes. She currently purchases Fiasp brand insulin to treat his diabetes, and, in the past, she purchased Novolog, Humalog and Levemir brand insulin. Ms. Olinger and her son were previously insured under high deductible plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles. Under these terms of their coverage, Ms. Olinger paid for at least Novolog and Levemir brand insulin based on list prices. As a direct result of the scheme, she has overpaid for at least Novolog and Levemir brand insulin.

### d.     Tremayne Sirmons

51.     Plaintiff Tremayne Sirmons is a citizen of the State of Florida and resides in Winter Park, Florida.

52.     Mr. Sirmons has type 1 diabetes, and he currently takes Novolog and Lantus brand insulin to treat his diabetes. In the past, he took Humalog and Levemir brand insulin. Mr. Sirmons is, and has been, insured under high deductible, employer sponsored plans, and other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Sirmons's coverage, he paid for at least Humalog and Levemir brand insulin based on list prices. As a direct result of the scheme, Mr. Sirmons has overpaid for at least Humalog and Levemir brand insulin.

e.    **Hector J. Valdes, Sr.**

53.    Plaintiff Hector J. Valdes, Sr. is a citizen of the State of Florida and resides in Miami, Florida.

54.    Mr. Valdes, Sr. has type 2 diabetes. In the past, he took Humalog brand insulin to treat his diabetes. Mr. Valdes, Sr. is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Valdes, Sr. coverage, he paid for at least Humalog brand insulin based on list price. As a direct result of the scheme, Mr. Valdes, Sr. has overpaid for at least Humalog brand insulin.

f.    **Ann-Marie Jordan**

55.    Plaintiff Ann-Marie Jordan is a citizen of the State of Delaware and resides in Dover, Delaware. However, Ms. Jordan also purchased insulin in the State of Florida.

56.    Ms. Jordan has type 1 diabetes, and she is a brittle diabetic. She currently takes Lantus and Humalog brand insulin to treat her insulin, and, in the past, she took Novolog brand insulin. Ms. Jordan is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Jordan's coverage, she paid for at least Lantus and Novolog brand insulin based on list prices. As a direct result of the scheme, Ms. Jordan overpaid for at least Lantus and Novolog brand insulin.

9.      **Georgia Plaintiff**

     a.      **Marilyn Person**

57.      Plaintiff Marilyn Person is a citizen of the State of Ohio and resides in Dayton,

Ohio. However, prior to moving to Ohio in 2020, Ms. Person was a citizen of the State of Georgia.

58.      Ms. Person has type 2 diabetes, and she currently takes Novolog, Lantus, and

Levemir brand insulin to treat her diabetes. In the past, she took Humalog, Basaglar and Novolog

brand insulin. Ms. Person is, and has been, insured under Medicare Part D plans that require out-

of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any,

and require payment of a percentage of the list price of the drugs, as coinsurance. Under these

terms of Ms. Person's coverage, she paid for at least Levemir and Novolog brand insulin based on

list prices. From time to time, Ms. Person obtains samples when she cannot afford her prescribed

insulin medications. As a direct result of the scheme, Ms. Person has overpaid for at least Levemir

and Novolog brand insulin.

10.      **Illinois Plaintiffs**

     a.      **Andrè Arnold**

59.      Plaintiff Andrè Arnold is a citizen of the State of Illinois and resides in Belleville,

Illinois.

60.      Ms. Arnold has type 2 diabetes, and she currently takes Lantus brand insulin to

treat her diabetes. In the past, she took Tresiba brand insulin. Ms. Arnold is, and has been,

insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs

until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of

the list price of the drugs, as coinsurance. Under these terms of Ms. Arnold's coverage, she paid for

at least Lantus and Tresiba brand insulin based on list prices. As a direct result of the scheme, Ms. Arnold has overpaid for at least Lantus and Tresiba brand insulin.

### b.   Adam Levett

61.   Plaintiff Adam Levett is a citizen of the State of Illinois and resides in Chicago, Illinois.

62.   Mr. Levett has type 1 diabetes, and he currently takes Basaglar and Novolog brand insulin to treat his diabetes. In the past, he took Lantus brand insulin. Mr. Levett is, and has been, insured under high deductible, and other, employer-sponsored plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Levett's coverage, he paid for at least Basaglar, Novolog and Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Levett has overpaid for at least Basaglar, Novolog and Lantus brand insulin.

### 11.   Indiana Plaintiffs

### a.   Mary Bobo

63.   Plaintiff Mary Bobo is a citizen of the State of Indiana and resides in Kirklin, Indiana.

64.   Ms. Bobo has type 1 diabetes, and she currently takes Humalog brand insulin. In the past, she took Novolog and Fiasp brand insulin. Ms. Bobo was previously insured in high deductible and other health plans that required out-of-pocket payments for prescription drugs until reaching the plans' deductibles, and required payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Bobo's insurance coverage, she has paid for at least

Novolog and Fiasp brand insulin based on list prices. As a direct result of the scheme, Ms. Bobo has overpaid for at least Novolog and Fiasp brand insulin.

### b.    Arthur Janz

65.     Plaintiff Arthur Janz is a citizen of the State of Indiana and resides in Elkhart, Indiana.

66.     Mr. Janz has type 2 diabetes, and he currently takes Tresiba and Novolog brand insulin to treat his diabetes. In the past, he took Levemir and Lantus brand insulin. Mr. Janz is, and has been, insured under Medicare Part D plans, and other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Janz's coverage, he paid for at least Tresiba, Novolog, Levemir and Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Janz has overpaid for at least Tresiba, Novolog, Levemir and Lantus brand insulin.

### c.    Marie Saffran

67.     Plaintiff Marie Saffran is a citizen of the State of Nevada and resides Las Vegas, Nevada. However, before 2016, she was previously a citizen of the State of Indiana.

68.     Ms. Saffran has type 2 diabetes, and she currently takes Basaglar brand insulin to treat her diabetes. She previously took Humalog, Toujeo, and Lantus brand insulin. Ms. Saffran was previously insured in high deductible health plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Saffran's coverage, she paid for at least Humalog and Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Saffran has overpaid for at least Humalog and Lantus brand insulin.

### d. Scott Dercks

69.    Plaintiff Scott Dercks is a citizen of the State of Wisconsin and resides in

Milwaukee, Wisconsin. However, before moving to Wisconsin in 2014, Mr. Dercks was a citizen of

the State of Indiana, and purchased insulin there.

70.    Mr. Dercks has type 2 diabetes, and he currently takes Humalog brand insulin to

treat his diabetes. In the past, he took Lantus and Novolog brand insulin. Mr. Dercks is, and has

been, insured under Medicare Part D plans that require out of pocket payments for prescription

drugs until the consumer reaches the plans' deductibles, if any, and require payment of a

percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Dercks'

he paid for at least Humalog and Lantus brand insulin based on list prices. As a direct result of the

scheme, Mr. Dercks has overpaid for at least Humalog and Lantus brand insulin.

### 12. Iowa Plaintiff

### a. Richard Knauss

71.    Plaintiff Richard Knauss is a citizen of the State of Iowa and resides in Madrid,

Iowa.

72.    Mr. Knauss has type 1 diabetes, and he currently takes Novolog and Lantus brand

insulin to treat his diabetes. In the past, he took Humalog brand insulin. Mr. Knauss is, and has

been, insured under Medicare Part D plans that require out-of-pocket payments for prescription

drugs until the consumer reaches the plans' deductibles, if any, and require payment of a

percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Knauss's

coverage, he paid for at least Novolog, Lantus and Humalog brand insulin based on list prices. As a

direct result of the scheme, Mr. Knauss has overpaid for at least Novolog, Lantus and Humalog

brand insulin.

13.     **Kansas Plaintiffs**

      a.     **Kandyce Gunther**

73.     Plaintiff Kandyce Gunther is a citizen of the State of Kansas and resides in Douglass, Kansas.

74.     Ms. Gunther has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Novolog and Lantus brand insulin. Ms. Gunther was previously insured under high deductible health plans, and other health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Gunther's coverage, she paid for at least Novolog and Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Gunther has overpaid for at least Novolog and Lantus brand insulin.

      b.     **Susan Marsh**

75.     Plaintiff Susan Marsh is a citizen of the State of Kansas and resides in Lenexa, Kansas.

76.     Ms. Marsh has type 1 diabetes and she currently takes Novolog brand insulin to treat her diabetes. In the past, she took Apidra, Humalog and Lantus brand insulin. Ms. Marsh is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. She was previously insured under high deductible, and other health insurance plans that also required that she pay out-of-pocket due to deductibles and coinsurance. Under these terms of Ms. Marsh's coverage, she paid for at least

Novolog brand insulin based on list price. As a direct result of the scheme, Ms. Marsh has overpaid for at least Novolog brand insulin.

### 14.   Louisiana Plaintiffs

#### a.   Terry Brewster

77.   Plaintiff Terry Brewster is a citizen of the State of Arkansas and resides in Eureka Springs, Arkansas. Prior to moving to Arkansas, Mr. Brewster was a citizen of the State of Louisiana and purchased insulin there.

78.   Mr. Brewster has type 1 diabetes and currently takes Fiasp and Basaglar brand insulin to treat his diabetes. In the past, he took Apidra, Novolog, Lantus and Humalog brand insulin. Mr. Brewster was previously insured under high deductible and other health plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans deductible, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Brewster's coverage, he paid for at least Apidra, Novolog and Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Brewster has overpaid for at least Apidra, Novolog and Lantus brand insulin.

#### b.   Robyn Rushing

79.   Plaintiff Robyn Rushing is a citizen of the State of Louisiana and resides in Winnsboro, Louisiana.

80.   Ms. Rushing has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Toujeo brand insulin. Ms. Rushing is, and has been, insured under Medicare Part D, high deductible, and other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and/or require payment of a percentage of the list price of the drugs, as coinsurance. Under these

terms of Ms. Rushing's coverage, she paid for at least Humalog brand insulin based on list price. In addition, she was uninsured for a period in 2015 and paid for insulin out-of-pocket based on list price. As a direct result of the scheme, Ms. Rushing has overpaid for at least Humalog brand insulin.

### 15.    Maine Plaintiff

#### a.    Molly Thompson

81.    Plaintiff Molly Thompson is a citizen of the State of Maine and resides in Portland, Maine.

82.    Ms. Thompson has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Levemir and Lantus brand insulin. Ms. Thompson current health insurance plan requires payment of a percentage of the list price of the drugs, as coinsurance. Previously, she had high deductible plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and also paid coinsurance. Under these terms of Ms. Arnold's coverage, she paid for at least Humalog and Levemir brand insulin based on list prices. As a direct result of the scheme, Ms. Thompson has overpaid for at least Humalog and Levemir brand insulin.

### 16.    Maryland Plaintiff

#### a.    Brian Phair

83.    Plaintiff Brian Phair is a citizen of the State of Maryland and resides in North Bethesda, Maryland.

84.    Mr. Phair has type 1 diabetes and currently takes Humalog brand insulin to treat his diabetes. In the past, he took Novolog brand insulin. Mr. Phair was previously insured under high deductible health plans, and other health plans, that require out-of-pocket payments

for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Phair's coverage, he paid for at least Humalog brand insulin based on list prices. As a direct result of the scheme, Mr. Phair has overpaid for at least Humalog brand insulin.

### 17.     Massachusetts Plaintiffs

#### a.     Donald Chaires

85.     Plaintiff Donald Chaires is a citizen of the Commonwealth of Massachusetts and resides in Springfield, Massachusetts.

86.     Mr. Chaires has type 2 diabetes and currently takes Levemir brand insulin to treat his diabetes. In the past, he took Lantus and Novolog brand insulin. Mr. Chaires is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Chaires' coverage, he paid for at least Levemir, Lantus and Novolog brand insulin based on list price. As a direct result of the scheme, Mr. Chaires has overpaid for at least Levemir, Lantus and Novolog brand insulin.

#### b.     Sheila Cooney

87.     Plaintiff Sheila Cooney is a citizen of the Commonwealth of Massachusetts and resides in Plainville, Massachusetts.

88.     Ms. Cooney has type 2 diabetes and currently takes Basaglar brand insulin to treat her diabetes. In the past, she took Lantus brand insulin. Ms. Cooney is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. She was previously insured under other health plans that also

required that she pay out-of-pocket due to deductibles and coinsurance. Under these terms of Ms. Cooney's coverage, she has paid for at least Basaglar and Lantus brand insulin. As a direct result of the scheme, Ms. Cooney has overpaid for at least Basaglar and Lantus brand insulin.

### c.   Gerald Girard

89.   Plaintiff Gerald Girard is a citizen of the Commonwealth of Massachusetts and resides in Fairhaven, Massachusetts.

90.   Mr. Girard has type 2 diabetes and he currently takes Humalog and Lantus brand insulin to treat his diabetes. In the past, he took Novolog brand insulin. Mr. Girard is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. He was previously insured under employer-sponsored health plans that also required that he pay out-of-pocket due to deductibles and coinsurance. Under these terms of Mr. Girard's coverage, he paid for at least Humalog, Lantus and Novolog brand insulin based on list price. As a direct result of the scheme, Mr. Girard has overpaid for at least Humalog, Lantus and Novolog brand insulin.

### d.   Sara Hasselbach

91.   Plaintiff Sara Hasselbach is a citizen of the State of California and resides in San Diego, California. However, she resided in the Commonwealth of Massachusetts from 2009 to 2015, and she and her her family maintain a residence there, where they have stayed every summer, during the academic break.

92.   Ms. Hasselbach has type 1 diabetes and currently takes Humalog and Lantus brand insulin to treat her diabetes. In the past, she took Novolog, Levemir and Basaglar brand insulin. Ms. Hasselbach is, and has been, insured under high deductible plans that require out-of-

pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Hasselbach's coverage, she paid for at least Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Hasselbach has overpaid for at least Lantus brand insulin.

### 18.  Michigan Plaintiffs

#### a.  Ritch Hoard

93.     Plaintiff Ritch Hoard is a citizen of the State of Michigan and resides in Atlanta, Michigan.

94.     Mr. Hoard has type 1 diabetes and currently takes Lantus brand insulin to treat his diabetes. Mr. Hoard is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Hoard's coverage, he paid for at least Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Hoard has overpaid for at least Lantus brand insulin.

#### b.  Susan Landis

95.     Plaintiff Susan Landis is a citizen of the State of Michigan and resides in Taylor, Michigan.

96.     Ms. Landis has type 1 diabetes. In the past, she took Lantus, Novolog and Humalog brand insulin. Ms. Landis is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Landis's coverage, she paid for at least Lantus, Novolog and Humalog brand insulin

based on list prices. As a direct result of the scheme, Ms. Landis has overpaid for at least Lantus, Novolog and Humalog brand insulin.

### c.   Andrew Van Houzen

97.     Plaintiff Andrew Van Houzen is a citizen of the State of Tennessee, and resides in Allardt, Tennessee. However, prior to March 2021, Mr. Van Houzen was a citizen of the State of Michigan.

98.     Mr. Van Houzen has type 2 diabetes and currently takes Lantus brand insulin to treat his diabetes. Mr. Van Houzen is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Van Houzen's coverage, he paid for at least Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Van Houzen has overpaid for at least Lantus brand insulin.

### 19.   Minnesota Plaintiff

### a.   Quinn Nystrom

99.     Plaintiff Quinn Nystrom is a citizen of the State of Minnesota and resides in Baxter, Minnesota.

100.    Ms. Nystrom has type 1 diabetes and currently takes Novolog brand insulin to treat her diabetes. In the past, she took Humalog brand insulin. Ms. Nystrom is, and has been, insured under employer-sponsored, high deductible and other health plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms.

Nystrom's coverage, she paid for at least Novolog brand insulin based on list prices. As a direct result of the scheme, Ms. Nystrom has overpaid for at least Novolog brand insulin.

### 20.   Missouri Plaintiffs

#### a.   Monique Armstrong

101.    Monique Armstrong is a citizen of the State of Missouri and resides in St. Louis, Missouri.

102.    Ms. Armstrong has type 1 diabetes, and currently takes Humalog and Lantus brand insulin. In the past, she took Levemir and Novolog brand insulin. Since 2019, Ms. Armstrong has been insured in high deductible health plans that require out of pocket payments for prescription drugs until the consumer reaches the plans' deductible. Under these terms of Ms. Armstrong's insurance coverage, she paid for at least Levemir brand insulin based on list price. As a direct result of the scheme, Ms. Armstrong has overpaid for at least Levemir brand insulin.

#### b.   Lauren Robb

103.    Plaintiff Lauren Robb is a citizen of the State of Missouri and resides in Webster Groves, Missouri.

104.    Ms. Robb has type 1 diabetes, and currently takes Humalog and Lantus brand insulin to treat her diabetes. Ms. Robb is, and has been, insured under high deductible and other health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Robb's coverage, she paid for at least Humalog brand insulin based on list prices. As a direct result of the scheme, Ms. Robb has overpaid for at least Humalog brand insulin.

c.      Mary Maberry

105.    Mary Maberry is a citizen of the State of Missouri and resides in Hillsboro,

Missouri.

106.    Ms. Maberry has type 2 diabetes and currently takes Lantus brand insulin to treat

her diabetes. In the past, she took Levemir, Humalog and Novolog brand insulin. Ms. Maberry is,

and has been, insured under Medicare Part D plans, that require out-of-pocket payments for

prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment

of a percentage of the list price of the drugs, as coinsurance. She was previously insured under

employer-sponsored health plans that also required that she pay out-of-pocket due to deductibles

and coinsurance. Under these terms of Ms. Maberry's coverage, she paid for at least Humalog and

Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Maberry has

overpaid for at least Humalog and Lantus brand insulin.

21.     Nevada Plaintiff

a.      Leslie Bauer

107.    Plaintiff Leslie Bauer asserts claims on behalf of her deceased husband, Andrew

Bauer, as Trustee of his estate. Andrew Bauer was a citizen of the State of Nevada and resided in

Las Vegas, Nevada.

108.    Mr. Bauer had type 2 diabetes and took Lantus brand insulin to treat his diabetes.

Mr. Bauer had been insured under Medicare Part D, and individual health plans, that required

out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles,

and required payment of a percentage of the list price of the drugs, as coinsurance. Under these

terms of Mr. Bauer's coverage, he paid for at least Lantus brand insulin based on list price. As a

direct result of the scheme, Mr. Bauer overpaid for at least Lantus brand insulin. He also lost his vision and his kidney failed due to the high cost of insulin.

      **22.**    **New Jersey Plaintiffs**

           **a.**    **Carole Andrew**

      109.    Plaintiff Carole Andrew is a citizen of the State of New Jersey and resides in the Borough of Milltown, New Jersey.

      110.    Until this year, Ms. Andrew purchased insulin for her son, who has type 1 diabetes. This year, her son started paying for his own insulin, but had difficulty affording it due to price increases, so Ms. Andrew has continued to pay a portion of the cost. Since 2015, when he was diagnosed, she has purchased Novolog, Basaglar and Lantus brand insulin to treat his diabetes. Ms. Andrew and her son were previously insured under health insurance plans that require out-of-pocket payments for prescription drugs until reaching the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of their insurance coverage, Ms. Andrew has paid for at least Novolog, Basaglar and Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Andrew has overpaid for at least Novolog, Basaglar and Lantus brand insulin.

           **b.**    **Michael Carfagno**

      111.    Plaintiff Michael Carfagno is a citizen of the State of New Jersey and resides in Clementon, New Jersey.

      112.    Mr. Carfagno has type 2 diabetes, and he currently takes Novolog and Tresiba brand insulin to treat his diabetes. In the past, he took Levemir brand insulin. Mr. Carfagno is, and has been, insured under Medicare Part D plans, and, previously, other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans'

deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Carfagno's coverage, he paid for at least Tresiba and Novolog brand insulin based on list price. As a direct result of the scheme, Mr. Carfagno has overpaid for at least Tresiba and Novolog brand insulin.

      **c.**      **David Hernandez**

113.     Plaintiff David Hernandez is a citizen of the State of New Jersey and resides in Belleville, New Jersey.

114.     Mr. Hernandez has type 1 diabetes, and he recently received a pancreas transplant so he no longer takes insulin. In the past, he took Humalog and Lantus brand insulin to treat his diabetes. Before 2014, Mr. Hernandez was uninsured and paid out-of-pocket for insulin based on list price, or had sporadic insurance coverage under high-deductible plans that required out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles. Under these terms of Mr. Hernandez's coverage, he paid for at least Humalog and Lantus brand insulin based on list prices. During this time, he was not always able to afford his insulin. As a result, his blood sugar levels caused severe damage to his eyes and kidneys. He is now blind in one eye and has had a kidney transplant due to his inability to afford insulin and control his type 1 diabetes. As a direct result of the scheme, Mr. Hernandez has overpaid for at least Humalog and Lantus brand insulin.

      **d.**      **Barry Hunsinger**

115.     Plaintiff Barry Hunsinger is a citizen of the State of New Jersey and resides in Watchung, New Jersey.

116.     Mr. Hunsinger has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. In the past, he took Novolog brand insulin. Mr. Hunsinger is currently

insured under a Medicare Part D plan that only requires out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, because he also purchases Part G coverage to keep the cost of his insulin down. He previously had high deductible, employer-sponsored health plans that require out-of-pocket payments for deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Hunsinger's coverage, he paid for at least Humalog and Novolog brand insulin based on list prices. As a direct result of the scheme, Mr. Hunsinger has overpaid for at least Humalog and Novolog brand insulin.

23.    **New Mexico Plaintiffs**

a.    **Francis Barnett**

117.    Plaintiff Francis Barnett is a citizen of the State of New Mexico and resides in Albuquerque, New Mexico.

118.    Mr. Barnett has type 2 diabetes. In the past, he took Humalog, Lantus, Basaglar and Novolog brand insulin. Mr. Barnett is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Barnett's coverage, he paid for at least Lantus, Basaglar and Novolog brand insulin based on list prices. As a direct result of the scheme, Mr. Barnett has overpaid for at least Lantus, Basaglar and Novolog brand insulin.

b.    **Roseanna Harrison-Barnett**

119.    Plaintiff Roseanna Harrison-Barnett is a citizen of the State of New Mexico and resides in Albuquerque, New Mexico.

120.    Ms. Harrison-Barnett has type 2 diabetes. In the past, she took Lantus, Novolog and Humalog brand insulin to treat her diabetes. Ms. Harrison-Barnett is, and has been, insured under

Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. She was previously insured under employer-sponsored health plans that also required that she pay out-of-pocket due to deductibles and coinsurance. Under these terms of Ms. Harrison-Barnett's coverage, she paid for at least Lantus brand insulin based on list prices. As a direct result of the scheme, she has overpaid for at least Lantus brand insulin.

### c.    Clayton McCook

121.    Plaintiff Clayton McCook is a citizen of the State of Oklahoma and resides in Allen, Oklahoma. However, Mr. McCook has also purchased insulin in the State of New Mexico.

122.    Mr. McCook purchases insulin for his daughter, who has type 1 diabetes. He currently purchases Novolog brand insulin to treat her diabetes, and, in the past, he purchased Humalog and Lantus brand insulin. Mr. McCook and his daughter are currently insured in a high deductible plan, and were previously insured in high deductible and other health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of their coverage, Mr. McCook paid for at least Novolog, Humalog and Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. McCook has overpaid for at least Novolog, Humalog and Lantus brand insulin.

### 24.    New York Plaintiffs

### a.    Tracy Gerber

123.    Plaintiff Traci Gerber is a citizen of the State of New York and resides in Liverpool, New York.

124.    Ms. Gerber has type 1 diabetes and she currently takes Basaglar brand insulin. In the past, she took Humalog, Novolog, Lantus brand insulin. Ms. Gerber is currently insured under an individual health plan, and, previously, under employer-sponsored health plans, that required out-of-pocket payments for prescription drugs until reaching the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under the terms of Ms. Gerber's coverage, she paid for at least Basaglar brand insulin based on list price. As a direct result of the scheme, Ms. Gerber has overpaid for at least Basaglar brand insulin.

b.    **Robert Lowman**

125.    Plaintiff Robert Lowman is a citizen of the State of New York and resides in Cheektowaga, New York.

126.    Mr. Lowman has type 1 diabetes, and he currently takes Basaglar brand insulin to treat his diabetes. In the past, he took Lantus, Novolog, Levemir and Humalog brand insulin. Prior to July 2017, Mr. Lowman periodically had employer-sponsored health plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Lowman's coverage, he paid for at least Lantus and Humalog brand insulin based on list prices. And, Mr. Lowman was periodically without insurance, and paid for insulin out-of-pocket and based on list prices. As a direct result of the scheme, Mr. Lowman has overpaid for at least Lantus and Humalog brand insulin.

c.    **Melissa Passarelli**

127.    Plaintiff Melissa Passarelli is a citizen of the State of New York and resides in Dix Hills, New York.

128.    Ms. Passarelli has type 1 diabetes, and takes Novolog and Levemir brand insulin to treat her diabetes. She used to take Humalog and Lantus brand insulin. Ms. Passarelli was previously insured under high deductible health plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Passarelli's coverage, she paid for at least Novolog brand insulin based on list prices. As a direct result of the scheme, Ms. Passarelli has overpaid for Novolog brand insulin.

**25.    North Carolina Plaintiff**

      **a.    Donna Miller**

129.    Plaintiff Donna Miller is a citizen of the State of North Carolina and resides in Fletcher, North Carolina.

130.    Donna Miller has type 2 diabetes. In the past, she took Humalog, Toujeo, Lantus and Novolog brand insulin to treat her diabetes. Ms. Miller is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Miller's coverage, she paid for at least Lantus and Novolog brand insulin based on list prices. As a direct result of the scheme, Ms. Miller has overpaid for at least Lantus and Novolog brand insulin.

**26.    North Dakota Plaintiff**

      **a.    Jacob Knaack**

131.    Plaintiff Jacob ("Jake") Knaack is a citizen of North Dakota and resides in Fargo, North Dakota.

132.     Mr. Knaack has type 1 diabetes and currently takes Novolog and Lantus brand insulin to treat his diabetes. In the past, he took Apidra and Humalog brand insulin. Mr. Knaack was previously insured under high deductible health plans, and other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Knaack's coverage, he paid for at least Humalog brand insulin based on list price. As a direct result of the scheme, Mr. Knaack has overpaid for at least Humalog brand insulin.

27.     **Ohio Plaintiffs**

a.     **Julia Blanchette**

133.     Plaintiff Julia Blanchette is a citizen of the State of Ohio and resides in Cleveland Heights, Ohio.

134.     Ms. Blanchette has type 1 diabetes, and takes Fiasp brand insulin to treat her diabetes. In the past, she took Novolog and Apidra brand insulin. Ms. Blanchette was previously insured under health plans that requires out of pocket payments for prescription drugs until the consumer reaches the plans' deductible. Under these terms of Ms. Blanchette's coverage, she paid for at least Apidra brand insulin based on list price. As a direct result of the scheme, Ms. Blanchette has overpaid for at least Apidra brand insulin.

b.     **Ritch Hoard**

135.     Plaintiff Ritch Hoard is a citizen of the State of Michigan and resides in Atlanta, Michigan. However, Mr. Hoard also purchased insulin in the State of Ohio.

136.     Mr. Hoard has type 1 diabetes and currently takes Lantus brand insulin to treat his diabetes. Mr. Hoard is, and has been, insured under Medicare Part D plans that require out-of-

pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Hoard's coverage, he paid for at least Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Hoard has overpaid for at least Lantus brand insulin.

### c.      Marilyn Person

137.     Plaintiff Marilyn Person is a citizen of the State of Ohio and resides in Dayton, Ohio.

138.     Ms. Person has type 2 diabetes, and she currently takes Novolog, Lantus, and Levemir brand insulin to treat her diabetes. In the past, she took Humalog, Basaglar and Novolog brand insulin. Ms. Person is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Person's coverage, she paid for at least Levemir and Novolog brand insulin based on list prices. From time to time, Ms. Person obtains samples when she cannot afford her prescribed insulin medications. As a direct result of the scheme, Ms. Person has overpaid for at least Levemir and Novolog brand insulin.

### d.      Larissa Shirley

139.     Plaintiff Larissa Shirley is a citizen of the State of Ohio and resides in Marion, Ohio.

140.     Ms. Shirley has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes. In the past, she took Novolog and Fiasp brand insulin. Ms. Shirley was previously insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment

of a percentage of the list price of the drugs, as coinsurance. However, her coinsurance obligations became so high in the Medicare coverage gap, she had to switch to her husband's high deductible, employer-sponsored health plan, which also requires out-of-pocket payments before reaching a deductible, and for coinsurance. Although her doctor provided her samples from time to time, to reduce her high costs, under both Medicare Part D and her husband's plan, she paid for Novolog brand insulin based on the list price. As a direct result of the scheme, Ms. Shirley has overpaid for at least Novolog brand insulin.

