James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
Kevin Cooper
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY &
    AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Steve W. Berman
Hannah W. Brennan
Mark T. Vazquez
HAGENS BERMAN SOBOL
    SHAPIRO LLP
1301 2nd Ave., Suite 2000
Seattle, WA 98101
(206) 623-7292

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE INSULIN PRICING LITIGATION | Civil Action No. 2:17-cv-00699 (BRM)(ESK) |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................... 1

II.   LEGAL ARGUMENT ....................................................... 3

A.    COMMON ISSUES PREDOMINATE FOR CLASSES
      SEEKING RELIEF FOR "UNFAIR PRACTICES." ..................... 3

      1.    The class members belong to a captive market, so
            common issues predominate as to whether they could
            reasonably avoid the harm. ................................... 3

      2.    The defendants cannot avoid certification by speculating
            about "pass-through benefits" to gin up individual issues
            as to substantial injury. ..................................... 7

      3.    The defendants' subjective belief as to the moral
            culpability of the PBMs does not create an individualized
            issue as to legal causation. .................................. 8

      4.    Whether countervailing benefits exist and outweigh the
            harm is a common issue. .................................... 10

B.    COMMON ISSUES PREDOMINATE FOR THE
      UNCONSCIONABILITY THEORY. ................................... 11

      1.    New Jersey unconscionability class. ....................... 12

      2.    Texas unconscionability class. ............................. 13

      3.    Kansas unconscionability class. ............................ 13

      4.    Utah unconscionability class. .............................. 14

C.    A NATIONWIDE CLASS SHOULD BE CERTIFIED. ............. 14

D.    THE PROPOSED MULTI-STATE CLASSES SHOULD BE
      CERTIFIED. .......................................................... 19

1.    The three-part "substantial injury" test for unfairness
      applies under the laws of all 16 states at issue. .................................... 21

2.    Other state-law elements cited by the defendants do not
      preclude certification of the multi-state classes .................................... 25

      a.    Scienter does not present individualized issues. ....................... 26

      b.    Questions of proximate causation are common. ....................... 26

      c.    Issues concerning statutes of limitations and accrual
            do not present individual questions. ......................................... 28

      d.    The "other state-specific issues" identified by the
            defendants do not preclude certification. ................................. 32

3.    Any "ascertainable loss" requirement does not bar
      certification. ............................................................................................ 36

E.    THE PLAINTIFFS' DAMAGES MODEL RELIABLY
      MEASURES CLASS-WIDE INJURY AND DAMAGES. ........................... 38

      1.    Dr. Rosenthal's structural break method reliably measures
            when the class period begins by analyzing the effects of
            defendants' conduct ................................................................. 38

      2.    Class action plaintiffs routinely use averages to prove
            damages, as plaintiffs validly do here ..................................... 40

      3.    Benefit-of-the-bargain damages do not require the
            plaintiffs to suffer an ascertainable loss as a result of
            deception; it suffices that plaintiffs suffered an
            ascertainable loss as a result of an unconscionable act ......................... 42

F.    THE PLAINTIFFS USE A WEALTH OF DETAILED PBM
      AND PHARMACY TRANSACTIONAL DATA TO IDENTIFY
      THE CLASS MEMBERS. ........................................................................ 44

      1.    Defendants mischaracterize the Third Circuit's
            ascertainability requirements. ................................................. 46

- ii -

2. Dr. Rosenthal can remove class members who used manufacturer coupons and need not remove class members who used pharmacy coupons. .................................................. 49

3. The plaintiffs proposed methods of ascertaining the class meet the Third Circuit's requirement. .................................................... 50

4. Price differences have nothing to do with ascertainability. .................. 52

G. CLASS CERTIFICATION IS A SUPERIOR MEANS OF RESOLVING THE CLAIMS. ........................................................................ 53

H. PLAINTIFFS SATISFY RULE 23(A). .......................................................... 57

1. The question concerning the lawfulness of the defendants' "undisputed" conduct alone satisfies commonality. ............................ 57

2. Victims of an excessive overcharge who trace their injuries to the same practice are both typical and adequate class representatives. ........................................................................................ 59

I. A RULE 23(B)(2) CLASS SHOULD BE CERTIFIED. ................................ 61

III. CONCLUSION .......................................................................................... 63

010646-11/2030303 V1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Accutane Litig.*,
    235 N.J. 229 (2018) ................................................................ 15, 16, 17

*In re Actiq Sales & Mktg. Pracs. Litig.*,
    307 F.R.D. 150 (E.D. Pa. 2015) ...................................................... 54

*Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp*,
    2021 WL 3612155 (3d Cir. Aug. 16, 2021)........................................ 20

*Afzal v. BMW of N. Am., LLC*,
    2020 WL 2786926 (D.N.J. May 29, 2020).......................................... 47

*Agostino v. Quest Diagnostics Inc.*,
    256 F.R.D. 437 (D.N.J. 2009) ........................................................ 31

*Akins v. Firstbank, N.A.*,
    415 A.2d 567 (Me. 1980) ............................................................... 29

*Albaugh v. The Reserve*,
    930 N.W.2d 676 (Iowa 2019) ......................................................... 23

*Amato v. Subaru of Am., Inc.*,
    2021 WL 2154976 (D.N.J. May 27, 2021).......................................... 34

*AMC W. Hous. LP v. NIBCO, Inc.*,
    2019 WL 4491331 (W.D. Okla. Sept. 18, 2019).................................. 30

*Andren v. Alere, Inc.*,
    2017 WL 6509550 (S.D. Cal. Dec. 20, 2017)..................................... 33

*In the Matter of Apple Inc.*,
    2014 WL 1330287 (FTC Mar. 25, 2014)............................................ 4

*Arch Ins. Co. v. Precision Stone, Inc.*,
    584 F.3d 33 (2d Cir. 2009) ............................................................. 7

*Arch v. Am. Tobacco Co.,*
  175 F.R.D. 469 (E.D. Pa. 1997) ........................................................ 57

*Ass'n for Accessible Meds. v. Frosh,*
  887 F.3d 664 (4th Cir. 2018) ........................................................... 62

*Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.,*
  458 F. Supp. 3d 95 (D. Mass. 2020) ................................................. 30

*Barnes v. Am. Tobacco Co.,*
  161 F.3d 127 (3d Cir. 1998) ............................................................. 31

*BlackRock Balanced Cap. Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.,*
  2018 WL 5619957 (S.D.N.Y. Aug. 7, 2018) ...................................... 43

*Boley v. Univ. Health Servs., Inc.,*
  36 F.4th 124 (3d Cir. 2022) ................................................. 59, 60, 61

*BP Am. Prod. Co. v. Patterson,*
  263 P.3d 103 (Colo. 2011) ............................................................... 28

*In re Broiler Chicken Antitrust Litig.,*
  2022 WL 1720468 (N.D. Ill. May 27, 2022) ..................................... 38

*Bumpers v. Cmty. Bank of N. Va.,*
  367 N.C. 81 (2013) .......................................................................... 23

*Byrd v. Aaron's Inc.,*
  784 F.3d 154 (3d Cir. 2015) ................................................. 46, 47, 51

*Cadco, Ltd. v. Doctor's Ass'ns, Inc.,*
  204 A.3d 737 (Conn. Ct. App. 2019) .................................................. 8

*Cain v. Midland Funding, LLC,*
  256 A.3d 765 (Md. 2021) ................................................................. 30

*Carr v. Flowers Foods, Inc.,*
  2019 WL 2027299 (E.D. Pa. May 7, 2019) ....................................... 63

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
  308 F.R.D. 606 (N.D. Cal. 2015) ...................................................... 40

- v -

*CFPB v. D & D Mktg.*,
   2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ...................................................... 4

*Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*,
   35 So. 3d 1053 (La. 2010) .................................................................................. 27

*Chin v. Chrysler Corp.*,
   182 F.R.D. 448 (D.N.J. 1998) ............................................................................ 54

*City Select Auto Sales v. BMW Bank of N. Am., Inc.*,
   867 F.3d 434 (3d Cir. 2017) .............................................................................. 45

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
   795 F.3d 380 (3d Cir. 2015) ......................................................... 31, 53, 55, 59

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*,
   558 F. Supp. 3d 350 (W.D. Tex. 2021) ................................................................ 5

*Cotte v. CVI SGP Acquisition Tr.*,
   2022 WL 464307 (D. Utah Feb. 15, 2022) ........................................................ 14

*Cotten v. Wilson*,
   576 S.W.3d 626 (Tenn. 2019) ............................................................................ 28

*Counts v. Gen. Motors, LLC*,
   2022 WL 2079757 (E.D. Mich. June 9, 2022) .................................................... 35

*Cox v. Sears Roebuck & Co.*,
   647 A.2d 454 (N.J. 1994) ................................................................................... 12

*D'Agostino v. Maldonado*,
   216 N.J. 168 (2013) ........................................................................................... 43

*Dal Ponte v. Am. Mortg. Express Corp.*,
   2006 WL 2403982 (D.N.J. Aug. 17, 2006) ........................................................ 18

*Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*,
   839 A.2d 942 (N.J. Super. Ct. Law. Div. 2003) ................................................. 27

*Deibler v. SanMedica Int'l, LLC*,
   2021 WL 6198062 (D.N.J. Dec. 30, 2021) .......................................................... 6

- vi -

*In re Disposable Contact Lens Antitrust,*
    329 F.R.D. 336 (M.D. Fla. 2018) .......................................................... 40

*In re Domestic Drywall Antitrust Litig.,*
    2017 WL 3700999 (E.D. Pa. Aug. 24, 2017)....................................... 63

*Downing v. Abercrombie & Fitch,*
    265 F.3d 994 (9th Cir. 2001) ................................................................ 15

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974) .............................................................................. 53

*Elias v. Ungar's Food Prods.,*
    252 F.R.D. 233 (D.N.J. 2008) .............................................................. 18

*Elward v. Electrolux Home Prod., Inc.,*
    264 F. Supp. 3d 877 (N.D. Ill. 2017) (IN) ........................................... 29

*In re EpiPen Litig.,*
    2020 WL 1180550 (D. Kan. Mar. 10, 2020) ............................. 8, 25, 62

*Ferreras v. Am. Airlines, Inc.,*
    946 F.3d 178 (3d Cir. 2019) ................................................................. 59

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II),*
    2012 WL 379944 (D.N.J. Feb. 6, 2012)............................................... 31

*Frederick v. S. Star Cent. Gas Pipeline, Inc.,*
    2011 WL 3880902 (D. Kan. Sept. 2, 2011) .......................................... 14

*FTC v. Amazon.com, Inc.,*
    2016 WL 10654030 (W.D. Wash. July 22, 2016) .................................. 4

*FTC v. Direct Benefits Grp.,*
    LLC, 2013 WL 3771322 (M.D. Fla. July 18, 2013)............................... 4

*FTC v. Elec. Payment Sols. of Am. Inc.,*
    482 F. Supp. 3d 921 (D. Ariz. 2020) ..................................................... 4

*FTC v. Neovi, Inc.,*
    604 F.3d 1150 (9th Cir. 2010) ............................................................... 4

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) .................................................................. 21

*Fu v. Fu*,
   160 N.J. 108 (1999) ........................................................ 16, 17, 18, 19

*Garr v. City of Ottumwa*,
   846 N.W.2d 865 (Iowa 2014) .......................................................... 26

*Gasbi, LLC v. Sanders*,
   120 N.E.3d 614 (Ind. Ct. App. 2019) .............................................. 33

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011) .............................................................. 63

*Goodwin v. Yeakle's Sports Bar & Grill, Inc.*,
   62 N.E.3d 384 (Ind. 2016) (IN) ....................................................... 27

*Greco v. Grewal*,
   2020 WL 5793709 (D.N.J. Sept. 29, 2020) ..................................... 59

*Hargrove v. Sleepy's LLC*,
   974 F.3d 467 (3d Cir. 2020) ....................................................... 47, 48

*Harnish v. Widener Univ. Sch. of Law*,
   833 F.3d 298 (3d Cir. 2016) ....................................................... 36, 37

*Harrell v. BMW of N. Am., LLC*,
   517 F. Supp. 3d 527 (D.S.C. 2021) (SC) ......................................... 29

*Harris Cnty. v. Eli Lilly & Co.*,
   2022 WL 479943 (S.D. Tex. Feb. 16, 2022) .................................... 35

*House of Raeford Farms of Louisiana LLC v. Poole*,
   2021 WL 1081837 (W.D. La. Mar. 18, 2021) ............................. 29, 30

*Howard v. Wilkes & McHugh, PA*,
   2009 WL 10699545 (W.D. Tenn. Apr. 15, 2009) ............................ 29

*Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*,
   384 N.J. Super. 275 (App. Div. 2006) ............................................. 19

*Jacobellis v. Ohio,*
    378 U.S. 184 (1964) ................................................................. 1

*Johnson v. GEICO Cas. Co.,*
    672 F. App'x 150 (3d Cir. 2016) ........................................... 33

*Jones v. BMW of N. Am., LLC,*
    2020 WL 5752808 (M.D.N.C. Sept. 25, 2020) ............................. 29, 30

*Katz v. Belveron Real Est. Partners, LLC,*
    28 F.4th 300 (1st Cir. 2022) ................................................ 28

*Keith v. Health-Pro Home Care Servs., Inc.,*
    873 S.E.2d 567 (N.C. 2022) ................................................ 28

*Kinseth v. Weil-McLain,*
    913 N.W.2d 55 (Iowa 2018) ................................................ 27

*Klaxon v. Stentor Elec. Mfg. Co.,*
    313 U.S. 487 (1941) ........................................................ 16

*Krueger v. Grand Forks Cnty.,*
    852 N.W.2d 354 (N.D. 2014) ................................................ 28

*Kugler v. Romain,*
    58 N.J. 522 (1971) ........................................................ 12

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.,*
    2018 WL 6567709 (D.N.J. Dec. 12, 2018) ................................... 40

*Legacy Crossing, L.L.C. v. Travis Wolff & Co., L.L.P.,*
    229 F. App'x 672 (10th Cir. 2007) ....................................... 29, 30

*Lehman Bros. Holdings, Inc. v. Kee,*
    268 A.3d 178 (Del. 2021) ................................................... 29

*Lessin v. Ford Motor Co.,*
    2021 WL 3810584 (S.D. Cal. Aug. 25, 2021) ................................ 33

*Leszanczuk v. Carrington Mortg. Servs., LLC,*
    21 F.4th 933 (7th Cir. 2021) ............................................... 8

*In re Linerboard Antitrust Litigation,*
    305 F.3d 145 (3d Cir. 2002) ................................................... 30, 31, 56

*Lon Smith & Assocs., Inc. v. Key,*
    527 S.W.3d 604 (Tex. App. 2017) ........................................ 13

*Mahoney v. Wells Fargo Bank, N.A.,*
    2022 WL 1446934 (D. Mass. Mar. 25, 2022) ....................... 29

*Maniscalco v. Brother Int'l (USA) Corp.,*
    709 F.3d 202 (3d Cir. 2013) ................................................. 15, 16