28.     **Oklahoma Plaintiffs**

a.     **Melinda Bell**

141.    Plaintiff Melinda Bell is a citizen of the State of Oklahoma and resides in Allen, Oklahoma.

142.    Ms. Bell purchases insulin for her son who has type 1 diabetes. She currently purchases Humalog brand insulin for him, and has purchased Lantus, Tresiba and Novolog brand insulin in the past. During 2016, Ms. Bell and her son were insured under a high deductible plan that requires out-of-pocket payments for prescription drugs until the consumer reaches the plan's deductible, and requires payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of their coverage, Ms. Bell has paid for at least Lantus and Novolog brand insulin based on list prices. As a direct result of the scheme, Ms. Bell has overpaid for at least Lantus and Novolog brand insulin.

b.     **Clayton McCook**

143.    Plaintiff Clayton McCook is a citizen of the State of Oklahoma and resides in Allen, Oklahoma.

144.     Mr. McCook purchases insulin for his daughter, who has type 1 diabetes. He currently purchases Novolog brand insulin to treat her diabetes, and, in the past, he purchased Humalog and Lantus brand insulin. Mr. McCook and his daughter are currently insured in a high deductible plan, and were previously insured in high deductible and other health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of their coverage, Mr. McCook paid for at least Novolog, Humalog and Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. McCook has overpaid for at least Novolog, Humalog and Lantus brand insulin.

c.     **Shannon Meadows**

145.     Plaintiff Shannon Meadows is a citizen of the State of Oklahoma and resides in Duncan, Oklahoma.

146.     Ms. Meadows has type 1 diabetes, and she currently takes Levemir and Novolog brand insulin to treat her diabetes. In the past, she took Toujeo, Lantus and Humalog brand insulin. Ms. Meadows is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. She was previously insured under other health insurance plans that also required that she pay out-of-pocket due to deductibles and coinsurance. Under these terms of Ms. Meadows's coverage, she paid for at least Levemir, Novolog, Toujeo and Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Meadows has overpaid for at least Levemir, Novolog, Toujeo and Lantus brand insulin.

29.   **Oregon Plaintiffs**

   a.   **Russell Scott Palmer**

147.   Plaintiff Russell Scott Palmer is a citizen of the State of Oregon and resides in Eugene, Oregon.

148.   Mr. Palmer has type 2 diabetes, and he currently takes Lantus and Novolog brand insulin to treat his diabetes. Mr. Palmer was previously insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. He previously had an employer-sponsored health plan that also required out-of-pocket payment up to a deductible. Under these terms of Mr. Palmer's coverage, he paid for at least Lantus brand insulin based on list price. As a direct result of the scheme, Mr. Palmer has overpaid for at least Lantus brand insulin.

   b.   **Kim Wallan**

149.   Plaintiff Kim Wallan is a citizen of the State of Oregon and resides in Medford, Oregon.

150.   Ms. Wallan's son has type 1 diabetes. In the past, she purchased Humalog, Novolog and Lantus brand insulin to treat his diabetes. Ms. Wallan was uninsured for a period in 2014 and 2015, and paid for her son's insulin out-of-pocket based on list price. As a direct result of the scheme, Ms. Wallan has overpaid for at least Novolog and Lantus brand insulin.

   c.   **Scott Christensen**

151.   Plaintiff Scott Christensen is a citizen of the State of Utah and resides in Elk Ridge, Utah. However, from November 2014 to April 2016, Mr. Christensen was a citizen of the State of Oregon, and purchased insulin there.

- 44 -

152.    Mr. Christensen has type 1 diabetes, and he currently alternates between Novolog and Humalog brand insulin to treat his diabetes. In the past, he took Apidra brand insulin. Mr. Christensen was previously insured under employer sponsored insurance plans that required out-of-pocket payments for prescription drugs until reaching the plans' deductibles, and required payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Christensen's coverage, he paid for at least Novolog, Humalog and Apidra brand insulin based on list price. In addition, for a portion of 2016, his insurance provider did not cover his insulin medications, and he was therefore forced to pay for his insulin out-of-pocket based on list price during that time. As a direct result of the scheme, Mr. Christensen overpaid for at least Novolog, Humalog and Apidra brand insulin.

30.    **Pennsylvania Plaintiff**

a.    **Kerry Ann Stare**

153.    Plaintiff Kerry Ann Stare is a citizen of the Commonwealth of Pennsylvania and resides in Bethel Park, Pennsylvania.

154.    Ms. Stare has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Novolog and Lantus brand insulin. Ms. Stare was previously insured in a high deductible plan, and other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Stare's coverage, she paid for at least Novolog and Lantus brand insulin based on list prices. As a direct result of the scheme, Ms. Stare has overpaid for at least Novolog and Lantus brand insulin.

31.     **South Carolina Plaintiffs**

a.     **Jonathan Rollins**

155.    Plaintiff Jonathan Rollins is a citizen of the State of South Carolina and resides in Charleston, South Carolina. From mid-2015 to mid-2017, Dr. Rollins was a citizen of the Commonwealth of Virginia and resided in Roanoke, Virginia.

156.    Dr. Rollins has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. In the past, he took Novolog and Basaglar brand insulin. Dr. Rollins was previously insured under health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and/or require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Dr. Rollins's coverage, he paid for at least Humalog, Novolog and Basaglar brand insulin based on list prices. As a direct result of the scheme, Dr. Rollins has overpaid for at least Humalog, Novolog and Basaglar brand insulin.

b.     **Sarah Krueger**

157.    Plaintiff Sarah Krueger is a citizen of the State of South Carolina and resides in Okatie, South Carolina.

158.    Ms. Krueger has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Lantus and Novolog brand insulin. Ms. Krueger is currently, and has been, insured under employer-sponsored, high deductible and other health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Krueger's coverage, she paid for at least Novolog brand

insulin based on list prices. As a direct result of the scheme, Ms. Krueger has overpaid for at least Novolog brand insulin.

### 32.    Tennessee Plaintiffs

#### a.    Tyler Campbell

159.    Plaintiff Tyler Campbell is a citizen of the State of Tennessee and resides in Old Hickory, Tennessee.

160.    Mr. Campbell has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. In the past, he took Novolog brand insulin. Mr. Campbell has been periodically uninsured, including in 2011, 2018 and 2019, and during those periods, he paid out-of-pocket for his prescription drugs, including Humalog and Novolog brand insulin, based on list price. As a direct result of the scheme, Mr. Campbell has overpaid for at least Humalog and Novolog brand insulin.

#### b.    Willie Phillips

161.    Plaintiff Willie Phillips is a citizen of the State of Tennessee and resides in Prospect, Tennessee.

162.    Ms. Phillips has type 2 diabetes, and she currently takes Levemir brand insulin to treat her diabetes. Ms. Phillips is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Phillips's coverage, she paid for at least Levemir brand insulin based on list prices. As a direct result of the scheme, Ms. Phillips has overpaid for at least Levemir brand insulin.

33.     **Texas Plaintiffs**

a.     **Patricia Dague**

163.     Plaintiff Patricia Dague is a citizen of the State of Texas and resides in Rosenberg, Texas. From 2001 to 2013, Ms. Dague was a citizen of the State of Ohio.

164.     Ms. Dague has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes. Ms. Dague is, and has been, insured under Medicare Part D plans, and, previously, under other health insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Dague's coverage she paid for at least Lantus and Novolog brand insulin based on list prices. As a direct result of the scheme, Ms. Dague has overpaid for at least Lantus and Novolog brand insulin.

b.     **Michael Horton**

165.     Plaintiff Michael Horton is a citizen of the State of Texas and resides in Telephone, Texas.

166.     Mr. Horton has type 2 diabetes, and he currently takes Levemir and Humalog brand insulin to treat his diabetes. In the past, he took Novolog, Basaglar and Lantus brand insulin. Mr. Horton was previously insured in high deductible, employer-sponsored health plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Horton's coverage, he paid for at least Levemir, Novolog, Basaglar and Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Horton has overpaid for at least Levemir, Novolog, Basaglar and Lantus brand insulin.

- 48 -

### c.  Laura Stark

167.  Plaintiff Laura Stark is a citizen of the State of Texas and resides in Cypress, Texas.

168.  Ms. Stark purchases insulin for her son, who has type 1 diabetes. She currently purchases Novolog and Tresiba brand insulin to treat her son's diabetes, and in the past, she purchased Humalog, Levemir and Lantus brand insulin. Ms. Stark and her son are, and have been, insured under high deductible plans, and other medical insurance plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of their coverage, Ms. Stark paid for at least Novolog, Tresiba and Humalog brand insulin based on list prices. As a direct result of the scheme, Ms. Stark has overpaid for at least Novolog, Tresiba and Humalog brand insulin.

### d.  Bret Stewart

169.  Plaintiff Bret Stewart is a citizen of the State of Texas and resides in Dalhart, Texas.

170.  Mr. Stewart has type 1 diabetes. In the past, he took Lantus, Humalog, Apidra, Toujeo, Novolog and Levemir brand insulin to treat his diabetes. Mr. Stewart is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. He was previously insured under other health insurance plans that also required that he pay out-of-pocket due to deductibles and coinsurance. Under these terms of Mr. Stewart's coverage, he paid for at least Lantus, Humalog, Apidra, Toujeo, and Levemir brand insulin based on list prices. As a direct result of the scheme, Mr. Stewart has overpaid for at least Lantus, Humalog, Apidra, Toujeo, and Levemir brand insulin.

### 34.  Utah Plaintiffs

#### a.  Scott Christensen

171.    Plaintiff Scott Christensen is a citizen of the State of Utah and resides in Elk Ridge, Utah.

172.    Mr. Christensen has type 1 diabetes, and he currently alternates between Novolog and Humalog brand insulin to treat his diabetes. In the past, he took Apidra brand insulin. Mr. Christensen was previously insured under employer sponsored insurance plans that required out-of-pocket payments for prescription drugs until reaching the plans' deductibles, and required payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Christensen's coverage, he paid for at least Novolog, Humalog and Apidra brand insulin based on list price. In addition, for a portion of 2016, his insurance provider did not cover his insulin medications, and he was therefore forced to pay for his insulin out-of-pocket based on list price during that time. As a direct result of the scheme, Mr. Christensen overpaid for at least Novolog, Humalog and Apidra brand insulin.

#### b.  Dianna Gilmore

173.    Plaintiff Dianna Gilmore is a citizen of the State of Utah and resides in Spanish Fork, Utah.

174.    Ms. Gilmore has type 2 diabetes, and she currently takes Toujeo and Novolog brand insulin to treat her diabetes. In the past, she took Levemir, Lantus and Humalog brand insulin. Ms. Gilmore is, and has been, insured under Medicare Part D plans, that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. She was previously insured under employer-sponsored health plans that also required that she pay out-of-pocket due to

- 50 -

deductibles and coinsurance. Under these terms of Ms. Gilmore's coverage, she paid for at least Levemir, Novolog, Toujeo and Lantus brand insulin based on list prices. In addition, she was uninsured for a period and paid for insulin out-of-pocket based on list price. As a direct result of the scheme, she has overpaid for at least Levemir, Novolog, Toujeo and Lantus brand insulin.

35.    **Virginia Plaintiff**

a.    **Jonathan Rollins**

175.    Plaintiff Jonathan Rollins is a citizen of the State of South Carolina and resides in Charleston, South Carolina. However, from mid-2015 to mid-2017, Dr. Rollins was a citizen of the Commonwealth of Virginia.

176.    Dr. Rollins has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. In the past, he took Novolog and Basaglar brand insulin. Dr. Rollins was previously insured under health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and/or require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Dr. Rollins's coverage, he paid for at least Humalog, Novolog and Basaglar brand insulin based on list prices. As a direct result of the scheme, Dr. Rollins has overpaid for at least Humalog, Novolog and Basaglar brand insulin.

36.    **Wisconsin Plaintiffs**

a.    **Scott Dercks**

177.    Plaintiff Scott Dercks is a citizen of the State of Wisconsin and resides in Milwaukee, Wisconsin.

178.    Mr. Dercks has type 2 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. In the past, he took Lantus and Novolog brand insulin. Mr. Dercks is, and has

been, insured under Medicare Part D plans that require out of pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Mr. Dercks' coverage he paid for at least Humalog and Lantus brand insulin based on list prices. As a direct result of the scheme, Mr. Dercks has overpaid for at least Humalog and Lantus brand insulin.

b.     **Angela Kritselis**

179.     Plaintiff Angela Kritselis is a citizen of the State of Wisconsin and resides in Grafton, Wisconsin.

180.     Ms. Kritselis has type 1 diabetes, and she currently takes Humalog and Lantus brand insulin to treat her diabetes. In the past, she took Novolog brand insulin. Ms. Kritselis was previously insured under high deductible and other health insurance plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and require payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Kritselis's coverage, she paid for at least Humalog, Lantus and Novolog brand insulin based on list prices, and she saw the health savings account that she maintained in 2006-2016 dwindle away as a result, due to the high cost of insulin. In addition, she was periodically uninsured before 2018 and paid for insulin out-of-pocket, based on list price. As a direct result of the scheme, Ms. Kritselis has overpaid for at least Humalog, Lantus and Novolog brand insulin.

c.     **Deanna Grimm**

181.     Plaintiff Deanna Grimm is a citizen of the State of New Mexico and resides in Cliff, New Mexico. However, Ms. Grimm was previously a citizen of the State of Wisconsin, and purchased insulin there.

182.    Ms. Grimm has type 1 diabetes, and she takes Humalog brand insulin to treat her diabetes. In the past she was insured under high deductible health plans, and other health insurance plans, that required out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, and required payment of a percentage of the list price of the drugs, as coinsurance. Under these terms of Ms. Grimm's coverage, she paid for at least Humalog based on list price. As a direct result of the scheme, Ms. Grimm has overpaid for Humalog brand insulin.

        **d.**     **Robyn Rushing**

183.    Plaintiff Robyn Rushing is a citizen of the State of Louisiana and resides in Winnsboro, Louisiana. However, prior to 2015, Ms. Rushing was a citizen of the State of Wisconsin.

184.    Ms. Rushing has type 1 diabetes and currently takes Humalog brand insulin to treat her diabetes. In the past, she took Toujeo brand insulin. Ms. Rushing is, and has been, insured under Medicare Part D plans that require out-of-pocket payments for prescription drugs until the consumer reaches the plans' deductibles, if any, and/or require payment of a percentage of the list price of the drugs, as coinsurance. She was previously insured under high deductible and other health insurance plans that also required that she pay out-of-pocket due to deductibles and coinsurance. Under these terms of Ms. Rushing's coverage, she paid for at least Humalog brand insulin based on list price. In addition, she was uninsured for a period in 2015 and paid for insulin out-of-pocket based on list price. As a direct result of the scheme, Ms. Rushing has overpaid for at least Humalog brand insulin.

185.    On information and belief, each plaintiff paid out-of-pocket for analog insulin and those payments were based on the artificially inflated list prices. As a result, each plaintiff has been

injured. With the exception of Mr. Hernandez, each plaintiff will continue to purchase analog insulin in the future.

**B.     Defendants**

186.     Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana. Eli Lilly's principal place of business is Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly manufactures Humalog and Basaglar, which are used for the treatment of diabetes. Lilly's revenues from Humalog in 2016 were $2.84 billion. Its revenues from Humalog were $1.5 billion in 2013, $1.7 billion in 2015 and over $10 billion during the class period.

187.     Defendant Novo Nordisk Inc. is a Delaware corporation and has a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536. Novo Nordisk manufactures Fiasp, Novolog, Levemir, and Tresiba, which are used for the treatment of diabetes. Novo Nordisk's revenues from the sale of Novolog were $3.03 billion in 2016, over $2 billion in 2014 and 2015, and over $10 billion during the class period. Revenues from Levemir were $955 million in 2013, $1.3 billion in 2014, and $1.3 billion in 2015. Sales to diabetic patients are such a critical part of Novo Nordisk's business that its 2015 Annual Report's cover page stated in bold letters, "*Why Do So Many People in Cities Get Diabetes?*".

188.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi manufactures Apidra, Lantus, and Toujeo, which are used for the treatment of diabetes. Sanofi's revenues from Lantus were $6.98 billion in 2016 and over $4 billion in each year since 2013 for a total of $24 billion during the class period. Sanofi's SEC Form 20-F for the year 2015 notes that

"Lantus is particularly important; it was the Group's leading product . . . representing 17.2% of . . . net sales . . . ."

## III.   JURISDICTION AND VENUE

189.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the plaintiffs' claims arise under federal law and under 18 U.S.C. § 1964(c): this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

190.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because each defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to this complaint took place within this district.

191.   The Court has personal jurisdiction over each defendant. Each defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    DRUG PRICING IN THE UNITED STATES

### A.    Entities Involved in Drug Pricing

192.    The prescription drug industry consists of an opaque network of entities, including pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health and welfare plans), pharmacy benefit managers, and patient-consumers.

193.    *Pharmaceutical Companies*. Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs. This remains true even if these companies contract out the actual production of their drugs. Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers. Critically, pharmaceutical companies set the prices of their drugs and then those prices are used to calculate payments consumers make. The defendants here are pharmaceutical companies.

194.    *Wholesalers*. After production, the defendant manufacturers send their drugs to FDA-registered drug wholesalers for further distribution. Wholesalers purchase inventory and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.

195.    *Health benefit providers*. Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans. These plans submit payments on behalf of insured individuals to healthcare providers for services rendered to those individuals. Health insurers also cover a portion of their beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" includes public and private entities, the

latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits.

196.     *Pharmacy Benefit Managers*. Pharmacy benefit managers (PBMs) effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers. In this role, PBMs perform a variety of services on behalf of their health insurer clients, including the negotiation of rebates with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services. Nonetheless, they generally are not a direct link in the physical supply chain for pharmaceutical products because, in most instances, they do not take possession or control of prescription drugs. The largest PBMs are CVS Health, Express Scripts, and OptumRx. Together, they cover roughly 80 to 85 percent of privately insured Americans.

**B.     The Drug Payment & Distribution Structure**

197.     *Distribution*. Generally speaking, for retail pharmacy channels, branded prescription drugs are distributed from manufacturer to wholesaler, wholesaler to retail pharmacy (or mail order), and retailer to patient.

198.     *Downstream charges*. The downstream charges are from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of ingredient cost reimbursement and dispensing fees) and consumers (in the form of coinsurance, copayment, deductible payment, and/or cash).

199.     *Upstream charges*. The upstream charges are from health benefit providers and/or PBMs directly back to the manufacturer. These upstream charges are price discounts the defendant drug manufacturers offer PBMs and their health insurer clients in the form of "rebates." They typically occur well after the point-of-sale transactions.

200.    The figure below illustrates this payment structure. This figure labels certain payments "payment" and others "negotiated payment." The term "payment" refers to individual payments, made at the time of delivery; for example, when a patient walks into a pharmacy and picks up her prescription. At that moment, her health plan also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies. In contrast, a "negotiated payment" is a payment made under a negotiated contract. For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time. The figure also indicates the flow of products and rebates.

**Figure 3: The U.S. Drug Payment Structure[8]**



201.    When an insured consumer buys a medication from a pharmacy (a retailer), her insurer pays the pharmacy based on the price its PBM negotiated for that medication (the net

---

[8] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

price). In addition to her insurer's payment, the patient usually pays for a portion of the medication's cost, out-of-pocket. Importantly, the patient's payment is typically based on the list price the *drug manufacturer* set for that drug.

### C.    List pricing as a Basis for Reimbursement

202.    The prices for the drugs distributed in this chain are different for each participating entity: different actors pay different prices for the same drugs. In this system, only a drug's list price—known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Price (WAC)—is publicly available.

203.    The prescription drug industry is unusual in that there are stark differences in the way patients pay for the products versus the ways institutions and health benefit providers pay for the same products. The beneficiary of this industry's products (the patient) typically pays in one of several predictable ways for a *single* product based on the manufacturer's published list price. First, in the case of coinsurance, consumers pay a pre-set percentage of the point-of-sale transaction price, based on list price. Second, in the case of cash transactions, consumers pay a usual and customary price, based on list price. The greater the list price, the more a cash a consumer pays. And, third, in the case of deductibles, consumers pay a portion of the point-of-sale transaction price, based on list price. (Consumers might also pay a tiered or fixed copay). Consumers make these payments at the *point-of-sale* only. In contrast, intermediaries and third-party payers typically determine net costs for pharmaceuticals based on arrangements that apply to *hundreds of products*. And these charges occur not only at the point-of-sale, but also during later, off-invoice transactions.

204.    The use of price lists to calculate and communicate reimbursement payments reflects an efficient method by which to maintain the system's flexibility, minimize uncertainty through predictable costs, maximize coverage in a cost-effective manner, and provide a mechanism

for competition among payers. Payers' reimbursement formulas will often include a series of price benchmarks and payment caps. The price benchmarks used in payers' formulas are commonly adjusted by a percentage that is contractually set (for commercial payers) or established through regulatory procedures (for public payers). For example, reimbursement could be determined based on the lower of the drug's (i) AWP – $x$%, (ii) WAC + $y$%, and (iii) payment cap.

205.    Despite multiple modifications to health insurers' reimbursement policies over time, the most commonly and continuously used set of reference prices in reimbursement and provider payment calculations and negotiations for retail channel drug transactions remains WAC. Crucially, WAC is the basis for plaintiffs' payments in this case. Each of the defendants have complete control over the setting of the WAC for their products.

206.    From an administrative perspective, WAC provides a logical starting point for the calculation and communication of reimbursement to various pharmacy providers for various drugs. Moreover, given the historical use of WAC (and its mathematically related counterpart, AWP) by all industry participants, one cannot discount the significance of WAC's entrenchment in the complex and highly automated payment system that is used to process billions of payments. As such, it is widely used as a competitive list and to estimate costs and revenues.

207.    This list price serves as the immovable reference point off of which PBMs and drug manufacturers negotiate rebates. As previously explained, PBMs create formularies for their health insurer clients, and those formularies significantly influence patients' drug purchasing behavior. Health insurers cover all or a portion of their members' drug costs based on whether and where the drugs fall on their PBMs' formularies. Drug companies offer PBMs rebates– discounts off list prices–to influence the PBMs' formulary decisions.

208.    As explained in the following section, consumer payments are directly based on the manufacturers' list prices.

**D.    Consumer Drug Costs**

209.    Pharmaceutical companies directly set the prices certain consumers pay by setting list prices.

210.    When a consumer goes to a retail pharmacy (or the website of a mail order pharmacy) and requests to buy a drug, the pharmacy's computer system pulls up AWP, which is the list price the *manufacturer* of that drug set and published plus an approximately 15-20% markup. The basis for that price is *not* determined by the pharmacy or the wholesaler that brought the drug to the pharmacy. Rather, the pharmacy's computer system taps into a database of prices that manufacturers created and published through third party publishers. The pharmacy's search for the drug's price is akin to stockbroker's search for the price of a stock; the pharmacy, like the broker, does not and cannot change or influence the list price. It can only report that price to the consumer. In short, the prices pharmacies charge consumers are directly computed based on the manufacturer's list prices.[9]

211.    Three principal types of consumers pay based on the list prices that drug manufacturers—and drug manufacturers alone—set: (1) uninsured consumers; (2) consumers in high deductible plans; and (3) consumers with coinsurance obligations.

212.    *Uninsured*. Uninsured consumers must pay full, point-of-sale prices (based on list prices) every time they pick up their prescriptions. Despite the Affordable Care Act's expansion of Medicaid coverage and establishment of Health Insurance Marketplaces, millions of people—28.5

---

[9] This complaint refers to this price as the full, point-of-sale price (based on list price).

million in 2015—remain without coverage. This uninsured population is especially concentrated in states that did not take the Medicaid expansion, where diabetes is prevalent. Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but could not afford it.

213.    The uninsured are not the only patients saddled with high out-of-pocket costs. Despite their monthly insurance premiums, insured consumers often pay a significant portion of a drug's list price. Out-of-pocket costs for insured consumers come in three forms: deductibles, coinsurance requirements, and/or copayment requirements.

214.    *High deductible Plans.* The term "deductible" refers to a set amount of healthcare cost an insured must shoulder (out-of-pocket) before her plan will begin to contribute to her healthcare costs. Although most health plans have some form of a deductible, high deductible health plans are aptly named for their larger-than-average deductibles. And while high deductible health plans usually boast lower premiums, they are nonetheless more onerous to patients and families that need expensive care on a regular basis. Insured individuals in high deductible plans are usually required to pay full, point-of-sale prices (based on list prices) before they reach their deductibles.

215.    The past decade has witnessed a shift away from traditional health plans, which provide broader coverage, toward high deductible health plans. In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high deductible health plans, up from 17% in 2011. Although Preferred Provider Organizations (PPOs) are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs has fallen 10% over the last two years, while enrollment in high

deductible health plans has increased by 8%. Figure 4 illustrates the rising trend in high deductible plans.

**Figure 4: Percentage of covered workers enrolled in high deductible health plans from 2006-2016.**[10]



*Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



216.    Moreover, deductibles themselves have risen. The average annual deductible for an individual enrolled in a high deductible plan was between $2,031 and $2,295 in 2016, depending on the exact type of plan.[11] The average annual deductible for family coverage was between $4,321 and $4,364 in 2016, again, depending on the type of plan.

---

[10] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 3 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

[11] There are two primary types of high deductible health plans: high deductible plans with Health Reimbursement Arrangements and high deductible plans with Health Savings Accounts.

217.    A recent Kaiser Family Foundation study found that 30% to 40% of U.S.

households with private coverage do not have enough liquid assets to pay the deductible required

by their health plan. Figure 5 below demonstrates this reality.

**Figure 5: Share of non-elderly households with liquid assets less than their deductibles among people with private health insurance.[12]**



218.    Overall, in the entire employer-based health plan marketplace, deductibles have

risen 12% since 2015—four times faster than premiums increased in the same period. Among all

individuals enrolled in employer health plans (both high deductible plans as well as others), the

average deductible in 2016 was $1,478.

219.    The average deductible for individuals working at smaller firms was higher than

that in larger firms ($2,069 v. $1,238 in 2016).

---

[12] Drew Altman, *The Biggest Health Issue We Aren't Debating*, Axios (Nov. 22, 2017), https://www.axios.com/the-biggest-health-issue-we-arent-debating-2511098849.html (graphic based on data from Matthew Rae, Gary Claxton, and Larry Levitt, *Do Health Plan Enrollees Have Enough Money to Pay Cost Sharing*, Kaiser Family Foundation (Nov. 23, 2017), https://www.kff.org/health-costs/issue-brief/do-health-plan-enrollees-have-enough-money-to-pay-cost-sharing/).

220.    Figure 6 shows the increase in health plans with a general annual deductible of

$1,000 or more, broken down by firm size.

**Figure 6: Percentage of covered workers enrolled in a plan with a general annual deductible of $1000 or more for single coverage, by firm size, from 2006-2016.**[13]



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



221.    The average deductibles for plans available under the Affordable Care Act on the

Marketplace Exchanges are also high. The Marketplace health plans are broken into "metal" tiers:

bronze, silver, gold, and platinum. The cheapest plans—bronze and silver—unsurprisingly come with

very high deductibles. In 2016, the average deductibles in such plans were $5,765 for bronze plans

(up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

---

[13] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 4 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

222.     High deductible plans are particularly hard on patients with chronic diseases: not only do patients living with chronic diseases, like diabetes, hit their deductibles year after year, but they hit their deductibles over a shorter period of time, resulting in significant financial burden at the start of each year. Individuals and families who do not have savings or access to credit often take less insulin than they are prescribed to spread their out-of-pocket payments over a longer period of time.

223.     *Coinsurance and Copayments*. In addition to their deductibles, individuals with insurance typically make copayments or coinsurance payments for the healthcare services they need. A copayment is a fixed or tiered fee that an individual must pay for a healthcare service at the time of care; for example, when she picks up a prescription. Copayment rates vary depending on the drug; usually drugs in preferred formulary positions have lower copays, and drugs in disfavored formulary positions require larger copays.

224.     Coinsurance is similar. However, instead of paying a fixed or tiered fee for a particular service, individuals with coinsurance arrangements are required to pay a fixed *percentage* of the cost of the healthcare service provided. For drugs, this means a percentage of the plan's point-of-sale price, which is mathematically tied to the drug's *list* price. This percentage can vary, with lower coinsurance rates for preferred drugs and higher coinsurance rates for disfavored drugs.

225.     For those in high deductible health plans, copayments and coinsurance obligations begin after they reach their deductibles. Plans that cover prescription drugs right away, not requiring patients to reach deductibles first, usually require copayments or coinsurance contributions for every drug purchase.

226.    For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, the average coinsurance rates in 2016 were 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs (fourth tier drugs are usually specialty medications, for diseases such as cancer, and are extremely expensive). Humalog, Basaglar, Levemir, Novolog, Fiasp, Tresiba, Lantus, Toujeo, and Apidra are still branded drugs. Therefore, insurance plans generally classify them as second-tier or third-tier drugs on their formularies. As a result, coinsurance payments keyed to the list prices of these medicines can be quite burdensome.

227.    Recently, health plans have been demanding higher and higher coinsurance contributions from patients. Table 1 shows this trend.

### Table 1: Rising Coinsurance Rates

| Retail Coinsurance Payment | | | |
|---|---|---|---|
|  | T2 Brand | T3 Brand | Flat |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

228.    Overall, out-of-pocket spending for prescription drugs has shifted away from copayments toward deductibles and coinsurance spending over the past decade. In 2014, patients

paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to just 4% in 2004. Similarly, patients paid for 20% of their out-of-pocket drug expenses through coinsurance in 2014, compared to just 3% in 2004.