*Masquat v. DaimlerChrysler Corp.,*
    195 P.3d 48 (Okla. 2008) ...................................................... 29

*Mazzanti v. Gen. Elec. Co.,*
    2017 WL 923905 (D. Conn. Mar. 7, 2017) ........................... 29

*McAlister v. Ford Motor Co.,*
    2015 WL 4775382 (W.D. Okla. Aug. 13, 2015) ................... 36

*McGehee v. Forest Oil Corp.,*
    908 F.3d 619 (10th Cir. 2018) .............................................. 28

*McNair v. Synapse Grp.,*
    2009 WL 1873582 (D.N.J. June 29, 2009) ........................... 10

*McPeters v. LexisNexis,*
    11 F. Supp. 3d 789 (S.D. Tex. 2014) .................................... 13

*In re Mercedes-Benz Tele Aid Contract Litig.,*
    167 F.R.D. 113,151 (D.N.J. 2010) ....................................... 17

*Montich v. Miele USA, Inc.,*
    849 F. Supp. 2d 439 (D.N.J. 2012) ...................................... 19

*In re Motions to Certify Classes Against Ct. Reporting Firms,*
    715 F. Supp. 2d 1265 (S.D. Fla. 2010), *aff'd sub nom. Webber v.*
    *Esquire Deposition Servs., LLC,* 439 F. App'x 849 (11th Cir. 2011) ......................... 5

- x -

*Neale v. Volvo Cars of N. Am., LLC,*
794 F.3d 353 (3d Cir. 2015) ................................................................. 63

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
259 F.3d 154 (3d Cir. 2001) ................................................................. 56

*In re NFL Players Concussion Inj. Litig.,*
821 F.3d 410 (3d Cir. 2016) ................................................... 53, 58, 59

*In re Niaspan Antitrust Litig.,*
464 F. Supp. 3d 678 (E.D. Pa. 2020) .................................................. 41

*In re Niaspan Antitrust Litig.,*
555 F. Supp. 3d 155 (E.D. Pa. 2021) .................................................. 47

*Nieberding v. Barrette Outdoor Living, Inc.,*
302 F.R.D. 600 (D. Kan. 2014) ........................................................... 13

*Nyarko v. BMW of N. Am., LLC,*
2020 WL 1491361 (D. Md. Mar. 27, 2020) ........................................ 29

*Palmieri v. Intervet Inc.,*
2021 WL 2205854 (D.N.J. June 1, 2021) ............................................ 28

*Parrish v. Volkswagen Grp. of Am., Inc.,*
463 F. Supp. 3d 1043 (C.D. Cal. 2020) .............................................. 33

*Pastor v. State Farm Mut. Auto. Ins. Co.,*
487 F.3d 1042 (7th Cir. 2007) ............................................................. 57

*Payne v. FujiFilm U.S.A., Inc.,*
2010 WL 2342388 (D.N.J. May 28, 2010)........................................... 54

*In re Pepper Prods. Litig.,*
422 F. Supp. 3d 194 (D.D.C. 2019)..................................................... 20

*Peter G. Milne, P.C. v. Ryan,*
477 S.W.3d 888 (Tex. App. 2015) ....................................................... 13

*In re Pharm. Indus. Average Wholesale Price Litig.,*
230 F.R.D. 61 (D. Mass. 2005)....................................................... 25, 26

*In re Pharm. Indus. AWP Litig.,*
   491 F. Supp. 2d 20 (D. Mass. 2007) ...................................................... 24

*Pollard v. AEG Live, LLC,*
   2014 WL 4637017 (D.N.J. Sept. 16, 2014) ......................................... 37

*In re Pork Antitrust Litig.,*
   495 F. Supp. 3d 753 (D. Minn. 2020) .................................................. 33

*Porsche Cars N. Am., Inc. v. Diamond,*
   140 So. 3d 1090 (Fla. Dist. Ct. App. 2014) .................................. 6, 21

*Powers v. Lycoming Engines,*
   328 F. App'x 121 (3d Cir. 2009) .......................................................... 54

*In re Processed Egg Prod. Antitrust Litig.,*
   312 F.R.D. 124 (E.D. Pa. 2015) .......................................................... 62

*Quality Env't Processes, Inc. v. I.P. Petroleum Co.,*
   144 So.3d 1011 (La. 2014) .................................................................... 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
   292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir.
   2019).......................................................................................................... 38

*RBC Cap. Mkts., LLC v. Jervis,*
   129 A.3d 816 (Del. 2015)...................................................................... 27

*Remick v. City of Phil.,*
   2022 WL 742707 (E.D. Pa. Mar. 11, 2022)....................................... 62

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.,*
   706 P.2d 1028 (Utah 1985)............................................................ 12, 14

*Rocky Mountain Planned Parenthood, Inc. v. Wagner,*
   467 P.3d 287 (Colo. 2020)..................................................................... 27

*Saika v. Ocwen Loan Servicing, LLC,*
   357 F. Supp. 3d 704 (N.D. Ill. 2018) ................................................. 27

*Searles v. Fleetwood Homes of Pa., Inc.*,
878 A.2d 509 (Me. 2005) ...................................................................... 22

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ...................................... 41

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) ........................................... 35, 41

*Showpiece Homes Corp. v. Assurance Co. of Am.*,
38 P.3d 47 (Colo. 2001) ...................................................................... 24

*Siegel v. Shell Oil Co.*,
612 F.3d 932 (7th Cir. 2010) ............................................................ 4, 9

*Simmons v. Ford Motor Co.*,
2022 WL 845127 (S.D. Fla. Mar. 21, 2022) ...................................... 43

*Sitogum Holdings, Inc. v. Ropes*,
800 A.2d 915 (N.J. Super. Ct. Ch. Div. 2002) ................................... 12

*State Farm Mut. Auto. Ins. Co. v. Muse*,
2022 WL 413417 (11th Cir. Feb. 10, 2022) ...................................... 29

*In re Static Random Access Memory Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ....................................................... 40

*Stevenson Lumber Co.-Suffield v. Chase Assocs., Inc.*,
284 Conn. 205 (2007) .......................................................................... 27

*Stewart v. JP Morgan Chase Bank, N.A.*,
2022 WL 294763 (N.D. Ill. Feb. 1, 2022) .......................................... 30

*State ex rel. Stovall v. DVM Enters., Inc.*,
62 P.3d 653 (Kan. 2003) ...................................................................... 13

*In re Syngenta AG MIR 162 Corn Litig.*,
2016 WL 5371856 (D. Kan. Sept. 26, 2016) ................................... 7, 38

*In re Takata Airbag Prod. Liab. Litig.,*
    524 F. Supp. 3d 1266 (S.D. Fla. 2021) ................................................................. 36

*Thomas v. Generac Power Sys. Inc.,*
    2020 WL 9602345 (N.D. Fla. Dec. 28, 2020) .................................................... 27

*TitleMax of Del., Inc. v. Weissmann,*
    24 F.4th 230 (3d Cir. 2022) ............................................................................... 62

*Tomlinson v. Ocwen Loan Servicing, LLC,*
    2015 WL 7853957 (D. Kan. Dec. 3, 2015) ...................................................... 13

*Tucker v. Sierra Builders,*
    180 S.W.3d 109 (Tenn. Ct. App. 2005) ............................................................... 4

*Tungate v. MacLean-Stevens Studios, Inc.,*
    714 A.2d 792 (Me. 1998) ............................................................................... 8, 32

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ........................................................................................... 41

*Vista Healthplan, Inc. v. Cephalon, Inc.,*
    2015 WL 3623005 (E.D. Pa. June 10, 2015) .................................................... 20

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ........................................................................................... 58

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000) ............................................................................. 25

*Webster v. LLR, Inc.,*
    2018 WL 10230741 (W.D. Pa. Aug. 20, 2018) ................................................ 20

*Whataburger Rests. LLC v. Cardwell,*
    545 S.W.3d 73 (Tex. App. 2017) ...................................................................... 12

*Wilson v. Volkswagen Grp. of Am., Inc.,*
    2018 WL 4623539 (S.D. Fla. Sept. 26, 2018) .................................................. 33

*Wright v. PRG Real Est. Mgmt., Inc.,*
    826 S.E.2d 285 (S.C. 2019) .............................................................................. 28

## STATUTES

Colo. Rev. Stat. Ann. § 6-1-115 ........................................................................ 29

Indiana Code Section 24-5-0.5-3 ...................................................................... 32

Iowa Code Ann. § 714H.5(5) ............................................................................ 30

Iowa Code § 714H.2(1) ..................................................................................... 26

N.D. Cent. Code Ann. § 28-01-24 ..................................................................... 29

N.D. Cent. Code Ann. § 51-15-02 ..................................................................... 24

N.D. Cent. Code Ann. § 51-15-12 ..................................................................... 30

S.C. Code Ann. § 39-5-150 ................................................................................ 30

Tenn. Code Ann. § 47-18-110 ........................................................................... 30

## OTHER AUTHORITIES

1 Maine Jury Instruction Manual § 7-80 (2022) ............................................... 27

Inflation Reduction Act of 2022, Pub. L. No.117-169, § 11406 (2022) ..................... 1

James R. Strickland, *Note, David's Sling: The Undetected Power of Indiana's
Deceptive Consumer Sales Act*, 51 Ind. L. Rev. 211 (2018) ..................................... 24

Manual for Complex Litigation (4th) § 22.634 (2004) ............................................. 25

MPJI-Cv 7:9 ....................................................................................................... 28

NEWBERG ON CLASS ACTIONS § 4:54 ............................................................. 40

Restatement (Second) of Conflicts of Law § 6, comment e (2022) ......................... 18

Rule 23(b)(3)(D) ....................................................................................... 53, 54

# I.    INTRODUCTION

Given the iniquity of their conduct, defendants fall back on the fallacy that one cannot demarcate the line between "fair" and "unfair" under the law without making some arbitrary distinction. But the idea that *rebates are generally lawful* does not preclude the conclusion that *defendants' behavior in this case is unlawful*. And the notion that a trier of fact cannot judge when lawful conduct becomes unlawful defies basic legal principles. As Justice Stewart famously wrote about the line between free expression and criminal obscenity: "I know it when I see it."[1]

In this instance, lawmakers,[2] the media, and the public see it—"*it*" being the unfairness of defendants' conduct. Whether a jury sees it too remains up to them. But objective facts and standards provide common to the class guiding principles: (1) the speed and size of list price increases in relation to net price; (2) the age of the analog insulin products; (3) the subversion of competition between interchangeable treatments; (4) shadow pricing; (5) a captive market; and (7) the knowledge of harm to diabetics. Taken together, these facts common to each class member illuminate the line between standard industry practice and unlawful conduct that has inflicted

---

[1] *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

[2] *See* Inflation Reduction Act of 2022, Pub. L. No.117-169, § 11406 (2022); "Sen. Schumer talks on what the Inflation Reduction Act means for Americans," *All Things Considered*, NPR.ORG (Aug. 8, 2022), *available at* https://www.npr.org/2022/08/08/1116389427/sen-schumer-talks-on-what-the-inflation-reduction-act-means-for-americans.

- 1 -

pain on millions. *Something* caused insulin list prices to skyrocket despite competitive market conditions. A jury can examine evidence of that something and decide whether it meets the elements of state law claims. And Rule 23 provides the ideal—if not the *only*—mechanism for adjudicating those claims.

Unlike in other consumer class actions that require individual receipts or affidavits to ascertain the class, the pharmaceutical industry maintains an abundance of transactional data that identifies not only the purchaser and product, but also important details of each transaction. And because only the defendants have their hands on the lever that drives list price—the core input for all relevant transactions—a jury can draw a straight line from the defendants' misconduct to the prices paid by all class members.

To avoid certification, defendants must resort to manufacturing individualized issues where none exist. Some families purportedly should have spent more on insurance premiums. Others should have contravened their physicians' advice and purchased human insulin they weren't prescribed. Some class members, defendants suppose, could afford to pay more. But just because defendants can callously imagine such things, that does not make them relevant. Defendants must present a legal basis for their positions. And neither Rule 23 nor state law provides one.

In truth, this is a straightforward case with a manageable plan. Plaintiffs proceed under one theory of liability. The most important choice-of-law factors

dictate that a single state law—that of the forum state—should apply, making a trial even more practicable. And the simplicity of plaintiffs' theory coupled with the prevalence of detailed transactional data means ascertaining injured class members isn't difficult. In a case where the entire country sees the injustice being done, the Court is not powerless to act. Plaintiffs' motion for class certification should be granted and a trial date set.

## II.    LEGAL ARGUMENT

### A.    Common issues predominate for classes seeking relief for "unfair practices."

#### 1.    The class members belong to a captive market, so common issues predominate as to whether they could reasonably avoid the harm.

The defendants contend class members could have avoided substantial injuries from their conduct by: (1) seeking out financial assistance programs; (2) purchasing different insurance; or (3) taking human insulin they weren't prescribed. Each suggestion proves more offensive than the last and ignores both the realities of the market and relevant authority.

To begin, defendants provide no authority for their *ipse dixit* that affordability programs create individualized issues as to whether each class member could have reasonably avoided substantial injury. Defendants cite only cases in which consumers could avoid harm by not buying a product *at all* or by choosing a different one

- 3 -

altogether.[3] Of course, for an insulin-dependent diabetic, these options make no sense and could prove catastrophic. And where the basis for all retail prices (WAC) is the same everywhere, the consumer couldn't have avoided it as a matter of fact.

Courts uniformly reject arguments that the potential availability of rebates or other reimbursement means that any harm was reasonably avoidable. In *FTC v. Neovi, Inc.*, the Ninth Circuit found that requiring a consumer to search for a "'reimbursement required a substantial investment of time, trouble, aggravation, and money.'"[4] In other words, the defendants can't sidestep liability by requiring class members to jump through the hoops they set up.[5] Numerous courts agree.[6]

The defendants also find no support for their contention that "consumer[s]

---

[3] *See, e.g., Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (plaintiff "could—and did—purchase gasoline from non-defendants"); *Tucker v. Sierra Builders*, 180 S.W.3d 109, 118 (Tenn. Ct. App. 2005) (plaintiff had "ability to decide whether or not to purchase" from someone else).

[4] 604 F.3d 1150, 1158 (9th Cir. 2010) (quoting district court).

[5] The defendants also have not shown that a single class representative was eligible for a patient assistance program or coupon they did not use.

[6] *See FTC v. Elec. Payment Sols. of Am. Inc.*, 482 F. Supp. 3d 921, 931 (D. Ariz. 2020) ("'obtaining reimbursement require[s] a substantial investment of time, trouble, aggravation, and money.'"); *FTC v. Amazon.com, Inc.*, 2016 WL 10654030, at *10 (W.D. Wash. July 22, 2016) ("customers could [not] reasonably avoid their injury by seeking a refund"); *In the Matter of Apple Inc.*, 2014 WL 1330287, at *25 (FTC Mar. 25, 2014) ("companies . . . cannot impose on consumers the responsibility for ferreting out material aspects of payment systems"); *FTC v. Direct Benefits Grp.*, LLC, 2013 WL 3771322, at *14 (M.D. Fla. July 18, 2013) ("refunds . . . [do] not render the injury avoidable"); *CFPB v. D & D Mktg.*, 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016) ("consumers could [not] have avoided injury by wising up to the scheme earlier on").