229. *Medicare Part D*. Finally, patients in Medicare Part D plans—Medicare's prescription drug program—often pay a large portion of their drugs' list prices. In 2017, the Medicare Part D standard prescription drug plan had a $400 deductible and a 25% coinsurance obligation up to an initial coverage limit of $3,700. This meant patients in Medicare Part D plans paid full, point-of-sale prices (based on list price) until they spent $400. After they hit this deductible, they paid 25% of their drugs' point-of-sale prices (based on list prices) until they, together with their plans, spent $3,700 on drugs. Once Part D patients met this $3,700 coverage limit, they fell into the Coverage Gap, more commonly known as the "Donut Hole." In the Donut Hole, they were required to pay 40% of their brand-name drugs' point-of-sale prices. Only once the patients' total out-of-pocket spending (both before and in the Donut Hole) reached $4,950 did their Medicare Part D plans begin to shoulder 95% of their healthcare costs again. Figure 7 demonstrates patient cost-sharing in the standard Medicare Part D plan for 2017.

Figure 7: The standard Medicare prescription drug benefit in 2017.[14]




NOTE: Some amounts rounded to nearest dollar. ¹Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.

## E.    Impact on Consumers

230.    The defendants and their collaborators have exploited the drug pricing and payment system, forcing patient consumers to pay drastically higher prices for analog insulins than their insurers (if they have insurance). If a patient is uninsured, she is required to pay *full, point-of-sale prices* (based on list prices); if a patient is responsible for all of her drugs' costs before she hits her deductible, she is required to pay *full, point-of-sale prices* (based on list prices) until she meets her deductible; if a patient pays coinsurance, she pays for a percentage of her drugs' *point-of-sale*

---

[14] *The Medicare Part D Prescription Drug Benefit*, The Kaiser Family Foundation 6 (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

*prices* (based on list prices); if the patient is in a Medicare Part D plan, she pays based on list price before she meet her deductible, and then pays between 25% and 40% of *point-of-sale prices* (based on list prices).

231.     An example helps illustrate this structure. A woman with diabetes needs to purchase a box of insulin pens. She goes to her local retail pharmacy, where the pharmacist tells her the box's AWP is $450. She has health insurance through her employer. Her plan requires her to pay a $2,000 deductible and then 30% coinsurance after she hits her deductible. If she has not yet reached her deductible, she pays $382.50 (AWP – 15%) for the box of insulin. If she has reached her deductible (paid $2,000 in health care costs), she pays $114.75 ((AWP – 15%) x .3) for the box. The consumer believes her insurer paid the remaining $267.75. But it has not. In fact, in a transaction concealed from the patient, the drug manufacturer has paid an undisclosed amount of money back to the PBM. The PBM then paid a portion of this "rebate" to its insurer client. Thus, the net price of this insulin to the consumer's insurer is much lower than the price she paid.

232.     In the case of insulin, the defendants' publicly reported list prices, used for consumer transactions, has climbed further and further away from the net prices that institutional payers pay. The net prices of analog insulins to PBMs and insurers are much lower: 35%, 40%, or even 50% lower than list prices.

233.     Taking the above example one step further: the manufacturer's publicly-reported list price is $450, but its secret net price to PBMs is $229.50 AWP minus 15%, less a 40% "rebate"). As a result, when the consumer paid $382.50 for the box during her deductible period,

she really paid 166% of the net price ($382.50 divided by $229.50). And when she paid $114.75 for her 30% coinsurance, she really paid 50% coinsurance ($114.75 divided by $229.50).

F.   **Drug Manufacturer Manipulation of PBM Incentives**

234.    PBMs turn a profit in two primary ways relevant here: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, PBMs take a cut of the drug price discounts they negotiate with drug companies (with the rest sometimes passed on to their health insurer clients). The manufacturers' "rebate" arrangements are meant to create an incentive for PBMs to negotiate lower *real* drug prices. But the manufacturers know that this business model can be manipulated such that PBMs no longer have an incentive to control costs.

235.    PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, i.e., when a drug "goes generic." But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar efficacy and risk profiles. That is the case with the analog insulins. In such a scenario, the drug companies should compete for formulary access by lowering their list prices.

236.    But the defendants have found a way to game this system. As the defendants have realized, the spread between net and list price can be enlarged by *raising list prices* while holding *net prices constant* (or decreasing them slightly). In exchange for this spread enlargement, the PBMs agree with the manufacturer, either explicitly or implicitly, to favor, or at least not disfavor, the drug with the most elevated list price. The defendants know that when they increase the list prices of their insulins, the PBMs can earn substantially greater revenues so long as net prices remain constant.

237.    The perverse, reverse incentives for larger list prices (and consequent consumer overpayments) was described in a recent report on the drug industry:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher list price increases than would otherwise occur, particularly on the eve of a general election. Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [list price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid list price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of list price inflation at least as high, and ideally just a bit higher, than peers'. Durable list price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher list prices directly impact consumers who have not yet met their deductibles.[15]

238.    This is not the first time manipulation of the spread between list and net prices has been the subject of large-scale litigation. In *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the District Court for the District of Massachusetts certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher, engaged in a scheme to inflate the list prices of brand name drugs. McKesson asserted that a class could not be certified because the PBMs had become aware of the phony increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for its health insurer clients. However, part of the evidence the district court relied upon in rejecting this argument was evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of consumers and health insurers:

---

[15] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

> Because these PBMs benefited from the increased [list price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [third party payers] of the inflated AWP, let alone fiercely compete to mitigate any damage. As proof, Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[16]

239.     Just so, the defendants here have used the phony list prices to their advantage. They use the spread between prices to provide kickbacks to PBMs in exchange for formulary status. Indeed, as the District Court for the District of Massachusetts explained, rebates are really "direct kickbacks," disguised as market-share discounts and rebates."[17] This "rebate" scheme enables the defendants to maintain preferred formulary positions without reducing their net prices.

240.     And the PBMs benefit from the larger spreads. The PBMs boast of the "increased rebates" they have achieved, when, in reality, the "discounts" they have obtained are simply reductions off artificially-inflated list prices. In other words, these "discounts" are not discounts at all.

241.     The losers in this scheme are analog insulin consumers. When the defendants publish fraudulent list prices so that they can offer PBMs larger spreads, they harm: uninsured patients, insured consumers in high deductible plans, insured consumers paying coinsurance, and insured consumers in Medicare Part D plans, especially those who reach the Donut Hole, all

---

[16] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

[17] *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

whom pay for analog insulin based on the defendants' *list* prices. Defendants were well aware of the impact of their list prices on consumers.

## V.     ANALOG INSULIN

**A.     Diabetes: The Disease and Demographics**

242.     Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with diagnosed diabetes. Over 30 million people, 9.4% of the country, live with diabetes. A life-threatening disease, many of those living with diabetes rely on daily insulin treatments to survive. Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days. Diabetic ketoacidosis is responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[18]

243.     The number of Americans who live with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over 10 million. Just 14 years later, the head count tripled again. Now over 30 million people—9.4% of the country—live with the disease. And this trend does

---

[18] Abbas E. Kitabchi, et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 Diabetes Care 1335, 1335 (2009).

not appear to be slowing: 86 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes.

244.    Diabetes occurs when a person has too much glucose—sugar—in their blood stream. Normally, the human body breaks down ingested food into glucose, which in turn feeds cells and enables them to function. In this process, insulin functions as a key, opening the cells and permitting glucose to enter. A lack of insulin or responsiveness to insulin causes the process to break down. Glucose is unable to enter the cells, which leads to high blood sugar levels. Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

245.    There are two basic types of diabetes. Roughly 90-95% of Americans living with diabetes developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term. To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce. About a quarter of type 2 patients rely on insulin treatment.

246.    Type 1 diabetes occurs when a patient completely ceases insulin production. This form of diabetes is usually diagnosed in children and young adults, but can occur at any age. In contrast to type 2 patients, people with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die. Individuals living with type 1 must rely on insulin treatments from the point of diagnosis until death.

247.    If left untreated or under-treated, diabetes can become a debilitating and deadly disease. Indeed, it remains the seventh leading cause of death in the United States despite the availability of effective treatment. People with diabetes are almost twice as likely to have heart disease or a heart attack and one and one-half times more likely to have a stroke as those without the disease. Chronic kidney disease and failure is also much more common among those with diabetes. Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections and even amputations. Finally, the disease is the leading cause of blindness.

248.    The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos and Pacific Islanders. For example, Native Americans are 420% more likely to die from diabetes-related causes of death than other Americans. With decreased access to nutritious food sources and fitness options, low-income individuals are at a greater risk of obesity and, correspondingly, diabetes. These same demographic groups also account for a disproportionate share of the uninsured.

B.    The Origins of Insulin Treatment

249.    Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the harmful symptoms and health complications associated with the disease are entirely avoidable. And what's more, unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

250.    In 1922, two men pioneered a technique for removing active insulin from an animal pancreas that could then be used to treat human patients with diabetes.

251.    A "widely celebrated tale of biomedical serendipity,"[19] this breakthrough is revered for two reasons. First, the duo that discovered how to extract insulin for patient treatment was an unlikely pair: a young orthopedic surgeon without laboratory training, Frederick Banting, and his medical-student assistant, Charles Best. Second, neither Banting nor Best applied for a patent on their game-changing innovation because they wanted to ensure their discovery remained open to the public, available to all. This decision offers a sad commentary on the state of the current pharmaceutical industry.

252.    Ironically, Banting and Best eventually ended up applying for a patent to guarantee access: Banting and Best realized that if they did not patent their drug, someone else would. To prevent others from obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 each. As they wrote to the University's president, the patent was a form of publication: "When the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[20]

253.    After selling their patent to the University of Toronto, university researchers attempted to manufacture insulin on campus. However, they quickly realized they lacked the facilities necessary to meet the demand. Therefore, to scale production, the University of Toronto teamed up with Eli Lilly, "an established pharmaceutical company with experience producing

---

[19] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[20] M. Bliss, *The Discovery of Insulin* (2013).

glandular extracts."[21] Under this arrangement, Eli Lilly was allowed to apply for U.S. patents on any improvements to the manufacturing process. In addition to their contract with Eli Lilly, the Toronto team licensed the rights to produce insulin to a few other companies, including Denmark's Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium.[22] Those initial licenses laid the groundwork for Eli Lilly and Nordisk's future domination over the sale of insulin products.

254.    Although the Toronto team's early iteration of insulin was immediately perceived as "a lifesaving drug of vast clinical public health significance,"[23] subsequent research led to further improvements in the drug's efficacy. The original animal insulin isolated by the Toronto team was short acting—it only had an effect on patient blood sugar levels for three to six hours. In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin altered its absorption into the blood stream, prolonging its effect. This form of insulin became known as long-acting. A subsequent innovation in 1946—the addition of zinc to form the crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH)—made it possible to combine long-acting and rapid-acting insulin. This advance allowed many diabetes patients to take a single daily injection. Soon afterward, a method for prolonging the action of insulin without adding protamine was discovered. These developments offered new options for the dosing of insulin. But they also extended the reach of insulin patents into the 1970s.

---

[21] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[22] Nordisk and Novo merged in 1989 to form Novo Nordisk.

[23] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172 (2015).

255.     When the animal-based insulin patents finally began to expire, researchers took another step forward in the development of insulin technology. In the late 1970s, scientists began to produce human insulin through recombinant technology. By 1982, Eli Lilly brought the first recombinant human insulins—Humulin R (regular) and N (NPH)—to the U.S. marketplace. Around the same time, Novo and Nordisk developed methods for chemically converting bovine insulin into human insulin. In 1988, a year prior to merging, Novo and Nordisk obtained approval for their own recombinant insulin. This innovation allowed them to continue shared domination over insulin sales with Eli Lilly. It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin patents, promising to stretch into the 21st century.

256.     After the introduction of human insulin, an improved understanding of the human genetic code and recombinant technology put a third insulin development within reach. In the mid-1980s, scientists began to modify the molecular structure of insulin, attempting to improve its physiological effects. By 1996, Eli Lilly had obtained approval for Humalog (generic name, insulin lispro), the first rapid-acting, man-made insulin. This new type of insulin—known as an analog—allowed for faster absorption times. Never far behind, Novo Nordisk released its own rapid-acting analog, Novolog (generic name, insulin aspart), in 2000. Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra (generic name, insulin glulisine).

257.     The same technological advances that brought about rapid-acting analogs gave rise to long-acting analogs. In 2000, Sanofi released the first long-acting analog. This drug was branded as Lantus (generic name, insulin glargine). Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir (generic name, insulin detemir). The first patents on these long-

acting analogs expired in June 2014, nearly a century after Banting and Best's first patent application in 1923.

258.    In February 2015, Sanofi launched a higher dosage of insulin glargine, branded as Toujeo (generic name, insulin glargine). In September 2015, Novo Nordisk released a fourth type of long-acting insulin called Tresiba (generic name, insulin degludec). In December 2016, Eli Lilly released its own version of insulin glargine, branded as Basaglar (generic name, insulin glargine). Basaglar is a follow-on product to Lantus.[24]

259.    In September 2017, the Novo Nordisk released a fourth rapid-acting insulin called Fiasp (generic name, insulin aspart). Fiasp is a slightly modified version of Novolog. Table 2 summarizes the current insulin treatment landscape.

---

[24] It is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's (FDCA) Abbreviated New Drug Application pathway—the normal pathway to generic entry—for approval. Instead, Basaglar was approved through a different FDCA pathway as a follow-on medication.

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2019 (WAC) |
| *Human* | **Rapid-acting** | Humulin R | Insulin Regular | Eli Lilly | 1982 | $148.70 (vial[i]) |
| | | Novolin R | Insulin Regular | Novo Nordisk | 1991 | $137.70 (vial[ii]) |
| | **Intermediate** | Humulin N | Insulin Suspension Isophane (NPH) | Eli Lilly | 1982 | $148.70 (vial[iii]) |
| | | Novolin N | Insulin Suspension Isophane (NPH) | Novo Nordisk | 1991 | $137.70 (vial[iv]) |
| *Analogs* | **Rapid-Acting** | Humalog | Lispro | Eli Lilly | 1996 | $530.40 (pen[v]) |
| | | | | | | $510.45 (vial[vi]) |
| | | Novolog | Aspart | Novo Nordisk | 2000 | $558.83 (pen[vii]) |
| | | | | | | $289.36 (vial[viii]) |
| | | Apidra | Glulisine | Sanofi | 2004 | $651.76 (pen[ix]) |
| | | | | | | $337.39 (vial[x]) |
| | | Fiasp | Aspart | Novo Nordisk | 2017 | $558.83 (pen[xi]) |
| | | | | | | $289.36 (vial[xii]) |
| | **Long-Acting** | Lantus | Glargine | Sanofi | 2000 | $425.31 (pen[xiii]) |
| | | | | | | $283.56 (vial[xiv]) |
| | | Levemir | Detemir | Novo Nordisk | 2005 | $462.21 (FlexTouch[xv]) |
| | | | | | | $308.14 (vial[xvi]) |
| | | Basaglar | Glargine | Eli Lilly | 2016 | $326.36 (pen[xvii]) |
| | | Toujeo | Glargine | Sanofi | 2015 | $647.87 (pen[xviii]) |
| | | Tresiba | Insulin Degludec | Novo Nordisk | 2016 | $610.11 (pen[xix]) |

---

[i] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[ii] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

---

iii Humulin N 100unit/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

iv Novolin N 100units/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

v Humalog KwikPen 100unit/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

vi Humalog 100unit/ml Cartridge Solution for Injection (box, 5 cartridges, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

vii Novolog FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

viii Novolog 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

ix Apidra SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018).

x Apidra 100unit/ml Solution for Injection (vial, 10 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018).

xi Fiasp FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

xii Fiasp 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

xiii Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

xiv Lantus 100units/mL Solution for Injection (vial, 10 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

xv Levemir FlexTouch 100units/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2016).

xvi Levemir 100units/ml Solution for Injection (vial, 10 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2018).

xvii Basaglar KwikPen 100units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2017).

xviii Toujeo SoloStar 300units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 1.5 ml Insulin Glargine 300U/1mL, Solution for injection) (2018).

xix Tresiba Insulin Degludec 200units/mL Pre-Filled Pen Solution for Injection (box, 3 pens, 3 ml Insulin Glargine 200U/1mL, Solution for injection) (2018).

C.      **Current Insulin Treatment Landscape**

260.    Today, analogs dominate insulin sales. Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas. As a result, it can be used in more flexible ways.

261.    The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

262.    For type 1 patients, insulin analogs are unquestionably the best course of treatment. Doctors uniformly prescribe analogs for type 1 patients.

263.    For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin regimen."[25] Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

264.    But doctors still prefer to prescribe analog insulins to type 2 patients. A recent study found that as of 2010, among adults who filled prescriptions for more than one brand of insulin, 91.5% filled prescriptions for insulin analogs. The study found that percentage has grown considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin. Now, type 2 patients use human insulin less frequently: the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.

---

[25] American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/S52?ijkey=07291605370b 0a3e07418e06fb5e894fb4314f05&keytype2=tf_ipsecsha.

**Figure 8: Type of insulin used among U.S. adults with type 2 diabetes
(who filled more than one prescription).[26]**



265.    In 2016, the top three selling insulins were all analogs: Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and Eli Lilly's rapid-acting Humalog: $2.84 billion.

**D.    Climbing Insulin List Prices**

266.    Despite the availability of many highly effective insulins, too many people living with diabetes go without proper treatment for a familiar reason: cost.

---

[26] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

267.    Eli Lilly raised the list prices of Humalog to $530.40 for a package of pens and $510.45 for a box of cartridges by the end of 2017. Eli Lilly also raised the list prices of Basaglar to $326.36 for a package of pens by the end of 2017. Figure 9 demonstrates Eli Lilly's price increases from 2006 to 2019 for Humalog, and Figure 10 illustrates Eli Lilly's price increases for Basaglar.

**Figure 9: Rising list prices of Humalog vials and pens from 2008-2021**





Figure 10: Rising list prices of Basaglar pens from 2016-2021

268.    Novo Nordisk's list prices for Levemir were $403.50 for a package of pens at the end of 2017 and $293.75 for a vial at the end of 2018. Novo Nordisk's list prices for Novolog sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list prices for Fiasp also sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list price for Tresiba was $484.68 for a package of pens at the end of 2018. Most diabetes patients need at least one package of insulin per month. Figures 11 and 12 demonstrate Novo Nordisk's price increases from 2006 to 2019 for Levemir and Novolog. And Figures 13 and 14 show Novo Nordisk's list price increases for Tresiba and Fiasp.



Figure 11: Rising list prices of Levemir vials and pens from 2006-2021



Figure 12: Rising list prices of Novolog vials and pens from 2006-2021



Figure 13: Rising list prices of Tresiba pens from 2015-2021

**Figure 14: Rising list prices of Fiasp pens from 2017-2021**



269.     Sanofi's list prices for Lantus, the top-selling analog insulin, sat at $404.29 for a package of pens and $269.54 for a vial at the end of 2018. Sanofi's list prices for Apidra were $521.41 for a package of pens and $269.91 for a vial at the end of 2018. Sanofi's list price for Toujeo was $620.57 for a package of Toujeo pens at the end of 2018. Figures 15 and 16 demonstrate Sanofi's price increases from 2006 to 2019 for Lantus and Apidra vial and pen packages. Figure 17 demonstrates Sanofi's list prices increases for Toujeo.



Figure 15: Rising list prices of Lantus vials and pens from 2006-2021

**Figure 16: Rising list prices of Apridra vials and pens from 2006-2021**





Figure 17: Rising list prices of Toujeo pens from 2015-2021

270.    The list prices of insulin analogs have not always been so high. In just the last five years, Sanofi and Novo Nordisk have raised Lantus's and Levemir's reported prices an astounding 168% and 169%, respectively. In fact, in 2016, Novo Nordisk and Sanofi were responsible for the highest drug list price increases in the *entire pharmaceutical industry*. This distinction largely reflected their price hikes for Lantus and Levemir. Figure 18 shows Eli Lilly, Novo Nordisk, and Sanofi's exponential list price hikes from 2000 to 2015.

**Figure 18: Rising insulin list prices from 2000-2015.**[27]



271.    Eli Lilly, Novo Nordisk, and Sanofi have not only dramatically increased their insulins' list prices in the last 10 years, they have done so in perfect lock-step. In thirteen instances since 2009, Sanofi and Novo Nordisk raised the list prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the decimal point within

---

[27] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

a few days of each other."[28] As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[29] Eli Lilly, Novo Nordisk, and Sanofi have engaged in the same lock-step behavior with respect to their rapid-acting analog insulins, Humalog, Novolog, and Apidra, respectively.

272.    An example from 2014 demonstrates this behavior and shows how the defendants inflated their list prices in ways that were completely untethered from their insulins' efficacy, value, or production costs. In May 2014, Novo Nordisk's U.S. Pricing Committee (PC) discussed how to respond to Sanofi's recent pricing actions. Farruq Jafery of Novo Nordisk emailed the rest of the pricing committee, stating "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen. Based on our PC discussion on 5/19/2014, we agreed that the best strategy for Levemir® is to observe the market and maintain list price parity to competitors. As such, we will be moving forward with a 16.1% increase on Levemir® vial and a 9.9% increase on Levemir FlexPen® and FlexTouch® effective tomorrow 5/31/2014." Novo Nordisk then followed through, matching Sanofi's list price increases precisely, to the tenth of a percent. And by doing so netted the company approximately $125 million in additional revenue.[30]

273.    Novo Nordisk continued to track Sanofi's pricing actions and respond with incredible speed. In November 2014, Sanofi again raised the list price of Lantus vials and pens 11.9%; within hours, Novo Nordisk's pricing committee sought (and ultimately received) approval

---

[28] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015).

[29] *Id.*

[30] Charles E. Grassley, Ron Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 54.

to raise by 11.9% the price of Levemir.[31] Rich DeNunzio of Novo Nordisk estimated the increase would generate approximately an additional $25 million in revenue to the company in 2014 (despite the hike being taken at the end of the year).[32]

274.    Figures 19 and 20 demonstrate this shadow pricing behavior with respect to Lantus and Levemir, with the entry of Eli Lilly's Basaglar, Novo Nordisk's Tresiba, and Sanofi's Toujeo noted as well. Figures 21 and 22 demonstrate this behavior with respect to Novolog, Fiasp, Humalog, and Apidra.

---

[31] *Id.* at 55.

[32] *Id.* at 56.



**Figure 19: Rising list prices of long-acting insulins from 2006-2021**

**Figure 20: Rising Lantus and Levemir list prices from 2001-2015**



Figure 21: Rising list prices of rapid-acting insulin from 2006-2021



**Figure 22: Rising Humalog and Novolog list prices from 1996-2016**



**E.    Eli Lilly, Novo Nordisk, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status.**

275.    In the past, Novo Nordisk maintained that its price increases reflected the "clinical benefit" of its drugs.[33] But Levemir and Novolog are the exact same drugs they were 10 years ago—the clinical benefits of these medications have not changed. Where clinical benefit has not

---

[33] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

changed, it cannot be used to justify a 169% price increase. Therefore, another factor motivates these list price increases.

276.    Research and development costs do not account for these list price increases as such have been a fraction of revenues. For example, during the period 2014-2018, Sanofi reported net sales of $37 billion for its insulin products with R&D costs of $902 million. In the same time period, Eli Lilly spent $395 million on R&D with $1.4 billion in sales and marketing expenses on revenues of $22.4 billion.

277.    The real reason Eli Lilly, Novo Nordisk, and Sanofi have increased their list prices is because these firms choose to compete based on hidden rebates to PBMs rather than transparent prices for all. PBMs control the formularies that determine whether people living with diabetes will purchase Eli Lilly, Novo Nordisk, and Sanofi's analog insulins. The defendants have realized that they can manipulate the PBMs' formulary choices by artificially inflating their list prices, rather than lowering net prices.

278.    Under pressure to explain its rising list prices, Novo Nordisk admitted to this behavior in a press release. On November 30, 2016, Novo Nordisk stated:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by **XX percent leads to an automatic XX percent profit** for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit

we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[34]

Explaining the company's list price increases, Novo Nordisk directly admitted that it "set[s] list price" with an eye to achieving "preferred" formulary status.

279.     For over a decade, Novo Nordisk has steeply raised the list prices of Levemir and Novolog while keeping the net prices of these medicines constant. Figures 23 and 24 (included in Novo Nordisk's press release) illustrate this conduct.

**Figure 23: Net versus List Prices of Novolog Vials[35]**



---

[34] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

[35] *Id.*

Figure 24: Net versus List Prices of Novolog FlexPens[36]



280.     Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary

positions: "The reason drugmakers sharply raise list prices without a corresponding increase in net

price is that PBMs demand higher rebates in exchange for including the drug on their preferred-

drug lists."[37]

281.     Sanofi has also conceded its participation in this list price inflation scheme:

> [S]ince 2014, we have increased the level of rebates granted for
> Lantus® in order to maintain favorable formulary positions with
> key payers in the US.[38]

282.     Sanofi's manipulation of its spreads is visible in Figure 25.

---

[36] *Id.* The FlexPen is a type of insulin injection. Patients who use this pen stick themselves with
a pen-like insulin distributor instead of injecting insulin through a pump or syringe.

[37] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at
B1.

[38] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2016).

Figure 25: Net versus List Price of Lantus



283.    Eli Lilly's, Novo Nordisk's, and Sanofi's spread-increasing behavior is also visible from data on these companies' "rebates" to PBMs and insurers.

284.    The two figures below illustrate Eli Lilly's "rebates" from 2007 to 2014. Figures 26 and 27 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 26:**
Eli Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.



**Figure 27:**
Eli Lilly's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.



285.    Novo Nordisk has also greatly increased its spreads. Figures 28 and 29 show the amount Novo Nordisk has increased its rebates (spreads) from 2007 to 2014.

**Figure 28: Novo Nordisk's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



**Figure 29: Novo Nordisk's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



286.    Finally, Sanofi has greatly increased its spreads. Figures 30 and 31 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 30: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



*Source: Company data, Credit Suisse estimates*

**Figure 31: Sanofi's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



*Source: Company data, Credit Suisse estimates*

287.    The arbitrary and deceptive nature of the defendants' list prices are underscored by how they price drugs to achieve "parity" when a new product launches. One would expect when a new insulin hits the market, older insulins would become more affordable as some patients flock to the newer and ostensibly more desirable medicines. But the opposite happens. Instead, drug manufacturers *inflate* the price of their older insulin products so that they can launch the newer insulins at higher prices and still ensure that consumers switch to those newer, more expensive insulins. If the drug makers did not raise the list prices of their older medications, consumer would just stay on those medications rather than making the switch to the new ones. For example, in 2014, Sanofi aggressively began raising the list price of Lantus to achieve "a single price point for Lantus . . . believing that it would remove cost as a barrier for switching patients to Toujeo to become the preferred basal insulin."[39]

288.    Sanofi and Novo Nordisk have stretched the spreads on their analog insulin medications to the point where they have become the second and third largest rebators in the entire pharmaceutical industry.

289.    Although the Defendants Drug Manufacturers claim they "need" to inflate their list prices to obtain formulary status, this explanation omits a crucial detail. Drug companies could compete for formulary status in a manner that would help consumers: *they could significantly lower list (and net) prices*. Yet, the insulin manufacturers refuse to significantly lower their net prices. And the PBMs continue to accept the manufacturers' list-price-raising behavior so long as net prices stay constant.

---

[39] Grassley & Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 51.

290.     Indeed, upon facing pressure from lawmakers to lower their list prices in recent years, the defendants analyzed the pros-and-cons of doing so. But Novo Nordisk, for example, lamented not being able to compete without massive rebates, and feared retaliation in the supply chain from PBMs and others who benefit from the practice of inflating list price and then buying formulary access with rebates.[40]

**F.     The defendant drug manufacturers' list price inflation deceived and harmed the plaintiffs and class members.**

291.     The defendants' false list prices have deceived the plaintiffs and class members. During the class period, the vast majority of plaintiffs and class members had no idea that the list prices they struggled to afford were not only different from the prices PBMs and insurers receive, but actually trend in an *entirely different direction*.

292.     As the defendants' list prices soared further and further away from their net prices, these list prices became so misrepresentative, so untethered from their true average prices as to be unlawful.

293.     During the class period, Eli Lilly, Novo Nordisk, and Sanofi deliberately and intentionally published list prices for the analog insulins that did not reflect the actual, market prices of the drugs. Instead, these list prices were fabricated overstatements; inflations designed to create net-to-list price spreads that the defendants could market to PBMs in exchange for formulary status.

294.     The defendant drug manufacturers concealed their analog insulins' net prices and prevented the plaintiffs and class members from knowing what these prices were to ensure the

---

[40] Grassley & Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 62.