- 4 -

could have chosen a plan with co-pays" to avoid legal harm.[7] And for good reason. The notion that it's *reasonable* for consumers to get specific insurance to dodge the defendants' scheme is not endorsed by any case the defendants cite.[8] It's also frivolous,[9] particularly where most get insured through employers, when plans with flat copays can cost thousands, and when insurance must meet the needs of the entire family.[10]

Perhaps most baseless, the defendants believe consumers should override their doctors' prescriptions and purchase human insulin they were not directed to take. Even if some diabetics have tried human insulin, that does not mean it's reasonable as a matter of law to expect any given class member to experiment with medication to avoid defendants' conduct. If anything, the fact that the defendants suggest

---

[7] *See* Def. Br. at 32.

[8] Defendants cite a case in which lawyers could have avoided charges by "requesting that the court-reporting firms omit (or charge a different per-page rate for) the indices from any transcripts they order." *In re Motions to Certify Classes Against Ct. Reporting Firms*, 715 F. Supp. 2d 1265, 1277-78 (S.D. Fla. 2010), *aff'd sub nom. Webber v. Esquire Deposition Servs., LLC*, 439 F. App'x 849 (11th Cir. 2011). Suffice to say, class members couldn't pay less by *requesting* lower prices.

[9] *Cf. Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 558 F. Supp. 3d 350, 361-62 (W.D. Tex. 2021) (rejecting argument "that overdraft fees are 'reasonably avoidable' because consumers could simply put sufficient funds in their accounts or avoid taking out loans").

[10] *See* Expert Rebuttal Report of Meredith Rosenthal, Ph.D. In Support of Class Certification ("Rosenthal Rebuttal ¶¶ 10-11") (Exhibit 1 to the Declaration of Steve W. Berman In Support of Plaintiffs' Reply In Support of Motion for Class Certification ("Berman Reply Decl.")).

- 5 -

altering a prescribed treatment plan to such ends proves just how trapped class members are.

Even the cases relied on by the defendants explain why they're wrong. The point of the "reasonably avoidable" requirement is to allow consumers to act as free market "regulators," picking and choosing with whom they do business.[11] But that's the point: *there is no free market in the analog insulin market*. Patients prescribed an analog insulin can only choose between the defendants' products subject to the same scheme. In a case like this, "where the claim is based on allegations of 'some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking,'" plaintiffs may prove on a classwide basis that the injuries were not reasonably avoidable.[12]

What's more, defendants' arguments present common issues on the merits under an objective, reasonable person standard.[13] A jury may decide using common proof whether it's reasonable to expect the average consumer to avoid an overcharge by altering their physician's prescribed treatment, buying different insurance, or

---

[11] *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1099 (Fla. Dist. Ct. App. 2014).

[12] *Id.*

[13] *Deibler v. SanMedica Int'l, LLC*, 2021 WL 6198062, at *11 n.21 (D.N.J. Dec. 30, 2021) (explaining that the NJCFA applies objective reasonable consumer standard susceptible to common proof).

scouring the market for discounts only available to the select few.

> **2.    The defendants cannot avoid certification by speculating about "pass-through benefits" to gin up individual issues as to substantial injury.**

The defendants suppose that "rebates may have lowered a consumer's costs in ways not reflected in the transaction price."[14] Yet, they fail to provide any factual or legal basis for how their musings create predominating individual issues regarding the "substantial injury" element. To begin, *defendants* must prove that passed-through rebates offset class members' losses.[15] But they have not identified a single putative class member whose losses purportedly are offset by a pass-through of rebates, confirming that they rely on pure speculation.[16]

Moreover, defendants spuriously summarize the takeaway from *Cadco, Ltd. v. Doctor's Associations, Inc.* as "whether 'cost savings' were 'in any way passed through to the consumer' [is] relevant to substantial-injury analysis."[17] The plaintiff in *Cadco* alleged that a restaurant franchise unfairly used the plaintiffs' heating plate design to

---

[14] Def. Br. at 34.

[15] *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 42 (2d Cir. 2009) ("a setoff claim is properly characterized as an affirmative defense").

[16] *See In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *9 (D. Kan. Sept. 26, 2016) ("Syngenta has not identified any class member whose gains . . . would completely offset the damages . . . under plaintiffs' damage models, and thus it is speculative whether any class members had no injury for these reasons.").

[17] Def. Br. at 34.

buy identical plates from a rival.[18] While the court noted that defendants' cost savings didn't pass through to the consumer, it did not endorse such a pass-through defense as valid. In fact, it did *the opposite*, rejecting out of hand the same speculative defense offered here.[19]

The defendants ignore another key distinction.[20] Unlike in *Cadco*, the hypothetical benefit here would come from collateral sources. The defendants do not cite a single case for the proposition that they may use theoretical trickle-down savings from non-parties as offsets. And regardless, the purported relevance and admissibility of payments from a collateral source presents a common issue.[21]

### 3. The defendants' subjective belief as to the moral culpability of the PBMs does not create an individualized issue as to legal causation.

The defendants admit they control the list prices of their drugs. And it's their manipulation of these list prices that impacts the prices class members pay; when they increase list prices, the plaintiffs' spending increases. Nevertheless, these truths

---

[18] 204 A.3d 737, 751 (Conn. Ct. App. 2019).

[19] *Id.*

[20] Other cases cited by defendants are also inapposite. *See Leszanczuk v. Carrington Mortg. Servs., LLC*, 21 F.4th 933, 943 (7th Cir. 2021) (plaintiff "could have avoided the inspection fee by contracting with a different mortgage servicer"); *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 798 (Me. 1998) (a commission "as little as $1.25 ... would clearly be insubstantial").

[21] *In re EpiPen Litig.*, 2020 WL 1180550, at *27 (D. Kan. Mar. 10, 2020) ("whether the collateral source doctrine applies to plaintiffs who used insurance to pay for their EpiPen purchases is a legal issue that presents a common question").

- 8 -

don't stop the defendants from asserting "PBMs' and other entities' roles in causing any consumer's alleged injury requires a case-by-case inquiry."[22]

The defendants conflate moral blame with proximate causation. They may subjectively fault PBMs and insurers for not passing on more savings. But the defendants offer no basis for the idea that their subjective finger-pointing amounts to an intervening *legal cause* of the plaintiffs' harm. Nor can they, because the defendants speak of an additional harm, separate from the one alleged by plaintiffs. Even accepting the contention that others in the supply chain bear responsibility for higher premiums, fewer point-of-sale rebates, or greater coinsurance rates, the plaintiffs do not seek to recover in this lawsuit *those* harms caused by non-parties. The plaintiffs seek to recover damages for injuries directly attributable to the defendants' unlawful and unfair list price manipulation.

The defendants even acknowledge their rebate scheme hurt class members in the same way—by inflating WAC, they amplified the core pricing input for insulin purchases.[23] The cases cited by the defendants do nothing to overcome that. In *Siegel*, putative class members could have bought gasoline from "non-defendants;"[24] here, class members could only buy defendants' analog insulin because only defendants

_____

[22] *See* Def. Br. at 35.

[23] *See* Pls.' Class Br. at 25-32 n.86-118.

[24] 612 F.3d at 937.

- 9 -

produce it. In *McNair v. Synapse Group*, classwide evidence could not prove deception because "each named Plaintiff reacted very differently" to the deceptive material;[25] here, the claims do not rely on reactions to deceptive acts, as everyone paid prices directly based on defendants' inflated benchmarks.

### 4.    Whether countervailing benefits exist and outweigh the harm is a common issue.

The defendants recycle their flawed argument regarding the "substantial injury" element, insisting that "Plaintiffs have no classwide means of assessing the benefits of rebates" to the PBMs and others.[26] It fails for the same reasons.

First, *consumers* don't receive any direct benefits from rebates, *third parties* do. Insurers get lower net prices. And PBMs pocket fees and capture a portion of the rebates to insurers. Thus, as the defendants point out, any so-called "benefits" to patients must come from the insurers *as collateral sources*, and the defendants present no authority that payments made by a collateral source are relevant and admissible.[27]

Second, the benefit must not just exist in a hypothetical sense; it must *outweigh* the harm. Even if one accepts that rebates provide marginal pass-through value to some consumers, one must also accept that they create no *net* benefits to consumers

---

[25] 2009 WL 1873582, at *10 (D.N.J. June 29, 2009).

[26] Def. Br. at 36.

[27] And as noted before, whether such payments are admissible presents a common issue. *See supra* note 21.

- 10 -

over the but-for world with a lower WAC. Insurers save by virtue of lower prices, not lower prices *because of rebates*. The defendants unwittingly underscore an important point of plaintiffs' case: they created this system with excessive list prices and secret rebates that allowed middlemen to profit at the expense of the class. In a but-for world where defendants acted lawfully, consumers benefit not only by their insurers saving money, but also by virtue of a lower list price. The defendants' theory that countervailing benefits of rebates *outweigh* the harm of inflated insulin prices defies common sense. And, in any event, presents a common issue.

Further, the defendants' attempt to distinguish cases concerning average wholesale prices (AWP) relies on their misrepresentation: that the plaintiffs "do not dispute that the defendants' list prices are what they claim to be: the prices Defendants charge wholesalers, *exclusive of rebates and discounts*."[28] The italicized portion is crucial. For, as in the *AWP* cases, the list prices here bear no relation to the ultimate prices paid by wholesalers after accounting for secret rebates.

## B.    Common issues predominate for the unconscionability theory.

In challenging predominance of common issues for the unconscionability theory of liability, defendants cite only cases concerning *individuals' claims* as

---

[28] *See* Def. Br. at 37 (emphasis added).

- 11 -

supposed proof that unconscionability can't be litigated in *class actions*.[29] Needless to say, such cases don't stand for that proposition. And as shown in the opening brief and below, each proposed unconscionability class should be certified.

### 1.    New Jersey unconscionability class.

The defendants suggest New Jersey law precludes certification because "unconscionability is 'fact-specific and applied on a case-by-case basis.'"[30] But the case on which they rely cites *Kugler v. Romain*, where the New Jersey Supreme Court explained that "mass consumer transactions growing out of unequal bargaining power and unfair practices should *not* be handled on a case-by-case basis."[31] The defendants engage in more disingenuous quotation when they claim the "capacity to mislead is the prime ingredient" to the plaintiffs' theory.[32] They leave out that this quote applies to "*consumer fraud*," and that the original source of the quote—the New Jersey Supreme Court—distinguished between unconscionability and consumer fraud in that same case.[33]

---

[29] *See Sitogum Holdings, Inc. v. Ropes*, 800 A.2d 915, 920 (N.J. Super. Ct. Ch. Div. 2002); *Whataburger Rests. LLC v. Cardwell*, 545 S.W.3d 73 (Tex. App. 2017); *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1041 (Utah 1985).

[30] Def. Br. at 38 (quoting *Judge v. Blackfin Yacht Corp.*, 815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003)).

[31] 58 N.J. 522, 537 (1971) (emphasis added).

[32] Defs.' Br. at 39 (citing *Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc.*, 2018 WL 1535285, at *5 (D.N.J. Mar. 29, 2018)).

[33] *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (emphasis added).

- 12 -

2.    **Texas unconscionability class.**

The defendants believe that Texas law requires a jury evaluate each class member's circumstances in an unconscionability claim. They are wrong. In each case cited by the defendants, class members either could have hired a different service or simply failed to prove unconscionable pricing.[34] Those courts did not address a situation, such as here, where all class members belonged to a captive market.

3.    **Kansas unconscionability class.**

In challenging certification under Kansas law,[35] the defendants disregard *Nieberding v. Barrette Outdoor Living, Inc.*, which certified an unconscionability class under the KCPA for "selling the class a product that 'grossly' exceeded its worth."[36] Instead, the defendants cite two inapposite non-class cases ruling on the merits.[37] And the only class-certification decision defendants cite did not certify an

---

[34] *Peter G. Milne, P.C. v. Ryan*, 477 S.W.3d 888 (Tex. App. 2015) (other advisors available); *Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604 (Tex. App. 2017) (other insurers available); *McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 807 n.13 (S.D. Tex. 2014) ("LexisNexis did not take advantage of its status as sole provider").

[35] *See* Defs.' Br. at 39-40. The defendants contend that the plaintiffs did not allege a Kansas unconscionability claim, but ignore that the plaintiffs seek any "just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq*," which includes § 50-627 barring unconscionable practices. 3d. Am. Compl. ¶ 731.

[36] 302 F.R.D. 600, 616 (D. Kan. 2014).

[37] *See State ex rel. Stovall v. DVM Enters., Inc.*, 62 P.3d 653, 659 (Kan. 2003) (affirming summary judgment for defendants who "did not deceive, oppress, or misuse superior bargaining power"); *Tomlinson v. Ocwen Loan Servicing, LLC*, 2015 WL 7853957, at *4 (D. Kan. Dec. 3, 2015) (dismissing claim that "issuance of the 1099-C was an unconscionable act because [plaintiff's] debt was already settled").

- 13 -

unconscionability claim because the relevant leases "were executed at various times, for various primary terms, and under a variety of different terms and conditions."[38] Here, the scheme was uniform for all class members—each paid based on the single list price the defendants' set for each product at issue.

### 4. Utah unconscionability class.

To argue that Utah law requires assessing each class member's unique circumstances, defendants merely cite two inapposite cases—a decision dismissing a complaint that pleaded no facts to support unconscionability, and an individual contract claim.[39] As neither deals with class certification, the argument fails.

## C. A nationwide class should be certified.

The defendants' challenge to a nationwide class rests on a misapplication of the Restatement choice-of-law factors. As if straight from a class defendant playbook, their argument—that each state's interest in applying its own statute trumps all else—is as worn as it is wrong. According to the defendants, states' interests mandate the rote application of their laws even if that choice-of-law frustrates the goals of the

---

[38] *Frederick v. S. Star Cent. Gas Pipeline, Inc.*, 2011 WL 3880902, at *3 (D. Kan. Sept. 2, 2011).

[39] *See Cotte v. CVI SGP Acquisition Tr.*, 2022 WL 464307, at *10 (D. Utah Feb. 15, 2022) (dismissing claim that "'simply repackaged [Defendants'] allegedly deceptive conduct and called it unconscionable.'") (citation omitted); *Res. Mgmt. Co.*, 706 P.2d at 1041 (individual claim that contract was unconscionable).

relevant statutes.[40] But the law is not so rigid and illogical as to command such a nonsensical result. For where each state seeks to deter the same unfair conduct and protect consumers, and where the unlawful conduct occurred in a single state, one law—in this case, New Jersey law—should apply for all.

Under § 145 of the Restatement, which applies to tort claims, the relevant contacts are with New Jersey (the domicile of Sanofi and Novo Nordisk, where injury-causing conduct occurred and where the relationship is centered) or a class member's home state (domicile of class members and where most injuries occur). To determine which of these locations has a "more significant relationship," the Court looks to the factors under § 6.[41]

The defendants misapply these factors, relying heavily on *Maniscalco v. Brother International (USA) Corporation*. But *Maniscalco* applied § 148 of the Restatement, which applies only "[w[here a fraud or misrepresentation claim has been alleged,"[42]

---

[40] *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001) (dismissing as "pure fancy" the argument that a state would seek to restrict its citizens from recovery that others could obtain under another state's law).