PBMs could and would benefit from the spreads between the net and list prices. Put another way, the defendants' publication of their list prices, while concealing their net prices, is the basis for the *quid pro quo* with the PBMs. If consumers did not understand list prices as reasonable approximations of the cost of their analog insulins—as reasonable bases for their cost-sharing obligations—PBMs and health insurers would not be able to use the defendants' list prices as a basis for consumer cost-sharing. If the PBMs could not use these list prices as a basis for reimbursement, the spreads between list and net prices would evaporate. Without spreads to sell, the defendant drug manufacturers would have nothing to offer PBMs in exchange for preferred formulary status except lower prices.

295.    Instead, the defendants' spread schemes enabled them to offer something of value to the PBMs (large spreads on which to make profits) in exchange for preferred formulary status. If the defendants did not have these spreads to offer, they would have been forced to compete for preferred formulary status through lower prices. Put simply, without the fraudulent spread schemes, the defendants would have competed for PBM business the way competitors do in healthy markets: by lowering the prices. Such competition would have benefited the plaintiffs and class members greatly. But instead of competing on lower prices, each defendant competed on larger spread.

296.    To do so, the defendants closely guarded their pricing structures and sales figures for their analog insulins. Each Defendant drug manufacturer kept secret the net prices it offered to the three largest PBMs.

297.    Each defendant also concealed its fraudulent conduct by signing confidentiality agreements with those in the supply chain that knew the net prices.

298.    Each defendant's efforts to conceal its pricing structures for the analog insulins is evidence that it knew that its conduct was fraudulent.

299.    In sum, each defendant concealed that: (i) its list prices were fraudulently-inflated, (ii) it was manipulating the list prices of its analog insulins, (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the analog insulins as they were sold to PBMs, (iv) the net prices to PBMS were either held constant or else decreasing, and (v) contrary to consumer expectations, any co-insurance payments were no longer "co" as the insurance companies were paying based on a materially different amount.

300.    The defendants' publication of their list prices, combined with their concealment of their net prices, deceived the plaintiffs and class members into believing that the analog insulins' list prices were reasonably related to the drugs' net price and, if insured, reasonably related to what the insurers were paying. Namely, if a consumer had a co-insurance obligation of 20 percent, the insurer was paying 80 percent of the same price on which the 20 percent was calculated.

301.    The plaintiffs relied on the defendants' representations regarding their list prices and paid for their analog insulins based on these fraudulent list prices to their detriment. The plaintiffs, unaware of the true facts about the pricing of the analog insulins, continue to pay for the analog insulins based on their list prices, the only price truly available to them.

302.    As a result of the defendant drug manufacturers' deceptive, unfair, and unconscionable conduct, the plaintiffs and members of the class have overpaid for their analog insulins when they pay for these medications based on their list prices. As previously explained, the defendants' list price inflation harms the plaintiffs and class members. People living with diabetes

who are uninsured, who are in high deductible plans, who have high coinsurance rates, and/or who are in Medicare Part D plans must pay for their analog insulins based on the defendants' artificially inflated *list* prices. No other entity in the drug supply chain sets these list prices and no other entity in the supply chain has the ability to change these list prices, on which consumer payments are directly based. The amount the plaintiffs and class members have overpaid is the difference between the drugs' point-of-sale prices and a reasonable approximation of the drugs' net prices.

303.    Currently, 150 million Americans get healthcare insurance through their employers. Increasingly, individuals within this group are unable to afford their prescribed insulins due to the cost-sharing obligations their health plans impose. A 2014 study found that among patients with commercial insurance, out-of-pocket costs for people with type 2 diabetes rose a staggering 89% from 2000 to 2010.

304.    In fact, patients with endocrine disorders, such as diabetes, are more likely to shoulder out-of-pocket costs in excess of $1,000 than patients *in any other disease class*. As Figure 32 illustrates, 70% of people with endocrine disorders have out-of-pocket drug spending at or above $1,000.

**Figure 32: Conditions that are more likely to lead to high out-of-pocket spending.**



305.     The increasing number of patients with high deductible plans and coinsurance obligations, together with the rise in coinsurance rates, has made the pain associated with the analog insulin price hikes particularly acute. Although insulin has been available for over 100 years, Eli Lilly, Novo Nordisk, and Sanofi's price hikes are now making it harder than ever to obtain.[41]

---

[41] The Affordable Care Act sets a limit for patient out-of-pocket spending. For 2017, the Affordable Care Act has capped out-of-pocket costs at $7,150 for an individual plan and $14,300

306.     The defendant drug manufacturers' pattern of fraudulent conduct in artificially inflating the list prices of the analog insulins directly and proximately caused plaintiffs and the members of the class to substantially overpay for those drugs.

307.     The plaintiffs were diligent in pursuing an investigation of the claims asserted in this Third Amended Complaint. Through no fault of their own, they did not receive inquiry notice nor learn of the factual basis for their claims in this complaint and the injuries suffered therefrom until recently.

### G.     The Health Impact of Artificial Pricing

308.     For many plaintiffs and class members, the defendants' artificial price inflation has cost them their health, financial stability, and emotional wellbeing. Unable to afford the defendants' price increases, many plaintiffs have begun to engage in highly risky behaviors with respect to their disease. Plaintiffs report under-dosing their insulin, skipping their refills, injecting expired insulin, re-using needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, foregoing one or even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness. Multiple plaintiffs have lost their vision as a result of their inability to consistently afford insulin. Others have experienced loss of kidney function, and have had to have kidney transplants. Ineffective control of blood sugar can also cause sustained hyperglycemia and, in severe cases, diabetic ketoacidosis—a life-threatening condition. Many plaintiffs describe multiple trips to emergency

---

for family plans. Nevertheless, for many low income and middle-income individuals and families, these ceilings provide little relief—many cannot afford to hit them.

rooms for diabetic ketoacidosis. Other plaintiffs explain that their insulin costs have left them unable to afford the healthy diets they should be maintaining. Too many plaintiffs re-use needles and pen tips to cut back on their diabetes costs. This practice is dangerous as it can cause infection. Others attempt to lower their costs by skipping the glucose testing they should be doing prior to injecting insulin. Foregoing glucose testing can lead to under- or over-dosing insulin. While analog insulin should be improving the health of plaintiffs, the defendants' price hikes have had the opposite effect.

309.    The toll of the defendants' price hikes is not just physical: the high cost of insulin causes serious financial difficulty and emotional stress. Multiple class members spend over 50% of their income on their insulin supplies. Plaintiffs describe going into debt, taking out loans, moving back in with their parents, and quitting school to pay for their insulin. Multiple plaintiffs state that they keep the heat low—even in the dead of winter—so they can afford insulin. Parents of children with diabetes describe the anguish of not being able to afford pre-kindergarten and other educational services for their children due to their insulin costs. They say that the cost of insulin is a huge stress in their children's lives, as these young patients realize the financial strain their disease puts on their families. As one plaintiff, whose son has type 1 diabetes, explained:

> As a mom, of course I would sacrifice anything for my child, so over the years, we have had to learn to adjust to living around the cost of insulin. [My son] and his sisters live at home and commute to a nearby college instead of being able to go off to college, . . . all with keeping in mind that we all need to learn a lifestyle of constantly fearing the cost to keep [my son] going, as this is a lifelong disease. However, the most immediate financial consequence came that very first month of diagnosis when we had not budgeted for a sudden increase in our bills. So when [we were] suddenly hit with an extra expense for insulin, the first thing to go was the youngest sibling's pending preschool tuition. This cost was the easiest to cut financially, but not mentally/emotionally. We could not cut our other bills (mortgage, utilities, etc.) much more, so my youngest child has forgone her early childhood education. It makes me feel like a horrible mother to admit, but that was

our panic response to save ourselves from going into more debt. We are a family that . . . works hard for everything we have. We don't take handouts or accumulate debt. We put ourselves through college and earn all that we have. We value a strong work ethic; we are middle America. Since [my son's] diagnosis, every penny I spend and save is with affording insulin in mind. Since type 1 is hereditary, an autoimmune disease, any of our other children could be diagnosed at any time, and their children, and so on, so in that sense, our entire family is 100% insulin dependent, and it could span generations. Without it, my son can't survive.

Most plaintiffs described the anxiety associated with their insulin costs as all-consuming and constant.

310.    Cognizant of the damage increasing list prices have inflicted on patients, Novo Nordisk has belatedly announced it they will take steps, going forward, to rein in this harm. In its November 30, 2016 press release, Novo Nordisk made a modest commitment to "limit[] any potential future list price increases for our medicines to no more than single-digit percentages annually."[42]

311.    Long overdue, these affordability measures still do not end or even address the insidious practice of artificially inflating the spread between list and net price. Nor do they make whole the patients who have spent thousands of dollars out-of-pocket on long acting insulins for the past few years. Therefore, these measures fail to address the structural issues that have given rise to the price hikes that have hurt under-insured and uninsured diabetes patients for years.

312.    Individuals living with diabetes spend, on average, twice as much as those without the disease despite the fact that treatment for the disease has existed for more than 100 years. Diagnosed diabetes now costs the United States over $245 billion per year; an estimated $1 of every $5 spent on health care in the United States. The defendant drug manufacturers' artificial

---

[42] Novo Nordisk Press Release, *supra*.

inflation of analog insulin prices has pushed, and will continue to push, access to life-saving drugs out of reach of uninsured and underinsured American diabetes patients, even despite recent efforts to control prices. Without access to proper treatment, diabetes patients experience serious and costly health complications. Despite Banting and Best's efforts to ensure insulin was widely accessible, the pharmaceutical companies that have inherited their legacy have eschewed this aspiration, sublimating it to the companies' profit margins. The fraudulent practice of creating a large spread between list and net prices has harmed and will continue to harm diabetes patients across the country. Millions more will suffer painful complications and early death unless Eli Lilly, Novo Nordisk, and Sanofi make analog insulin more affordable.

313.    This case focuses on the overcharges the plaintiffs have incurred as a result of the defendants' fraudulent scheme. Plaintiffs seeks relief from these overcharges.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

314.    Plaintiffs and class members had no way of knowing about the defendants' scheme and deception with respect to insulin pricing.

315.    The manufacturers and PBMs refuse to disclose the net prices of insulin, labeling them trade secrets. Hence, a reasonable plaintiff and consumer could not discover the truth.

316.    Within the period of any applicable statutes of limitation, plaintiffs and members of the proposed class could not have discovered, through the exercise of reasonable diligence, that the defendants were concealing the conduct complained of herein and misrepresenting the true cost of insulin.

317.    Plaintiffs and the other class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that the defendants were engaged in the

scheme and were publishing phony list prices, nor would a reasonable and diligent investigation have disclosed the true facts.

318.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all insulin products identified herein.

**B.    Fraudulent Concealment Tolling**

319.    All applicable statutes of limitation have also been tolled by the defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.    Estoppel**

320.    The defendants were under a continuous duty to disclose to plaintiffs and class members the true character, quality, and nature of the list prices upon which their payments for insulin were based.

321.    Based on the foregoing, the defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

322.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a class defined as follows:

> All individual persons in the United States and its territories who paid any portion of the purchase price for a prescription of Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba, and/or Toujeo at a price calculated by reference to a list price, AWP (Average Wholesale Price), and/or WAC (Wholesale Acquisition Price) for purposes other than resale.

323.    The class period is tolled to the earliest date of the defendant drug manufacturers'
initiation of the scheme described herein, wherein the defendant drug manufacturers artificially
inflated the list prices of Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba, and
Toujeo (the analog insulins) to offer PBMs higher spreads in exchange for preferred formulation
status (the spread scheme).

324.    Excluded from the class are: (a) Eli Lilly and any entity in which it has a controlling
interest, and their legal representatives, officers, directors, assignees, and successors; (b) Novo
Nordisk and any entity in which it has a controlling interest, and their legal representatives,
officers, directors, assignees, and successors; (c) Sanofi and any entity in which it has a controlling
interest, and their legal representatives, officers, directors, assignees, and successors; and (c) any co-
conspirators, and their officers, directors, management, employees, subsidiaries, and affiliates.

325.    There are a number of ways in which an individual person may pay a portion of the
list price of an analog insulin and thereby gain inclusion in the class. First, a person may be
uninsured and, therefore, responsible for paying 100% of the cost of her analog insulins based on
the defendant drug manufacturers' list prices (the uninsured scenario). Second, a person's
insurance plan may require her to satisfy a deductible before insurance benefits cover all or a
portion of her prescription needs. If so, that person is paying for 100% of the cost of her analog
insulins based on the defendant drug manufacturers' list prices before she meets her deductible
(the deductible scenario). Third, a person may have a coinsurance requirement. If so, that person is
paying a portion of the cost of her analog insulins based on the defendant drug manufacturers' list
prices (the coinsurance scenario). Fourth, a person may obtain insurance through a Medicare Part

D Plan. If so, that person is paying a portion of the cost (or 100% of the cost before she meets her deductible) based on the defendant drug manufacturers' list prices (the Medicare Part D scenario).

326.    In each of these scenarios—the uninsured scenario, the deductible scenario, the coinsurance scenario, and the Medicare Part D scenario—a person's out-of-pocket expense for the analog insulins is determined based on the list prices defendant drug manufacturers unilaterally set for these drugs. Accordingly, each falls within the class definition.

327.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for the analog insulins throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals. The class is readily identifiable from information and records in the possession of the defendant drug manufacturers.

328.    Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and all members of the class were damaged by the same wrongful conduct of the defendants—i.e., as a result of defendant drug manufacturers' misconduct, these purchasers paid artificially inflated prices for the analog insulins, and they will continue to do so in the future.

329.    Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of plaintiffs are coincident with, and not antagonistic to, those of the other members of the class.

330.    Lead counsel that represents the plaintiffs are experienced in the prosecution of class action litigation and have particular experience with class action litigation involving pharmaceutical products and extensive experience in class actions concerning the use of list

pricing, including two cases in federal district court (*AWP* and *McKesson*) that resulted in recoveries well in excess of $500 million.

331.    Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because the defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally-applicable conduct is inherent in the defendants' wrongful conduct.

332.    Questions of law and fact common to the class include, but are not limited to:

i.    Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in a fraudulent, unfair, and/or deceptive scheme or course of conduct by improperly publishing inflated list prices for their analog insulins, which the plaintiffs and class members purchased;

ii.    Whether Eli Lilly, Novo Nordisk, and Sanofi artificially inflated the list prices of the analog insulins;

iii.    What the list prices versus net (true average) prices for the analog insulins are;

iv.    Whether it was the policy and practice of Eli Lilly, Novo Nordisk, and Sanofi to prepare marketing and sales materials for PBMs that contained comparisons of their list prices and net prices for their analog insulins and the spreads available;

v.    Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in a pattern and practice of paying illegal kickbacks, disguised as "rebates," to PBMs, such as CVS Health, Express Scripts, and OptumRX, that created substantial spreads between the list and net prices;

vi.    Whether the large list-to-net price spreads were intended to induce CVS Health, Express Scripts, and OptumRX to give Eli Lilly's, Novo Nordisk's, and Sanofi's analog insulins favorable placement on the PBMs' formularies;

vii.    Whether Eli Lilly, Novo Nordisk, and Sanofi used artificially inflated list prices as a starting point for negotiating these kickbacks or "rebates" for the analog insulins;

    viii.    Whether each defendant conspired with the PBMs for the purpose of carrying out this spread scheme;

    ix.    Whether the spread scheme caused plaintiffs and class members to make inflated payments based on the artificial list prices for the analog insulins;

    x.    Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in a pattern of deceptive and/or fraudulent activity intended to defraud or deceive plaintiffs and class members;

    xi.    Whether Eli Lilly, Novo Nordisk, and Sanofi formed one-on-one enterprises with each of the largest PBMs—CVS Health, Express Scripts, and OptumRx—for the purpose of carrying out the spread schemes;

    xii.    Whether Eli Lilly, Novo Nordisk, and Sanofi engaged in mail or wire fraud in furtherance of the spread schemes;

    xiii.    Whether Eli Lilly's, Novo Nordisk's, and Sanofi's conduct violated RICO;

    xiv.    Whether Eli Lilly, Novo Nordisk, and Sanofi are liable to plaintiffs and class members for damages for conduct actionable under the various state consumer protection statutes; and

    xv.    Whether Eli Lilly, Novo Nordisk, and Sanofi are liable to plaintiffs and the class members for damages flowing from their misconduct.

333.    Plaintiffs and members of the class have all suffered, and will continue to suffer, harm and damages as a result of the defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the class likely would find the cost of litigating their claims

to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally, defendants have acted and failed to act on grounds generally applicable to plaintiffs and the class and require court imposition of uniform relief to ensure compatible standards of conduct toward the class, thereby making appropriate equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

334.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(C) (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)[43]

335.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this amended complaint.

336.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

---

[43] Plaintiffs assume the Court's rulings, *see* ECF Nos. 305 and 252, on the plaintiffs' claims for damages and injunctive relief under RICO will apply equally to the plaintiffs' Third Amended Complaint, as the plaintiffs have not amended their allegations to claim that the plaintiffs purchase their analog insulins directly from the Defendant Drug Manufacturers. The plaintiffs only keep these claims in the complaint for appellate purposes.

A.      **Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under RICO.**

337.    This count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.

§ 1962(c), is asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of

the plaintiffs and class members as represented by the named plaintiffs.

338.    Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each

"persons," as that term is defined in 18 U.S.C. § 1961(3).

339.    The following pharmacy benefit managers are each "persons," as that term is

defined in 18 U.S.C. § 1961(3): (a) CVS Health Corporation (CVS), a Delaware corporation with

its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is

one of the largest PBMs in the United States and provides comprehensive prescription benefit

management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc.

(Express Scripts), a Delaware corporation with its principal place of business located at 1 Express

Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79

million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place

of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the

United States and covers 65 million lives.

B.      **The Manufacturer-PBM Insulin Pricing RICO Enterprises**

340.    For purposes of this claim, the RICO "enterprises" are associations-in-fact

consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that

administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog

and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus,

and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees,

and agents. These associations-in-fact enterprises are collectively referred to herein as the
"Manufacturer-PBM Insulin Pricing Enterprises."

341.    Each of the Manufacturer-PBM Insulin Pricing Enterprises is an ongoing and
continuing business organization consisting of both corporations and individuals that are and have
been associated for the common and/or shared purposes of selling, purchasing, and administering
the analog insulins to individual plaintiffs and class members and deriving secret profits from these
activities (the spread scheme). These profits are greater than either the defendant drug
manufacturers or the PBMs could obtain absent their fraudulent concealment of the substantial
rebates from defendant drug manufacturers to PBMs.

342.    To accomplish this common purpose, the defendant drug manufacturers
periodically and systematically inflate the list prices of the analog insulins. They did so willfully,
and with knowledge that class members make payments directly based on the manufacturers' list
price. The Manufacturer-PBM Insulin Pricing Enterprises then represented—either affirmatively or
through half-truths and omissions—to the general public and consumers, including plaintiffs and
the class, that the analog insulin list prices are a reasonable approximation of the actual cost of
these medicines. The Manufacturer-PBM Insulin Pricing Enterprises conceal from the general
public and consumers, like the plaintiffs and class members, the reality that the net prices offered
to PBMs in exchange for preferred formulary positions are *exponentially lower.*

343.    It is this scheme that is fraudulent. The defendant drug manufacturers' benchmark
prices are no longer a reasonable approximation of the actual price of insulin, and the
Manufacturer-PBM Insulin Pricing Enterprises concealed the magnitude of the spreads between
benchmark prices and net prices from the plaintiffs and the class. The Manufacturer-PBM Insulin

Pricing Enterprises also concealed from the public the purpose of these spreads: the spreads ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring significant price reductions; and they result in higher profits for the PBMs, whose earnings increase as the spread between list and net prices grows.

344.    Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin list prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. With respect to the defendant drug manufacturers, these corporations would not be able to market large spreads to PBMs in exchange for favorable formulary positions without the use of the inflated list prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. The PBMs share this common purpose because, without the use of the inflated list prices, their profits on the spread between list and net prices would collapse. As a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into two general categories: (i) they keep the difference between what they pay pharmacies for drugs, which is negotiated as a percentage of list price plus dispensing costs, and what insurers pay them, which is a higher percentage of list price plus dispensing costs; (ii) they pocket a percentage of the "spread" between prices.

345.    Each of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each defendant drug manufacturer and each PBM that is an associate. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, there is a common communication network by which each defendant drug manufacturer and each PBM share information on a regular basis,

including information regarding the analog insulin list prices and net prices. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, each defendant drug manufacturer and each PBM functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Insulin Pricing Enterprises was operated by the specific defendant drug manufacturer for criminal purposes, namely, carrying out the spread scheme.

346.    At all relevant times, the PBMs have been aware of the Manufacturer-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct, and have reaped profits from that conduct. The PBMs strike rebate deals with the defendant drug manufacturers to conceal the true net prices of the analog insulins and profit from the inflated list prices. The PBMs have represented to the public that the rebates they negotiate save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But they have known that the increasing spreads did not and do not actually decrease the net prices of the analog insulins: the list prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the Manufacturer-PBM Insulin Pricing Enterprises' common purpose of enlarging the hidden spreads between net and list price, the PBMs would have had the incentive to disclose the fraudulence of the defendant Manufacturers' list prices. By failing to disclose this information, the PBMs and defendant drug manufacturers perpetuated the conduct of the Manufacturer-PBM Insulin Pricing Enterprises.

347.    Further, the PBMs took instructions and commands from the defendant drug manufacturers regarding use of the analog insulin list prices, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *access rebates* for placement of products on their formulary; (ii) *market share rebates* for garnering higher market share

than established targets; (iii) *administrative fees* for assembling data to verify market share results; and (iv) *other fees and grants* in an effort to promote products.

348.     In order to garner all of these fees from the defendant drug manufacturers, each PBM and each defendant drug manufacturer meet on a regular basis to discuss analog insulin prices, spreads, marketing opportunities, and coordination of all of the above.

349.     There is a common communication network between each PBM and each manufacturer for the purpose of implementing the rebate scheme and for the exchange of financial rewards for the PBM activities that benefit the defendant drug manufacturers.

350.     At all relevant times, each one of the PBMs was aware of the defendants drug manufacturers' spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

351.     For purposes of this count, the Manufacturer-PBM Insulin Pricing Enterprises are further identified as follows:

**1.     The Eli Lilly-PBM Enterprises**

352.     The Eli Lilly-PBM Enterprises are three separate associations-in-fact consisting of each of the PBMs that administers purchases of Eli Lilly's Humalog and Basaglar, including its directors, employees, and agents, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-CVS association-in-fact enterprise; (2) the Eli Lilly-Express Scripts association-in-fact enterprise; and (3) the Eli Lilly-OptumRx association-in-fact enterprise. Each of the Eli Lilly-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Eli Lilly's rapid-acting analog insulin product, Humalog, and it's long-acting analog insulin product, Basaglar, as treatments for type 1

and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx. As to each of these Eli Lilly-PBM Enterprises, there is a common communication network by which Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx share information on a regular basis. As to each of these Eli Lilly-PBM Enterprises, Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx function as continuing but separate units. At all relevant times, each of the Eli Lilly-PBM Enterprises was operated and conducted by Eli Lilly for criminal purposes, namely, carrying out the spread scheme.

### 2. The Novo Nordisk-PBM Insulin Pricing Enterprises

353.    The Novo Nordisk-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Novo Nordisk's Fiasp, Novolog, Levemir, and Tresiba including its directors, employees, and agents, and Novo Nordisk, including its directors, employees and agents: (1) the Novo Nordisk-CVS association-in-fact enterprise; (2) the Novo Nordisk-Express Scripts association-in-fact enterprise; and (3) the Novo Nordisk-OptumRx association-in-fact enterprise. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog insulin products, Levemir and Tresiba, and its rapid-acting analog insulin products, Fiasp and Novolog, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novo

Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, there is a common communication network by which Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx share information on a regular basis. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx function as continuing but separate units. At all relevant times, each of the Novo Nordisk-PBM Insulin Pricing Enterprises was operated and conducted by Novo Nordisk for criminal purposes, namely, carrying out the spread scheme.

        3.      **The Sanofi-PBM Insulin Pricing Enterprises**

     354.    The Sanofi-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Sanofi's Apidra, Lantus, and Toujeo, including its directors, employees, and agents, and Sanofi, including its directors, employees and agents: (1) the Sanofi-CVS association-in-fact enterprise; (2) the Sanofi-Express Scripts association-in-fact enterprise; and (3) the Sanofi-OptumRx association-in-fact enterprise. Each of the Sanofi-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Sanofi-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx. As to each of these Sanofi-PBM Insulin Pricing Enterprises, there is a common communication network by

which Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx share information on a regular basis. As to each of these Sanofi-PBM Insulin Pricing Enterprises, Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx function as continuing but separate units. At all relevant times, each of the Sanofi-PBM Insulin Pricing Enterprises was operated and conducted by Sanofi for criminal purposes, namely, carrying out the spread scheme.

355.    The Manufacturer-PBM Insulin Pricing Enterprises (Eli Lilly-CVS, Eli Lilly-Express Scripts, Eli Lilly-OptumRx, Novo Nordisk-CVS, Novo Nordisk-Express Scripts, Novo-Nordisk-OptumRx, Sanofi-CVS, Sanofi-Express Scripts, and Sanofi-OptumRx) knowingly made material misrepresentations to class members in furtherance of the fraudulent scheme regarding:

      a.      The net prices of the analog insulins;[44]

      b.      The extent to which the net prices of the analog insulins departed from their artificially-inflated list prices;

      c.      That the analog insulins' list prices served as a reasonable cost-sharing list and that this list price was a fair basis on which to base consumer out-of-pocket payments;

      d.      The extent to which the defendant drug manufacturers and the PBMs negotiated the rebates discounting the list prices of the analog insulins in good faith and for a proper purpose;

      e.      Whether the rebates were intended to benefit plan members and/or the general public;

---

[44] The Eli Lilly-PBM Enterprises made these misrepresentations with respect to Humalog and Basaglar. The Novo Nordisk-PBM Insulin Pricing Enterprises made these representations with respect to Fiasp, Novolog, Levemir, and Tresiba. The Sanofi-PBM Enterprises made these misrepresentations with respect to Apidra, Lantus, and Toujeo. All references to "analog insulins" refer to the specific insulins relevant to each manufacturer PBM enterprise.

f.     Whether the rebates saved plan members and the general public money;

g.     Whether the "preferred" formulary status of the analog insulins reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' formulary committees;

h.     Whether the analog insulins would have been placed in "preferred" formulary positions absent the spreads; and

f.     The extent to which the spread schemes forced plaintiffs and the class members to incur additional expenses for their analog insulin prescriptions.

356.   The defendant drug manufacturers alone could not have accomplished the purposes of the Manufacturer-PBM Insulin Pricing Enterprises without the assistance of the PBMs. For the defendant drug manufacturers to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formularies, on which varying analog insulins were given favorable treatment. And the PBMs did so by telling clients, potential clients, and investors that they secured lower prices. The lower prices were illusory, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the Manufacturer-PBM Enterprise could not have achieved its common purpose.

357.   The impacts of the Manufacturer-PBM Insulin Pricing Enterprises are still in place, i.e., the increased spreads between the benchmark and net prices of the analog insulins are still being maintained and increased.

358.   The foregoing evidences that the defendant drug manufacturers and PBMs were each willing participants in the Manufacturer-PBM Insulin Pricing Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure

designed to effectuate the Enterprises' purposes, i.e., to increase profits for both the defendant drug manufacturers and the PBMs through kickbacks to the PBMs and continued formulary status without net price reductions for the defendant drug manufacturers.

C.     **The defendant drug manufacturers' use of the U.S. mails and interstate wire facilities**

359.    Each of the Manufacturer-PBM Insulin Pricing Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries: the sale, purchase and/or administration of the analog insulins; the setting of the prices of the analog insulins; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for the analog insulins by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of the analog insulins. During the class period, the Manufacturer-PBM Insulin Pricing Enterprises participated in the administration of the analog insulins to millions of individuals located throughout the United States.

360.    During the class period, Eli Lilly, Novo Nordisk, and Sanofi's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

361.    The nature and pervasiveness of the defendant drug manufacturers' spread scheme, which was orchestrated out of the corporate headquarters of the defendant drug manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the PBMs.

362.    Most of the precise dates of defendant drug manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have

been hidden and cannot be alleged without access to these defendants' books and records. Indeed, an essential part of the successful operation of the spread scheme alleged herein depended upon secrecy, and as alleged above. And the defendant drug manufacturers took deliberate steps to conceal their wrongdoing. However, the plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the spread scheme.

363.    The defendant drug manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the spread scheme involved thousands of communications throughout the class period including, *inter alia*:

    a.    Marketing materials about the list prices for the analog insulins and the available spreads, which defendant drug manufacturers sent to PBMs located across the country;

    b.    Written and oral representations of the analog insulin list prices that the defendant drug manufacturers made at least annually and, in many cases, several times during a single year;

    c.    Thousands of written and oral communications discussing, negotiating, and confirming the placement of a defendant drug manufacturer's analog insulin or insulins on a particular PBM's formulary;

    d.    Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBMs paid for the analog insulins, and/or to conceal those prices or the spread scheme;

e.      Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBMs to persuade them to advocate one defendant drug manufacturers' analog insulin over a competitor's product;

f.      Written and oral communications with U.S. government agencies and private insurers that fraudulently misrepresented what the list prices were, or that were intended to deter investigations into the true nature of the list prices or to forestall changes to reimbursement based on something other than list prices;

g.      Written and oral communications with health insurers and patients;

h.      Transmission of list prices from manufacturers to third parties.

i.      Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the defendant drug manufacturers' spread scheme; and

j.      In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the spread scheme. These mails include some of the documents referenced in this Third Amended Complaint.