[41] *In re Accutane Litig.*, 235 N.J. 229, 261 (2018). These are: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.*

[42] 709 F.3d 202, 207 (3d Cir. 2013).

- 15 -

whereas § 145 applies here to the defendants' unconscionable business practices. And, crucially, the pertinent conduct in *Maniscalco* occurred *in Japan*, not New Jersey.[43] *Maniscalco* also predates *In re Accutane Litigation*, where the New Jersey Supreme Court held that the judicial interests of certainty, predictability and ease in applying the law are paramount in a complex case such as this.[44]

The defendants dismiss such interests of judicial administration, merely citing a case involving a single-car accident.[45] But in a complex class action involving numerous plaintiffs from several states, such as here, the "most significant Restatement factors" are (f)—"certainty, predictability and uniformity of result"—and (g)—"ease in the determination and application of the law to be applied."[46] In *Accutane*, the New Jersey Supreme Court held these factors weighed heavily in favor of the applying New Jersey law since applying only one state's law, the law of New Jersey, would ensure predictable and uniform results in an otherwise complex case.[47] And the trial judge would only have to apply familiar New Jersey law rather than the laws of 45 states, resulting in fewer errors and more timely disposition of the

_____

[43] *Id*. at 211-12.

[44] 235 N.J. at 263. A federal court follows the choice of law rules of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[45] *See Fu v. Fu*, 160 N.J. 108, 114-15 (1999).

[46] *Accutane*, 235 N.J. at 263.

[47] *Id*.

- 16 -

plaintiffs' claims.[48]

In retort, the defendants' invoke "competing state interests" to advance their own, which smacks of irony. The defendants do not explain how a choice-of-law result that complicates recovery supposedly *protects* the interests of other states in deterring conduct or compensating victims. Nor can they. According to a court in this district, such a result frustrates the state interests the defendants purport to defend and creates perverse incentives for corporate defendants.[49]

As the New Jersey Supreme Court held, a forum state should not apply choice-of-law principles in a way that discriminates against out-of-state residents,[50] and should consider if applying the forum state's law would frustrate the policies of other states.[51] "If a strong state policy or interest will be neither fostered by applying that state's law, nor frustrated by the failure to apply it, it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[52] So, "the initial focus should be on 'what [policies] the legislature or court intended

---

[48] *Id.* at 263-64.

[49] *See In re Mercedes-Benz Tele Aid Contract Litig.*, 167 F.R.D. 113,151 (D.N.J. 2010). ("Granting the relief sought by Mercedes . . . would infringe the compensatory interests of all six of the states in which this litigation's constituent actions were filed.").

[50] *Accutane*, 235 N.J. at 262.

[51] *Fu*, 160 N.J. at 122.

[52] *Id.* at 122-23.

- 17 -

to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation."[53] In other words, the Court should consider whether all state interests would be just as easily (if not better) advanced by applying the law of one state to all consumers.

Through this lens, applying New Jersey law to all class members' claims best furthers *all* state interests. Consumer protection statutes protect and compensate wronged consumers.[54] And the New Jersey Consumer Fraud Act aims to deter unfair and unconscionable conduct by New Jersey businesses and make whole the victims, even if out of state.[55] Moreover, the level of protection provided and the stringency of punishments under each state's consumer fraud statute are not competing resolutions of a particular policy issue; they reflect legislatures' decisions to create actions attacking the same wrongdoing.[56] Application of a single law provides the best (and most efficient) opportunity for consumers to recover nationwide. And it furthers New Jersey's goal of deterring corporate misconduct in its state.

---

[53] *Id.* at 125 (quoting *Pfizer, Inc. v. Employers Ins. of Wausau*, 154 N.J. 187, 198 (1998)). *See also* Restatement (Second) of Conflicts of Law § 6, comment e (2022). ("If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made.").

[54] *Dal Ponte v. Am. Mortg. Express Corp.*, 2006 WL 2403982, at *5 (D.N.J. Aug. 17, 2006).

[55] *Elias v. Ungar's Food Prods.*, 252 F.R.D. 233, 147 (D.N.J. 2008) (Shwartz, M.J.).

[56] *Dal Ponte*, 2006 WL 2403982, at *6.

- 18 -

Finally, the defendants overstate the importance of the parties' expectations about what law should apply; this factor holds little weight in the field of torts.[57] So it doesn't matter if plaintiffs could reasonably expect to be held to the law of their home state or if defendants should expect to be sued under New Jersey law.

In short, applying New Jersey law nationwide is neither unprecedented nor incompatible with the goals of its sister states.[58] It streamlines case management, promotes judicial efficiency, and advances—rather than frustrates—the similar interests of the class members' home states. In a case with such enormous public significance, application of a New Jersey nationwide class is appropriate.

**D.    The proposed multi-state classes should be certified.**

Contrary to the defendants' arguments, the proposed multi-state classes satisfy Rule 23(b)(3). The defendants first engage in the misleading use of brackets when they claim that "there is 'almost universal reluctance to certify [multi-state consumer

---

[57] *Fu*, 160 N.J. at 123. The justified expectations of a party can become a factor if defendants conformed their conduct to comply with the law of their home state, but someone seeks to hold them liable under the law of another state. *See Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 450 (D.N.J. 2012) (quoting Restatement § 6, comment g). But that is plainly not a factor where defendants here seek to *avoid* the law of their home state.

[58] *See Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 384 N.J. Super. 275, 303-05 (App. Div. 2006) (certifying nationwide class applying New Jersey Consumer Fraud Act). The New Jersey Supreme Court reversed the Appellate Division's decision in *Operating Engineers*, 192 N.J. 372 (2007), but not on choice-of-law grounds. *Id.* at 388 n.3.

- 19 -

protection] class actions.'"[59] In reality, the case they quote states that "[w]ith regard to Plaintiffs' *consumer fraud and deceptive trade practice claims*, courts have been loath to certify classes based on claims arising out of *consumer fraud* statutes of the various states."[60] The court didn't consider certifying multi-state classes for "unfair acts" based on a three-part test. And the other cases cited are inapposite because they don't address multi-state classes alleging "unfair acts" under the three-part test.[61]

Nor do the defendants find support with *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*,[62] in which a district court declined to certify a fifty-state class for breach of warranty, strict products liability, and negligence. The Third Circuit affirmed, but only because the plaintiffs submitted "a chart listing the type of law in each state and patterned jury instructions for the various claims in all fifty states" without providing an actual plan to manage all three claims in all fifty states.[63] Conversely, this case involves one cause of action and 16 states, and plaintiffs' trial plan explains the

---

[59] Def. Br. at 49 (quoting *Webster v. LLR, Inc.*, 2018 WL 10230741, at *8 (W.D. Pa. Aug. 20, 2018)).

[60] *Webster*, 2018 WL 10230741, at *8 (emphasis added).

[61] *See Vista Healthplan, Inc. v. Cephalon, Inc.*, 2015 WL 3623005, at *36 (E.D. Pa. June 10, 2015) (attempting to certify two classes with more than 24 states applying varying state antitrust, consumer fraud, and unjust enrichment standards); *In re Pepper Prods. Litig.*, 422 F. Supp. 3d 194, 226, 228 (D.D.C. 2019) ("[a]lthough every state's consumer protection statute prohibits deceptive acts, they do not utilize a uniform definition of deception").

[62] 2021 WL 3612155 (3d Cir. Aug. 16, 2021).

[63] *Id.*, at *4

010646-11/2030303 V1

standards applicable to each, the type of evidence that they will offer to satisfy those standards, and detailed sample jury instructions.

### 1. The three-part "substantial injury" test for unfairness applies under the laws of all 16 states at issue.

The defendants misrepresent the plaintiffs' position regarding the substantial injury test. The plaintiffs do not contend that the "cigarette rule" is identical *in its entirety* to the 1980 rule. Instead, the plaintiffs explain that the "substantial injury" prong of the "cigarette rule" is the same as the three-part 1980 FTC rule.[64] According to the Third Circuit, "the FTC could deem a practice unfair based on the third prong—substantial consumer injury—without finding that at least one of the other two prongs was also satisfied."[65] So, contrary to the defendants' argument, all states at issue apply the same "substantial injury" test, regardless of the applicable rule.

The defendants' cases do not support the contrary. In *Porsche*, the Florida Court of Appeal held that "the 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA,"[66] precisely the plaintiffs' position here. The defendants also assert, to no avail, that the "Maine Supreme Court has likewise described the Cigarette Rule as 'outdated' and substantively

---

[64] *See* Pl. Br. at 81-83 (citing *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015)).

[65] *Wyndham*, 799 F.3d at 244 (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)).

[66] 140 So. 3d at 1098.

- 21 -

distinct from the 1980 Standard."[67] But again, *Searles* applied the three-part test the plaintiffs espouse here.[68] And *Searles* did not discuss whether the older "substantial injury" test parallels the newer FTC test. As the Third Circuit established in *Wyndham*, those tests are *identical*. Similarly, the defendants miss the mark by claiming some courts still look to the first and second prongs of the cigarette rule. That may be, but it doesn't refute the plaintiffs' point: because the test is in the disjunctive, the plaintiffs here can rely solely on the third prong.

The defendants then misread case law to assert, "many states have developed their own jurisprudence on what makes conduct unfair."[69] For example, they maintain that Louisiana bars "'[o]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct.'"[70] Yet they leave out that "other unethical conduct" includes the "'substantially injurious'" conduct here.[71]

In North Carolina, the defendants misinterpret *Dalton v. Camp*, declaring "'[s]ome type of egregious or aggravating circumstances must be alleged and

---

[67] Def. Br. at 52 (quoting *Searles v. Fleetwood Homes of Pa., Inc.*, 878 A.2d 509, 519 n.10 (Me. 2005)).

[68] *See* 878 A.2d at 519 n.10.

[69] Def. Br. at 52.

[70] *Id.* (quoting *Quality Env't Processes, Inc. v. I.P. Petroleum Co.*, 144 So.3d 1011, 1025 (La. 2014)).

[71] *Quality Env't*, 144 So. 3d at 1025 (citation omitted).

- 22 -

proved.'"[72] But again they omit *Bumpers v. Community Bank of North Virginia*,[73] where the Court applied the substantial injury test without requiring additional "egregious" conduct. And *Dalton* didn't discuss "substantial injury," let alone hold that one must prove "egregious" conduct in addition to "substantial injury."

Similarly, the defendants claim that in Iowa, "a practice must be 'contrary to what an ordinary consumer would anticipate.'"[74] Yet, they disregard *Albaugh v. The Reserve*, which defined "unfair practice" as one that "causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces."[75] The Court did *not* require proof that an unfair act runs contrary to what an ordinary consumer would anticipate.

The defendants next aver that, in Massachusetts, "'[a]dherence to industry standards or customs is one factor that supports a finding of no unfairness.'"[76] Similarly, they declare that Maine "exempt[s] practices that 'properly complied with [another statute]' or rules."[77] But these not only present merits issues irrelevant at

---

[72] Def. Br. at 52 (quoting *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001)).

[73] 367 N.C. 81, 91 (2013).

[74] Def. Br. at 52 (quoting *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 37 (Iowa 2013)).

[75] 930 N.W.2d 676, 685 (Iowa 2019).

[76] Def. Br. at 52 (quoting *In re Pharm. Indus. AWP Litig.*, 491 F. Supp. 2d 20, 94 (D. Mass. 2007)).

[77] Def. Br. at 52-53 (quoting *Laing v. Clair Car Connection*, 2003 WL 1669624, at *3 (Me. Super. Ct. Jan. 29, 2003)).

- 23 -

this stage, they also present common issues that support certification. Still, the defendants don't argue that they "properly complied" with a statute or rule. And the case they cite in Massachusetts rebuts the idea that industry customs here preclude an unfairness finding. When "discounting became so prevalent that the list price no longer reflected the price that most people paid, it became unfair and deceptive to continue publishing such a list price upon which the AWP is based."[78]

The defendants also err in stating that this Court cannot decide whether the three-part FTC standard applies in Colorado, Indiana, and North Dakota. While no higher court in these states has explicitly outlined a test for unfair conduct, that fact does not bar certification because: (1) it's a common issue of law as to what test should apply; and (2) there are reasons to suggest each state would apply the three-part FTC test. For example, in North Dakota, the three-part FTC test appears *in the text of the statute*.[79] In Colorado, the state Supreme Court defined the scope of "unfair" acts by citing *Sperry & Hutchinson*, which applied the three-part test from the "cigarette rule."[80] And in Indiana, at least one article advocates adopting the same.[81]

---

[78] *In re AWP*, 491 F. Supp. 2d at 105.

[79] N.D. Cent. Code Ann. § 51-15-02 (West).

[80] *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo. 2001), as modified on denial of reh'g (Jan. 11, 2002).

[81] James R. Strickland, *Note, David's Sling: The Undetected Power of Indiana's Deceptive Consumer Sales Act*, 51 Ind. L. Rev. 211, 211-12 (2018).

The defendants do not cite a single case that would foreclose these results.

Finally, the defendants' citation to *In re EpiPen Litigation* does nothing to help their cause. In *EpiPen*, the plaintiffs sought to certify a class under 20 states that even the plaintiffs conceded used competing standards to define unfair conduct.[82] In this case, class certification involves only one standard of unfair conduct.

### 2. Other state-law elements cited by the defendants do not preclude certification of the multi-state classes.

The defendants do not support their claim that "variation in *other* elements under these laws, including scienter, causation, limitations periods, and available remedies" preclude certification.[83] The defendants discuss the state laws *abstractly*, without showing that the alleged differences would make any *realistic* difference in this matter. "Courts should look at how issues are likely to play out in the context of the case to see what individual issues are likely to arise, and what state law differences are irrelevant and may be ignored."[84] Here, the differences cited by defendants are irrelevant.

---

[82] *In re EpiPen Litig.*, 2020 WL 1180550, at *57.

[83] Def. Br. at 50.

[84] *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 84 (D. Mass. 2005) ("AWP"). *See also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 297 (1st Cir. 2000) (affirming class certification where district court found that "'[u]nder either [grouping's] rule, the factual proffer will be largely the same'" as to limitations defense) (quoting district court); Manual for Complex Litigation (4th) § 22.634, p. 412 (2004) (where there is "little *relevant* difference in the governing law," the court can certify "appropriate grouping of claims") (emphasis added).

- 25 -

### a. Scienter does not present individualized issues.

The defendants' contention that the "statutes vary as to scienter" is immaterial.[85] The plaintiffs claim *only* that the defendants acted intentionally, so there is no need to instruct a jury as to reckless or unknowing behavior.[86]

### b. Questions of proximate causation are common.

The defendants err that the States at issue "vary on" proximate causation.[87] The defendants first misleadingly contend that "Iowa has abandoned proximate causation in favor of a 'scope of liability' formulation."[88] *Garr* held that in "a *negligence* cause of action," a "scope of liability" concept has replaced "proximate causation."[89] In contrast, the Iowa Private Right of Action for Consumer Frauds Act defines "actual damages" as "all compensatory damages *proximately caused* by the prohibited practice or act that are reasonably ascertainable in amount."[90]

The defendants' further contention that "proximate cause" is not "a uniform

---

[85] *See* Def. Br. at 54.