**D.    Conduct of the RICO Enterprises' affairs**

364.    During the class period, each of the defendant drug manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the defendant drug manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

a.      Each of the defendant drug manufacturers has directly controlled the list and net prices for its analog insulins, which determines the amount of each of the PBMs' compensation;

b.      Each of the defendant drug manufacturers has directly controlled the lists prices that it publicly reports;

c.      Each of the defendant drug manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its analog insulins;

d.      Each of the defendant drug manufacturers has relied upon its employees and agents to promote the spread scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

e.      Each of the defendant drug manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Insulin Pricing Enterprises with which it is associated by providing rebates (as detailed above) or other inducements to place that defendant drug manufacturer's analog insulin or insulins on a PBM's formulary or advocate the use of a certain analog insulins. These inducements include the defendant drug manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to retain a significant portion of the rebates. Furthermore, PBMs

usually refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true number of rebates that the PBM has received in connection with the health plan client.

f.      The defendant drug manufacturers intended that the PBMs would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers and consumers like the plaintiffs and class members money on their prescription needs; and

g.      The defendant drug manufacturers represented to the general public, by stating the analog insulins' list prices without stating that these list prices differed substantially from those net prices offered to the PBMs, that the analog insulins' list prices reflected or approximated analog insulins' true price.

365.    Each of the Manufacturer-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by the respective defendant drug manufacturer.

366.    In violation of Section 1962(c) of RICO, each of the defendant drug manufacturers has conducted the affairs of each of the Manufacturer-PBM Insulin Pricing Enterprises with which they associated by reporting fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, thereby inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

E.      **The defendant drug manufacturers' pattern of racketeering activity**

367.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of

racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The defendant drug manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their spread schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the defendant drug manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

368.    Each defendant drug manufacturer's fraudulent and unlawful spread scheme consisted, in part, of deliberately overstating the list prices for its analog insulins, thereby creating a spread between net and list prices. Each defendant drug manufacturers then used those spreads to induce each of the PBMs to advocate and favor that particular defendant drug manufacturer's drugs.

369.    The spread scheme was calculated and crafted such that plaintiffs and members of the class would pay for the analog insulins based on the artificially inflated, list prices. In designing and implementing the spread scheme, the defendant drug manufacturers were cognizant, at all times, of the fact those plaintiffs and class members were not part of the enterprise and relied upon the integrity of the defendant drug manufacturers in setting the list prices.

370.    By intentionally and artificially inflating the list prices, and by subsequently failing to disclose such practices to the plaintiffs and class members, each of the defendant drug

manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

371.    The defendant drug manufacturers' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive plaintiffs and members of the class. Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the defendant drug manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the class. Each of the defendant drug manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Insulin Pricing Enterprises with which each of them is and was associated in fact.

372.    The defendant drug manufacturers' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

373.    The Anti-Kickback Statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance

program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

374.    The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has increased the benchmark price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM can make more money. This is a classic kickback.

## F.    The defendant drug manufacturers' motive

375.    The defendant drug manufacturers' motive in creating and operating the spread scheme and conducting the affairs of the Manufacturer-PBM Insulin Pricing Enterprises described herein was to fraudulently obtain sales of and profits from their analog insulins.

376.    The spread scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the defendant drug manufacturers' analog insulins. Thus, each of the defendant drug manufacturers used the spread scheme to sell more of its drugs, thereby fraudulently gaining sales, marketplace share, and profits.

## G.    Damages caused by the defendant drug manufacturers' rebate scheme

377.    The defendant drug manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused the plaintiffs and members of the class to be injured in their business or property. The plaintiffs and class members have overpaid many hundreds of millions of dollars based on the defendants' deceptive list prices for their analog

insulins. Each defendant intended and foresaw that the plaintiffs and class members would make such payments tied directly to the defendants' list prices.

378.    The defendant drug manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported the list prices and other information by the same methods in furtherance of their spread scheme. The plaintiffs and members of the class have made inflated payments for the analog insulins based on and/or in reliance on reported and false list prices.

379.    As previously explained, when a plaintiff or class member fills a prescription for one of the analog insulins, she is responsible for paying all or a portion of the medication's cost. If the plaintiff or class member is uninsured, she must pay 100% of the drugs' point-of-sale prices, which are directly tied to the defendant drug manufacturers' list prices. If the plaintiff or class member has a high deductible health plan, she must pay 100% of the drugs' point-of-sale prices, which are directly tied the defendant drug manufacturers' list prices, until she satisfies her deductible. If the plaintiff's or class member's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drugs' point-of-sale prices, which are directly tied to the defendant drug manufacturers' list prices. And if the plaintiff or class member is a member of a Medicare Part D plan, she is responsible for paying all or a portion of her drugs' point-of-sale prices based directly on the defendant drug manufacturers' list prices, until she reaches her maximum contribution.

380.    The amount of each of these cash payments is tied directly to the defendant drug manufacturers' list prices. No other intermediary in the supply chain has control over or is responsible for the list prices on which consumer payments are based. By setting the list prices of

the analog insulins, the defendants are setting the prices plaintiffs and class members must pay. Therefore, when each defendant drug manufacturer artificially inflates each analog insulin's list price and then uses each Manufacturer-PBM Insulin Pricing Enterprises to sell those analog insulins, they also artificially inflate plaintiffs' and class members' out-of-pocket expenses.

381.    The plaintiffs' and class members' damages are therefore the difference between the defendants' reported benchmark prices and the net prices at which they sell their analog insulins for all plaintiff and class member out-of-pocket payments.

382.    Plaintiffs' injuries, and those of the class members, were proximately caused by the defendant drug manufacturers' racketeering activity. But for the misrepresentations that the defendant drug manufacturers made regarding the list prices of their analog insulins and the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, plaintiffs and others similarly situated would have paid less, out-of-pocket, for their analog insulins.

383.    The defendant drug manufacturers racketeering activity directly and proximately caused the plaintiffs' injuries.

384.    The plaintiffs and class members were both: (i) the participants in the marketplace that most directly relied on the falsity of the defendants' inflated list prices, and (ii) the participants that were most directly harmed by the fraud. There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms resulting from the defendant drug manufacturers' fraudulent scheme.

a. *Wholesalers are not eligible to be plaintiffs for this fraud.* Although wholesalers purchase the physical vials and pens of analog insulin directly from the defendants, wholesaler prices are determined on the basis of wholesale acquisition price (i.e., WAC)

- 145 -

not average wholesale price (i.e., AWP). The defendants' inflated AWPs (used at the point of sale) do not affect wholesaler purchases, and, therefore, the wholesalers suffer no damages here. To the extent that the WAC wholesalers paid for the analog insulins followed the same unlawful price hikes as AWP, in the circumstances of this case, the wholesalers suffered no "injury to business or property" within the meaning of the RICO. Wholesalers suffer no damages because the charges they make to their customers (other wholesalers or pharmacies) are mathematically and automatically tied to the exact same WAC list price. In other words, wholesalers are both charged and themselves use to charge others the same unlawfully inflated benchmark price. In addition, wholesalers would have bought the exact same insulin products were it not for the fraud (i.e., this is not a situation where the wholesaler has been deprived the ability to buy some other product, such as a generic or biosimilar to the brand). As a result, even when benchmark prices escalate due to the fraud here, wholesalers buy the same products and receive the same (or more) net revenues from the buy-sell transactions than they otherwise would. Furthermore, wholesalers typically effectuate "chargebacks" and other off-invoice, price reductions that are a part of the secret price concessions that are unrevealed to consumers and play a part of the unlawful scheme to widen the gulf between benchmark prices and net manufacturer prices. As a result, wholesalers are not wholly unaware of secret price concessions the defendant manufacturers provide.

b. *Pharmacies are not eligible to be plaintiffs for this fraud.* Similar observations apply to retail and mail order pharmacies. Like wholesalers, retailers purchase the defendants' products on the basis of WAC, not AWP. Thus, again, the inflated benchmark prices used

at the point of sale do not affect retailers and they suffer no damages here. To the extent that the WAC retailers paid followed the same unlawful price hikes as AWP, in the circumstances of this case, the retailers suffered no "injury to business or property" within the meaning of the RICO. Retailers suffer no damages because the charges they make to their customers (other retailers or plans) are mathematically and automatically tied to the exact same WAC list price. In other words, retailers are both charged and themselves use to charge others the same unlawfully inflated benchmark price. In addition, retailers would have bought the exact same insulin products were it not for the fraud (i.e., this is not a situation where the retailer has been deprived the ability to buy some other product, such as a generic or biosimilar to the brand). As a result, even when benchmark prices escalate due to the fraud here, the retailers buy the same products and receive the same (or more) net revenues from the buy-sell transactions than they otherwise would. Furthermore, retailers typically effectuate "chargebacks" and other off-invoice, price reductions that are a part of the secret price concessions that are unrevealed to consumers and play a part of the unlawful scheme to widen the gulf between benchmark prices and net manufacturer prices. As a result, retailers are not wholly unaware of secret price concessions the defendant manufacturers provide.

      c. *Pharmacy benefit managers are not eligible to be plaintiffs for this fraud.* PBMs, when undertaking their role as benefit managers, are not in the physical distribution chain at all. They are not potential plaintiffs. And to the extent they also run mail order operations, they remain ineligible as plaintiffs for all of the reasons stated in this and the previous three paragraphs.

d. *Health benefit providers are not eligible to be plaintiffs for this fraud.* Similar observations apply to health plans. While health plans do, in fact, initially reimburse pharmacies based on the same inflated AWP created by the manufacturers, the plans' payments are entirely distinct from the payments that are made by their insureds and by cash-only purchasers. There is no overlap in the impact of the fraud between consumer overpayments and the reimbursements made by plans.

e. *Consumer are the only RICO plaintiffs for this fraud.* In contrast to all these marketplace participants, consumers are the most effective plaintiffs for this RICO fraud. Consumers directly and innocently rely—at the point-of-sale—on the unlawfully inflated benchmark prices that the defendants cause to be published. The charges consumers pay (coinsurance, cash payments, deductibles payments, etc.) are directly tied to the unlawfully inflated benchmarks. The damages incurred by the plaintiffs and class members do not overlap with those of any other marketplace participant. This is not a case about how sequential participants in a marketplace pass-on an inflated price from one level to another such that, in the end, consumers overpay. Here, whatever transactions may or may not happen between manufacturers and wholesalers or wholesalers and pharmacies *have little to nothing to do with the prices plaintiffs and class members pay.* It is the defendant manufacturers, through their control over benchmark prices, that determine what the plaintiffs and class members pay.

385.     By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the defendant drug manufacturers are jointly and severally liable to plaintiffs

and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

386.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent benchmark prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting benchmark prices that do not approximate their true net prices.

**COUNT TWO**

**VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)**
**BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C)**
**(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)[45]**

387.    The plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

---

[45] Plaintiffs assume the Court's rulings, *see* ECF Nos. 305 and 252, on the plaintiffs' claims for damages and injunctive relief under RICO will apply equally to the plaintiffs' Third Amended Complaint, as the plaintiffs have not amended their allegations to claim that the plaintiffs

388.     This count is against Eli Lilly, Novo Nordisk, and Sanofi.

389.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

390.     The defendant drug manufacturers have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Manufacturer-PBM Insulin Pricing Enterprises described previously through a pattern of racketeering activity.

391.     As set forth in detail above, the defendant drug manufacturers' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, the defendants inflated the stated list prices of the analog insulins to achieve an unlawful purpose; made false or misleading statements or material omissions regarding the net prices of their analog insulins; and made false or misleading statements or material omissions regarding the existence and amount of their analog insulins' list-to-net price spread. The truth about the net prices of the analog insulins as distinguished from the inflated list prices would be material to a reasonable consumer.

392.     From the outset, the defendants knew, but did not disclose, that the list prices they selected and published for the analog insulins did not reflect the net prices of those products. The defendant drug manufacturers knew that the list prices they selected were not reasonable approximations of the true market prices of their analog insulins. Yet they held out these list prices as reasonable approximations of the true costs of the analog insulins and reasonable bases for

---

purchase their analog insulins directly from the Defendant Drug Manufacturers. The plaintiffs only keep these claims in the complaint for appellate purposes.

consumer cost-sharing obligations with respect to these medicines. The defendant drug manufacturers substantially inflated the list prices of their analog insulins so they could offer larger spreads to the PBMs in exchange for favorable formulary positions. The defendants knew, but did not disclose, that the list-to-net price spreads did not reduce the prices paid by the plaintiffs and class members who purchased their analog insulins based on list price. The defendant drug manufacturers knowingly and deliberately misled consumers regarding the pricing of the analog insulins.

393.    The nature of the above-described defendant drug manufacturers' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

394.    The defendant drug manufacturers have and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

   a.    Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

   b.    Multiple instances of wire fraud in violations of 18 U.S.C. § 1343;

   c.    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952; and

   d.    Multiple instances of bribery in violation of state statutes, including but not limited to N.J. Stat. Ann. § 2C:21-10(a).

395.    The defendant drug manufacturers' violations of the above federal and state laws and the effects thereof detailed above are continuing and will continue. The plaintiffs and

members of the class have been injured in their property by reason of these violations: the plaintiffs and class members have made billions of dollars in payments for the analog insulins that they would not have made but for the defendant drug manufacturers' conspiracy to violate 18 U.S.C. § 1962(c).

396.    The defendant drug manufacturers' racketeering activity directly and proximately injured the plaintiffs and members of the class: the plaintiffs and class members substantially overpaid for their analog insulins when they paid for these medicines at the point of sale based on the defendants' list prices.

397.    By virtue of these violations of 18 U.S.C. § 1962(d), the defendant drug manufacturers are jointly and severally liable to plaintiffs and the class for three times the damages the plaintiffs and class have sustained, plus the cost of this suit, including reasonable attorneys' fees.

398.    By virtue of these violations of 18 U.S.C. § 1962(d), under the provisions of Section 1964(d) of RICO, the plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent list prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that

calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendant manufacturers to prevent them from reporting list prices that do not approximate their true net prices.

### FACTUAL ALLEGATIONS RELATED TO STATE LAW RACKETEERING COUNTS AND STATE CIVIL CONSPIRACY COMMON LAWS (COUNTS 3 THROUGH 10)

399.    The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

400.    The defendant drug manufacturers' conduct constitutes violations of various states' civil racketeering statutes and state civil conspiracy common laws. As set forth below,

**A.    The Manufacturer-PBM Insulin Pricing Racketeering Enterprises**

401.    For purposes of these counts, the racketeering "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the Defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

402.    Each of the Manufacturer-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of selling, purchasing, and administering the analog insulins to individual plaintiffs and class members and deriving secret profits from these activities (the spread scheme). These profits are greater than either the defendant drug

manufacturers or the PBMs could obtain absent their fraudulent concealment of the substantial rebates from defendant drug manufacturers to PBMs.

403.    To accomplish this common purpose, the defendant drug manufacturers periodically and systematically inflate the list prices of the analog insulins. They did so willfully, and with knowledge that class members make payments directly based on the manufacturers' list price. The Manufacturer-PBM Insulin Pricing Enterprises then represented—either affirmatively or through half-truths and omissions—to the general public and consumers, including plaintiffs and the class, that the analog insulin list prices are a reasonable approximation of the actual cost of these medicines. The Manufacturer-PBM Insulin Pricing Enterprises conceal from the general public and consumers, like the plaintiffs and class members, the reality that the net prices offered to PBMs in exchange for preferred formulary positions are *exponentially lower.*

404.    It is this scheme that is fraudulent. The defendant drug manufacturers' list prices are no longer a reasonable approximation of the actual price of insulin, and the Manufacturer-PBM Insulin Pricing Enterprises concealed the magnitude of the spreads between list prices and net prices from the plaintiffs and the class. The Manufacturer-PBM Insulin Pricing Enterprises also concealed from the public the purpose of these spreads: the spreads ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring significant price reductions; and they result in higher profits for the PBMs, whose earnings increase as the spread between list and net prices grows.

405.    Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin list prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. With respect to the defendant drug manufacturers, these corporations

would not be able to market large spreads to PBMs in exchange for favorable formulary positions without the use of the inflated list prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. The PBMs share this common purpose because, without the use of the inflated list prices, their profits on the spread between list and net prices would collapse. As a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into two general categories: (i) they keep the difference between what they pay pharmacies for drugs, which is negotiated as a percentage of list price plus dispensing costs, and what insurers pay them, which is a higher percentage of list price plus dispensing costs; (ii) they pocket a percentage of the "spread" between prices.

406.    Each of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each defendant drug manufacturer and each PBM that is an associate. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, there is a common communication network by which each defendant drug manufacturer and each PBM share information on a regular basis, including information regarding the analog insulin list prices and net prices. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, each defendant drug manufacturer and each PBM functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Insulin Pricing Enterprises was operated by the specific defendant drug manufacturer for criminal purposes, namely, carrying out the spread scheme.

407.    At all relevant times, the PBMs have been aware of the Manufacturer-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct, and

have reaped profits from that conduct. The PBMs strike rebate deals with the defendant drug manufacturers to conceal the true net prices of the analog insulins and profit from the inflated list prices. The PBMs have represented to the public that the rebates they negotiate save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But they have known that the increasing spreads did not and do not actually decrease the net prices of the analog insulins: the list prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the Manufacturer-PBM Insulin Pricing Enterprises' common purpose of enlarging the hidden spreads between net and list price, the PBMs would have had the incentive to disclose the fraudulence of the defendant manufacturers' list prices. By failing to disclose this information, the PBMs and defendant drug manufacturers perpetuated the conduct of the Manufacturer-PBM Insulin Pricing Enterprises.

408.    Further, the PBMs took instructions and commands from the defendant drug manufacturers regarding use of the analog insulin list prices, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *access rebates* for placement of products on their formulary; (ii) *market share rebates* for garnering higher market share than established targets; (iii) *administrative fees* for assembling data to verify market share results; and (iv) *other fees and grants* in an effort to promote products.

409.    In order to garner all of these fees from the defendant drug manufacturers, each PBM and each defendant drug manufacturer meet on a regular basis to discuss analog insulin prices, spreads, marketing opportunities, and coordination of all of the above.

410.    There is a common communication network between each PBM and each manufacturer for the purpose of implementing the rebate scheme and for the exchange of financial rewards for the PBM activities that benefit the defendant drug manufacturers.

411.    At all relevant times, each one of the PBMs was aware of the defendant drug manufacturers' spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

412.    For purposes of this count, the Manufacturer-PBM Insulin Pricing Enterprises are further identified as follows:

**1.    The Eli Lilly-PBM Enterprises**

413.    The Eli Lilly-PBM Enterprises are three separate associations-in-fact consisting of each of the PBMs that administers purchases of Eli Lilly's Humalog and Basaglar, including its directors, employees, and agents, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-CVS association-in-fact enterprise; (2) the Eli Lilly-Express Scripts association-in-fact enterprise; and (3) the Eli Lilly-OptumRx association-in-fact enterprise. Each of the Eli Lilly-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Eli Lilly's rapid-acting analog insulin product, Humalog, and it's long-acting analog insulin product, Basaglar, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx. As to each of these Eli Lilly-PBM Enterprises, there is a common communication network by which Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx

share information on a regular basis. As to each of these Eli Lilly-PBM Enterprises, Eli Lilly and

CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx function as continuing but separate

units. At all relevant times, each of the Eli Lilly-PBM Enterprises was operated and conducted by

Eli Lilly for criminal purposes, namely, carrying out the spread scheme.

### 2.     The Novo Nordisk-PBM Insulin Pricing Enterprises

414.     The Novo Nordisk-PBM Insulin Pricing Enterprises are three separate associations-

in-fact consisting of each of the PBMs that administered purchases of Novo Nordisk's Fiasp,

Novolog, Levemir, and Tresiba including its directors, employees, and agents, and Novo Nordisk,

including its directors, employees and agents: (1) the Novo Nordisk-CVS association-in-fact

enterprise; (2) the Novo Nordisk-Express Scripts association-in-fact enterprise; and (3) the Novo

Nordisk-OptumRx association-in-fact enterprise. Each of the Novo Nordisk-PBM Insulin Pricing

Enterprises is an ongoing and continuing business organization consisting of both corporations

and individuals that are and have been associated for the common or shared purposes of exchanges

kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog

insulin products, Levemir and Tresiba, and its rapid-acting analog insulin products, Fiasp and

Novolog, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of

the Novo Nordisk-PBM Insulin Pricing Enterprises has a systemic linkage because there are

contractual relationships, financial ties, and continuing coordination of activities between Novo

Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx. As to

each of these Novo Nordisk-PBM Insulin Pricing Enterprises, there is a common communication

network by which Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo Nordisk

and OptumRx share information on a regular basis. As to each of these Novo Nordisk-PBM

Insulin Pricing Enterprises, Novo Nordisk and CVS, Novo Nordisk and Express Scripts, and Novo

Nordisk and OptumRx function as continuing but separate units. At all relevant times, each of the Novo Nordisk-PBM Insulin Pricing Enterprises was operated and conducted by Novo Nordisk for criminal purposes, namely, carrying out the spread scheme.

     **3.**     **The Sanofi-PBM Insulin Pricing Enterprises**

     415.     The Sanofi-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Sanofi's Apidra, Lantus, and Toujeo, including its directors, employees, and agents, and Sanofi, including its directors, employees and agents: (1) the Sanofi-CVS association-in-fact enterprise; (2) the Sanofi-Express Scripts association-in-fact enterprise; and (3) the Sanofi-OptumRx association-in-fact enterprise. Each of the Sanofi-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Sanofi-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx. As to each of these Sanofi-PBM Insulin Pricing Enterprises, there is a common communication network by which Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx share information on a regular basis. As to each of these Sanofi-PBM Insulin Pricing Enterprises, Sanofi and CVS, Sanofi and Express Scripts, and Sanofi and OptumRx function as continuing but separate units. At all relevant times, each of the Sanofi-PBM Insulin Pricing Enterprises was operated and conducted by Sanofi for criminal purposes, namely, carrying out the spread scheme.

4.     **The material misrepresentations of the Manufacturer-PBM Insulin Pricing Enterprises**

416.    The Manufacturer-PBM Insulin Pricing Enterprises (Eli Lilly-CVS, Eli Lilly-Express Scripts, Eli Lilly-OptumRx, Novo Nordisk-CVS, Novo Nordisk-Express Scripts, Novo-Nordisk-OptumRx, Sanofi-CVS, Sanofi-Express Scripts, and Sanofi-OptumRx) knowingly made material misrepresentations to class members in furtherance of the fraudulent scheme regarding:

a.     The net prices of the analog insulins;[46]

b.     The extent to which the net prices of the analog insulins departed from their artificially-inflated list prices;

c.     That the analog insulins' list prices served as a reasonable cost-sharing list and that this list price was a fair basis on which to base consumer out-of-pocket payments;

d.     The extent to which the defendant drug manufacturers and the PBMs negotiated the rebates discounting the list prices of the analog insulins in good faith and for a proper purpose;

e.     Whether the rebates were intended to benefit plan members and/or the general public;

f.     Whether the rebates saved plan members and the general public money;

---

[46] The Eli Lilly-PBM Enterprises made these misrepresentations with respect to Humalog and Basaglar. The Novo Nordisk-PBM Insulin Pricing Enterprises made these representations with respect to Fiasp, Novolog, Levemir, and Tresiba. The Sanofi-PBM Enterprises made these misrepresentations with respect to Apidra, Lantus, and Toujeo. All references to "analog insulins" refer to the specific insulins relevant to each manufacturer PBM enterprise.

      g.     Whether the "preferred" formulary status of the analog insulins reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' formulary committees;

      h.     Whether the analog insulins would have been placed in "preferred" formulary positions absent the spreads; and

      f.     The extent to which the spread schemes forced plaintiffs and the class members to incur additional expenses for their analog insulin prescriptions.

417.    The defendant drug manufacturers alone could not have accomplished the purposes of the Manufacturer-PBM Insulin Pricing Enterprises without the assistance of the PBMs. For the defendant drug manufacturers to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formularies, on which varying analog insulins were given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured lower prices. The lower prices were illusory, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the Manufacturer-PBM Enterprise could not have achieved its common purpose.

418.    The impacts of the Manufacturer-PBM Insulin Pricing Enterprises are still in place, i.e., the increased spreads between the list and net prices of the analog insulins are still being maintained and increased.

419.    The foregoing evidences that the defendant drug manufacturers and PBMs were each willing participants in the Manufacturer-PBM Insulin Pricing Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure

designed to effectuate the Enterprises' purposes, i.e., to increase profits for both the defendant

drug manufacturers and the PBMs through kickbacks to the PBMs and continued formulary status

without net price reductions for the defendant drug manufacturers.

**B.      Conduct of the Enterprises' affairs**

420.      During the class period, each of the defendant drug manufacturers has exerted

control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated

and each of the defendant drug manufacturers have conducted or participated in the conduct of

the affairs of those association-in-fact racketeering enterprises, directly or indirectly. Such

participation was carried out in the following ways:

a.      Each of the defendant drug manufacturers has directly controlled the list

and net prices for its analog insulins, which determines the amount of each of the PBMs'

compensation;

b.      Each of the defendant drug manufacturers has directly controlled the lists

prices that it publicly reports;

c.      Each of the defendant drug manufacturers has directly controlled the

creation and distribution of marketing, sales, and other materials used to inform each of

the PBMs of the profit potential of its analog insulins;

d.      Each of the defendant drug manufacturers has relied upon its employees

and agents to promote the spread scheme through the U.S. mails, through interstate wire

facilities, and through direct contacts with providers and the PBMs; and

e.      Each of the defendant drug manufacturers has controlled and participated

in the affairs of the Manufacturer-PBM Insulin Pricing Enterprises with which it is

associated by providing rebates (as detailed above) or other inducements to place that

Defendant drug manufacturer's analog insulin or insulins on a PBM's formulary or advocate the use of a certain analog insulins. These inducements include the defendant drug manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to retain a significant portion of the rebates. Furthermore, PBMs usually refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true number of rebates that the PBM has received in connection with the health plan client.

      f.      The defendant drug manufacturers intended that the PBMs would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers and consumers like the plaintiffs and class members money on their prescription needs; and

      g.      The defendant drug manufacturers represented to the general public, by stating the analog insulins' list prices without stating that these list prices differed substantially from those net prices offered to the PBMs, that the analog insulins' list prices reflected or approximated analog insulins' true price.

421.      Each of the Manufacturer-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by the respective defendant drug manufacturer.

422.     Each of the defendant drug manufacturers has conducted the affairs of each of the Manufacturer-PBM Insulin Pricing Enterprises with which they associated by reporting fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

### C.     The defendant drug manufacturers' pattern of racketeering activity

423.     Each defendant drug manufacturer's fraudulent and unlawful spread scheme consisted, in part, of deliberately overstating the list prices for its analog insulins, thereby creating a spread between net and list prices. Each defendant drug manufacturers then used those spreads to induce each of the PBMs to advocate and favor that particular defendant drug manufacturer's drugs.

424.     The spread scheme was calculated and crafted such that plaintiffs and members of the class would pay for the analog insulins based on the artificially inflated list prices. In designing and implementing the spread scheme, the defendant drug manufacturers were cognizant, at all times, of the fact those plaintiffs and class members were not part of the enterprise and relied upon the integrity of the defendant drug manufacturers in setting the list prices.

425.     By intentionally and artificially inflating the list prices, and by subsequently failing to disclose such practices to the plaintiffs and class members, each of the defendant drug manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

426.     The defendant drug manufacturers' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive plaintiffs and members

of the class. Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the defendant drug manufacturers was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the class. Each of the defendant drug manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Insulin Pricing Enterprises with which each of them is and was associated in fact.

427.    The defendant drug manufacturers' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

428.    The Anti-Kickback Statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

429.    The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the

"discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has increased the list price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM can make more money. This is a classic kickback.

**D.      The Defendant Drug Manufacturers' Motive**

430.    The defendant drug manufacturers' motive in creating and operating the spread scheme and conducting the affairs of the Manufacturer-PBM Insulin Pricing Enterprises described herein was to fraudulently obtain sales of and profits from their analog insulins.

431.    The spread scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the defendant drug manufacturers' analog insulins. Thus, each of the defendant drug manufacturers used the spread scheme to sell more of its drugs, thereby fraudulently gaining sales, marketplace share, and profits.

**E.      Damages caused by the defendant drug manufacturers' rebate scheme**

432.    The defendant drug manufacturers' violations of state racketeering laws have directly and proximately caused the plaintiffs and members of the class to be injured in their business or property. The plaintiffs and class members have overpaid many hundreds of millions of dollars based on the defendants' deceptive list prices for their analog insulins. Each defendant intended and foresaw that the plaintiffs and class members would make such payments tied directly to the defendants' list prices.

433.    The defendant drug manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported the list prices and other information by the same methods in furtherance of their spread scheme. The plaintiffs and members of the class have made inflated payments for the analog insulins based on and/or in reliance on reported and false list prices.