[86] *See AWP*, 230 F.R.D. at 85 ("[P]laintiffs have wisely noted that they are pressing only the theory that defendants intentionally made fraudulent misrepresentations.... Therefore, different standards governing scienter do not present individual issues.") (footnote omitted).

[87] Def. Br. at 54.

[88] *See* Def. Br. at 54 (citing *Garr v. City of Ottumwa*, 846 N.W.2d 865 (Iowa 2014)).

[89] 846 N.W.2d 869 (emphasis added).

[90] Iowa Code § 714H.2(1) (emphasis added).

- 26 -

standard" is also misguided.[91] The court in *Debra F. Fink* indicated that some state

consumer protection acts apply only a "but for" test but did not identify those

states.[92] The defendants similarly fail to identify any such state. The *Debra F. Fink*

court also stated that many states require proof that the wrongful act is a "but for"

cause and a "substantial factor" in causing losses, so that a "foreseeable independent

act" does not relieve the defendant of liability.[93] Under those standards, the

defendants cannot show any different requirements for proximate causation that

would make a difference in this case. All relevant states apply "but for," "substantial

factor" and foreseeability tests.[94] The plaintiffs don't object to a jury instruction that

---

[91] *See* Def. Br. at 54-55 (citing *Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 839 A.2d 942 (N.J. Super. Ct. Law. Div. 2003)).

[92] 839 A.2d at 977.

[93] *Id.* at 977-78. The sole exception is Michigan, which the court explained uses a "socially and economically desirable" test. *Id.* at 978. But Michigan law is not at issue here.

[94] *See Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287, 292-93 (Colo. 2020) **(CO)** ("substantial factor" and foreseeability); *Stevenson Lumber Co.-Suffield v. Chase Assocs., Inc.*, 284 Conn. 205, 214 (2007) **(CT)** (actual cause that is a substantial factor in the resulting harm and was foreseeable); *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 864 (Del. 2015) **(DE)** ("but for" and foreseeability); *Thomas v. Generac Power Sys. Inc.*, 2020 WL 9602345, at *5 (N.D. Fla. Dec. 28, 2020) **(FL)** (reasonably foreseeable); *Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 718 (N.D. Ill. 2018) **(IL)** ("but for" and foreseeability); *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 393 (Ind. 2016) **(IN)** (injury was a "natural and probable consequence" and "reasonably foreseen"); *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 75 (Iowa 2018) **(IA)** ("substantial factor" and "except for"); *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1057 (La. 2010) **(LA)** ("result of another person's use of" unfair practices); 1 Maine Jury Instruction Manual § 7-80 (2022) **(ME)** (conduct must play "substantial part in bringing about or actually

- 27 -

applies all three tests, because the plaintiffs can readily establish causation under any or all of them, particularly where the defendants have openly admitted that their list price scheme results in higher insulin prices for the class.

### c. Issues concerning statutes of limitations and accrual do not present individual questions.

The defendants erroneously argue that their statute of limitations defenses (and accompanying accrual of claims rules) preclude certification.[95] The defendants ignore that the plaintiffs' rely on the discovery rule or the fraudulent concealment doctrine (or both) to toll the limitations period under each state's laws.[96] All states apply the fraudulent concealment doctrine to decide whether claims are timely.[97]

---

causing the injury," which "was either a direct result, or a reasonably foreseeable consequence of the act or failure to act"); MPJI-Cv 7:9 (**MD**) (reasonably foreseeable); *Katz v. Belveron Real Est. Partners, LLC*, 28 F.4th 300, 313 (1st Cir. 2022) (**MA**) (causal connection and foreseeable loss); *Keith v. Health-Pro Home Care Servs., Inc.*, 873 S.E.2d 567, 583 (N.C. 2022) (**NC**) ("natural and continuous sequence" produces injuries that a "person of ordinary prudence could have reasonably foreseen"); *Krueger v. Grand Forks Cnty.*, 852 N.W.2d 354, 364 (N.D. 2014) (**ND**) ("natural and continuous sequence" produces injuries, which resulted in "substantial part" from wrongful acts); *McGehee v. Forest Oil Corp.*, 908 F.3d 619, 625 n.4 (10th Cir. 2018) (**OK**) ( "defendant's conduct [must have] foreseeably and substantially caused the injury"); *Wright v. PRG Real Est. Mgmt., Inc.*, 826 S.E.2d 285, 295 (S.C. 2019) (**SC**) ("but for" and foreseeability); *Cotten v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019) (**TN**) ("substantial factor" and foreseeability).

[95] Def. Br. at 55-56.

[96] *See* Third Amended Complaint, ¶¶ 314-319.

[97] *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 112–13 (Colo. 2011) (**CO**) ("[Plaintiffs'] fraudulent concealment claim [to toll the statute of limitations] is amenable to class-wide adjudication"); *Palmieri v. Intervet Inc.*, 2021 WL 2205854, at *13 (D.N.J. June 1, 2021) (**CT**) ("[Plaintiff's] allegations sufficiently plead fraudulent

And all of them—except for Connecticut, Florida, Indiana, and Maine—apply a

discovery rule for tolling their consumer protection acts' limitations periods.[98]

_____

concealment under [CUTPA]"); *Mazzanti v. Gen. Elec. Co.*, 2017 WL 923905, at *6
(D. Conn. Mar. 7, 2017) (**CT, DE, FL, IL**) (certifying consumer protection class that
included Connecticut, Delaware, Florida, and Illinois, where "fraudulent
concealment to toll the statute of limitations predominates"); *Lehman Bros. Holdings,
Inc. v. Kee*, 268 A.3d 178, 186 (Del. 2021) (**DE**) (fraudulent concealment doctrine
applies under Del. Code Ann. tit. 10, § 8106, which applies to actions based on
statutes); *State Farm Mut. Auto. Ins. Co. v. Muse*, 2022 WL 413417, at *9 (11th Cir.
Feb. 10, 2022) (**FL**) ("genuine issues of material fact exist as to whether fraudulent
concealment tolled the statute of limitations" for FDUTPA claim); *Elward v.
Electrolux Home Prod., Inc.*, 264 F. Supp. 3d 877, 892 (N.D. Ill. 2017) (**IN**) (fraudulent
concealment can toll statute of limitations under Indiana Deceptive Consumer Sales
Act); *House of Raeford Farms*, 2021 WL 1081837, at *6 (W.D. La. Mar. 18, 2021)
(**LA**) (fraudulent concealment doctrine applies to LUTPA claims); *Akins v. Firstbank,
N.A.*, 415 A.2d 567, 569 (Me. 1980) (**ME**) (Me. Rev. Stat. tit. 14, § 859, which
extends limitations provisions until after discovery, applied "to fraudulent
concealment from the plaintiff of the existence of a cause of action"); *Nyarko v.
BMW of N. Am., LLC*, 2020 WL 1491361, at *9 (D. Md. Mar. 27, 2020) (**MD**)
(fraudulent concealment precluded dismissal of claim under Maryland Act);
*Mahoney v. Wells Fargo Bank, N.A.*, 2022 WL 1446934, at *10 (D. Mass. Mar. 25,
2022) (**MA**) (fraudulent concealment doctrine precluded summary judgment for
defendant on Chapter 93A claim); *Jones v. BMW of N. Am., LLC*, 2020 WL
5752808, at *3 (M.D.N.C. Sept. 25, 2020) (**NC**) (fraudulent concealment doctrine
applies to claim under North Carolina Act); N.D. Cent. Code Ann. § 28-01-24 (**ND**)
(fraudulent concealment tolls any claim under North Dakota law); *Legacy Crossing,
L.L.C. v. Travis Wolff & Co., L.L.P.*, 229 F. App'x 672, 682 (10th Cir. 2007) (**OK**)
(applying fraudulent concealment doctrine under Oklahoma Act); *Masquat v.
DaimlerChrysler Corp.*, 195 P.3d 48, 57 (Okla. 2008) (**OK**) ("Common issues
predominate in this matter as to the ... alleged fraudulent concealment asserted in
response to Defendant's statute of limitations defense."); *Harrell v. BMW of N. Am.,
LLC*, 517 F. Supp. 3d 527, 536 (D.S.C. 2021) (**SC**) ("fraudulent concealment"
claims barred dismissal under South Carolina Act); *Howard v. Wilkes & McHugh, PA*,
2009 WL 10699545, at *13 (W.D. Tenn. Apr. 15, 2009) (**TN**) ("Whether the
doctrine of fraudulent concealment will operate to toll the statute of limitations on
Plaintiffs' claims is another issue common to the entire class.").

[98] Colo. Rev. Stat. Ann. § 6-1-115 (**CO**) (discovery rule applies to claims under
Colorado Act); *Lehman Bros. Holdings, Inc.*, 268 A.3d at 186 (**DE**) (discovery rule
applies under Del. Code Ann. tit. 10, § 8106, which applies to actions based on

Defendants also ignore that in *In re Linerboard Antitrust Litigation*,[99] the Third

Circuit held that a statute of limitations defense (and whether defendants engaged in

fraudulent concealment that tolled the limitations period) did not preclude class

certification. "Notwithstanding the individual determinations that will undoubtedly

arise at trial, common issues of concealment predominate here because the inquiry

necessarily focuses on defendants' conduct, that is, what defendants did rather than

what plaintiffs did."[100] The "key questions" did not concern individual knowledge,

because "the critical inquiry will be whether defendants successfully concealed the

existence of the alleged conspiracy, which proof will be common among the class

members in each class."[101]

---

statutes); *Stewart v. JP Morgan Chase Bank, N.A.*, 2022 WL 294763, at *3 (N.D. Ill. Feb. 1, 2022) (**IL**) (discovery rule applies to claims under Illinois Act); Iowa Code Ann. § 714H.5(5) (**IA**) (discovery rule applies under Iowa Act); *House of Raeford Farms of Louisiana LLC v. Poole*, 2021 WL 1081837, at *6 (W.D. La. Mar. 18, 2021) (**LA**) (discovery rule applies to LUTPA claims); *Cain v. Midland Funding, LLC*, 256 A.3d 765, 782 (Md. 2021) (**MD**) (discovery rule applies to claim under Maryland Act); *Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.*, 458 F. Supp. 3d 95, 106 (D. Mass. 2020) (**MA**) (discovery rule applies to Chapter 93A action); *Jones*, 2020 WL 5752808, at *3 (**NC**) (discovery rule applies to claim under North Carolina Act); N.D. Cent. Code Ann. § 51-15-12 (**ND**) (discovery rule applies under North Dakota Act); *Legacy Crossing, L.L.C.*, 229 F. App'x at 682 (**OK**) (applying discovery rule to claim under Oklahoma Act); *AMC W. Hous. LP v. NIBCO, Inc.*, 2019 WL 4491331, at *4 (W.D. Okla. Sept. 18, 2019) (applying discovery rule to claim under Oklahoma Act); S.C. Code Ann. § 39-5-150 (**SC**) (discovery rule applies to claims under South Carolina Act); Tenn. Code Ann. § 47-18-110 (**TN**) (discovery rule applies to claim under Tennessee Act).

[99] 305 F.3d 145 (3d Cir. 2002).

[100] *Id.* at 163 (citation omitted).

[101] *Id.* (citation omitted).

Similarly here, the plaintiffs contend that no class member could have discovered the claim before the initial complaint was filed (and that fraudulent concealment applies) because the defendants hid their scheme as of that time. That means that "the critical inquiry will be whether defendants successfully concealed the existence of the alleged conspiracy, which proof will be common among the class members in each class."[102]

The cases cited by the defendants stand for the unremarkable proposition that certification "*may* be denied" when individual limitations issues predominate.[103] And the defendants' cases are inapposite.[104] Finally, even if the plaintiffs fail to prove that the discovery rule or fraudulent concealment doctrine tolls the limitations

---

[102] *Linerboard*, 305 F.3d at 163; *see also In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 401 (3d Cir. 2015) (rejecting defendants' argument that "the 'actively misled' and 'reasonable due diligence' components [of fraudulent concealment for tolling the limitations period] will require individualized fact finding, which undermines any claim of predominance").

[103] *See* Def. Br. at 55 (emphasis added).

[104] *See Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998) ("determining when a plaintiff's claim accrued necessitates two individual inquiries for each plaintiff: when he began smoking and how much he has smoked since then"); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 467 (D.N.J. 2009) ("marked variations among the state consumer fraud statutes with respect to, *inter alia*, available remedies, ascertainable loss, limitations periods, coupled with the patient-by-patient and contract-by-contract inquiries already required to determine liability, destroy any modicum of Class cohesiveness," without discussing tolling); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2012 WL 379944, at *34 n.25 (D.N.J. Feb. 6, 2012) ("the Court need not decide whether variations in state law would make class litigation unmanageable, because the Court is persuaded that predominance has been defeated for the independent reasons explained above").

- 31 -

period, the proper course of action would be to limit the claims under each state's

laws to losses suffered with the limitations period for each state, not to deny class

certification.

### d.  The "other state-specific issues" identified by the defendants do not preclude certification.

The few other "state-specific issues" discussed by the defendants do not

undermine class certification.[105] *First*, the defendants erroneously claim that under

Maine law, the plaintiffs must show they were deceived into buying something they

would not otherwise buy. In the sole case the defendants cite, the court held that

charges for photographs were not "unfair" where a price difference of "as little as

$1.25 . . . would clearly be insubstantial . . . ."[106] The court then *separately* held that

the "commission practice does not induce consumers to act to their detriment and is

not deceptive within the meaning of the UTPA."[107] Thus, the court did *not* hold that

to be "unfair," a price must have induced a purchase. The defendants also falsely

claim that Indiana law only allows claims for deceptive acts.[108] Section 24-5-0.5-3 of

the Indiana Code, which bars both unfair and deceptive acts, is entitled "Deceptive

acts." Therefore, the reference to "deceptive acts" in Section 24-5-0.5-4 does not bar a

---

[105] *See* Def. Br. at 56-59.

[106] *Tungate*, 714 A.2d at 797.

[107] *Id.*

[108] Def. Br. at 56.

private action for unfair acts. Defendants ignore that in *Gasbi, LLC v. Sanders*,[109] the court reversed the dismissal of a claim under § 24-5-0.5-4 for an "unfair consumer practice prohibited by the Consumer Act."

*Second*, the defendants contend that the proposed Colorado representative bought his analog insulin before the Colorado Act was amended to bar "unfair acts."[110] Whether the amendment is retroactive presents a common issue. And in any event, the plaintiffs intend to substitute a new plaintiff (and proposed class representative) from Colorado, for whom they will promptly provide discovery responses and who will be made available for a deposition.[111]

*Third*, the defendants erroneously argue that this Court cannot certify classes under Colorado and Utah law because their "statutes do not authorize monetary relief in class actions."[112] Numerous courts have held that Rule 23 supplants Utah's and Colorado's limitations.[113] The defendants cite cases to the contrary, but Third

---

[109] 120 N.E.3d 614, 617 (Ind. Ct. App. 2019).