434.     As previously explained, when a plaintiff or class member fills a prescription for one of the analog insulins, she is responsible for paying all or a portion of the medication's cost. If the plaintiff or class member is uninsured, she must pay 100% of the drugs' point-of-sale prices, which are directly tied to the defendant drug manufacturers' list prices. If the plaintiff or class member has a high deductible health plan, she must pay 100% of the drugs' point-of-sale prices, which are directly tied the defendant drug manufacturers' list prices, until she satisfies her deductible. If the plaintiff's or class member's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drugs' point-of-sale prices, which are directly tied the defendant drug manufacturers' list prices. And if the plaintiff or class member is a member of a Medicare Part D plan, she is responsible for paying all or a portion of her drugs' point-of-sale prices based directly on the defendant drug manufacturers' list prices, until she reaches her maximum contribution.

435.     The amount of each of these cash payments is tied directly to the defendant drug manufacturers' list prices. No other intermediary in the supply chain has control over or is responsible for the list prices on which consumer payments are based. By setting the list prices of the analog insulins, the defendants are setting the prices plaintiffs and class members must pay. Therefore, when each defendant drug manufacturer artificially inflates each analog insulin's list price and then uses each Manufacturer-PBM Insulin Pricing Enterprises to sell those analog insulins, they also artificially inflate plaintiffs' and class members' out-of-pocket expenses.

436.     The plaintiffs' and class members' damages are therefore a share of the difference between the defendants' reported list prices and the net prices at which they sell their analog insulins for all plaintiff and class member out-of-pocket payments.

437.    Plaintiffs' injuries, and those of the class members, were proximately caused by the defendant drug manufacturers' racketeering activity. But for the misrepresentations that the defendant drug manufacturers made regarding the list prices of their analog insulins and the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, plaintiffs and others similarly situated would have paid less, out-of-pocket, for their analog insulins.

438.    The defendant drug manufacturers racketeering activity directly and proximately caused the plaintiffs' injuries.

439.    The plaintiffs and class members were both: (i) the participants in the marketplace that most directly relied on the falsity of the defendants' inflated list prices, and (ii) the participants that were most directly harmed by the fraud. There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms resulting from the defendant drug manufacturers' fraudulent scheme.

a. *Wholesalers are not eligible to be plaintiffs for this fraud.* Although wholesalers purchase the physical vials and pens of analog insulin directly from the defendants, the wholesalers suffered no "injury." Wholesalers suffer no damages because the charges they make to their customers (other wholesalers or pharmacies) are mathematically and automatically tied to the exact same WAC list price. In other words, wholesalers are both charged and themselves use to charge others the same unlawfully inflated list price. In addition, wholesalers would have bought the exact same insulin products were it not for the fraud (i.e., this is not a situation where the wholesaler has been deprived of the ability to buy some other product, such as a generic or biosimilar to the brand). As a result, even when list prices escalate due to the fraud here, wholesalers buy the same products and

receive the same (or more) net revenues from the buy-sell transactions than they otherwise would. Furthermore, wholesalers typically effectuate "chargebacks" and other off-invoice, price reductions that are a part of the secret price concessions that are unrevealed to consumers and play a part of the unlawful scheme to widen the gulf between list prices and net manufacturer prices. As a result, wholesalers are not wholly unaware of secret price concessions the defendant manufacturers provide.

b. *Pharmacies are not eligible to be plaintiffs for this fraud.* Similar observations apply to retail and mail order pharmacies. Like wholesalers, retailers suffer no damages here. Retailers suffer no damages because the charges they make to their customers (other retailers or plans) are mathematically and automatically tied to the exact same WAC list price. In other words, retailers are both charged and themselves use to charge others the same unlawfully inflated list price. In addition, retailers would have bought the exact same insulin products were it not for the fraud (i.e., this is not a situation where the retailer has been deprived the ability to buy some other product, such as a generic or biosimilar to the brand). As a result, even when list prices escalate due to the fraud here, the retailers buy the same products and receive the same (or more) net revenues from the buy-sell transactions than they otherwise would. Furthermore, retailers typically effectuate "chargebacks" and other off-invoice, price reductions that are a part of the secret price concessions that are unrevealed to consumers and play a part of the unlawful scheme to widen the gulf between list prices and net manufacturer prices. As a result, retailers are not wholly unaware of secret price concessions the defendant manufacturers provide.

c. *Pharmacy benefit managers are not eligible to be plaintiffs for this fraud.* PBMs, when undertaking their role as benefit managers, are not in the physical distribution chain at all. They are not potential plaintiffs. And to the extent they also run mail order operations, they remain ineligible as plaintiffs for all of the reasons stated in this and the previous three paragraphs.

d. *Health benefit providers are not eligible to be plaintiffs for this fraud.* Similar observations apply to health plans. While health plans do, in fact, initially reimburse pharmacies based on the same inflated WAC created by the manufacturers, the plans' payments are entirely distinct from the payments that are made by their insureds and by cash-only purchasers. There is no overlap in the impact of the fraud between consumer overpayments and the reimbursements made by plans.

e. *Consumer are the only plaintiffs for this fraud.* In contrast to all these marketplace participants, consumers are the most effective plaintiffs for this racketeering fraud. Consumers directly and innocently rely—at the point-of-sale—on the unlawfully inflated list prices that the defendants cause to be published. The charges consumers pay (coinsurance, cash payments, deductibles payments, etc.) are directly tied to the unlawfully inflated lists. The damages incurred by the plaintiffs and class members do not overlap with those of any other marketplace participant. This is not a case about how sequential participants in a marketplace pass-on an inflated price from one level to another such that, in the end, consumers overpay. Here, whatever transactions may or may not happen between manufacturers and wholesalers or wholesalers and pharmacies *have little to nothing to do with*

*the prices plaintiffs and class members pay*. It is the defendant manufacturers, through their control over list prices, that determine what the plaintiffs and class members pay.

## COUNT THREE

## VIOLATION OF ARIZONA'S CIVIL RACKETEERING STATUTES ARIZ. REV. STAT. §§ 13-2314.04, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

440.    The Arizona plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

441.    Under Ariz. Rev. Stat. § 13-2301, a racketeering "enterprise" may be "any group of persons associated in fact although not a legal entity."

**A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Arizona's racketeering statutes.**

442.    This count, which alleges violations of Ariz. Rev. Stat. § 13-2314, is asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of the plaintiffs and class members as represented by the named plaintiffs.

443.    Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each "persons," as that term is defined in Ariz. Rev. Stat. Ann. § 13-105(30).

444.    The following pharmacy benefit managers are each "persons," as that term is defined in Ariz. Rev. Stat. Ann. § 13-105(30): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United

States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

**B.      The Manufacturer-PBM Insulin Pricing Racketeering Enterprises.**

445.    For purposes of this claim, and as alleged above, the racketeering "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the Defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

**C.      The defendant drug manufacturers' pattern of racketeering activity.**

446.    During the class period, each of the defendant drug manufacturers has, as outlined above, exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of § 13-2314.04 of Arizona's racketeering statutes, each of the defendant drug manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact racketeering enterprises, directly or indirectly.

447.    In violation of Sections 13-2301(D)(4)(b) and13-2304.04 of Arizona's racketeering statutes, each of the defendant drug manufacturers reported fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

448.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under Ariz. Rev. Stat.§ 13–2310(B), (using false pretenses to knowing obtain a benefit per a fraudulent scheme), 18 U.S.C. § 1341 (relating to mail fraud), and 18 U.S.C. § 1343 (relating to wire fraud).

449.    Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of Ariz. Rev. Stat. § 13-2314, in which the defendant drug manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

**D.    Damages caused by the Defendant Drug Manufacturers' violations of Arizona's racketeering statutes.**

450.    By virtue of these violations, under the provisions of § 13-2314.04(A) of Arizona's racketeering statutes, the defendant drug manufacturers are jointly and severally liable to plaintiffs and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

451.    By virtue of these violations, under the provisions of § 13-2314.04(C) of Arizona's racketeering statutes, the plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their WACs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent list prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for

- 173 -

diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting list prices that do not approximate their true net prices.

COUNT FOUR

**VIOLATION OF COLORADO ORGANIZED CRIME ACT
COLO. REV. STAT. ANN. §§ 18-17-101, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

452.    The Colorado plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

453.    Under Colo. Rev. Stat. Ann. § 18-17-103(2), "enterprise" means "any individual, sole proprietorship, partnership, corporation, trust, or other legal entity or any chartered union, association, or group of individuals, associated in fact although not a legal entity, and shall include illicit as well as licit enterprises and governmental as well as other entities."

A.    **Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Colorado's Organized Crime Act.**

454.    This count, which alleges violations of Colo. Rev. Stat. Ann. § 18-17-104, is asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of the plaintiffs and class members as represented by the named plaintiffs.

455.    Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each "persons," as that term is defined in Colo. Rev. Stat. Ann. § 18-17-103(4).

456.    The following pharmacy benefit managers are each "persons," as that term is defined in Colo. Rev. Stat. Ann. § 18-17-103(4): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode

- 174 -

Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

**B.    The Manufacturer-PBM Insulin Pricing Racketeering Enterprises.**

457.    For purposes of this claim, the racketeering "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

**C.    The defendant drug manufacturers' pattern of racketeering activity.**

458.    During the class period, each of the defendant drug manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Colo. Rev. Stat. Ann. § 18-17-104, each of the defendant drug manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact racketeering enterprises, directly or indirectly.

459.    In violation of Colo. Rev. Stat. Ann. § 18-17-104, each of the defendant drug manufacturers reported fraudulently inflated list prices for the analog insulins and by

- 175 -

misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

460.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

461.    Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of Colo. Rev. Stat. § 18-17-103(3), in which the defendant drug manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

**D.    Damages caused by the defendant drug manufacturers' rebate scheme.**

462.    By virtue of these violations, under Colo. Rev. Stat. Ann. § 18-17-106(7), the defendant drug manufacturers are jointly and severally liable to plaintiffs and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

463.    By virtue of these violations, under Colo. Rev. Stat. Ann. § 18-17-106, the plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent list prices. In a country where

tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting list prices that do not approximate their true net prices.

**COUNT FIVE**

**VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT FLA. STAT. ANN. § 772.101, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

464.    The Florida plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

465.    Under Fla. Stat. Ann. § 772.102(3), an "enterprise" means "any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

**A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Florida's Organized Crime and Racketeering Act.**

466.    This count, which alleges violations of Fla. Stat. Ann. § 772.103, is asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of the plaintiffs and class members as represented by the named plaintiffs.

467.    Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each "persons," as that term is defined in Fla. Stat. Ann. § 1.01.

468.     The following pharmacy benefit managers are each "persons," as that term is defined in Fla. Stat. Ann. § 1.01: (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

**B.     The Manufacturer-PBM Insulin Pricing Racketeering Enterprises.**

469.     For purposes of this claim, the racketeering "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

**C.     The defendant drug manufacturers' pattern of racketeering activity**

470.     During the class period, each of the defendant drug manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Fla. Stat. Ann. § 772.103, each of the defendant drug manufacturers have

conducted or participated in the conduct of the affairs of those association-in-fact racketeering enterprises, directly or indirectly.

471.    In violation of Fla. Stat. Ann. § 772.103, each of the defendant drug manufacturers reported fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

472.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

473.    Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of Fla. Stat. Ann. § 772.102(4), in which the defendant drug manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

**D.    Damages caused by the defendant drug manufacturers' rebate scheme**

474.    By virtue of these violations, under Fla. Stat. Ann. § 772.104(1), the Defendant drug manufacturers are jointly and severally liable to plaintiffs and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

475.    By virtue of these violations, under Fla. Stat. Ann. § 772.104(1),plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will

continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the

defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members

of the class will continue to pay based on the defendants' fraudulent list prices. In a country where

tens of thousands of citizens cannot afford their analog insulins, or where the expense of such

drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent,

unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy.

Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent

them from reporting list prices that do not approximate their true net prices.

## COUNT SIX

### VIOLATION OF THE GEORGIA RICO (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS) ACT
### GA. STAT. ANN. § 16-14-1, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

476.    The Georgia plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs of this Third Amended Complaint.

477.    Under Ga. Stat. Ann. § 16-14-3, an "enterprise" means "any person, sole

proprietorship, partnership, corporation, business trust, union chartered under the laws of this

state, or other legal entity; or any unchartered union, association, or group of individuals

associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and

governmental as well as other entities."

**A.    Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Georgia's RICO Act.**

478.    This count, which alleges violations of Ga. Stat. Ann. §§ 16-14-3 and 16-14-4, is

asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of the plaintiffs

and class members as represented by the named plaintiffs.

479.     Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each "persons," as that term is defined in § 16-1-3(12).

480.     The following pharmacy benefit managers are each "persons," as that term is defined in Ga. Stat. Ann. § 16-1-3(12): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

**B.     The Manufacturer-PBM Insulin Pricing Racketeering Enterprises.**

481.     For purposes of this claim, the racketeering "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

**C.     The defendant drug manufacturers' pattern of racketeering activity.**

482.     During the class period, each of the defendant drug manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated

and, in violation of Ga. Stat. Ann. § 16-14-3, each of the defendant drug manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact racketeering enterprises, directly or indirectly.

483.    In violation of Ga. Stat. Ann. § 16-14-3, each of the defendant drug manufacturers reported fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

484.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

485.    Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of Ga. Stat. Ann. § 16-14-3(4), in which the defendant drug manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

D.    **Damages caused by the defendant drug manufacturers' rebate scheme.**

486.    By virtue of these violations, under Ga. Stat. Ann. § 16-14-6, the defendant drug manufacturers are jointly and severally liable to plaintiffs and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

487.    By virtue of these violations, under Ga. Stat. Ann. § 16-14-6, plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees.

Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent list prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting list prices that do not approximate their true net prices.

**COUNT SEVEN**

**VIOLATION OF THE NORTH CAROLINA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT**
**N.C. GEN. STAT. § 75D-1, *ET SEQ.***
**(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

488.    The North Carolina plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

489.    Under N.C. Gen. Stat. § 75D-3, "enterprise" means "any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this State, or other legal entity; or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities."

A.   **Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under North Carolina's RICO Act.**

490.   This count, which alleges violations of N.C. Gen. Stat. § 75D-4, is asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of the plaintiffs and class members as represented by the named plaintiffs.

491.   Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each "persons," as that term is defined in N.C. Gen. Stat. § 12-3(6).

492.   The following pharmacy benefit managers are each "persons," as that term is defined in N.C. Gen. Stat. § 12-3(6): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

B.   **The Manufacturer-PBM Insulin Pricing Racketeering Enterprises.**

493.   For purposes of this claim, the racketeering "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees,

and agents. These associations-in-fact enterprises are collectively referred to herein as the

"Manufacturer-PBM Insulin Pricing Enterprises."

**C.     The defendant drug manufacturers' pattern of racketeering activity.**

494.     During the class period, each of the defendant drug manufacturers has exerted

control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated

and, in violation of N.C. Gen. Stat. § 75D-4, each of the defendant drug manufacturers have

conducted or participated in the conduct of the affairs of those association-in-fact racketeering

enterprises, directly or indirectly.

495.     In violation of N.C. Gen. Stat. § 75D-4, each of the defendant drug manufacturers

reported fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs

and class members through the publication of their list prices that these list prices were reasonable

bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members

to pay inflated amounts for the analog insulins.

496.     Each of the defendant drug manufacturers has conducted and participated in the

affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of

racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (relating to mail

fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

497.     Collectively, these violations constitute a "pattern of racketeering activity," within

the meaning of N.C. Gen. Stat. § 75D-3(b) in which the defendant drug manufacturers intended

to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

**D.     Damages caused by the defendant drug manufacturers' rebate scheme.**

498.     By virtue of these violations, under N.C. Gen. Stat. § 75D-8, the Defendant drug

manufacturers are jointly and severally liable to plaintiffs and members of the class for three times

the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

499.     By virtue of these violations, under N.C. Gen. Stat. § 75D-8, plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent list prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting list prices that do not approximate their true net prices.

## COUNT EIGHT

### VIOLATION OF THE UTAH PATTERN OF UNLAWFUL ACTIVITY ACT
### UTAH CODE ANN. § 76-10-1601, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

500.     The Utah plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

501.     Under Utah Code Ann. § 76-10-1602(1), "enterprise" means "any individual, sole proprietorship, partnership, corporation, business trust, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, and includes illicit as well as licit entities."

**A.      Eli Lilly, Novo Nordisk, and Sanofi are culpable "persons" under Utah's Pattern of Unlawful Activity Act.**

502.    This count, which alleges violations of Utah Code Ann. § 76-10-1603, is asserted against Eli Lilly, Novo Nordisk, and Sanofi, as identified below, on behalf of the plaintiffs and class members as represented by the named plaintiffs.

503.    Plaintiffs, the members of class, and Eli Lilly, Novo Nordisk, and Sanofi are each "persons," as that term is defined in Utah Code Ann. § 76-10-1602(3).

504.    The following pharmacy benefit managers are each "persons," as that term is defined in Utah Code Ann. § 76-10-1602(3): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

**B.      The Manufacturer-PBM Insulin Pricing Racketeering Enterprises.**

505.    For purposes of this claim, the racketeering "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees,

and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

**C.    The defendant drug manufacturers' pattern of racketeering activity**

506.    During the class period, each of the defendant drug manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Utah Code Ann. § 76-10-1603, each of the defendant drug manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact racketeering enterprises, directly or indirectly.

507.    In violation of Utah Code Ann. § 76-10-1603, each of the defendant drug manufacturers reported fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

508.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

509.    Collectively, these violations constitute a "pattern of unlawful activity," within the meaning of Utah Code Ann. § 76-10-1602(2) in which the defendant drug manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

**D.    Damages caused by the defendant drug manufacturers' rebate scheme.**

510.    By virtue of these violations, under Utah Code Ann. § 76-10-1605, the Defendant drug manufacturers are jointly and severally liable to plaintiffs and members of the class for twice

the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

511.    By virtue of these violations, under Utah Code Ann. § 76-10-1605, plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent list prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting list prices that do not approximate their true net prices.

## COUNT NINE

### VIOLATION OF THE WISCONSIN ORGANIZED CRIME CONTROL ACT
### WIS STAT. § 946.80, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

512.    The Wisconsin plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

513.    Under Wis. Stat. § 946.82, "enterprise" means "any sole proprietorship, partnership, limited liability company, corporation, business trust, union organized under the laws of this state or other legal entity or any union not organized under the laws of this state,

association or group of individuals associated in fact although not a legal entity. "Enterprise"

includes illicit and licit enterprises and governmental and other entities."

**A.    Eli Lilly, Novo Nodisk, and Sanofi are culpable "persons" under Wisconsin's Organize Crime Control Act.**

514.    This count, which alleges violations of Wis. Stat. § 946.83, is asserted against Eli

Lilly, Novo Nodisk, and Sanofi, as identified below, on behalf of the plaintiffs and class members

as represented by the named plaintiffs.

515.    Plaintiffs, the members of class, and Eli Lilly, Novo Nodisk, and Sanofi are each

"persons," as that term is defined in Wis. Stat. § 990.01.

516.    The following pharmacy benefit managers are each "persons," as that term is

defined in Wis. Stat. § 990.01: (a) CVS Health Corporation (CVS), a Delaware corporation with

its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is

one of the largest PBMs in the United States and provides comprehensive prescription benefit

management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc.

(Express Scripts), a Delaware corporation with its principal place of business located at 1 Express

Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79

million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place

of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the

United States and covers 65 million lives.

**B.    The Manufacturer-PBM Insulin Pricing Racketeering Enterprises**

517.    For purposes of this claim, the racketeering "enterprises" are associations-in-fact

consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that

administers purchases of the defendant drug manufacturers' analog insulins (Eli Lilly's Humalog

and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) one of the defendant drug manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

## C.   The defendant drug manufacturers' pattern of racketeering activity

518.    During the class period, each of the defendant drug manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Wis. Stat. §§ 946.82-.83, each of the defendant drug manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact racketeering enterprises, directly or indirectly.

519.    In violation of Wis. Stat. § 946.82-83, each of the defendant drug manufacturers reported fraudulently inflated list prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their list prices that these list prices were reasonable bases for plaintiff and class member out-of-pocket payments, inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

520.    Each of the defendant drug manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

521.    Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of Wis. Stat. § 946.82, in which the defendant drug manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

D.     **Damages caused by the defendant drug manufacturers' rebate scheme**

522.     By virtue of these violations, under Wis. Stat. § 946.87, the defendant drug manufacturers are jointly and severally liable to plaintiffs and members of the class for twice the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

523.     By virtue of these violations, under Wis. Stat. § 946.87, plaintiffs and members of the class further seek injunctive relief against the defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. With the exception of one plaintiff, all named plaintiffs will continue purchasing the defendants' analog insulin medications for the rest of their lives. And the plaintiffs and members of the class will continue to pay based on the defendants' fraudulent list prices. In a country where tens of thousands of citizens cannot afford their analog insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against the defendants, to prevent them from reporting list prices that do not approximate their true net prices.

**COUNT TEN**

**VIOLATION OF STATE CIVIL CONSPIRACY COMMON LAWS**
**AL, AZ, AR, CA, CO, CT, DE, FL, GA, IL, IN, IA, KS, LA, ME, MD, MA, MI, MN, MS, NV, NJ, NM, NY, NC, ND, OH, OK, OR, PA, SC, TN, TX, UT, VA, WI**
**(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

524.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

525.    This claim is brought by all plaintiffs against Defendants Novo Nordisk, Sanofi, and Eli Lilly, and alleges violations of the civil conspiracy laws of the following states: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Wisconsin.

526.    As detailed above, each of the defendant drug manufacturers separately agreed with the PBMs to commit unlawful and tortious actions in fraudulently pricing the insulin products to consumers and the public. Each defendant drug manufacturer separately shared with the PBMs the common purposes of selling, purchasing, and administering the analog insulins to individual plaintiffs and class members and deriving secret profits from thee above-alleged spread scheme. These profits are greater than either the defendant drug manufacturers or the PBMs could obtain absent their fraudulent concealment of the substantial rebates from defendant drug manufacturers to PBMs.

527.    To effectuate this common purpose, the defendant drug manufacturers periodically and systematically inflated the list prices of the analog insulins. They did so willfully, and with knowledge that class members make payments directly based on the manufacturers' list price. They then represented—either affirmatively or through half-truths and omissions—to the general public and consumers, including plaintiffs and the class, that the analog insulin list prices are a reasonable approximation of the actual cost of these medicines and a proper basis for consumer payments. The defendant drug manufacturers and PBMs then concealed from the general public

and consumers, like the plaintiffs and class members, the reality that the net prices offered to PBMs in exchange for preferred formulary positions are exponentially lower.

528.    The defendant drug manufacturers and PBMs also share a common purpose of perpetuating use of insulin list prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. With respect to the defendant drug manufacturers, these corporations would not be able to market large spreads to PBMs in exchange for favorable formulary positions without the use of the inflated list prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. The PBMs share this common purpose because, without the use of the inflated list prices, their profits on the spread between list and net prices would collapse. As a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into two general categories: (i) they keep the difference between what they pay pharmacies for drugs, which is negotiated as a percentage of list price plus dispensing costs, and what insurers pay them, which is a higher percentage of list price plus dispensing costs; (ii) they pocket a percentage of the "spread" between prices.

529.    Each defendant drug manufacturer has a systemic link to the PBMs because there are contractual relationships, financial ties, and continuing coordination of activities between them. There is a common communication network by which each defendant drug manufacturer and each PBM share information on a regular basis, including information regarding the analog insulin list prices and net prices.

530.    At all relevant times, the PBMs have been aware of the defendant drug manufacturers, have been knowing and willing participants in that conduct, and have reaped

profits from that conduct. The PBMs strike rebate deals with the defendant drug manufacturers to conceal the true net prices of the analog insulins and profit from the inflated list prices. The PBMs have represented to the public that the rebates they negotiate save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But they have known that the increasing spreads did not and do not actually decrease the net prices of the analog insulins: the list prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the common purpose of enlarging the hidden spreads between net and list price, the PBMs would have had the incentive to disclose the fraudulence of the defendant manufacturers' list prices. By failing to disclose this information, the PBMs and defendant drug manufacturers perpetuated their unlawful and tortious conduct.

531.    Further, the PBMs took instructions and commands from the defendant drug manufacturers regarding use of the analog insulin list prices, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) access rebates for placement of products on their formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants in an effort to promote products.

532.    In order to garner all of these fees from the defendant drug manufacturers, each PBM and each defendant drug manufacturer meet on a regular basis to discuss analog insulin prices, rebates, spreads, marketing opportunities, and coordination of all of the above.

533.    There is a common communication network between each PBM and each manufacturer for the purpose of implementing the rebate scheme and for the exchange of financial rewards for the PBM activities that benefit the defendant drug manufacturers.

534.     At all relevant times, each one of the PBMs was aware of the defendant drug manufacturers' spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

535.     The defendant drug manufacturers and PBMs had the unlawful intent to injure diabetic consumers of insulin, namely plaintiffs and the class, and profit from their harm. This unlawful intent lacked justification.

536.     Each defendant committed at least one overt act pursuant to and in furtherance of the common purpose or design of the conspiracy, as alleged in the preceding paragraphs.

537.     Among the unlawful and tortious acts committed pursuant to and in furtherance of the conspiracy were (i) violations of the state and federal racketeering laws, including the predicate acts of mail and wire fraud; and (ii) violations of the various state law consumer fraud statutes.

538.     Plaintiffs and the class were damaged by the conspiracy when they overpaid for insulin as a result the defendants' unlawful actions and agreement with the PBMs.

### FACTUAL ALLEGATIONS RELATED TO CONSUMER FRAUD COUNTS (COUNTS 11 THROUGH 56)[47] (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

539.     The plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

---

[47] Plaintiffs assume the Court's rulings, *see* ECF Nos. 305 and 252, on the plaintiffs' claims under various states' consumer protection statutes will apply equally to the plaintiffs' Third Amended Complaint. The plaintiffs only keep these claims in the complaint for appellate purposes.

540.    The defendant drug manufacturers' conduct set forth above constitutes unfair competition or unfair, unconscionable, deceptive, and/or fraudulent acts or practices in violation of various states' consumer protection statutes.

541.    As described above, the defendants engaged in unfair, unconscionable, and deceptive business practices prohibited by state consumer protection laws including: inflating the stated list prices of the analog insulins to achieve an unlawful purpose; making false or misleading statements or material omissions regarding the net prices of the analog insulins; making false or misleading statements or material omissions regarding the existence and amount of the analog insulins' list-to-net price spread; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. The truth about the net prices of the analog insulins as distinguished from the inflated list prices would be material to a reasonable consumer.

542.    The defendant drug manufacturers also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, unfair practices, misrepresentations, or concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission in connection with the pricing and sale of the analog insulins.

543.    From the outset, the defendants knew, but did not disclose, that the list prices they selected and published for the analog insulins did not reflect the net prices of those products. The defendant drug manufacturers knew that the list prices they selected were not reasonable approximations of the true market prices of their analog insulins. Yet they held out these list prices as reasonable approximations of the true costs of the analog insulins and reasonable bases for

consumer cost-sharing obligations with respect to these medicines. The defendant drug manufacturers substantially inflated the list prices of their analog insulins so they could offer larger spreads to the PBMs in exchange for favorable formulary positions. The defendants knew, but did not disclose, that the list-to-net price spreads did not reduce the prices paid by the plaintiffs and class members who purchased their analog insulins based on list price. The defendant drug manufacturers knowingly and deliberately misled consumers regarding the pricing of the analog insulins.

544.    Furthermore, as is set forth above, the prices the plaintiffs and class members pay for analog insulin, based on their list prices, have been skyrocketing. The analog insulins the defendant drug manufacturers are selling have not changed since they entered the marketplace in the 1990s and 2000s. These analog insulins are no more effective and provide no more benefit than they did decades ago. Nonetheless, the defendant drug manufacturers have exponentially increased their list prices.

545.    There is no economic or technological reason why analog insulin would have become more expensive to produce during the period outlined above. Indeed, with technological advances and economies of scale, the per-unit cost of analog insulin should have gone down during the same period that the defendant drug manufacturers were drastically raising prices.

546.    The defendant drug manufacturers were able to raise the list prices of insulin because consumers with diabetes literally have no choice but to purchase and use their prescribed analog insulins. If they do not, they will die, and the defendant drug manufacturers know it. Even cutting back on analog insulins to save money, as is described above, can lead to serious health consequences.

547.    The defendant drug manufacturers' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

548.    The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

549.    The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has increased the list price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM can make more money. This is a classic kickback.

550.    The defendant drug manufacturers' actions are made all the more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, giving the defendant drug manufacturers and PBMs more people to take advantage of. Moreover, each of the defendant drug manufacturers knows that the others have not and will not compete based on real

reductions in net price; they prefer to compete on inflation of list prices. Even in the absence of collusion, it is in each of the defendant drug manufacturers' individual best interest to not compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all of three.