[110] *See* Def. Br. at 57.

[111] *See Johnson v. GEICO Cas. Co.*, 672 F. App'x 150, 157 (3d Cir. 2016) ("a court may grant leave to substitute new representatives when a named class representative becomes inadequate").

[112] Def. Br. at 57.

[113] *See Lessin v. Ford Motor Co.*, 2021 WL 3810584, at *15 (S.D. Cal. Aug. 25, 2021) (Colorado); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 790 (D. Minn. 2020) (Utah); *Parrish v. Volkswagen Grp. of Am., Inc.*, 463 F. Supp. 3d 1043, 1062 (C.D. Cal. 2020) (Utah); *Wilson v. Volkswagen Grp. of Am., Inc.*, 2018 WL 4623539, at *14 (S.D. Fla. Sept. 26, 2018) (Utah); *Andren v. Alere, Inc.*, 2017 WL 6509550, at *21 (S.D. Cal. Dec. 20, 2017) (Colorado).

Circuit law undermines their argument. In *Amato v. Subaru of America, Inc.*,[114] Judge
Rodriguez stated that courts "have disagreed on how to apply *Shady Grove*'s plurality
decision to class action bars where, as here, the class action bar is part of a specific
state statute."[115] Some courts "have adopted Justice Scalia's categorical approach and
found that '*Shady Grove* instructs that state consumer protection class action bars do
not apply to those claims if brought as a class action under Federal Rule of Civil
Procedure 23.'" Judge Rodriguez then explained that "[w]hile the Third Circuit has
applied *Shady Grove* to class action bars like the one at issue here, it has endorsed
Justice Scalia's approach elsewhere."[116] Judge Rodriguez then concluded that "[w]hile
the *Nuveen* court did not apply *Shady Grove* to Rule 23 or class-action bars contained
within state statutes, it implicitly found that district courts should follow Justice
Scalia's approach when evaluating potential conflicts between federal rules and state
laws more broadly. Taking this approach and focusing only on the procedural or
substantive nature of Rule 23, it is clear that 'Rule 23, not state law, governs the
availability of class action treatment of Plaintiff's claims.'"[117] Therefore, Defendants'

---

[114] 2021 WL 2154976 (D.N.J. May 27, 2021).

[115] *Id.* at *7 (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S.
393 (2010)).

[116] *Id.* (citing *Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v.
WithumSmith Brown, P.C.*, 692 F.3d 283 (3d Cir. 2012); *Interfaith Cmty. Org. v.
Honeywell Int'l, Inc.*, 726 F.3d 403, 409 (3d Cir. 2013)).

[117] *Id.* at *8 (citation omitted).

argument that classes cannot be certified under Colorado and Utah law is incorrect.

*Fourth*, the antitrust cases cited by the defendants do not support their position that the Texas and Oklahoma statutes at issue bar indirect purchasers actions.[118] The defendants' cases held that an antitrust claim dressed up as consumer protection claim cannot avoid the indirect purchaser rule under antitrust law.[119] But here, the plaintiffs do not make antitrust claims masquerading as consumer protection claims. Rather than alleging collusion, the plaintiffs explain that the defendants engaged in shadow pricing wherein they carefully watched and then copied each other's price increases without any explicit agreement. And the defendants do not show that those two states bar indirect purchaser claims in state-law RICO cases, let alone that the plaintiffs' claims for "unfair acts" are RICO claims in disguise. Indeed, courts have dismissed RICO "indirect purchaser" claims but nonetheless allowed Texas DTPA claims to proceed, and other courts have allowed claims by indirect purchasers to proceed under the Oklahoma Act.[120]

---

[118] Def. Br. at 58.

[119] *See Harris Cnty. v. Eli Lilly & Co.*, 2022 WL 479943, at *13 (S.D. Tex. Feb. 16, 2022) (plaintiff's "conspiracy allegations 'masquerade' as 'consumer protection' claims despite mirroring 'prohibited antitrust' claims under federal law"); *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 420 (E.D. Pa. 2010) (indirect purchaser rule "preclude[s] the assertion of an indirect purchaser's anti-competitive conduct claims under the OCPA").

[120] *See, e.g., Counts v. Gen. Motors, LLC*, 2022 WL 2079757, at *23 (E.D. Mich. June 9, 2022) (dismissing RICO claim under "indirect purchaser" rule but declining

### 3.    Any "ascertainable loss" requirement does not bar certification.

Defendants wrongly argue that class members did not suffer ascertainable losses in states requiring such proof.[121] The defendants rely on *Harnish v. Widener University School of Law*, in which the defendant allegedly "defrauded a putative class of law students by publishing misleading statistics about its graduates' employment, which caused the students to pay 'inflated' tuition."[122] The plaintiffs claimed they could "prove that all class members' positions were worsened by the publication of misleading employment statistics because [the defendant], as an efficient-market actor responding to those statistics, charged everyone higher tuition, regardless of whether the statistics impacted each individual class member's decision-making as a consumer."[123] The Third Circuit affirmed denial of class certification because ""recognizing 'price inflation' as a 'cause' of 'ascertainable loss' is essentially the same as extending the fraud-on-the-market presumption to all consumer-fraud cases. The practical effect of both theories is indeed the same, and both depend on the

---

to dismiss Texas DTPA claim even though "Defendants are upstream suppliers that did not communicate with Plaintiff"); *In re Takata Airbag Prod. Liab. Litig.*, 524 F. Supp. 3d 1266, 1295 (S.D. Fla. 2021) (same); *McAlister v. Ford Motor Co.*, 2015 WL 4775382, at *4 (W.D. Okla. Aug. 13, 2015) (declining to dismiss claim by consumer against Ford for "unfair acts").

[121] Def. Br. at 59-62.

[122] 833 F.3d 298, 302 (3d Cir. 2016).

[123] *Id.* at 311.

existence of an efficient market."[124]

In contrast, the plaintiffs' "ascertainable loss" theory here is based on the defendants' unfair and unconscionable conduct, not fraud on the market caused by misrepresentations. The defendants *directly* set the list prices that the plaintiffs pay, and they knew that the class members would bear their list price inflation. Whether there is an efficient market for insulin retail prices is irrelevant.

In a similar case, the court held that "price inflation allegations" under the NJCFA did not "implicate a 'fraud on the market' approach."[125] The court explained that the plaintiff "does not allege that she suffered a loss because AEG made false remarks, for example, in promoting the concerts, which were reflected in the artificially high price paid by Pollard for tickets."[126] Instead, the plaintiff alleged "that AEG wrongfully manipulated the market for tickets to the concerts by withholding an amount of tickets in excess of the amount permitted by Section 35.1 and thus drove up the ticket price by reducing the supply available to the general public."[127] Similarly here, the plaintiffs do not contend that the defendants defrauded the market but instead that the defendants set unfairly inflated list prices, knowing that

---

[124] *Id.* at 312.

[125] *Pollard v. AEG Live, LLC*, 2014 WL 4637017, at *6 (D.N.J. Sept. 16, 2014).

[126] *Id.*

[127] *Id.*

- 37 -

certain consumers—the class here—would pay those inflated prices. As in *Pollard*, that theory does not implicate a "fraud on the market" approach.[128]

## E.  The plaintiffs' damages model reliably measures class-wide injury and damages.

### 1.  Dr. Rosenthal's structural break method reliably measures when the class period begins by analyzing the effects of defendants' conduct.

The defendants' attack on Dr. Rosenthal's damages model begins with a misconception. The structural break (or trend break) analysis does not attempt to determine the unfairness or lawfulness of defendants' actions. The jury will decide that. What the structural break test does is determine the class period. Several courts have upheld the test for this purpose.[129]

In antitrust cases, for example, the test evaluates when some significant change in pricing or production occurs.[130] This result can then be compared to the

---

[128] Defendants cite a litany of cases regarding ascertainable loss, *see* Def. Br. at 61 n.18, but none of those cases addresses whether the types of unfair acts at issue here resulted in ascertainable losses.

[129] *E.g.*, *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *8-10 (N.D. Ill. May 27, 2022) (admitting expert testimony of structural break test to determine class period); *In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *10 (same); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 57 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019) (same).

[130] *E.g.*, *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *8 (examined when the "historic decrease in Broiler production" occurred in the market relative to trends from 2000 to 2020); *In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *10 (analysis looked at "historic break" between corn prices and milo prices); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d at 57 (relationship between freight rates and fuel prices).

- 38 -

evidence of conduct alleged to determine if that conduct caused the sudden change. That's no different than how Dr. Rosenthal uses it here.

Plainly, *something* changed about the way in which defendants price insulin. The Senate investigation, media coverage, and defendants' admissions stand proof of that. The structural break test simply measures with scientific precision when that change occurred. The jury may then investigate what the defendants did to cause that trend break and can decide the lawfulness of that conduct from there.

Of course, substantial evidence shows what caused the change is not a mystery, undermining the defendants' attempt to cast doubt on plaintiffs' theory of the unlawful conduct. All three defendants faced downward pricing pressures, with interchangeable products and exclusive formularies becoming the norm. Yet, each defendant subverted this competitive environment, took advantage of their captive market, and aggressively raised list prices. The defendants could get away with such conduct because they raised prices in tandem and then offered PBMs enormous rebates—kickbacks that demonstrate the genuine, stagnant value the defendants perceived their insulins to hold. And they did so despite knowing the financial difficulty it would cause the consumer class here.

The defendants nevertheless assert there's no difference between conduct before and after the trend break because rebates are generally lawful. But the drug manufacturers oversimplify their characterization of the relevant conduct to obscure

- 39 -

the fact that "*rebates are lawful*" and "*defendants' behavior was unlawful*" are not mutually exclusive ideas. Speech is also generally lawful; that doesn't mean it's a defense to a charge of defamation. State legislatures have granted power to the jury to decide the line between legally fair and unfair conduct, and whether defendants consider that line arbitrary does not matter.

### 2. Class action plaintiffs routinely use averages to prove damages, as plaintiffs validly do here.

The defendants maintain that using averages to prove damages may conceal "individualized differences" among class members.[131] Yet, they gloss over the many cases where experts use averages and courts reject similar challenges.[132] Nor do they explain how Dr. Rosenthal's use of averages here bears any resemblance to any case they cite. The direct tie between list price and injury differentiates Dr. Rosenthal's model here from those relating to the delayed entry of generic drugs in *Niaspan* and

---

[131] *See* Def. Br. at 68.

[132] *See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 628 (N.D. Cal. 2015) ("[A]ttacking averaged data is a standard defense tactic . . . so it is unsurprising that courts have often evaluated and approved the appropriate use of averages."); *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 2018 WL 6567709, at *6-7 (D.N.J. Dec. 12, 2018) ("the fact that some [ ] purchasers were injured more or less strongly than others is not only permitted, but is a reason for why averages are appropriate in the damages calculation"); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 389 (M.D. Fla. 2018) ("The use of averages to prove common impact to a putative class is accepted."); *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009) ("the use of averaged and aggregated data is not fatal"); *see also* NEWBERG ON CLASS ACTIONS § 4:54; § 11:6 (explaining same).

*Sheet Metal Workers*, where there were not such direct ties for payer preferences.[133]

Specifically, Dr. Rosenthal uses averaged monthly cash prices to prove "that cash prices are a function of list prices" by showing how strongly cash prices at pharmacies overall correlate to list prices set by defendants over time.[134] And she uses average net prices as a yardstick by which to compare list prices in the actual and but-for worlds.[135] The defendants retort that Dr. Rosenthal must consider each pharmacy U&C cash price or rebate, but in an argument that's purposefully opaque, they fail to explain *why* that's so or *what* individualized differences among class members average cash and net prices purportedly conceal. Rather than conceal, the statistics provided by Dr. Rosenthal use common evidence to show when and if there was a break in the market, which supports predominance. The yardstick that she has presented can be used here as well as be introduced in an individual case to sustain a jury's finding of injury, which is all that is needed.[136]

---

[133] *See, e.g., In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 712 (E.D. Pa. 2020); *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552, at *30 (E.D. Pa. Sept. 30, 2010).

[134] Rosenthal Rebuttal ¶ 34.

[135] Rosenthal Report ¶ 58.

[136] *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 450 (2016) (affirming verdict against the defendant in class action and holding that representative proof from a sample, based on an expert witness's estimation of average time that employees spent donning and doffing protective gear, could be used to show predominance of common questions of law or fact).

As explained in Dr. Rosenthal's rebuttal report, just because variation exists among cash prices and rebates to PBMs doesn't mean such differences matter to class members or their injuries. What matters is that a change in the list price produces a proportional change in the prices paid by patients regardless of these so-called variations.[137] In other words, Persons A and B may have different insurance, with one paying 75% of AWP and the other 80%, but both still would pay 10% less if the list price were 10% less.[138] The purportedly concealed individualized differences are imagined. And Dr. Rosenthal's use of averages is permissible.

### 3. Benefit-of-the-bargain damages do not require the plaintiffs to suffer an ascertainable loss as a result of deception; it suffices that plaintiffs suffered an ascertainable loss as a result of an unconscionable act.

The defendants incorrectly aver that "the only surviving 'legal theory of the harmful event'" is a "'benefit of the bargain' loss caused by a misrepresentation."[139] In fact, this Court held that "Plaintiffs have adequately pled an ascertainable loss pursuant to the 'benefit-of-the-bargain' theory, as they contend that they were '*unfairly* deprived of the benefit of the bargain' as they paid more than their pro-rata share of the net prices of the subject insulin."[140] Similarly, the New Jersey Supreme

---

[137] Rosenthal Rebuttal ¶ 34.

[138] *Id.*

[139] Defs.' Br. at 73 (citation omitted).

[140] Op. (Feb. 15, 2019), at 30 (ECF No. 252) (emphasis added).

- 42 -

Court has applied the benefit-of-the-bargain standard to a claim for unconscionable

conduct. In *D'Agostino v. Maldonado*, the New Jersey Supreme Court explained that

"[o]ur cases distinguish between a plaintiff who can demonstrate no loss—be it an

out-of-pocket loss or the loss of the value of his or her interest in property—and a

plaintiff who can demonstrate that he or she has been deprived of the 'benefit of the

bargain' because of a CFA violation."[141] The Court held that if "an unconscionable

commercial practice has caused the plaintiff to lose money or other property, that

loss can satisfy both the 'ascertainable loss' element of the CFA claim and constitute

'damages sustained' for purposes of the remedy imposed under the CFA."[142]

Similarly here, Dr. Rosenthal's damages model captures the inflationary effect

of defendants' conduct, which caused class members to suffer benefit-of-the-bargain

damages.[143] The defendants harp that "[s]he concedes that she has not attempted to

---

[141] 216 N.J. 168, 190 (2013).

[142] *Id.* at 192-93.