551.    By exponentially raising the list prices on which consumer cost-sharing obligations are based, while offering the three largest PBMs significantly lower, but secret, net prices, the defendants have engaged in unfair, unconscionable, and deceptive business practices in violation of state consumer protection laws. In the course of their business, the defendants willfully failed to disclose and actively concealed the reality that their list prices are not reasonable approximations of the net prices of their analog insulins, and therefore are not reasonable basis for the class members' payments for these drugs. This course of conduct was deceptive as well as unconscionable and unfair.

552.    The defendant drug manufacturers intentionally and knowingly misrepresented material facts and/or omitted material facts regarding the true prices of the analog insulins with the intent to mislead consumers, including the plaintiffs. As alleged above, the defendant drug manufacturers, through the Manufacturer-PBM Insulin Pricing Enterprises, made material misstatements about the prices of the analog insulins and the existence and extent of rebates on these drugs. These misstatements and omissions were either false or misleading.

553.    The defendant drug manufacturers owed the plaintiffs a duty to disclose the reality that the list prices of the analog insulins were not reasonable approximations of the true costs of these medications and were not reasonable bases for the consumers' cost sharing obligations because the defendant drug manufacturers:

a. Possessed knowledge about the list prices of the analog insulins;

b. Possessed exclusive, non-public, and material information regarding the net prices of the analog insulins; and

c. Made false or incomplete representations about the prices of the analog insulins, while purposefully withholding material facts from the plaintiffs that contradicted these representations.

554. Because the defendant drug manufacturers fraudulently concealed the true prices of the analog insulins, the plaintiffs were deprived of the benefit of their bargain: they grossly overpaid for the analog insulins.

555. The defendant drug manufacturers' concealment of the analog insulin pricing fraud was material to the plaintiffs. Had the plaintiffs known that the net prices of these analog insulins were much lower, they would have demanded that the list prices on which their cost-sharing obligation were based be lowered as well.

556. The defendant drug manufacturers' unfair, unconscionable, and/or deceptive acts or practices harmed the plaintiffs. They also were likely to and did, in fact, deceive reasonable consumers, including the plaintiffs, about the true prices of the analog insulins.

557. The defendant drug manufacturers knew, or should have known, that their conduct violated state consumer protection laws.

558. As a direct and proximate result of the defendant drug manufacturers' conduct, the plaintiffs and class members have suffered injury-in-fact and/or actual damages. As a direct and proximate result of the defendant drug manufacturers' misconduct, all plaintiffs and class members who purchased the analog insulin incurred damages in the amount of the difference

between the defendant drug manufacturers' reported list prices for these medicines and their net prices for plaintiff and class member out-of-pocket payments.

559.     This wrongful conduct by the defendant drug manufacturers, coupled with the damages incurred by the plaintiffs and class members, entitles members of the class to relief under the consumer protection laws of the state in which each plaintiff or class member resides, as set forth below.

**COUNT ELEVEN**

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. STAT. ANN. § 56:8-1,** *ET SEQ.*
**(AGAINST NOVO NORDISK AND SANOFI ON BEHALF OF A NATIONWIDE**
**CLASS)**

560.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

561.     This claim is brought by all plaintiffs that have purchased the analog insulins made by Novo Nordisk. Novo Nordisk is a corporation with its headquarters in Plainsboro, New Jersey. New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries"[48] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[49] Furthermore, New Jersey has some of the "strongest

---

[48] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[49] *Kalow & Springut LLP v. Commence Corp.*, No. 07-3442 (JEI/AMD), 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, No. 04-2152, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

consumer protection laws in the nation."[50] Therefore, although other states may have some interest in protecting their own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[51]

562.    This claim is further brought by all plaintiffs that have paid for the analog insulins made by Sanofi. Sanofi is a corporation with its headquarters in Bridgewater, New Jersey.

563.    Plaintiffs seek in this Count a nationwide class applying New Jersey law to the claims against Novo Nordisk and Sanofi.

564.    The New Jersey Consumer Fraud Act (NJCFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."[52]

565.    Novo Nordisk, Sanofi, and the plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

---

[50] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

[51] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

[52] N.J. Stat. Ann. § 56:8-2.

- 203 -

566.    Novo Nordisk and Sanofi engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

567.    As described above, Novo Nordisk and Sanofi engaged in deceptive business practices prohibited by the NJCFA, including artificially inflating the publicly reported list prices of their analog insulins; misrepresenting, affirmatively and/or through omission, that their list prices were reasonable approximations of the true prices of these medicines; concealing and/or misrepresenting the net prices of their analog insulins; concealing and/or misrepresenting the existence and amount of the list-to-net price spreads for their analog insulins; and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce. In violation of the NJCFA, these acts and omissions constitute "unconscionable commercial practice[s], deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission in connection with the sale"[53] and pricing of their analog insulins.

568.    From the outset, Novo Nordisk and Sanofi knew, but did not disclose, that the list prices they selected and published for their analog insulins did not reflect the true prices of those products. They created substantial spreads between the list and net prices of those medications and they knew these spreads resulted in windfalls to the PBMs. Novo Nordisk and Sanofi offered these spreads to CVS, Express Scripts, and OptumRx in exchange for their agreement to grant exclusive or at least favorable placement on their formularies.

---

[53] N.J. Stat. Ann. § 56:8-2.

569.     Novo Nordisk and Sanofi knew, but did not disclose, that the list-to-net price spreads injured consumers who paid for all or part of their prescriptions out-of-pocket based on list prices. Novo Nordisk and Sanofi knowingly and deliberately misled consumers regarding the existence, purpose, and extent of net price reductions off list prices. Novo Nordisk and Sanofi knowingly and deliberately misled consumers as to whether the list prices were reasonable approximations of the true prices of these medicines and, therefore, reasonable bases for consumer cost-sharing obligations.

570.     By failing to disclose the net prices they offered to PBMs and by actively concealing this pricing deceit, Novo Nordisk, and Sanofi engaged in unfair and deceptive business practices in violation of the NJCFA. In the course of Novo Nordisk's and Sanofi's business, they willfully failed to disclose and actively concealed their misrepresentations regarding list prices.

571.     Novo Nordisk and Sanofi intentionally and knowingly misrepresented material facts regarding the true prices of their analog insulins with the intent to mislead consumers, including plaintiffs.

572.     Novo Nordisk's and Sanofi's conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

573.     The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program

that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

574.    The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturers' net selling prices—to the extent that the manufacturers have increased the list prices to make up for an increased "rebate," all that they have done is created a widened spread from which the PBM can make more money. This is a classic kickback.

575.    Novo Nordisk and Sanofi owed the plaintiffs a duty to disclose the fact that each list price did not approximate its true price because each:

      a.    Possessed exclusive knowledge about the means by which they selected the list prices;

      b.    Knew material, non-public information regarding the existence and amount of the spreads between the list and net prices; and

      c.    Made incomplete representations about the prices of their analog insulins, while purposefully withholding material facts from the plaintiffs that contradicted these representations.

576.    The truth about the actual prices of these medicines, as distinguished from their inflated list prices, would be material to a reasonable consumer.

577.    Novo Nordisk's and Sanofi's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the plaintiffs.

578.    Novo Nordisk and Sanofi knew, or should have known, that their conduct violated the NJCFA.

579.    As a direct and proximate result of Novo Nordisk's and Sanofi's violations of the NJCFA, the plaintiffs and class members have suffered injury-in-fact and/or actual damages. As a direct and proximate result of Novo Nordisk's and Sanofi's misconduct, all plaintiffs and class members incurred damages in the amount of the difference between Novo Nordisk's and Sanofi's reported list prices and their net prices for their analog insulins.

580.    This wrongful conduct by Novo Nordisk and Sanofi, coupled with the damages the plaintiffs and class members incurred, entitles members of the class to relief under the NJCFA. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[54] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[55] Therefore, the plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and

---

[54] N.J. Stat. Ann. § 56:8-19.

[55] *Id.*

reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

COUNT TWELVE

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. STAT. ANN. § 56:8-1,** *ET SEQ.*
**(AGAINST NOVO NORDISK AND SANOFI ON BEHALF OF A NATIONWIDE**
**CLASS)**

581.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

582.    This claim is brought by all plaintiffs that have purchased the analog insulins made by Novo Nordisk. Novo Nordisk is a corporation with its headquarters in Plainsboro, New Jersey. New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries"[56] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[57] Furthermore, New Jersey has some of the "strongest consumer protection laws in the nation."[58] Therefore, although other states may have some interest in protecting their own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's

---

[56] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[57] *Kalow & Springut LLP v. Commence Corp.*, No. 07-3442 (JEI/AMD), 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, No. 04-2152, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[58] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

- 208 -

law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[59]

583.    This claim is further brought by all plaintiffs that have paid for the analog insulins made by Sanofi. Sanofi is a corporation with its headquarters in Bridgewater, New Jersey.

584.    Plaintiffs seek in this Count a nationwide class applying New Jersey law to the claims against Novo Nordisk and Sanofi.

585.    In addition to prohibiting fraudulent and deceptive conduct, the NJCFA prohibits unfair or unconscionable conduct.

586.    Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[60] Unconscionable practices include performance of an agreement, in addition to inducing a purchase.[61] Charging a price far in excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the NJCFA.[62]

587.    As the Third Circuit recently recognized, "unfair" and "unconscionable" business practices are "a category of business practices entirely separate from practices that are fraudulent,

---

[59] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

[60]    *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

[61]    *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. April 18, 2011) (citing *New Mea Constr. Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

[62]    *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Grp., LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equip. Rental*, No. 06-cv-03830, 2012 WL 12906183 (D.N.J. June 25, 2012).

deceptive, or misleading" prohibited under the NJCFA.[63] The NJCFA "prohibit[s] business practices that are 'unfair' or 'unconscionable' in addition to practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them."[64]

588.     As is set forth above, the prices the plaintiffs and class members pay for analog insulin, based on their list prices, have been skyrocketing. This overpayment is a result of Novo Nordisk's and Sanofi's spread scheme, wherein they sell larger list prices, and therefore spreads, to the largest PBMs in exchange for preferred formulary positions.

589.     The analog insulins Novo Nordisk and Sanofi are selling have not changed since they entered the marketplace in the 1990s and 2000s. These analog insulins are no more effective and provide no more benefit than they did decades ago. Nonetheless, the Novo Nordisk and Sanofi have exponentially increased their list prices.

590.     There is no economic or technological reason why analog insulin would have become more expensive to produce during the period outlined above. Indeed, with technological advances and economies of scale, the per-unit cost of analog insulin should have gone down during the same period that Novo Nordisk and Sanofi were drastically raising prices.

591.     Novo Nordisk and Sanofi were able to raise the list prices of insulin because consumers with diabetes literally have no choice but to purchase and use their prescribed analog

---

[63] *Cottrell v. Alcon Labs.*, 874 F.3d 154, 165 (3d Cir. 2017).

[64] *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, "even if no person was in fact misled or deceived thereby").

insulins. If they do not, they will die, and Novo Nordisk and Sanofi know it. Even cutting back on analog insulins to save money, as is described above, can lead to serious health consequences.

592.    These actions are made all the more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, giving Novo Nordisk, Sanofi, and PBMs more people of whom they can take advantage. Moreover, Novo Nordisk and Sanofi know that the other has not and will not compete based on real reductions in net price; each prefers to compete on inflation of list prices. Even in the absence of collusion, it is in each of Novo Nordisk's and Sanofi's individual best interest to not compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all three.

593.    The plaintiffs, on behalf of the class, therefore allege that Novo Nordisk and Sanofi, in violation of N.J. Stat. Ann. § 56:8-2, have engaged in an unconscionable commercial practice in connection with their sale and pricing of the analog insulins.

594.    The plaintiffs and other class members have suffered ascertainable losses as a result of the defendants' unfair and unconscionable act complained of herein. Under N.J. Stat. Ann. § 56:8-19, they are entitled to relief in the amount of Novo Nordisk's and Sanofi's overcharges: the difference between the list prices for their analog insulins and a reasonable approximation of their net prices. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[65] Furthermore, "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained

---

[65] N.J. Stat. Ann. § 56:8-19.

by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[66] Therefore, the plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

**COUNT THIRTEEN**

**VIOLATION OF THE ALABAMA DECEPTIVE
TRADE PRACTICES ACT
ALA. CODE § 8-19-1, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

595.    The Alabama plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

596.    This claim is brought by the Alabama plaintiffs on behalf of residents of Alabama who are members of the class.

597.    The Alabama Deceptive Trade Practices Act (Alabama DTPA) declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."[67]

598.    Plaintiffs and class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

---

[66] *Id.*

[67] Ala. Code § 8-19-5.

599.    Plaintiffs, class members, and defendants are "persons" within the meaning of Ala. Code § 8-19-3(3).

600.    Each defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

601.    As alleged in this complaint, the defendant drug manufacturers have made "false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions"[68] with respect to their analog insulins.

602.    The defendants' conduct, as described in this complaint, also constitutes "unconscionable, false, misleading, [and] deceptive act or practice in the conduct of trade or commerce."[69]

603.    Pursuant to Ala. Code § 8-19-10, plaintiffs seek monetary relief against defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

604.    Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code § 8-19-1, *et seq.*

605.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Ala. Code § 8-19-10(e) to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

---

[68] *Id.*

[69] *Id.*

## COUNT FOURTEEN

### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
### ARIZ. REV. STAT. § 44-1521, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

606.    The Arizona plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

607.    This claim is brought by the Arizona plaintiffs on behalf of residents of Arizona who are members of the class.

608.    The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."[70]

609.    The defendants, plaintiffs, and class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

610.    Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

611.    The defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

---

[70] Ariz. Rev. Stat. § 44-1522(A).

612.     As alleged in this complaint, the defendants have employed "deception," "fraud, false pretense, false promise, misrepresentation, [and/]or concealment"[71] with respect to their analog insulins.

613.     The Defendant drug manufacturers' conduct, as described in this complaint, also constitutes "unfair act[s]."[72]

614.     Pursuant to the Arizona CFA, the plaintiffs seek monetary relief against each defendant in an amount to be determined at trial. The plaintiffs also seek punitive damages because the defendants have engaged in conduct that is wanton, reckless, or shows spite or ill-will,[73] and/or acted with reckless indifference to the interests of others.[74]

615.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT FIFTEEN

**VIOLATION OF THE ARKANSAS
DECEPTIVE TRADE PRACTICES ACT
ARK. CODE § 4-88-101, *ET SEQ.*
(AGAINST ELI LILLY AND NOVO NORDISK)**

616.     The Arkansas plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

---

[71] *Id.*

[72] *Id.*

[73] *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 577 (1974); *Lufty v. R. D. Roper & Sons Motor Co.*, 57 Ariz. 495, 115 P.2d 161 (1941).

[74] *See Sellinger*, 110 Ariz. at 577; *McNelis v. Bruce*, 90 Ariz. 261 (1961).

617.     This claim is brought by the Arkansas plaintiffs on behalf of residents of Arkansas who are members of the class.

618.     The Arkansas Deceptive Trade Practices Act (Arkansas DTPA) prohibits "[d]eceptive and unconscionable trade practices,"[75] which include, but are not limited to, "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade."[76] The Arkansas DTPA also prohibits "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A) Physical infirmity; (B) Ignorance; . . . or (E) A similar factor."[77] The statute further bars, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission."[78]

619.     Defendants, plaintiffs, and class members are "persons" within the meaning of Ark. Code § 4-88-102(5).

620.     Each drug at issue constitutes "goods" within the meaning of Ark. Code § 4-88-102(4).

621.     As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unconscionable" and "deceptive" acts in violation of the Arkansas DTPA.

---

[75] Ark. Code. § 4-88-107(a).

[76] *Id.* § 4-88-107(a)(10).

[77] *Id.* § 4-88-107(a)(8).

[78] *Id.* § 4-88-108.

622.     Plaintiffs seek monetary relief against defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because defendants acted wantonly in causing plaintiffs' and class members' injuries or with such a conscious indifference to the consequences that malice may be inferred.

623.     Plaintiffs also seek an order enjoining defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT SIXTEEN

### VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
### CAL. CIV. CODE § 1750, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

624.     The California plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

625.     This claim is brought by the California plaintiffs on behalf of residents of California who are members of the class.

626.     The California Legal Remedies Act (CLRA) prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer,"[79] including: "Making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions."[80]

627.     Each defendant is a "person" under Cal. Civ. Code § 1761(c).

---

[79] Cal. Civ. Code § 1770(a).

[80] *Id.* § 1770(a)(13).

628.    The plaintiffs and class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased one or more analog insulin at issue.

629.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts in violation of the CLRA.

630.    The plaintiffs seek injunctive relief under the CLRA for the defendants' violations of Cal. Civ. Code § 1770. On January 24, 2017, and January 25, 2017, the plaintiffs sent demand letters notifying the defendants of such claims for relief pursuant to Cal. Civ. Code § 1782(d). Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

631.    The plaintiffs also seek, under Cal. Civ. Code § 1780(a), monetary relief against the Defendant drug manufacturers for the harm their violations of the CLRA caused the plaintiffs.

632.    Under Cal. Civ. Code § 1780(b), the plaintiffs seek an additional award against each defendant of up to $5,000 for each plaintiff or class member who qualifies as a "senior citizen" or "disabled person" under the CLRA. Each defendant knew or should have known that its conduct was directed to one or more plaintiffs or class members who are senior citizens or disabled persons. The defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more plaintiffs or class members who are senior citizens or disabled persons are substantially more vulnerable to each defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from each defendant's conduct.

633.    The plaintiffs further seek an order enjoining defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA. The plaintiffs sent letters complying with Cal. Civ. Code § 1780(b) on January 24, 2017, and January 25, 2017, to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT SEVENTEEN

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

634.    The California plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

635.    This claim is brought by the California plaintiffs on behalf of residents of California who are members of the class.

636.    California Business and Professions Code § 17200 (UCL) prohibits "unlawful, unfair, or fraudulent business acts or practices."

637.    The defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, as described above.

638.    Defendants also violated the "fraudulent" prong of § 17200 through their pricing fraud, as described throughout this complaint.

639.    In addition, the defendants violated the "unfair" prong of § 17200[81] because the defendants' acts and practices described in this complaint, including artificial inflation of list prices to offer large rebates to the PBMs, caused the Defendant drug manufacturers to profit at the expense of consumers.

640.    The California courts have set out several definitions of unfairness. The Defendant drug manufacturers' conduct is unfair under each of them:

a.      "[T]he consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[82]

b.      The Defendant drug manufacturers' conduct "offends an established public policy [the FTC Policy Statement on Unfairness] or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[83]

c.      The plaintiffs' claim is predicated upon public policy which is "'tethered' to specific constitutional, statutory or regulatory provisions."[84]

641.    The defendants' actions, as set forth above, occurred within the conduct of their business and in trade or commerce.

---

[81] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." (internal quotation marks and citation omitted)).

[82] *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).

[83] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001)).

[84] *See West*, 214 Cal. App. at 806 (quoting *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003)).

642.    Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute.

643.    The plaintiffs request that this Court enter such orders or judgments as may be necessary, including: a declaratory judgment that each defendant has violated the UCL; an order enjoining the defendants from continuing their unfair, unlawful, and/or fraudulent trade practices; an order restoring to the plaintiffs any money lost as result of each defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits the defendants received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

644.    In addition, under Cal. Civ. Proc. Code § 1021.5, the Court "may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

## COUNT EIGHTEEN

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### COLO. REV. STAT. § 6-1-101, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

645.    The Colorado plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

646.     This claim is brought by the Colorado plaintiffs on behalf of residents of Colorado who are members of the class.

647.     The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business including, but not limited to: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."[85]

648.     Each defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

649.     Plaintiffs and class members are "consumers" for purposes of Colo. Rev. Stat. § 6-1-113(1)(a).

650.     Each defendant's conduct, as set forth above, occurred in the conduct or trade or commerce.

651.     As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was

---

[85] Colo. Rev. Stat. § 6-1-105(1).

known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction"[86] in violation of the Colorado CPA.

652.     Under Colo. Rev. Stat. § 6-1-113, plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages and (b) statutory damages in the amount of $500 for each plaintiff or class member.

653.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT NINETEEN

### VIOLATION OF THE CONNECTICUT
### UNFAIR TRADE PRACTICES ACT
### CONN. GEN. STAT. § 42-110A, ET SEQ.
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

654.     The Connecticut plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

655.     This claim is brought by the Connecticut plaintiffs on behalf of residents of Connecticut who are members of the class.

656.     The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[87]

---

[86] *Id.*

[87] Conn. Gen. Stat. § 42-110b(a).

657.    Each defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

658.    The defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

659.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes both "unfair" and "deceptive" acts in violation of the Connecticut UTPA.

660.    The plaintiffs and class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

661.    The defendants acted with reckless indifference to another's rights or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

662.    Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Conn. Gen. Stat. § 42-110g(d).

## COUNT TWENTY

### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### DEL. CODE TIT. 6, § 2513, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

663.    The Delaware plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

664.    This claim is brought by the Delaware plaintiffs on behalf of residents of Delaware who are members of the class.

665.     The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."[88]

666.     Each defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

667.     The defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

668.     As alleged in this complaint, the defendants' conduct with respect to the analog insulins violated the Delaware CFA.

669.     The plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each defendant's unlawful conduct.[89] The plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

670.     The defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

### COUNT TWENTY-ONE

### VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### FLA. STAT. § 501.201, *ET SEQ.*

### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

---

[88] Del. Code tit. 6, § 2513(a).

[89] *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).

671.     The Florida plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

672.     This claim is brought by the Florida plaintiffs on behalf of residents of Florida who are members of the class.

673.     The Florida Unfair and Deceptive Trade Practices Act (FUDTPA) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[90]

674.     In outlawing unfair acts or practices, the Florida Legislature adopted the FTC's interpretations of § 5(a)(1) of the Federal Trade Commission Act.[91] The Legislature specifically stated that a violation of FUDTPA "may be based upon . . . [t]he standards of unfairness . . . set forth and interpreted by the Federal Trade Commission or the federal courts."[92]

675.     The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the FUDTPA.

676.     In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the FUDTPA.[93]

677.     Plaintiffs and class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

---

[90] Fla. Stat. § 501.204(1).

[91] *Id.* § 501.204(2).

[92] *Id.* § 501.203(3)(b).

[93] *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice" under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and noting a separate definition for "deception" (internal quotation marks and citation omitted)).

678.     Each defendant engaged in "trade or commerce" within the meaning of Fla. Stat. §

501.203(8).

679.     The Florida Legislature has provided that a person who has suffered a loss as a

result of a violation of FUDTPA may recover actual damages, plus attorneys' fees and court costs,

all of which the plaintiffs seek in this action. The plaintiffs are entitled to recover their actual

damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

680.     FUDTPA provides that "[a]nyone aggrieved by a violation of this part may bring an

action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a

person who has violated, is violating, or is otherwise likely to violate this part."[94] The plaintiffs seek

an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief,

and any other just and proper relief available under the FUDTPA.

## COUNT TWENTY-TWO

### VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT OF 1975 GA. CODE ANN. § 10-1-390, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

681.     The Georgia plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs of this Third Amended Complaint.

682.     This claim is brought by the Georgia plaintiffs on behalf of residents of Georgia

who are members of the class.

683.     The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or

deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices

---

[94] Fla. Stat. § 501.211(1).

in trade or commerce" to be unlawful.[95] Such acts include, but are not limited to: "[a]dvertising goods or services with intent not to sell them as advertised"; and "[m]aking false or misleading statements concerning the reasons for, existence of, or amounts of price reductions."[96]

684.     Plaintiffs and class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-393(b).

685.     Each defendant engaged in "trade or commerce" within the meaning of Ga. Code Ann. § 10-1-393(b).

686.     As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes "[a]dvertising goods or services with intent not to sell them as advertised" and "[m]aking false or misleading statements concerning the reasons for, existence of, or amounts of price reductions."[97]

687.     The plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) under Ga. Code Ann. § 10-1-399(a).

688.     The plaintiffs also seek an order: enjoining the defendants' unfair, unlawful, and/or deceptive practices; attorneys' fees; and any other just and proper relief available under the Georgia FBPA.

689.     On January 24 and 25, 2017, certain plaintiffs sent letters complying with Ga. Code Ann. § 10-1-399(b) to the defendants.

---

[95] Ga. Code. Ann. § 101-393(a).

[96] *Id.* § 10-1-393(b).

[97] *Id.*

## COUNT TWENTY-THREE

## VIOLATION OF THE GEORGIA UNIFORM
## DECEPTIVE TRADE PRACTICES ACT
## GA. CODE ANN. § 10-1-370, *ET SEQ.*
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

690.    The Georgia plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

691.    This claim is brought by the Georgia plaintiffs on behalf of residents of Georgia who are members of the class.

692.    Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include: "Mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[98]

693.    The defendants, plaintiffs, and class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

694.    As alleged in this complaint, the defendants' conduct with respect to the analog insulins constitutes making "false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in . . .conduct which similarly creates a likelihood of confusion or of misunderstanding."[99]

695.    The plaintiffs seek an order that enjoin each defendant's unfair, unlawful, and/or deceptive practices, awards attorneys' fees, and awards any other just and proper relief available under Ga. Code Ann. § 10-1-373.

---

[98] Ga. Code Ann § 10-1-372(a).

[99] *Id.*

COUNT TWENTY-FOUR

VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE
BUSINESS PRACTICES ACT
815 ILL. COMP. STAT. § 505/1, *ET SEQ.*
(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

696.    The Illinois plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

697.    This claim is brought by the Illinois plaintiffs on behalf of residents of Illinois who are members of the class.

698.    The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."[100]

699.    That section also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[101]

700.    Each defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

701.    The plaintiffs and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

---

[100] 815 Ill. Comp. Stat. § 505/2.

[101] *Id.*

- 230 -

702.   The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the ICFA.

703.   In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the ICFA.[102]

704.   The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . . ."[103] Pursuant to this provision of the code, the plaintiffs seek monetary relief against each defendant in the amount of actual damages, as well as punitive damages because defendants each acted with fraud and/or malice and/or was grossly negligent.

705.   The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

## COUNT TWENTY-FIVE

### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### IND. CODE § 24-5-0.5-2, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

706.   The Indiana plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

---

[102] *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (stating that "[a] plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct" and "may allege that conduct is unfair . . . without alleging that the conduct is deceptive").

[103] 815 Ill. Comp. Stat. § 505/10a.

707.     This claim is brought by the Indiana plaintiffs on behalf of residents of Indiana who are members of the class.

708.     Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a supplier from committing "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction."[104] Such acts and practices include, but are not limited to, representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not."[105]

709.     Each defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2) and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

710.     Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

711.     The defendants' conduct, as described in this complaint, constitutes "deceptive acts" as well as "unfair" acts in violation of the Indiana DCSA.

712.     Under Ind. Code § 24-5-0.5-4, the plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for defendants' willfully deceptive acts.

713.     The plaintiffs also seek punitive damages based on the outrageousness and recklessness of each defendant's conduct.

---

[104] Ind. Code § 24-5-0.5-3(a).

[105] *Id.* § 24-5-0.5-3(b).

714.     The plaintiffs also seek an order enjoining each defendant's unfair and/or

deceptive acts or practices, attorneys' fees, and any other just and proper relief available under Ind.

Code § 24-5-0.5-4.

715.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying

with Ind. Code § 24-5-0.5-5(a) to the defendants. Because each defendant failed to remedy its

unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which

they are entitled.

## COUNT TWENTY-SIX

### VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### IOWA CODE § 714H.1, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

716.     The Iowa plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs of this Third Amended Complaint.

717.     This claim is brought by the Iowa plaintiffs on behalf of residents of Iowa who are

members of the class.

718.     The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits

any "practice or act the person knows or reasonably should know is an unfair practice, deception,

fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or

omission of a material fact, with the intent that others rely upon the unfair practice, deception,

fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in

connection with the advertisement, sale, or lease of consumer merchandise."[106]

---

[106] Iowa Code § 714H.3.1.

719.    Each defendant is a "person" under Iowa Code § 714H.2(7).

720.    The plaintiffs and class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased insulin.

721.    The defendants' conduct, as described in this complaint, constitutes "deceptive" practices as well as "unfair" practices in violation of the Iowa CFA.

722.    Pursuant to Iowa Code § 714H.5, the plaintiffs seek: an order enjoining each defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of each defendant's willful and wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

723.    Furthermore, pursuant to Iowa Code § 714H.7, the plaintiffs have obtained the permission of the Iowa Attorney General to file this Third Amended Complaint because it is "materially the same" as the original complaint, for which the plaintiffs obtained permission to file.

## COUNT TWENTY-SEVEN

### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### KAN. STAT. § 50-623, *ET SEQ.*
### (AGAINST NOVO NORDISK)

724.    The Kansas plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

725.    This claim is brought by the Kansas plaintiffs on behalf of residents of Kansas who are members of the class.

726.    The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."[107] Deceptive acts or practices include, but are not limited to: "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; and "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions."[108] These acts constitute deceptive conduct "whether or not any consumer has in fact been misled."[109]

727.    Plaintiffs and class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased insulin.

728.    The sale of insulin to plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

729.    The defendants' conduct, as described in this complaint, constitutes "deceptive" practices in violation of the Kansas CPA.