[143] The cases cited by Defendants are inapposite. *See, e.g., Simmons v. Ford Motor Co.*, 2022 WL 845127, at *17 (S.D. Fla. Mar. 21, 2022) (because "repair cost" damage model was invalid under New York law, which requires that defect be manifested, and under Florida law, which does not cover repair costs, "Plaintiffs do not have a valid class-wide measure of damages due to differences in how damages are calculated under each respective state law"); *BlackRock Balanced Cap. Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 5619957, at *13 (S.D.N.Y. Aug. 7, 2018) ("Dr. Hartzmark's model awards each current noteholder damages designed to compensate for all harm over a note's entire history, not just those that accrued during the noteholder's ownership.").

- 43 -

'measure injury caused by alleged misrepresentations.'"[144] But, as in *D'Agostino*, her analysis validly rests on unfair and unconscionable conduct, so Defendants' argument is irrelevant.

### F.    The plaintiffs use a wealth of detailed PBM and pharmacy transactional data to identify the class members.

Defendants claim that the proposed classes are not ascertainable. They don't argue that plaintiffs have failed to define the classes by objective criteria. Instead, they contend plaintiffs cannot identify those class members. Defendants are wrong.

Plaintiffs' class definitions include all who bought defendants' analog insulins in the class period based on list price. As a practical matter, this means anyone who purchased without using Medicaid, a copay, or assistance from one of the defendants' programs. Most of the data identifies such transactions straightaway.

Most of the pharmacy and PBM data have a column that identifies transactions under Medicaid.[145] And even if they don't, it's not "impossible" for Dr. Rosenthal to exclude these transactions, as the defendants claim. Dr. Rosenthal can identify Medicaid transactions by plan name (there are only a handful of Medicaid

---

[144] Def. Br. at 72.

[145] Rosenthal Report ¶ 106; Rosenthal Rebuttal ¶ 56.

plans in each state[146]) or the amount paid (Medicaid copays are set by law[147]).

As for copays, these payments are almost exclusively round-dollar amounts. As a result, Dr. Rosenthal can distinguish copays through a method that has been both tested to prove its near perfect accuracy and corroborated by industry professionals.[148] In response, the defendants complain that some insurance plans don't have flat copays. But they ignore three critical points. *First*, such plans are extremely rare, meaning patients paying an odd copay amount represent a very small number to begin with.[149] *Second*, Dr. Rosenthal can still identify this small number of odd-copay purchasers using her method.[150] *Third*, Dr. Rosenthal's method is very conservative, negating claims of prejudice or overinclusiveness by defendants.[151]

Similarly, the administrators of the defendants' patient assistance programs

---

[146] *See, e.g.*, Table 5, MEDICAID MANAGED CARE ENROLLMENT AND PROGRAM CHARACTERISTICS (2018), at 33, https://www.medicaid.gov/Medicaid/downloads/medicaid-mc-enrollment-report.pdf; *see also* Supplemental Declaration of Mark D. Fischer of Rawlings Analytics, LLC ("Fischer Supp. Decl.") ¶ 7 (Exhibit 2 to the Berman Reply Decl.).

[147] *See* State Medicaid Copay Requirements, *available at* https://www.kff.org/other/state-indicator/state-medicaid-pharmacy-copay-requirements/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[148] Rosenthal Rebuttal ¶ 54.

[149] *Id.* ¶¶ 54, 122.

[150] *Id.* ¶ 54.

[151] *Id. See City Select Auto Sales v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 442 n.4 (3d Cir. 2017) ("While a *high* degree of over-inclusiveness could prevent certification, *any* degree of over-inclusiveness will not do so.").

maintain data going back years that identify every patient who paid using one of defendants' programs.[152] Dr. Rosenthal can merge this data with PBM and pharmacy transactional data to exclude any necessary transactions.[153] Altogether, Dr. Rosenthal's ability to parse out these exclusions leave her free to ascertain the class from the remainder of the transactional data.

### 1. Defendants mischaracterize the Third Circuit's ascertainability requirements.

The Third Circuit has cautioned that "[i]f defendants intend to challenge ascertainability, they must be exacting in their analysis and not infuse the ascertainability inquiry with other class-certification requirements."[154] The defendants do not heed this admonishment. Nor do they heed the Third Circuit's most recent guidance, instead relying outdated authority.

*First*, the defendants unsuccessfully attempt to distinguish the Third Circuit's most recent decision—*Hargrove v. Sleepy's*—which refutes many of their core arguments. They suggest that a "complex" class definition with exclusions warrants a heightened ascertainability standard, different from that applied in *Hargrove*.[155] The

---

[152] *See* Mink Decl. ¶ 10 (ECF No. 525-1, Exhibit 17); Wetzel Decl. ¶10 (ECF No. ECF No. 525-1, Exhibit 16).

[153] Fischer Supplemental Decl. ¶¶ 4-6.

[154] *Byrd v. Aaron's Inc.*, 784 F.3d 154, 165 (3d Cir. 2015). *Byrd* further states that "we address class definition and ascertainability as separate inquiries." *Id.* at 168.

[155] *See* Defs.' Br. at 74-75 (claiming *Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3d Cir. 2020), does not control because this case is more "complex").

Third Circuit didn't limit *Hargrove* to smaller class actions or simpler classes.[156]

*Hargrove* controls here. *Niaspan* similarly does not support the defendants' claim; *Niaspan* simply explains that if there are exclusions from the class, plaintiffs must have an administratively feasible method for applying them.[157] This statement is in no way evidence of a heightened standard.[158]

*Second*, defendants concoct a new ascertainability rule that would require plaintiffs to use some single, centralized source of data to identify the class. Even though the defendants cite *Carrera*, the Third Circuit has refuted the notion that its older decisions lend themselves to such "exacting" interpretations.[159] The Third Circuit has placed no limitation on the kinds of evidence that can be used to ascertain a class, other than requiring class members to use more than mere say-so.[160] Plaintiffs "can use a combination of records," whether from the defendants, the public, nonparties, or class members.[161]

---

[156] *See generally Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3d Cir. 2020).

[157] *See In re Niaspan Antitrust Litig.*, 555 F. Supp. 3d 155, 163 (E.D. Pa. 2021) ('*Niaspan II*").

[158] *See, e.g., Hargrove*, 974 F.3d at 477; *Byrd*, 784 F.3d at 165.

[159] *Hargrove*, 974 F.3d at 479 (reversing district court for "essentially demand[ing] that [plaintiffs] identify the class members at the certification stage . . . [because] all that is required is that [they] show there is a 'reliable and administratively feasible *mechanism.'*") (emphasis added).

[160] *Byrd*, 784 F.3d at 164.

[161] *Afzal v. BMW of N. Am., LLC*, 2020 WL 2786926, at *8 (D.N.J. May 29, 2020); *Hargrove*, 974 F.3d at 479 ("Affidavits, in combination with records or other reliable

- 47 -

*Third*, ascertainability doesn't require identifying all class members "now."[162] The defendants flout Third Circuit guidance when they attack the plaintiffs' use of sample data. Plaintiffs "do not have to prove at this stage that each proposed class member was indeed [a member of the class], but only that the members can be identified. [The plaintiffs] have done exactly that by presenting large *samples* of [relevant data]."[163] The Third Circuit has found classes "ascertainable even though *no evidence* . . . had been submitted because [it] could imagine the types of evidence that could be identified and used."[164]

This Court need not use its imagination because the plaintiffs have culled, analyzed, and produced sufficient data to demonstrate their method works. They have data from the country's largest PBMs and pharmacies, who collectively represent the overwhelming majority of all prescriptions filled. The plaintiffs' reliance on deidentified samples of data reflects negotiations to alleviate the burdens on nonparties, protect the privacy of absent class members, and conserve resources. It does not leave the Court to "speculate" about uncollected data. The defendants don't explain why data samples won't suffice to demonstrate the plaintiffs' ability to

_____

and administratively feasible means, can meet the ascertainability standard.").

[162] Defs.' Br. at 75-76.

[163] *Hargrove*, 974 F.3d at 480 (emphasis added).

[164] *Id.* (emphasis added).

- 48 -

identify class members as a whole using the same method and comparable data.[165]

### 2. Dr. Rosenthal can remove class members who used manufacturer coupons and need not remove class members who used pharmacy coupons.

The defendants' theory that the proposed class contains large numbers of uninjured members rests on two faulty premises: (1) the plaintiffs must speculate as to the existence of transactional data for manufacturer coupon programs; and (2) those who used point-of-sale pharmacy coupons did not overpay for insulin.[166]

Regarding the first contention, *the defendants* acknowledge such data exists, and the program administrators *they hired* submitted declarations attesting to the same.[167] Those declarations also confirm the coupon data will contain all the information necessary to connect them to the transactional data.[168]

As to the second contention, pharmacy programs do not shield patients from the inflated list prices. The defendants name several pharmacies where customers may have received discounts, but each merely reduces the retail price by some

_____

[165] To the extent the defendants point to the small number of uninsureds identified in the data, this is patently misleading. These are partial datasets and samples of data, some of which fully omitted cash transactions. And regardless, Dr. Rosenthal needn't "distinguish uninsured transactions from insured transactions in which the consumer paid the full price" because in both instances, "the price paid by the consumer is tied to the list price." *See* Rosenthal Rebuttal ¶¶ 26-27.

[166] *See* Def. Br. at 86-89.

[167] *See* Mink Decl. ¶ 10; Wetzel Decl. ¶10.

[168] *See* Mink Decl. ¶ 11; Wetzel Decl. ¶11.; Fischer Supplemental Decl. ¶¶ 9-10.

modest percentage, meaning these class members still overpaid; paying 85% of an overcharge is still overpaying.[169] And because the data already reflect these discounts (*e.g.*, the patient paid amount will be exactly 85% of U&C), the plaintiffs do not need to subpoena additional nonparties to determine whether one was applied. Moreover, financial assistance from *non*-parties amount to collateral sources that do not offset plaintiffs' injuries.[170] So these class members have been harmed regardless, and as a matter of law, such transactions wouldn't need to be excluded anyway.

### 3. The plaintiffs proposed methods of ascertaining the class meet the Third Circuit's requirement.

*First*, the defendants' characterization of the plaintiffs' class exclusions as "arbitrary"[171] ignores the factual basis for this case. The plaintiffs tie their class definition to the allegation that defendants have unlawfully manipulated their list prices.  As a result, those who make coinsurance payments are in the classes, while those who make copayments are out, because the former transaction *is tied to list price* and the other is not. Certain Medicare transactions are in and Medicaid transactions are out for the same reason. Outside financial assistance is in and manufacturer assistance programs are out because the former doesn't shield the class from paying based on list price. Furthermore, third-party funds are irrelevant as collateral sources.

---

[169] Rosenthal Rebuttal ¶¶ 28-31.

[170] *See supra* note 21.

[171] *See* Def. Br. at 74.

These distinctions are rooted in the misconducted at issue.

*Second*, the defendants' insistence that the plaintiffs subpoena all 66,000 pharmacies in the United States overlooks the reality of the pharmaceutical supply industry.[172] The largest national pharmacy chains, subpoenaed in this litigation, account for more than 70% of pharmaceutical sales.[173] The largest PBMs, also subpoenaed, represent approximately 96% of insured Americans.[174] Given the enormous overlap in that data, few purchasers could conceivably slip through the cracks. And for those that do, plaintiffs' trial plan accounts for them: class members who have made purchases at non-chain (or small chain) pharmacies without insurance can come forward with records of their purchases.[175] This proposed method accounts for all class members.[176] And the defendants cite no authority that demands the plaintiffs do more.

---

[172] *See* Def. Br. at 77.

[173] Rosenthal Rebuttal ¶ 6.

[174] *Id.*

[175] *See* Pls.' Trial Plan (ECF No. 525-1, Exhibit 4).

[176] Still, nothing prevents the Court from limiting the class to purchases through the largest national PBMs and pharmacies if it so chooses, as there is no "'underinclusivity' standard [in] the ascertainability requirement." *Byrd*, 784 F.3d at 167. The Third Circuit has been clear: the "ascertainability standard is neither designed nor intended to force all potential plaintiffs who may have been harmed in different ways by a particular defendant to be included in the class in order for the class to be certified." *Id.*

- 51 -

#### 4.    Price differences have nothing to do with ascertainability.

The defendants also contend it's impossible to ascertain a class because factors other than list price sometimes affect the purchase price.[177] The latter may be true, but plaintiffs define the class to include transactions where "any portion of the purchase price" was calculated by reference to a list price, not transactions calculated *solely* by reference to list price. Defendants' injection of a nonexistent limitation into the plaintiffs' class definition proves nothing, and Dr. Rosenthal demonstrates the misleading nature of their argument.

*First*, the defendants' expert, Dr. Baker, uses charts to falsely exaggerate variability in retail prices at a given points in time. Defendants can't escape the fact that the correlation coefficient between list prices and retail prices is extraordinarily high for every drug, proving the strength of the relationship between the two.[178] *Second*, defendants ignore economic realities. Pharmacies sell analog insulin as a percentage of AWP and economic reasons force those pharmacies to peg their retail prices to list prices.[179] *Third*, even where there may be variation among individual

---

[177] Defs.' Br. at 79-80.

[178] Rosenthal Rebuttal ¶¶ 44, 51.

[179] Rosenthal Rebuttal ¶ 24; *see* Pls.' Br., n.63-66; *see* ██████████

pharmacies' cash prices, that means nothing. All patients still "would have paid 10% less if the AWP were 10% less" because "[w]hat matters is that a change in the AWP would have produced a proportional change in the cash prices paid by different patients."[180] In short, the defendants' attempt to deem the plaintiffs' method impossible requires the court to accept exaggerated representations of data, dismiss fundamental limitations on pharmacy pricing, and spurn basic math.

## G.    Class certification is a superior means of resolving the claims.

The defendants argue a class action is not the superior means of resolving this case, yet they omit a vital part of the analysis—*to what* is it not superior? The defendants don't address whether individual actions are feasible or practical, let alone superior. And they wholly ignore the "[e]conomic reality" that this case either moves forward as "a class action or not at all."[181] This is fatal to their position. Superiority "'asks the court to balance . . . the merits of a class action against those of *alternative available methods of adjudication.*'"[182] Without so much as hinting what

---

Berman Reply Decl. Exhibit 4

[180] *Rosenthal Rebuttal* ¶ 34.

[181] *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974).

[182] *In re NFL Players Concussion Inj. Litig.*, 821 F.3d 410, 434 (3d Cir. 2016) (citation omitted). *See also* Fed. R. Civ. P. 23(b)(3) (class action must be found "superior to *other* available methods") (emphasis added); *In re Cmty. Bank*, 795 F.3d at 409 ("[Defendant] does not consider the tremendous burden [of] presiding over tens of thousands of nearly identical cases . . . .").

those alternative available methods are, the defendants have no leg to stand on.

The omissions in the defendants' arguments don't stop there. They don't even address the first three superiority factors of Rule 23(b)(3), which plaintiffs explain in the opening brief. Instead, the defendants discuss only the fourth factor, considering "the likely difficulties in managing a class action."[183] By doing so, the defendants concede the first three factors. And they provide not one example of a court denying certification based entirely on the fourth—manageability concerns.