730.    Under Kan. Stat. Ann. § 50-634, the plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

---

[107] Kan. Stat. § 50-626(a).

[108] *Id.* § 50-626(b).

[109] *Id.*

731.     The plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT TWENTY-EIGHT

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW LA. REV. STAT. § 51:1401, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

732.     The Louisiana plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

733.     This claim is brought by the Louisiana plaintiffs on behalf of residents of Louisiana who are members of the class.

734.     The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."[110]

735.     The defendants, plaintiffs, and class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).

736.     The plaintiffs and class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

737.     Each defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

---

[110] La. Rev. Stat. § 51:1405(A).

738.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" practices in violation of the Louisiana CPL.

739.     Pursuant to La. Rev. Stat. § 51:1409, plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; an order enjoining each defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

## COUNT TWENTY-NINE

### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

740.     The Maine plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

741.     This claim is brought by the Maine plaintiffs on behalf of residents of Maine who are members of the class.

742.     The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[111]

743.     The defendants, plaintiffs, and class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

744.     The defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

---

[111] Me. Rev. Stat. tit. 5, § 207.

745.     The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maine UTPA.

746.     Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, the plaintiffs seek an order enjoining each defendant's unfair and/or deceptive acts or practices.

747.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A) to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT THIRTY

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### MD. COM. LAW CODE § 13-101, *ET SEQ.*
### (AGAINST ELI LILLY AND NOVO NORDISK)

748.     The Maryland plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

749.     This claim is brought by the Maryland plaintiffs on behalf of residents of Maryland who are members of the class.

750.     The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice, including: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"; "Failure to state a material fact if the failure deceives or tends to deceive"; "False or misleading representation[s] of fact which concern[] . . . [t]he reason for or the existence or amount of a price reduction"; and "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment,

suppression, or omission of any material fact with the intent that a consumer rely on the same."[112] The statute further provides that a person may not engage in such conduct regardless of whether the consumer is actually deceived or damaged.[113]

751.    Defendants, plaintiffs, and class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

752.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maryland CPA.

753.    Pursuant to Md. Code, Com. Law § 13-408, plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

754.    The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under Md. Code, Com. Law § 13-406.

## COUNT THIRTY-ONE

### VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

755.    The Massachusetts plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

756.    This claim is brought by the Massachusetts plaintiffs on behalf of residents of Massachusetts who are members of the class.

---

[112] Md. Code, Com. Law § 13-301.

[113] *Id.* § 13-302.

757.    Massachusetts law (the Massachusetts Act) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[114]

758.    The defendants, plaintiffs, and class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

759.    Each defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

760.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Massachusetts Act.

761.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, the plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff. Because the defendants' conduct was committed willfully and knowingly, the plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

762.    The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

763.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Mass. Gen. Laws ch. 93A, § 9(3) to the defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

---

[114] Mass. Gen. Laws ch. 93A, § 2.

## COUNT THIRTY-TWO

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### MICH. COMP. LAWS § 445.902, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

764.    The Michigan plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

765.    This claim is brought by the Michigan plaintiffs on behalf of residents of Michigan who are members of the class.

766.    The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."[115]

767.    Plaintiffs and class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

768.    Each defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

---

[115] Mich. Comp. Laws § 445.903(1).

769. The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Michigan CPA.

770. The plaintiffs seek: injunctive against the defendants to prevent their continuing unfair and deceptive acts; monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

771. The plaintiffs also seek punitive damages because each defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented the actual price of their analog insulins, inflated their list prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. They manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford a life-saving product. The defendants' conduct constitutes malice, oppression, and fraud, warranting punitive damages.

## COUNT THIRTY-THREE

### VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT MINN. STAT. § 325F.68, *ET SEQ.* (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

772. The Minnesota plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

773. This claim is brought by the Minnesota plaintiffs on behalf of residents of Minnesota who are members of the class.

774.    The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."[116]

775.    Each purchase of analog insulin constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

776.    The defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota CFA.

777.    Pursuant to Minn. Stat. § 8.31(3a), the plaintiffs seek actual damages, attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota CFA.

778.    The plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT THIRTY-FOUR

### VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT
### MINN. STAT. §§ 325D.43-48, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

779.    The Minnesota plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

---

[116] Minn. Stat. § 325F.69(1).

780.     This claim is brought by the Minnesota plaintiffs on behalf of residents of Minnesota who are members of the class.

781.     The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[117]

782.     The defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota DTPA.

783.     Pursuant to Minn. Stat. §§ 325 D.45, F.70, the plaintiffs seek actual damages, attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota DTPA.

784.     The plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT THIRTY-FIVE

### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### MO. REV. STAT. § 407.010, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

785.     The Missouri plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

786.     This claim is brought by the Missouri plaintiffs on behalf of residents of Missouri who are members of the class.

---

[117] Minn. Stat. § 325D.44.

787.    The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."[118]

788.    The defendant, plaintiffs, and class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

789.    The defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

790.    The defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Missouri MPA.

791.    The defendants are liable to the plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT THIRTY-SIX

## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
## NEV. REV. STAT. § 598.0903, *ET SEQ.*
## (AGAINST SANOFI)

792.    The Nevada plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

793.    This claim is brought by the Nevada plaintiffs on behalf of residents of Nevada who are members of the class.

---

[118] Mo. Rev. Stat. § 407.020.1.

794.    The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions"[119]; "[k]nowingly makes any other false representation in a transaction"[120]; "[f]ails to disclose a material fact in connection with the sale or lease of goods or services"[121]; and/or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion."[122]

795.    The defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Nevada CTPA.

796.    The plaintiffs seek their actual damages, punitive damages, an order enjoining the defendants' deceptive acts or practices, costs of court, attorneys' fees, and all other appropriate and available remedies under Nev. Rev. Stat. § 41.600.

---

[119] Nev. Rev. Stat. § 598.0915.

[120] *Id.*

[121] *Id.* § 598.0923.

[122] *Id.* § 598.0925.

## COUNT THIRTY-SEVEN

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. STAT. ANN. § 56:8-1, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

797.    The New Jersey plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

798.    This claim is brought by the New Jersey plaintiffs on behalf of residents of New Jersey who are members of the class.

799.    The New Jersey Consumer Fraud Act (NJCFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."[123]

800.    The defendants, plaintiffs, and class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

801.    The defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

802.    As described above, the defendants' conduct, as described in this complaint, constitutes "deceptive," "unfair," and "unconscionable" acts or practices in violation of the NJCFA.

---

[123] N.J. Stat. Ann. § 56:8-2.

803.    This wrongful conduct by the defendants, coupled with the damage the New Jersey plaintiffs and class members incurred, entitles members of the class to relief under the NJCFA. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[124] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[125]

804.    Therefore, the plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT THIRTY-EIGHT

### VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### N.M. STAT. § 57-12-1, *ET SEQ.*
### (AGAINST NOVO NORDISK AND SANOFI)

805.    The New Mexico plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

806.    This claim is brought by the New Mexico plaintiffs on behalf of residents of New Mexico who are members of the class.

---

[124] N.J. Stat. Ann. § 56:8-19.

[125] *Id.*

807.    The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to: "making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction"; "making false or misleading statements of fact for the purpose of obtaining appointments for the demonstration, exhibition or other sales presentation of goods or services"; and/or "failing to state a material fact if doing so deceives or tends to deceive."[126]

808.    The New Mexico UTPA further makes unlawful "unconscionable trade practice[s]," meaning "an act or practice in connection with the sale . . . or in connection with the offering for sale . . . of any goods or services, . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."[127]

809.    The defendants, plaintiffs, and class members are "person[s]" under N.M. Stat. § 57-12-2.

810.    The defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. § 57-12-2.

---

[126] N.M. Stat. Ann. § 57-12-2(D).

[127] *Id.* § 57-12-2(E).

811.     The defendants' conduct, as described in this complaint, constitutes a pattern of "false or misleading oral or written statement[s]" in violation of N.M. Stat. Ann. § 57-12-2(D).

812.     The defendants' conduct, as described in this complaint, also constitutes a pattern of "unconscionable trade practice[s]" in violation of N.M. Stat. Ann. § 57-12-2(E).

813.     Because the defendants' false, unconscionable, and willful conduct caused actual harm to the plaintiffs, the plaintiffs seek recovery of: actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; reasonable attorneys' fees and costs; injunctive relief, and all other proper and just relief available under N.M. Stat. § 57-12-10.

## COUNT THIRTY-NINE

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### N.Y. GEN. BUS. LAW §§ 349-350
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

814.     The New York plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

815.     This claim is brought by the New York plaintiffs on behalf of residents of New York who are members of the class.

816.     The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."[128]

817.     The plaintiffs and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

818.     Each defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

---

[128] N.Y. Gen. Bus. Law § 349.

819. The defendants' conduct, as described in this complaint, constitutes deceptive acts in violation of the New York GBL.

820. The defendants' deceptive acts and practices, which were intended to mislead consumers who purchased analog insulin, constitutes conduct directed at consumers.

821. Because the defendants' willful and knowing conduct caused injury to the plaintiffs, the plaintiffs seek recovery of: actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining defendants' unlawful conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT FORTY**

**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**N.C. GEN. STAT. § 75-1.1, *ET SEQ.***
**(AGAINST NOVO NORDISK AND SANOFI)**

822. The North Carolina plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

823. This claim is brought by the North Carolina plaintiffs on behalf of residents of North Carolina who are members of the class.

824. North Carolina's Unfair and Deceptive Acts and Practices Act (NCUDTPA) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."[129]

825. The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the NCUDTPA.

---

[129] N.C. Gen. Stat. § 75-1.1(a).

826.     In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the NCUDTPA.[130]

827.     Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

828.     Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages: "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict."[131]

829.     The plaintiffs seek an order trebling their actual damages, an order enjoining defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## COUNT FORTY-ONE

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### N.D. CENT. CODE § 51-15-02
### (AGAINST ELI LILLY)

830.     The North Dakota plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

---

[130] *Melton v. Family First Mortg. Corp.*, 576 S.E.2d 365, 368 (2003) ("A practice is unfair [under the NCUDTPA] when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" and offering a separate definition for "deceptive" practices (internal quotation marks and citations omitted)).

[131] N.C. Gen. Stat. § 75-16.

831.     This claim is brought by the North Dakota plaintiffs on behalf of residents of North Dakota who are members of the class.

832.     The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice."[132] The statute further provides that the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice."[133]

833.     The defendants, plaintiffs, and class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

834.     The defendants engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

835.     The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the North Dakota CFA.

836.     In addition, the defendants' conduct, as described in this complaint, constitutes "unconscionable conduct" acts in violation of the North Dakota CFA.

---

[132] N.D. Cent. Code § 51-15-02.

[133] *Id.*

837.    The defendants knowingly committed the conduct described above. As a result,

under N.D. Cent. Code § 51-15-09, the defendants are liable to the plaintiffs for treble damages in

amounts to be proven at trial, attorneys' fees, costs, and disbursements. The plaintiffs further seek

an order enjoining each defendant's unfair and/or deceptive acts or practices as well as other just

and proper available relief under the North Dakota CFA.

## COUNT FORTY-TWO

### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

838.    The Ohio plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs of this Third Amended Complaint.

839.    This claim is brought by the Ohio plaintiffs on behalf of residents of Ohio who are

members of the class.

840.    The Ohio Consumer Sales Practices Act (Ohio CSPA) broadly prohibits "unfair or

deceptive act[s] or practice[s] in connection with a consumer transaction."[134] Specifically, and

without limitation on the broad prohibition, the Ohio CSPA prohibits suppliers from representing

that "a specific price advantage exists, if it does not."[135]

841.    Each defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann.

§ 1345.01(C).

842.    The plaintiffs and class members are "consumers" as that term is defined in Ohio

Rev. Code Ann. § 1345.01(D).

---

[134] Ohio Rev. Code Ann. § 1345.02.

[135] *Id.*

- 254 -

843.    The plaintiffs' purchases of analog insulins are "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

844.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Ohio CSPA.

845.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the Ohio CSPA.

846.    As a result of the defendants' wrongful conduct, the plaintiffs have been damaged in an amount to be proven at trial. They seek all just and proper remedies, including, but not limited to: actual and statutory damages, an order enjoining defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.*

## COUNT FORTY-THREE

### VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### OKLA. STAT. TIT. 15, § 751, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

847.    The Oklahoma plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

848.    This claim is brought by the Oklahoma plaintiffs on behalf of residents of Oklahoma who are members of the class.

849.    The Oklahoma Consumer Protection Act (Oklahoma CPA) declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the

subject of a consumer transaction or the reason for, existence of, or amounts of price reduction"[136]

and/or "any practice which offends established public policy or if the practice is immoral,

unethical, oppressive, unscrupulous or substantially injurious to consumers."[137]

850.    The Oklahoma CPA further provides that if "[t]he commission of any act or

practice declared to be a violation of the Consumer Protection Act" "is also found to be

unconscionable," the violator is liable to the aggrieved customer for the payment of a civil penalty,

recoverable in an individual action only, in a sum set by the court of not more than Two Thousand

Dollars ($2,000.00) for each violation."[138] "In determining whether an act or practice is

unconscionable the following circumstances shall be taken into consideration by the court: (1)

whether the violator knowingly or with reason to know, took advantage of a consumer reasonably

unable to protect his or her interests because of his or her age, physical infirmity, ignorance,

illiteracy, inability to understand the language of an agreement or similar factor; (2) whether, at the

time the consumer transaction was entered into, the violator knew or had reason to know that

price grossly exceeded the price at which similar property or services were readily obtainable in

similar transactions by like consumers; . . . [and] (4) whether the violator knew or had reason to

know that the transaction he or she induced the consumer to enter into was excessively one-sided

in favor of the violator."[139]

851.    The plaintiffs and class members are "persons" under Okla. Stat. tit. 15, § 752.

---

[136] Okla. Stat. tit. 15, § 753.

[137] *Id.* § 752.

[138] *Id.* § 761.1.

[139] *Id.*

852.    Each defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

853.    The sale of insulin to the plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and each defendant's actions as set forth herein occurred in the conduct of trade or commerce.

854.    The defendants' conduct, as described in this complaint, constitutes "false or misleading statements" in violation of the Oklahoma CPA. The defendants' conduct, as described in this complaint, further constitutes practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers in violation of the Oklahoma CPA.

855.    The defendants' conduct as alleged herein was also unconscionable because (1) the defendants, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) the defendants knew or had reason to know that their list prices grossly exceeded the prices at which similar property or services were readily obtainable in similar transactions by like consumers; and (3) the defendants knew or had reason to know that the transactions they induced the consumers to enter were excessively one-sided in favor of each defendant.

856.    The plaintiffs seek punitive damages because the defendants' conduct was egregious. The defendants misrepresented the actual prices of their analog insulins, inflated their list prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. They manipulated the prices of their life-saving analog

insulins without regard to the impact of their scheme on consumers' ability to afford these life-saving drugs. The defendants' egregious conduct warrants punitive damages.

857.    Furthermore, because the defendants' unconscionable conduct caused injury to plaintiffs, plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees under Okla. Stat. tit. 15, § 761.1. The plaintiffs further seek an order enjoining each defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under the Oklahoma CPA.

## COUNT FORTY-FOUR

### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT OR. REV. STAT. § 646.605, *ET SEQ.* (AGAINST NOVO NORDISK AND SANOFI)

858.    The Oregon plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

859.    This claim is brought by the Oregon plaintiffs on behalf of residents of Oregon who are members of the class.

860.    The Oregon Unfair Trade Practices Act (Oregon UTPA) prohibits a person from, in the course of the person's business: making "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions"; making "false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods"; or engaging "in any other unfair or deceptive conduct in trade or commerce."[140]

861.    Each defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

---

[140] Or. Rev. Stat. § 646.608(1).

862.     Each analog insulin at issue is a "good" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

863.     The defendants' conduct, as described in this complaint, constitutes "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions" on the analog insulins; "false or misleading representations of fact concerning the offering price of, or the person's cost for" the analog insulins; and "unfair or deceptive conduct."[141]

864.     The plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). The plaintiffs are also entitled to punitive damages because defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others. The plaintiffs further seek an order enjoining each defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under Or. Rev. Stat. §§ 646.632, 636.

## COUNT FORTY-FIVE

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW 73 PA. CONS. STAT. § 201-1, *ET SEQ.* (AGAINST ELI LILLY AND NOVO NORDISK)

865.     The Pennsylvania plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

866.     This claim is brought by the Pennsylvania plaintiffs on behalf of residents of Pennsylvania who are members of the class.

---

[141] *Id.*

- 259 -

867.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pennsylvania CPL) prohibits "unfair or deceptive acts or practices," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."[142]

868.    The defendants, plaintiffs, and class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

869.    The plaintiffs purchased analog insulin primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

870.    All of the acts complained of herein were perpetrated by the defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

871.    The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Pennsylvania CPL.

872.    In addition, the defendants' conduct, as described in this complaint, constitutes "unfair" acts in violation of the Pennsylvania CPL.

873.    The defendants are liable to the plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.[143] The plaintiffs are also entitled to an award of punitive damages because the defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

---

[142] 73 Pa. Cons. Stat. § 201-2(4).

[143] 73 Pa. Cons. Stat. § 201-9.2(a).

COUNT FORTY-SIX

**VIOLATION OF THE SOUTH CAROLINA**
**UNFAIR TRADE PRACTICES ACT**
**S.C. CODE ANN. § 39-5-10,** *ET SEQ.*
**(AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)**

874.     The South Carolina plaintiffs incorporate by reference the allegations contained in
the preceding paragraphs of this Third Amended Complaint.

875.     This claim is brought by the South Carolina plaintiffs on behalf of residents of
South Carolina who are members of the class.

876.     The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits
"unfair or deceptive acts or practices in the conduct of any trade or commerce."[144]

877.     Each defendant is a "person" under S.C. Code Ann. § 39-5-10.

878.     The defendants' conduct, as described in this complaint, constitutes "deceptive
acts" in violation of the South Carolina UTPA.

879.     In addition, the defendants' conduct, as described in this complaint, constitutes
"unfair" acts in violation of the South Carolina UTPA.

880.     Pursuant to S.C. Code Ann. § 39-5-140(a), the plaintiffs seek monetary relief to
recover their economic losses. Because the defendants' actions were willful and knowing, the
plaintiffs' damages should be trebled.

881.     The plaintiffs further allege that the defendants' malicious and deliberate conduct
warrants an assessment of punitive damages because the defendants carried out despicable conduct
with willful and conscious disregard of the rights and safety of others, subjecting the plaintiffs to

---

[144] S.C. Code Ann. § 39-5-20(a).

cruel and unjust hardship as a result. The defendants misrepresented the actual prices of the analog insulins, inflated their list prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase their profits at the expense of consumers. They manipulated the prices of their life-saving products without regard to the impact of their scheme on consumers' ability to afford life-saving medicines. The defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

882.    The plaintiffs further seek an order enjoining each defendant's unfair or deceptive acts or practices.

## COUNT FORTY-SEVEN

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### TENN. CODE ANN. § 47-18-101, *ET SEQ.*
### (AGAINST ELI LILLY AND NOVO NORDISK)

883.    The Tennessee plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

884.    This claim is brought by the Tennessee plaintiffs on behalf of residents of Tennessee who are members of the class.

885.    Tennessee Consumer Protection Act (Tennessee CPA) prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."[145]

886.    The plaintiffs and class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

_____

[145] Tenn. Code Ann. § 47-18-104.

887.     Each defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

888.     Each defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

889.     The defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Tennessee CPA.

890.     Pursuant to Tenn. Code Ann. § 47-18-109(a), the plaintiffs seek monetary relief against each defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT FORTY-EIGHT

## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
### TEX. BUS. & COM. CODE § 17.41, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

891.     The Texas plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

892.     This claim is brought by the Texas plaintiffs on behalf of residents of Texas who are members of the class.

893.     Plaintiffs are individuals, partnerships, and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).[146]

---

[146] *See* Tex. Bus. & Com. Code § 17.41.

894.    The Texas Deceptive Trade Practices-Consumer Protection Act (TDTPA) provides: "(a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is: (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and (B) relied on by a consumer to the consumer's detriment; . . . [and] ([2]) any unconscionable action or course of action by any person . . . ."[147]

895.    The TDTPA defines an "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[148] The Texas courts further define an unconscionable act as "one that takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a 'grossly unfair degree,' or which results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration."[149]

896.    As alleged in this complaint, the defendants have engaged in false, misleading, or deceptive acts.

---

[147] *Id.* § 17.50.

[148] *Id.* § 17.45(5).

[149] *Brennan v. Manning*, No. 07-06-0041-CV, 2007 WL 1098476, at *5 (Tex. App. Apr. 12, 2007); *see also Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 623, 2017 WL 3298391, at *11 (Tex. Ct. App. Aug 3, 2017) ("The DTPA defines '[u]nconscionable action or course of action' as 'an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.'" (quoting Tex. Bus. & Comm. Code Ann. § 17.45(5))); *Robinson v. Match.com, L.L.C.*, 3:10-CV-2651-L, 2012 WL 5007777, at *4 (N.D. Tex. Oct. 17, 2012), *aff'd sub nom. Malsom v. Match.com, L.L.C.*, 540 F. App'x 412 (5th Cir. 2013); *McPeters v. LexisNexis*, 910 F. Supp. 2d 981, 988 (S.D. Tex. 2012).

897.    They have also engaged in unconscionable actions in violation of the TDTPA. The defendants knew, or had reason to know, that consumers would rely on their reported list price as the prices of their analog insulin. And they knew that these list prices were not fair or reasonable approximations of the actual cost of those analog insulins.

898.    Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the plaintiffs seek monetary relief against the defendants measured as actual damages in an amount to be determined at trial, treble damages for defendants' knowing violations of the TDTPA, and any other just and proper relief available under the TDTPA.

899.    Alternatively, or additionally, pursuant to Tex. Bus. & Com. Code § 17.50(b)(3) & (4), the plaintiffs who purchased analog insulin from the defendants in the class period are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on the defendants' violations of the TDTPA.

900.    The plaintiffs are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the TDTPA.

901.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Tex. Bus. & Com. Code § 17.50(a) to defendants. Because the defendants failed to remedy their unlawful conduct within the requisite period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT FORTY-NINE

### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
### UTAH CODE § 13-11-1, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

902.    The Utah plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

- 265 -

903.     This claim is brought by the Utah plaintiffs on behalf of residents of Utah who are members of the class.

904.     The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."[150]

905.     "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.[151]

906.     As alleged in this complaint, the defendants have engaged in deceptive acts in violation of the Utah CSPA.

907.     They have also engaged in unconscionable actions in violation of the Utah CSPA. The defendants knew, or had reason to know, that consumers would rely on their reported list price as the prices of their analog insulin. And they knew that these list prices were not fair or reasonable approximations of the actual cost of those analog insulins.

908.     Pursuant to Utah Code Ann. § 13-11-4, the plaintiffs seek: monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

---

[150] Utah Code § 13-11-4.

[151] *Id.* § 13-11-5.

## COUNT FIFTY

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### VA. CODE ANN. § 59.1-196, *ET SEQ.*
### (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

909.    The Virginia plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

910.    This claim is brought by the Virginia plaintiffs on behalf of residents of Virginia who are members of the class.

911.    The Virginia Consumer Protection Act (Virginia CPA) lists prohibited "fraudulent acts or practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."[152]

912.    Each defendant is a "supplier" under Va. Code Ann. § 59.1-198.

913.    The defendants' advertisements of the analog insulins' list prices were "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

914.    The defendants' conduct, as described in this complaint, constitutes "fraudulent acts" in violation of the Virginia CPA.

915.    Pursuant to Va. Code Ann. § 59.1-204, the plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff. Because the defendants' conduct was committed willfully and knowingly, the plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

---

[152] Va. Code Ann. § 59.1-200.

916.     The plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq.*

## COUNT FIFTY-ONE

## VIOLATION OF THE WISCONSIN
## DECEPTIVE TRADE PRACTICES ACT
## WIS. STAT. § 100.18
## (AGAINST ELI LILLY, NOVO NORDISK, AND SANOFI)

917.     The Wisconsin plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

918.     This claim is brought by the Wisconsin plaintiffs on behalf of residents of Wisconsin who are members of the class.

919.     The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading."[153]

920.     Each defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

921.     The plaintiffs and class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiffs purchased analog insulin.

922.     The defendants' conduct, as described in this complaint, constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

---

[153] Wis. Stat. § 100.18(1).

923.     The plaintiffs are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because the defendants' conduct was committed knowingly and/or intentionally, the plaintiffs are entitled to treble damages.

924.     The plaintiffs also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

## DEMAND FOR JUDGMENT

WHEREFORE, the plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court:

A.     Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare the plaintiffs as the representatives of the class;

B.     Enter judgments against the defendants and in favor of the plaintiffs and the class;

C.     Award the class damages (i.e., three times overcharges) in an amount to be determined at trial;

D.     Award the plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

E.     Enjoin the defendants from continuing to report artificially inflated list prices that do not approximate their true net prices to CVS, Express Scripts, and OptumRx.

Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all issues so triable.

Dated: April 20, 2021                    Respectfully submitted,

                                         CARELLA, BYRNE, CECCHI, OLSTEIN,
                                         BRODY & AGNELLO, P.C.


                                         By _____/s/ James E. Cecchi_____
                                              James E. Cecchi (NJBA #030861989)
                                         Lindsey H. Taylor
                                         5 Becker Farm Road
                                         Roseland, NJ 07068
                                         Telephone: (973) 994-1700
                                         Facsimile: (973) 994-1744
                                         jcecchi@carellabyrne.com
                                         ltaylor@carellabyrne.com


                                         By _____/s/ Steve W. Berman_____
                                              Steve W. Berman (admitted *pro hac vice*)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1301 Second Ave., Suite 2000
                                         Seattle, WA 98101
                                         Telephone: (206) 623-7292
                                         Facsimile: (206) 623-0594
                                         steve@hbsslaw.com


                                         Thomas M. Sobol (admitted *pro hac vice*)
                                         Hannah W. Brennan (admitted *pro hac vice*)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         55 Cambridge Parkway, Suite 301
                                         Cambridge, MA 02142
                                         Telephone: (617) 482-3700
                                         Facsimile: (617) 482-3003
                                         tom@hbsslaw.com
                                         hannahb@hbsslaw.com


                                         Mark T. Vazquez (admitted pro hac vice)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         455 N. CityFront Plaza Dr.
                                         Suite 2410
                                         Chicago, IL 60611
                                         Telephone: (708) 628-4962
                                         Facsimile: (708) 628-4950
                                         markv@hbsslaw.com

Craig L. Briskin (admitted *pro hac vice*)
MEHRI & SKALET, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, D.C. 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cbriskin@findjustice.com

Linda P. Nussbaum (admitted *pro hac vice*)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com

Michael E. Criden (admitted *pro hac vice*)
Lindsey C. Grossman (admitted *pro hac vice*)
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
mcriden@Cridenlove.com
lgrossman@cridenlove.com

Jayne A. Goldstein (admitted *pro hac vice*)
SHEPHERD FINKELMAN MILLER & SHAH, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jgoldstein@sfmslaw.com

Natalie Finkelman Bennett (NJBA #033601989)
SHEPHERD FINKELMAN MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
nfinkelman@sfmslaw.com

Roberta D. Liebenberg (admitted *pro hac vice*)
Adam J. Pessin (admitted *pro hac vice*)
Fine, Kaplan and Black, R.P.C.

One South Broad Street, Suite 2300
Philadelphia, PA 19107
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

Lynn Lincoln Sarko (admitted *pro hac vice*)
Derek W. Loeser (admitted *pro hac vice*)
Gretchen S. Obrist (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Michael Critchley (NJBA #251821972)
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue, Suite 303
Roseland, New Jersey 07068
Telephone: (973) 422-9200
Facsimile: (973) 422-9700
mcritchley@critchleylaw.com

Ellen Relkin (NJBA #006691985)
WEITZ & LUXENBERG
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Telephone: (212) 558-5500
ERelkin@weitzlux.com

Paul F. Novak (admitted *pro hac vice*)
Diana Gjonaj (admitted *pro hac vice*)
Gregory Stamatopoulos (admitted *pro hac vice*)
WEITZ & LUXENBERG
719 Griswold, Ste. 620
Detroit, MI 48226
Telephone: (313) 800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

Todd A. Seaver (admitted *pro hac vice*)
Jessica Moy (admitted *pro hac vice*)
BERMAN TABACCO
44 Montgomery St., Ste. 650
San Francisco, CA 94104
Telephone: (415) 433-3200
tseaver@bermantabacco.com
jmoy@bermantabacco.com

Nyran Rose Rasche (*pro hac vice* forthcoming)
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60601
Telephone: (312) 782-4880
nrasche@caffertyclobes.com

Stephen H. Weil (admitted *pro hac vice*)
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd fl.
Chicago, IL 60607
Telephone: 312-243-5900
weil@loevy.com

*Attorneys for Plaintiffs*