In any event, the purported manageability concerns lack merit. To start, the defendants are wrong that the class claims "require applying at least *twenty* states' varying legal standards, which itself forecloses certification."[184] As shown already, a jury need only consider *three* legal standards if this Court certifies all proposed classes: (1) "unconscionability" under New Jersey law; (2) the three-part FTC test for "unfair" acts under the laws of sixteen states; and (3) "unconscionability" under Texas law. That stands in stark contrast to the four cases the defendants cite, which required application of the laws of all fifty States.[185]

---

[183] *See* Rule 23(b)(3)(D).

[184] Def. Br. at 90.

[185] *See Powers v. Lycoming Engines*, 328 F. App'x 121, 124 (3d Cir. 2009) (attempting to multistate nationwide classes involving laws of all fifty states); *In re Actiq Sales & Mktg. Pracs. Litig.*, 307 F.R.D. 150, 168 (E.D. Pa. 2015) (same); *Payne v. FujiFilm U.S.A., Inc.*, 2010 WL 2342388, at *9 (D.N.J. May 28, 2010) (same); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 454, 455 (D.N.J. 1998) (same).

- 54 -

The defendants also list a series of supposed factual issues that bar a finding of manageability.[186] But by rehashing flawed predominance and commonality arguments, the defendants condemn them to the same fate[187]—not that any of these points legitimately raise manageability issues. *First*, the fact that this case involves "three different manufacturers that engaged in distinct conduct and made their own pricing decisions"[188] means nothing where courts routinely manage trials with far more than three defendants. And it means even less when the defendants here concede the conduct is undisputed.[189] *Second*, the defendants provide no reason why the existence of "66 different PBMs, consumers who made purchases at more than 60,000 pharmacies, and potentially hundreds of thousands of insurance plans"[190] impacts *manageability*. None of those facts require individualized inquiries. And any pharmaceutical class action must involve large numbers of consumers and navigate the complex industry. *Third*, Dr. Rosenthal provides common evidence as to why "prices for the products at issue became unlawful at different points in time,"[191]

---

[186] *See* Def. Br. at 90-91.

[187] *See In re Cmty. Bank*, 795 F.3d at 409 ("Because we have concluded that the District Court cannot be faulted for deciding that the commonality and predominance requirements for class certification have been satisfied, this tag-along argument fails.").

[188] Def. Br. at 90.

[189] Def. Br. at 94.

[190] Def. Br. at 91.

[191] Def. Br. at 91.

negating any manageability concern raised by the defendants. *Fourth*, the defendants may attempt to introduce evidence of affordability programs and coupons, but they do not explain why such efforts would prove unmanageable, especially given that (1) data allows the plaintiffs to exclude transactions under defendants' programs; (2) the pharmacy data already reflects coupons applied; and (3) third-party contributions amount to irrelevant collateral payments.

With neither logic nor law on their side, defendants resort to hyperbole, characterizing this case as a "mind-boggling undertaking." But their "mind-boggling" quotation comes from a securities case, *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,[192] that "require[d] proof of the circumstances surrounding each trade, the available alternative prices, and the state of mind of each investor at the time the trade was requested." As the Third Circuit later explained in *Linerboard*,[193] the "*Newton* court was staring a situation in the face where they would necessarily examine every stock purchase or sale because not every member of the putative class was injured." This case mirrors *Linerboard* because "all purchasers" are injured where "[t]hey were all affected by the increased price . . . reflected in the price paid by plaintiffs."[194]

---

[192] 259 F.3d 154, 187 (3d Cir. 2001).

[193] 305 F.3d at 158.

[194] Defendants cite another inapposite case in which the jury would "be required

- 56 -

Nor is there any merit to the defendants' assertion that "'a separate evidentiary hearing is required for each class member's claim.'"[195] In *Pastor*, the court found that "[i]ndividual hearings would be necessary to determine whether a class member made a claim for his $10 a day, whether his car was unusable, and if so for how long."[196] In contrast, individual hearings are not required here, because injured class members can be ascertained from the extensive data that is available.

## H.    Plaintiffs satisfy Rule 23(a).

### 1.    The question concerning the lawfulness of the defendants' "undisputed" conduct alone satisfies commonality.

The defendants' argument against commonality rests on a fundamental misstatement of the plaintiffs' theory, something they repeat throughout their briefing. The central question in this case asks not whether some threshold monetary amount to buy insulin is unfair, but whether *the defendants' conduct* in setting benchmark insulin list prices was unfair. Reframed in this manner—the one dictated by the statutes themselves—the question necessarily drives common answers. It asks *what the defendants did* and *what the defendants knew*. And those answers won't

_____

to determine for each class member whether he or she is addicted to cigarettes, and, if so, whether defendants (and which defendant) caused that addiction." *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 489 (E.D. Pa. 1997).

[195] Def. Br. at 91 (quoting *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007)).

[196] 487 F.3d at 1046.

change plaintiff-to-plaintiff. This alone satisfies the common issues requirement of

Rule 23(a), as the plaintiffs need only share "*one* question of fact or law" with the

class, a prerequisite deemed "easy enough" by this Circuit.[197]

The defendants can't get around this by pointing out that their conduct is

undisputed. That may be, but the central legal question—whether that conduct was

unlawful—is not. To hold millions of trials on the legality of the defendants' behavior

just because the parties don't dispute some underlying facts makes no sense.

To challenge the rest of the common questions posed in the plaintiffs'

opening brief, the defendants lean on a blanket statement that this "is not a case

where the same conduct has given rise to the same harm."[198] Yet they admit just

sentences later that the relevant pricing conduct is undisputed as to all the class.[199]

And the harm that every class member incurred—overpaying for analog insulin—

follows directly from that conduct because list prices drive the class's retail prices.

Thus, the defendants' reliance on a sex discrimination case is misguided. In

*Wal-Mart Stores, Inc. v. Dukes*,[200] "the class of female employees faced different

managers," making the relevant employment decisions "discretionary," "different,"

---

[197] *In re NFL Players Concussion Inj. Litig.*, 821 F.3d at 426-27 (citation omitted and emphasis added).

[198] Defs.' Br. at 93.

[199] Defs.' Br. at 94.

[200] 564 U.S. 338 (2011).

- 58 -

and sometimes "nondiscriminatory."[201] It's not difficult to see the difference between *Wal-Mart* and this case. The defendants here set only one list price for all, which in turn increases the price each class member pays.[202]

### 2. Victims of an excessive overcharge who trace their injuries to the same practice are both typical and adequate class representatives.

A recent decision by the Third Circuit rebuts the defendants' argument that the named plaintiffs, who are insured, cannot adequately represent uninsured class members. In *Boley v. Universal Health Services, Inc.*,[203] the Third Circuit affirmed certification of a class that alleged breach of duties under ERISA. Defendant Universal argued that the "named class representatives' claims are not typical of the class unless the named representatives invested in each of the challenged funds, because, otherwise, the representatives would lack an incentive to litigate on behalf of the class."[204] As the Court further described the defendants' argument, "any recovery stemming from those funds will not be allocated to the Named Plaintiffs'

---

[201] *NFL Players*, 821 F.3d at 427.

[202] *See id.* ("The concerns in *Wal–Mart* do not apply here because the [defendants] allegedly injured [plaintiffs] through the same course of conduct."); *In re Cmty. Bank.*, 795 F.3d at 399 (same). The cases cited by the defendants are inapposite. *See Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (a "yes or no" answer to "whether hourly-paid American employees at Newark airport are not being compensated for all hours worked . . . tells us nothing about actual common work habits"); *Greco v. Grewal*, 2020 WL 5793709, at *7 (D.N.J. Sept. 29, 2020) ("Defendants' conduct would be materially different as to each plaintiff").

[203] 36 F.4th 124 (3d Cir. 2022).

[204] *Id.* at 133.

accounts. . . . This lack of incentive, Universal insists, precludes a finding that the Named Plaintiffs' claims are typical of those of the class."[205]

But the Third Circuit stated that it "d[id] not find Universal's incentive argument persuasive."[206] The Court explained that "each participant who was charged excessive fees when investing in any of the Plan's funds can trace his or her injury to the same practice—Universal's alleged failure to properly consider expense ratios when selecting and updating the Plan's investment options."[207] The Court also explained that "Universal's alleged breach may have resulted in some funds charging participants significantly higher fees than others. But these differences relate to degree of injury and level of recovery. So long as the alleged cause of the injury remains the same across all funds, 'even relatively pronounced factual differences will generally not preclude a finding of typicality.'"[208]

Similarly here, the class representatives satisfy the typicality requirement for both insured and uninsured class members because all of them trace their injuries to the defendants' same unlawful practices.

*Boley* also refutes the defendants' challenge to adequacy concerning those class

---

[205] *Id.* at 133-34.

[206] *Id.* at 134.

[207] *Id.*

[208] *Id.* (citation omitted).

members who bought "products that no proposed class representative purchased."[209]
In *Boley*, the Third Circuit explained that "typicality and adequacy of representation
tend to merge because both look to potential conflicts."[210] Each class representative
here seeks to represent only class members who purchased insulin products in the
same state from the same defendant as that representative's purchases. And neither
Dr. Rosenthal's methodology for determining damages nor the plaintiffs' theory of
unfairness and unconscionability differs as to the analog insulin products at issue.
Indeed, the class periods for the various drugs differ only because the methodology
and legal theories of unfairness and unconscionability remain *consistent* across them.

## I.    A Rule 23(b)(2) class should be certified.

The defendants raise three points in opposition to the certification of Rule
23(b)(2) classes. Each fails for distinct reasons. *First*, the Third Amended Complaint
disproves the defendants' claim that the plaintiffs haven't identified the injunctive
relief they seek. Plaintiffs have repeatedly asked this Court to "[e]njoin the
defendants from continuing to report artificially inflated list prices that do not
approximate their true net prices to CVS, Express Scripts, and OptumRx."[211] Nor

---

[209] *See* Def. Br. at 97.

[210] 36 F.4th at 133 (citation and internal quotation marks omitted).

[211] *See, e.g.*, Third Amended Class Action Complaint [Dkt. 411], at 269 ("Demand
For Judgment."). And although this Court dismissed the plaintiffs' claim for
injunctive relief under RICO, it explained that the plaintiffs "seek an injunction 'to

- 61 -

would such relief require the Court to become the nation's insulin price regulator in perpetuity, as defendants' hyperbolize. It is specific *and* tied to objective standards, *i.e.*, the net prices offered to the largest PBMs.[212] And it doesn't raise dormant Commerce Clause issues either, where the Court isn't asked to specify the prices at which insulin must be sold, but instead is asked to require the defendants to price their insulin within the boundaries of state consumer protection laws.[213]

*Second*, the industry refers to the defendants' list prices as benchmarks because they are the core input for all retail prices and thus affect the prices paid by *all* class

---

prevent [Defendants] from reporting benchmark prices [i.e., AWPs] that do not approximate their true net prices,'" i.e., the net prices at which they sell their insulins to more than 85 percent of the market (CVS, Express Scripts, and Optum). Order dated Feb. 20, 2020 [Dkt. No. 304], at 6 (quoting Plaintiffs' brief). Plaintiffs seek the same injunction under State law.

[212] *See Remick v. City of Phil.*, 2022 WL 742707, at *13 (E.D. Pa. Mar. 11, 2022) ("Although much about the specific contours of [the challenged] policies, and thus the 'exacting precision' of the corresponding relief, has yet to be determined, the Court nevertheless finds that Plaintiffs' description of relief at this stage conforms with Rule 23(b)(2)") (citation omitted).

The cases cited by Defendants are inapposite. *See EpiPen*, 2020 WL 1180550, at *59 (rejecting a "vague, partially formulated request for injunctive relief"); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 170 (E.D. Pa. 2015) (proposed order was "intentionally incomplete") (citation omitted).

[213] Defendants cite *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 673 (4th Cir. 2018), which held that the dormant Commerce Clause barred Maryland from "specify[ing] the price at which goods may be sold beyond Maryland's borders." That decision doesn't mean this Court can't enjoin behavior that violates State laws. *See, e.g.*, *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 238 n.7 (3d Cir. 2022) (dormant Commerce Clause doesn't prohibit courts "decid[ing] choice-of-law questions for contracts that cover multiple states," or "'applying one state's law' to 'activities outside [that] state.'") (citation omitted).

members. For this reason, the defendants' position that the classes are insufficiently

cohesive for Rule 23(b)(2) relief fails. And the claims involved in the cases cited by

defendants bear no resemblance to this case.[214]

*Third*, the defendants erroneously claim that the plaintiffs do not sufficiently

assert future harm, boasting that recent "developments" in their pricing practices

moot an injunction.[215] But a court may certify a Rule 23(b)(2) class even if the

defendants' actions merely threaten "one or a few" class members.[216] Tellingly, the

defendants do *not* claim they stopped the conduct at issue in this suit. Instead, they

point to affordability programs, which only apply to a sliver of the class. Moreover,

whether those "developments" have any legal significance remains a question for the

merits stage, not class certification.

### III.    CONCLUSION

As self-evident as it may seem, unfair practices laws center on the defendants' unfair

---

[214] *See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 269 (3d Cir. 2011) (proposed medical monitoring trial hinged on "class members' individual characteristics and medical histories and to weigh the benefits and safety of a monitoring program"); *Carr v. Flowers Foods, Inc.*, 2019 WL 2027299, at *21 (E.D. Pa. May 7, 2019) (plan "simply graft[ed] the (b)(2) proposal onto the (b)(3) analysis absent further advocacy and analysis"); *In re Domestic Drywall Antitrust Litig.*, 2017 WL 3700999, at *16 (E.D. Pa. Aug. 24, 2017) (denying Rule 23(b)(2) certification where "[i]t would be unfair to saddle some indirect purchasers who may have an easier time proving causation than others with a binding negative judgment").

[215] *See* Def. Br. at 99-100.

[216] *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015) (citation and internal quotation marks omitted).

practices. This simple fact explains the suitability of classwide treatment. The claims and supporting evidence will necessarily turn on common issues with common answers—*what defendants did and what defendants knew*. Not that, in this case, the parties dispute the defendants' actions. Which makes the only remaining question whether those actions violate state laws. After a years-long pursuit to hold the defendants accountable, the American public still awaits a response to that question. Legislatures, having granted jurors the responsibility of drawing the line between fair and unfair conduct, have done their part to get an answer. It's time for the jury to do its part. For these reasons, the Court should grant the plaintiffs' Motion for Class Certification.

DATED: September 14, 2022                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO
LLP

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.

/s/ Steve W. Berman
Steve W. Berman
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

/s/ James E. Cecchi
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
decklund@carellabyrne.com

Thomas M. Sobol
Hannah W. Brennan
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com

Mark T. Vazquez
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
markv@hbsslaw.com

*Attorneys for Plaintiffs and Interim Co-Lead Counsel for the Class -*

010646-11/2030303 V1

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 14, 2022, I caused this Reply Brief in Support of Plaintiffs' Motion for Class Certification to be served on ALL DEFENSE COUNSEL OF RECORD via email.

<i>/s/ Steve W. Berman</i><br>
Steve W. Berman

010646-11/2030303 V1